**IN RE: George A. BAVELIS, Debtor.**

**George A. Bavelis, et al., Plaintiffs,**

**v.**

**Ted Doukas, et al., Defendants.**

**Case No. 10–58583**
**Adv. Pro. No. 10–2508**

United States Bankruptcy Court,
S.D. Ohio, Eastern Division,
at Columbus.

Filed February 22, 2017

Marion H. Little, Jr., Zeiger, Tigges & Little LLP, W. Mark Jump, Columbus, OH, for Plaintiffs.

Franklin Connor Davis, Columbus, OH, Philomena S. Ashdown, Cincinnati, OH, for Defendants.

John M. Stravato, Melville, NY, pro se.

John Doe Defendants 1–25, pro se.

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON RE-MAINING COUNTS OF SECOND AMENDED COMPLAINT

John E. Hoffman, Jr., United States Bankruptcy Judge

### I. Introduction

When debtors commence Chapter 11 bankruptcy cases, they become debtors in possession obligated to perform most of the duties of a trustee, including the duty to object to improper claims filed against the bankruptcy estate in order to increase the recovery realized by their legitimate creditors. George Bavelis, whose con-firmed Chapter 11 plan provides for a 100% repayment of his legitimate credi-tors' claims, dutifully fulfilled that obli-gation when he objected to the $14 million secured proof of claim filed by Quick Capi-tal of Long Island Corp. ("Quick Capital"), a company wholly owned by his former "friend," Ted Doukas. *See Bavelis v. Dou-kas (In re Bavelis)*, 490 B.R. 258 (Bankr. S.D. Ohio 2013) ("*Bavelis I*"), *aff'd*, No. 13–8015, 2013 WL 6672988 (6th Cir. BAP Dec. 19, 2013), *aff'd*, 773 F.3d 148 (6th Cir. 2014). In *Bavelis I*, a copy of which is attached as Appendix A, the Court disal-lowed Quick Capital's claim and held that neither Doukas nor any of his other com-panies had any claim against Bavelis's bankruptcy estate. If Doukas had been as faithful to Bavelis as Bavelis was to his creditors, Doukas would not have filed the

Quick Capital claim in the first place. But as explained in *Bavelis I*, Doukas repeatedly betrayed the confidence Bavelis placed in him before bankruptcy.

Tales of intrigue and confidence games are generally not the stuff of claim litigation in bankruptcy court. To the contrary, claim disputes usually center on more standard fare: Is the debtor in default of its loan agreement with the claimant? If so, has the claimant properly calculated its contractual damages? Or has the creditor instead included in its claim sums—late charges, attorney fees, unmatured interest and the like—it is not entitled to recover under the parties' agreement or applicable law? These and similar questions are frequently litigated in bankruptcy. But not so in this case, because Quick Capital lent Bavelis no funds. Instead, Doukas fraudulently induced Bavelis to execute the note on which the Quick Capital claim was based (the "QC Note") as part of a larger scheme designed to fleece Bavelis out of substantially all of his assets. Doukas did so after gaining Bavelis's trust at a time when he was emotionally vulnerable and financially in dire straits. And as also explained in *Bavelis I*, Doukas succeeded not only in fraudulently inducing Bavelis to execute the QC Note, but also in taking from Bavelis his direct and indirect membership interests in limited liability companies he had formed with his business partner, Mahammad Qureshi (the "Bavelis–Qureshi LLCs"). In short, having promised Bavelis that he would negotiate with Qureshi to resolve disputes regarding the management of the Bavelis–Qureshi LLCs, Doukas instead defrauded Bavelis into assigning his interests in the Bavelis–Qureshi LLCs to three of Doukas's wholly owned companies—defendants Blair International, Inc. ("Blair"); R.P.M. Recoveries, Inc. ("R.P.M."); and the aptly named Nemesis of LI Corp. ("Nemesis"). It is the assignments of the membership interests in three of the Bavelis–Qureshi LLCs (the "Assignments") that Bavelis here seeks to unwind as having been fraudulently induced by Doukas.[1]

Given Doukas's argument that part of the consideration for the QC Note was his promise to resolve the disputes over the Bavelis–Qureshi LLCs in a manner beneficial to Bavelis, the Court was required to make findings in *Bavelis I* regarding the fraud in which Doukas engaged in connection with the Assignments. Although they are extensive, the Court's findings distilled down to a central conclusion: Doukas is an unrepentant fraudster who made false promises to Bavelis in an attempt to misappropriate as many of Bavelis's assets as

---

1. After the Court granted Bavelis's motion to bifurcate his objection to Quick Capital's claim from the rest of this adversary proceeding, the Court entered a final judgment disallowing the claim in *Bavelis I*. Claim objections are core proceedings in which bankruptcy courts have the authority to enter final judgment under 28 U.S.C. §§ 157(b)(1) & 157(b)(2)(B). *See Waldman v. Stone*, 698 F.3d 910, 919 (6th Cir. 2012) ("When a debtor ... seeks disallowance of a creditor's proof of claim against the estate ... the bankruptcy court's authority [to enter a final judgment] is at its constitutional maximum."). By contrast, Bavelis's state law fraudulent inducement claims with respect to the Assignments, as well as Bavelis's request to unwind subsequent transfers that Doukas caused Nemesis to make to one of his other wholly owned companies, Leftheris Properties Corporation ("Leftheris"), are non-core proceedings. A bankruptcy court may enter final judgment in non-core proceedings only with the consent of the parties. 28 U.S.C. § 157(c)(2). Because Doukas, Blair, R.P.M., Nemesis and Leftheris (collectively, the "Doukas Defendants") have not consented to the entry of final judgment by this Court as to Bavelis's state law claims, it is required to submit this opinion as proposed findings of fact and conclusions of law to the United States District Court for the Southern District of Ohio under 28 U.S.C. § 157(c)(1) and Rule 9033 of the Federal Rules of Bankruptcy Procedure.

he could.[2] It is those findings, which have been upheld through two layers of appeal, that form much of the basis for the Court's proposed findings of fact and conclusions of law here. In short, the Court determines that the Assignments were fraudulently induced and that as a result of his fraudulent conduct Doukas should pay both compensatory damages and substantial punitive damages to Bavelis.

## II. Jurisdiction

■ For the reasons explained below, the Court has jurisdiction to hear these matters under 28 U.S.C. §§ 157 and 1334 and the general order of reference entered by the District Court.

Section 1334(b) of the Judicial Code sets forth three categories of civil proceedings over which the district courts (and the bankruptcy courts by reference) have original, but not exclusive, jurisdiction: (1) those "arising under title 11," (2) those "arising in" bankruptcy cases and (3) those "related to" such cases. 28 U.S.C. § 1334(b). *See Stern v. Marshall*, 564 U.S. 462, 473, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011); *Bavelis v. Doukas (In re Bavelis)*, 453 B.R. 832, 851–52 (Bankr. S.D. Ohio

2011).[3] Although the Doukas Defendants concede that the Court has "arising under" jurisdiction to rule on the avoidance of the transfers of the membership interests in the Bavelis–Qureshi LLCs as fraudulent transfers under §§ 548 and 544(b) of the Bankruptcy Code,[4] the Doukas Defendants argue that the Court lacks jurisdiction to hear the state law claims on which proposed findings of fact and conclusions of law are being submitted (the "State Law Claims"). Adv. Doc. 616 at 13–19; Adv. Doc. 677 at 14–19.[5] Because the State Law Claims neither "aris[e] under title 11" nor "aris[e] in ... a case under title 11," 28 U.S.C. § 1334(b), the Court may exercise jurisdiction over them only if they are "related to a case under title 11." *Id.*

■ "The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1142 (6th Cir. 1991) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).

---

2. Further evidence that Doukas's fraudulent behavior is incorrigible is set forth in a separate opinion the Court is issuing contemporaneously with this one. In that opinion (the "Sanctions Opinion"), the Court finds that Doukas and Quick Capital, as well as one of their former attorneys (Gary Goldstein), engaged in sanctionable conduct when they withheld material evidence during discovery and lied to Bavelis and the Court. This bad faith misconduct on the part of Doukas and Quick Capital (as well as Goldstein) included making misrepresentations in multiple documents they filed with the Court. As explained in the Sanctions Opinion, a copy of which is attached as Appendix B, the Court will be holding a hearing on the attorneys' fees and expenses and other sanctions that should be imposed on Doukas, Quick Capital and Goldstein as a result of their bad faith litigation conduct during this case.

3. The Court has issued four reported decisions in the Bavelis bankruptcy case. Although it was not the first, *Bavelis I* is so designated here due to its central importance to these proposed findings and conclusions, while the other Bavelis decisions that are cited will be referred to using the standard short form.

4. For the reasons explained below, the §§ 548 and 544(b) claims should be dismissed as moot.

5. References to "Adv. Doc. ___" are to docket entries in this adversary proceeding, Adversary Proceeding No. 10–2508, and references to "Doc. ___" are to docket entries in Bavelis's bankruptcy case, Case No. 10–58583.

The Court previously made a determination that it has related-to jurisdiction over the State Law Claims. *See Bavelis*, 453 B.R. at 851 ("In short, the Court has jurisdiction over the claims for relief set forth in each count of the Complaint because each of these claims either arises under the Bankruptcy Code or is related to [Bavelis's] bankruptcy case."). Indeed, the Court has found that the "outcome of the [State Law Claims] . . . conceivably could have an effect on the estate," because Bavelis was "acting in his capacity as the debtor in possession, and any recovery obtained by [Bavelis] would be for the benefit of his bankruptcy estate." *Id.* at 853. The manner in which the recovery from this adversary proceeding could conceivably benefit creditors of the bankruptcy estate was made clear in Bavelis's confirmed Chapter 11 plan, which provides for 100% repayment of creditors' claims. *See* Doc. 712 at 9–10 (defining "Retained Actions Net Proceeds" as including "consideration received . . . as a result of a settlement . . . or from the enforcement of any judgment obtained with respect to any of the Retained Actions"); *Id.* Ex. 2 (providing that "Retained Actions" includes all claims and causes of action in Adv. Pro. No. 10–2508); *Id.* at 22 (providing that "[Bavelis] may utilize any portion of Retained Actions Net Proceeds to fund any [of his] obligation[s] under this Plan . . . and the repayment of any other obligation for funds borrowed on or after the Effective Date to fund [Bavelis's] obligations under this Plan").[6]

Doukas, however, maintains that the confirmation of Bavelis's Chapter 11 plan and the proposed full payment of his creditors has deprived the Court of jurisdiction over the State Law Claims under the close-nexus test for bankruptcy jurisdiction. Adv. Doc. 677 at 15–19. Under the close-nexus test, jurisdiction following confirmation is limited to "[m]atters that affect the interpretation, implementation, consummation, execution, or administration of the confirmed plan." *Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 167 (3d Cir. 2004); *In re Thickstun Bros. Equip. Co.*, 344 B.R. 515, 521 (6th Cir. BAP 2006). But Bavelis commenced this adversary proceeding on October 20, 2010, long before his Chapter 11 plan was confirmed on December 12, 2014. And as the circuit court of appeals that developed the close-nexus test (the Third Circuit) itself has clarified, that test applies only to actions *filed post-confirmation*, while the conceivability standard of *Pacor* applies to actions *filed pre-confirmation. See Geruschat v. Ernst Young LLP (In re Seven Fields Dev. Corp.)*, 505 F.3d 237, 265 (3d Cir. 2007) ("[W]ith respect to 'related to' jurisdiction, the *Pacor* test applies in all disputes raised pre-confirmation and the 'close nexus' test applies in all disputes raised post-confirmation, regardless of when the conduct alleged in the complaint occurred."); *ConocoPhillips Co. v. SemGroup, L.P. (In re SemCrude, L.P.)*, 428 B.R. 82, 96–98 (Bankr. D. Del. 2010); *Liquidating Tr. v. Granite Fin. Sols., Inc. (In re MPC Computs., LLC)*, 465 B.R. 384, 392 (Bankr. D. Del. 2012).[7]

---

6. Bavelis's latest post-confirmation report shows that he still has approximately $2.38 million to pay to creditors in Class B–1 and Class B–2 and that his plan payments extend to 2021. Doc. 887 at 3–6.

7. *See also Papas v. Buchwald Capital Advisors, LLC (In re Greektown Holdings, LLC)*, 728 F.3d 567, 577–78 (6th Cir. 2013) (noting the difficulty of applying the *Pacor* test to disputes arising post-confirmation); *Thickstun Bros.*, 344 B.R. 515 (applying the close-nexus test to relief requested in motion filed post-confirmation).

This is because "[i]t has long been the case that the 'jurisdiction of the court depends upon the state of things at the time of the action brought.'" *SemCrude*, 428 B.R. at 96 (quoting *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 570, 124 S.Ct. 1920, 158 L.Ed.2d 866 (2004)); *Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 300 (3d Cir. 2012) ("Supreme Court precedent is clear that the date of filing is the date when subject matter jurisdiction is assessed."). Thus, if a bankruptcy court was vested with related-to jurisdiction over an adversary proceeding at the time it was filed—as this Court clearly was—subsequent events do not divest the court of that jurisdiction. *See, e.g., Nuveen Mun. Tr.*, 692 F.3d at 294 ("[T]he strength and longevity of [the time of filing] rule has led courts to hold that confirmation of a bankruptcy plan does not divest a district court of related-to jurisdiction over pre-confirmation claims."); *Owens-Ill., Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 626 (4th Cir. 1997) ("[I]f a federal court possesses subject matter jurisdiction over an action at the time it is commenced, a subsequent event cannot divest the court of that subject matter jurisdiction." (citing *Freeport–McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991))); *Empire State Bldg. Co. v. N.Y. Skyline, Inc. (In re N.Y. Skyline, Inc.)*, 471 B.R. 69, 79 (Bankr. S.D.N.Y. 2012) ("Neither the confirmation of Skyline's plan nor anything else that subsequently occurred deprived this Court of its subject matter jurisdiction over those claims and counterclaims.").

In *Nuveen Municipal Trust*, the Third Circuit flatly declined to "deviate from the hornbook rule that jurisdiction is assessed at the time of the filing of a complaint and [instead] assess jurisdiction [at the time of its decision] because [of] significant intervening events," including plan confirmation and near full-administration of the debtor's bankruptcy estate. *Nuveen Mun. Tr.*, 692 F.3d at 300. The court noted that a stricter jurisdictional standard applies to actions filed post-confirmation, but held that because the proceeding before it was brought before confirmation, it must determine the action's conceivable effect as of the date it was brought. *Id.* at 294–95. Similarly, the Fifth Circuit has held that related-to jurisdiction continues to exist over state law fraud claims even after confirmation of the debtor's plan. *See Newby v. Enron Corp. (In re Enron Corp. Sec.)*, 535 F.3d 325, 335–36 (5th Cir. 2008). In *Enron*, the Fifth Circuit acknowledged a prior ruling in which it had stated that "[a]fter a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan." *Id.* at 335 (quoting *Bank of La. v. Craig's Stores of Tex., Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001)). But the appellate court clarified that the *Craig's Stores* decision meant that "a bankruptcy court may lack jurisdiction over post-confirmation claims based on post-confirmation activities," *not* that "a bankruptcy court may *lose* jurisdiction over pre-confirmation claims based on pre-confirmation activities." *Id.* at 335.

This adversary proceeding illustrates why the time-of-filing rule makes sense. Here, "the parties and their counsel have spent considerable energy, time, and money litigating the claims in this forum," and the Court has "made [several] substantive rulings in the case." *PNC Bank, N.A. v. Rolsafe Int'l, LLC (In re Rolsafe Int'l, LLC)*, 477 B.R. 884, 898 (Bankr. M.D. Fla. 2012). Further, the matters at issue have been fully briefed and tried, and the Court is ready to issue its ruling. If the Court

were unable to retain jurisdiction over this case, the parties would be forced to relitigate the same claims elsewhere. *Id.* But the Court is already intimately familiar with this case's complex factual background. So "it would be rather inefficient to ask [another] court to familiarize itself [anew] with those facts and the attendant legal issues" when this Court is already prepared to issue proposed findings of fact and conclusions of law to the District Court. *Rolsafe,* 477 B.R. at 898.[8] For all the reasons set forth above, the Court has jurisdiction over the State Law Claims.

## III. Procedural History

After Bavelis filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on July 20, 2010 (the "Petition Date"), he commenced this adversary proceeding by filing a complaint that was then twice amended. The Court has before it the second amended complaint (the "Complaint") (Adv. Doc. 490) filed by Bavelis as well as two limited liability companies with which he is affiliated, FLOHIO, LLC ("FLOHIO") and Bavelis Family, LLC ("Bavelis Family"). Bavelis, FLOHIO and Bavelis Family will be referred to collectively as the "Plaintiffs."[9]

## A. Remaining Claims for Relief

As filed, the Complaint contained 17 counts. But six of those counts—Counts Three, Six, Nine, and Fifteen through Seventeen—are no longer pending:

- Count Three, which was bifurcated from the rest of this case, related to Bavelis's objection to Quick Capital's claim based on the QC Note. Following a four-day hearing on Bavelis's objection to the Quick Capital proof of claim and the issue of whether Doukas or any of his entities held a claim against Bavelis (the "Claim Objection Hearing"), the Court issued an opinion and order adjudicating Count Three. *Bavelis I,* 490 B.R. 258.

- Bavelis withdrew Counts Six and Nine in his proposed findings of fact and conclusions of law. Adv. Doc. 674 at 6 n.1 ("In light of the evidence presented, Mr. Bavelis has elected to withdraw his claim in Count Nine of the [Complaint] for duress and/or violation of Florida's 'elder abuse' provisions found in, inter alia, Fla. Stat. § 415.1111. The same is true as to the indemnification claim ... in Count Six.").

- In Count Fifteen, Bavelis sought the disallowance of certain claims under 11 U.S.C. § 502(d). The claims that Bavelis sought to disallow included the proof of claim filed by Quick Capital, and that claim was disallowed in *Bavelis I.* Bavelis also

8. Cf. *Peabody Landscape Constr. v. Schottenstein,* 371 B.R. 276, 280 (S.D. Ohio 2007) (granting defendant's motion to dismiss adversary proceeding commenced before plan confirmation because the proceeding was still in its early stages and the parties had "completed little discovery," meaning that there would be no prejudice to the plaintiff if it were required to file an action in state court).

9. Nondebtors Bavelis Family and FLOHIO became plaintiffs after the Court's entry of an order noting that (1) they are the real parties in interest as to Bavelis's request to unwind

certain transfers he had made on their behalf (as explained below) and (2) the Court would have jurisdiction over the claims by Bavelis Family and FLOHIO. *See* Adv. Doc. 435 at 12–13; *Carver v. Brecher (In re Carver),* 144 B.R. 643, 647 (S.D.N.Y. 1992) (holding that the bankruptcy court had related-to jurisdiction over an adversary proceeding commenced by an individual Chapter 11 debtor and two nondebtors, a corporation of which the debtor was the president and sole shareholder and a limited partnership of which he was the general partner).

sought to disallow any other claims filed by Doukas and his companies, but neither Doukas nor any of his entities other than Quick Capital filed a proof of claim, and the Court in any event held in *Bavelis I* that Doukas and his companies have no claim. In addition, Bavelis requested in Count Fifteen to disallow any claim filed by Defendant John Stravato, but he never filed a proof of claim.[10] For all these reasons, Count Fifteen is moot.

- Bavelis made an oral motion requesting the dismissal of Counts Sixteen and Seventeen without prejudice, a motion the Court granted. Adv. Doc. 592.

Bavelis entered into settlements with all of the defendants named in the Complaint other than Stravato and the Doukas Defendants. In particular, the Court approved settlements between Bavelis and defendant Qureshi (as well as his affiliates Rab Masroor, Financial Lending Services, LLC, BNK Real Estate, LLC and Qureshi Family, LLC) and between Bavelis and defendant Socal Capital, LLC ("Socal").

In light of all the foregoing, Counts One, Two, Four, Five, Seven, Eight, and Ten through Fourteen—as they relate to the Doukas Defendants and Stravato—remain pending. These counts were tried at two different times:

1. In what will be referred to as "Phase I," a trial was held on Counts One, Two, Four and Ten. By those counts, the Plaintiffs seek to set aside transfers they made to Doukas Defendants Nemesis, R.P.M. and Blair of the membership interests in the Bavelis–Qureshi LLCs, as well as later transfers Doukas caused Nemesis to make to Leftheris. The transcript of Phase I is docketed at Adv. Doc. 621 ("Transcript I").[11] Bavelis testified during Phase I, Tr. I at 74–99, and his Exhibits 33–37, 40–46, and 51–54 were admitted into evidence without objection, Tr. I at 100–04. The Plaintiffs filed proposed findings of fact and conclusions of law as to Counts One, Two, Four and Ten (Adv. Doc. 609), as did the Doukas Defendants (Adv. Doc. 616).

Doukas, Quick Capital, Nemesis and R.P.M. acknowledged in their proposed findings of fact filed after the Claim Objection Hearing that the Court may use the evidence presented

---

10. Stravato is an attorney who represented Doukas before the Petition Date. Bavelis seeks to hold Stravato liable for breaching fiduciary duties he allegedly owed to Bavelis and for conspiring with the Doukas Defendants.

11. The transcription of the trial on Counts One, Two, Four and Ten starts at page 49 of the transcript, while pages 1 through 48 cover a hearing following which the Court issued an opinion and order awarding Bavelis $62,411.56 in attorneys' fees and expenses incurred as a result of Doukas's contempt. *See Bavelis v. Doukas (In re Bavelis)*, 535 B.R. 228 (Bankr. S.D. Ohio 2015). After Bavelis filed a motion seeking to register the judgment in another jurisdiction, Doukas paid the judgment. The conduct in which Doukas engaged

that led to the contempt sanctions is described in detail in *Bavelis v. Doukas (In re Bavelis)*, 519 B.R. 707 (Bankr. S.D. Ohio 2014). In short, Doukas knowingly violated an agreed order of the Court—to which Doukas had consented—that prohibited him from transferring assets of the Bavelis–Qureshi LLCs and that also required him to provide Bavelis with complete access to certain documents. "In direct contravention of the requirements imposed by this order, Doukas obstructed Bavelis's access to … documents [when he] lied and said he had no responsive documents" during discovery, and he "then doubled down on his contempt, transferring assets the order prohibited him from transferring." *Id.* at 708–09.

during that hearing to rule on Bavelis's request to unwind the very transfers that would become the subject of the Phase I trial.[12] And based on the evidence presented during the Claim Objection Hearing, Doukas, Quick Capital, Nemesis and R.P.M. asked the Court to make findings of fact and issue conclusions of law in their favor with respect to most of the transfers that are the subject of the Complaint.[13]

2. In what will be referred to as "Phase II," a trial was held on: (a) Counts Five, Seven, Eleven, Twelve, Thirteen and Fourteen, by which Bavelis seeks damages from the Doukas Defendants under various legal theories; and (b) Count Eight, under which Bavelis seeks damages for an alleged breach of fiduciary duty by Stravato, who Bavelis also contends engaged in conspiracy as part of Count Fourteen.

The transcript of Phase II is docketed at Adv. Doc. 666 ("Transcript II").[14] During Phase II, Bavelis testified, Tr. II at 98–153, as did two of his attorneys—Richard Stovall ("Stovall"), Tr. II at 70–98, and Chris Hogan, *id.* at 158–72—and an expert witness, Larry

McClatchey, regarding attorneys' fees incurred by Bavelis, *id.* at 172–80. In addition, Bavelis's Exhibits 1–211 (except those marked as "Reserved" on Adv. Doc. 645), 221, 246 and 284 were admitted into evidence without objection. Tr. II at 153–58, 181. Doukas testified on behalf of himself and the Doukas Defendants, *id.* at 182–85, and his Exhibits V, AE and AF were admitted into evidence without objection. *Id.* at 186–87.

Bavelis and the Doukas Defendants also "stipulate[d] to the admissibility of (a) all testimony offered as part of the [hearing on the claim objection adjudicated in *Bavelis I* ] that was not excluded or stricken based on a sustained objection, and (b) the exhibits previously admitted into evidence by this Court in conjunction with [*Bavelis I* ]." Adv. Doc. 654. The parties also agreed that evidence offered during the show cause hearing was admissible for purposes of the trial on Counts Five, Seven, Eleven, Twelve, Thirteen, and Fourteen. Tr. II at 70.

In accordance with an order that was amended multiple times at the request of the parties, Bavelis filed proposed findings of fact and conclusions of law

12. *See* Adv. Doc. 245 at 3 ("Interwoven in the trial were issues relating to George Bavelis' and the Bavelis entities' ... sale of membership interests to Doukas entities. Although the counts relating to those entities were not scheduled for trial, the factual circumstances of the sale of LLC interests were tried in the context of the Plaintiff's/Bavelis' allegations that the membership interest sales were part of Doukas' fraudulent conduct. Therefore, in its ruling on this case, the Court may include a finding regarding the validity of the transfer of Florida LLC interests, including George Bavelis' transfers of his membership interests in GMAQ, LLC ... to the Doukas entities.").

13. This includes a transfer to Blair in March 2009. *See* Adv. Doc. 245 at 32–33. The only

transfers that Doukas and his companies did not include in the proposed findings and conclusions were transfers made to Leftheris. The reason they were not included is that Doukas was concealing those transfers from Bavelis in contempt of an order entered by this Court. *See Bavelis,* 519 B.R. 707.

14. Pages 55 through the end of this transcript cover the trial on Counts Five, Seven, Eight, Eleven, Twelve, Thirteen and Fourteen of the Complaint, while the first part of the transcript covers the second day of the show cause hearing on the bad-faith litigation conduct that is the subject of the Sanctions Opinion (the "Show Cause Hearing").

(Adv. Doc. 674) as to his Phase II claims for relief, as did the Doukas Defendants (Adv. Doc. 677).[15]

Bavelis also filed a supplemental brief (Adv. Doc. 682) regarding the Doukas Defendants' asserted right to a jury trial.[16]

## B. Entries of Default

In support of certain of their claims for relief, the Plaintiffs rely on entries of default that the Clerk of Courts (the "Clerk") entered against the corporate Doukas Defendants and Stravato.

### 1. The Corporate Doukas Defendants

■ The Clerk entered a default (Adv. Doc. 91) against Blair based on its failure to answer Bavelis's original complaint. Afterward, Blair filed an answer to the Complaint, as did Quick Capital, Nemesis, R.P.M. and Leftheris. Adv. Doc. 494. The attorney who filed the answer then withdrew from the representation of the Doukas Defendants,[17] and the Court set dead-

---

15. The Doukas Defendants' proposed findings of fact and conclusions of law also relate to the Show Cause Hearing. The portions relevant to the Complaint are located at pages 1 through 46.

16. Bavelis filed a motion seeking leave to file the supplemental brief, stating that the Doukas Defendants "did not ... raise [the jury trial] issue as part of the [Phase II] Hearing" and that Bavelis therefore "did not address that point in his proposed findings of fact and conclusions of law." Adv. Doc. 678 at 1. The Doukas Defendants did not oppose that motion, and the Court granted it. Bavelis then filed his supplemental brief, and the Doukas Defendants failed to respond to it.

The Court concludes that none of the Doukas Defendants has a right to a jury trial. Without discussing any authority supporting their position or attempting to develop the argument, the Doukas Defendants argued in a footnote to their proposed findings of fact and conclusions of law following Phase II that "[i]t should also be noted that Mr. Doukas and the other Doukas Defendants have consistently demanded a jury trial on the issues surrounding Bavelis' non-core, state-law based claims against them and this Court has no basis to deny them such a right." Adv. Doc. 677 at 20 n.5. That is all they said on the matter, and it is not sufficient. *See In re Anheuser–Busch Beer Labeling Mktg. & Sales Practices Litig.*, 644 Fed.Appx. 515, 529 (6th Cir. 2016) ("Where, as here, a litigant has failed to clearly raise an argument in the district court, we have concluded that the argument is forfeited. Nor would a different result obtain even if we were to interpret the plaintiffs' footnote as raising the argument they seek to make on appeal. We have re-

peatedly held that the perfunctory manner in which [an] argument was presented below may constitute a forfeiture of that argument." (citations and internal quotation marks omitted)). Furthermore, as Bavelis points out, Adv. Doc. 682 at 2, the Doukas Defendants have not consistently demanded a jury trial. And by participating in the Phase I and Phase II trials without raising their purported right to a jury trial, the Doukas Defendants waived any such right they had. For as the Sixth Circuit has held, "[t]he right to a jury trial may be waived by the conduct of the parties, and [all] the courts of appeal to have considered the issue have held that a party waives any right it may have to trial by jury by participating without objection in a bench trial." *Preferred RX, Inc. v. Am. Prescription Plan, Inc.*, 46 F.3d 535, 548 (6th Cir. 1995); *see also Cook v. Cleveland State Univ.*, 13 Fed.Appx. 320, 322 (6th Cir. 2001) ("The right to a jury also may be waived by failing to object to a bench trial and subsequently fully participating in the trial. Since *Cook* participated in and never objected to the bench trial, he waived his right to a jury trial.").

17. The Court previously noted the long line of attorneys who have represented the Doukas Defendants during this adversary proceeding. *See Bavelis*, 519 B.R. at 713 n.6. Indeed, no fewer than five different attorneys and/or law firms have represented Doukas at various times in this case. Their first attorney, Steven Newburgh, was admitted *pro hac vice*, but eventually withdrew from the representation. Next was Gary Goldstein, who also was admitted *pro hac vice*. In addition to being subject to sanctions for the reasons stated in the Sanctions Order, the Court revoked Gold-

lines for Quick Capital, Nemesis, R.P.M. and Leftheris to retain counsel or be deemed in default, because "[t]he law is well-settled that a corporation may appear in federal courts only through licensed counsel and not through the pro se representation of an officer, agent, or shareholder." *N.L.R.B. v. Consol. Food Servs., Inc.*, 81 Fed.Appx. 13, 14 n.1 (6th Cir. 2003). The Court, however, did not establish the consequences of any default; instead, the orders establishing the deadlines to retain counsel stated that those consequences would be the subject of further orders. Adv. Doc. 454 at 3; Adv. Doc. 563.

Quick Capital, Nemesis, R.P.M. and Leftheris failed to timely retain counsel, leading the Clerk to issue an entry of default as to them. Adv. Doc. 579. The corporate Doukas Defendants, however, eventually retained counsel who represented them (as well as Doukas) during both Phase I and Phase II. Bavelis nonetheless contends that the consequence of their default should be that they have admitted the allegations of the Complaint. As explained in the proposed conclusions of law, it is unclear whether the corporate Doukas Defendants should be deemed to have admitted the allegations of the Complaint under the circumstances present here. Furthermore, because as a matter of law Bavelis is not entitled to a judgment on the only count of the Complaint to which the deemed admissions are relevant—Count Fourteen (conspiracy against the corporate Doukas Defendants)—the Court need not decide whether their defaults have resulted in deemed admissions.

#### 2. Stravato

Stravato filed an answer to Bavelis's original complaint, Adv. Doc. 84, and neither the first amended complaint (Adv. Doc. 359) nor the Complaint itself included any allegations as to Stravato that were not already set forth in the original complaint that Stravato answered. Despite this, Bavelis sought entry of a default against Stravato based on his failure to answer the first amended complaint and the Complaint, Adv. Doc. 520, and the Clerk entered a default against him. Adv. Doc. 573. As with the corporate Doukas Defendants, Bavelis contends that the consequence of Stravato's default should be that he has admitted the allegations of the Complaint. As explained below, however, Stravato's answer to the original complaint

---

stein's admission for repeatedly filing documents that contained material omissions and false statements that he (and Doukas) knew to be false and for signing discovery responses on behalf of Quick Capital that were untruthful. Adv. Doc. 453 (order revoking Goldstein's admission *pro hac vice*). Goldstein was followed by attorneys from Vorys, Sater, Seymour and Pease LLP, but Doukas discharged them after they were involved in the case for less than six months and did so on the eve of a show cause hearing as to why he should not be held in civil contempt for conduct in which he engaged while Goldstein was representing him. Finally, attorney Jerry Peer appeared on behalf of the Doukas Defendants, but he too withdrew from the representation. *See Bavelis*, 519 B.R. at 713 n.6. The Doukas Defendants currently are being represented by their fifth group of attorneys.

In addition to the attorneys who actually represented them, two other attorneys sought to be admitted *pro hac vice* to represent the Doukas Defendants but were unsuccessful. One of those attorneys, Mark E. Brown, represented to the Court that he had fully disclosed his association with Goldstein, but he in fact failed to disclose that he and Goldstein continued to jointly represent certain Doukas affiliated entities in a bankruptcy case and an adversary proceeding in the United States Bankruptcy Court for the Eastern District of Tennessee. In addition, Brown had filed a document with another court stating that Doukas had complied with a discovery order when in fact Doukas had failed to do so in numerous respects. For those and other reasons, the Court denied Brown's motion for admission *pro hac vice*. Adv. Docs. 541 & 548.

makes Bavelis's contention untenable under controlling circuit law.

## IV. Findings of Fact

To summarize: The remaining counts of the Complaint are Counts One, Two, Four, Five, Seven, Eight, and Ten through Fourteen as they relate to Stravato and the Doukas Defendants. As discussed in its proposed conclusions of law, the Court proposes that the District Court dismiss Counts Five, Seven, Eight, Ten, and Twelve through Fourteen—Counts Five, Eight and Fourteen as a matter of law, and Counts Seven, Ten, Twelve and Thirteen as moot. Thus, based on the evidence presented, and having considered the demeanor and credibility of the witnesses, the Court proposes that the District Court make the findings of fact set forth below with respect to the following counts of the Complaint:[18]

| Count of Complaint | Claim for Relief |
|---|---|
| One | Request for a declaratory judgment that Doukas fraudulently induced Bavelis to make certain of the Assignments to Blair and R.P.M. and request for rescission of those Assignments |
| Two | Request for a declaratory judgment that Doukas fraudulently induced Bavelis to make certain of the Assignments to Nemesis and request for rescission of those Assignments |
| Four | Request for rescission of subsequent transfers based on the fraudulently induced Assignments |
| Eleven | Request for compensatory damages incurred as a result of the fraudulent inducement of the QC Note and the Assignments. Bavelis also seeks punitive damages. |

## A. Background Findings

The findings of fact and conclusions of law set forth in *Bavelis I* are adopted and incorporated by reference into this opinion in their entirety. In *Bavelis I*, the Court explained how it came to be that Bavelis trusted Doukas enough to execute the QC Note and the Assignments. One factor was Bavelis's emotional state when he first met Doukas. In December 2008, Bavelis, who was then in his mid–70s, lost his brother to a terminal illness. Having met Bavelis for the first time a month later, Doukas soon was referring to Bavelis as his "brother," a term that was incredibly meaningful to Bavelis given that his brother had just passed away. *Bavelis I*, 490 B.R. at 270. Doukas, who was about 20 years younger than Bavelis, also took advantage of their shared Greek heritage, using it to develop Bavelis's trust in him, as well as the confidence of Bavelis's wife, Georgia Gia Bavelis. *Id.* at 271–72. And Doukas likewise led both of the Bavelises "to believe that he shared [their] religious beliefs," including by presenting them "with a religious icon that he said was from Greece" and that he described as being something that would protect their home. *Id.* at 271.[19] All of this,

18. As was the case in *Bavelis I*, to the extent any of the findings of fact in this opinion are determined to be conclusions of law, they are adopted as such; likewise, to the extent any of the conclusions of law are determined to be findings of fact, they are adopted as such.

19. Taking advantage of purported religious affinity appears to be part of Doukas's modus operandi. *See Bavelis I*, 490 B.R. at 271 n.5 ("Doukas took a similar approach during negotiations that he later undertook with ... Qureshi. Among other things ... Doukas advised ... Bavelis that he was praying with ... Qureshi ... and learning the Koran, stating [about] ... Qureshi [that] 'he thinks him and me are together.' ").

plus Doukas's willingness to share details about his divorce and other aspects of his personal life, led Bavelis to believe that he and Doukas were not only brothers, but also, as Doukas put it, "friends for life." *Id.* Having gained Bavelis's trust, Doukas began taking steps to systematically misappropriate Bavelis's assets.

Doukas's first step was to gain an interest in one of the Bavelis–Qureshi LLCs, GMAQ. Bavelis had shared with Doukas his concerns about Qureshi and the disputes they were having regarding the management of the Bavelis–Qureshi LLCs. Doukas persuaded Bavelis that he had the experience and expertise that was needed to negotiate a consensual resolution with Qureshi. In March 2009, Doukas told Bavelis that he would need a 10% stake in GMAQ in order to be in a position to negotiate with Qureshi, and Bavelis readily agreed. Bavelis transferred his 10% interest in GMAQ to Blair [20] based on Doukas's promise that the interest would be returned to him as soon as a resolution with Qureshi was reached. *See id.* at 272–73. Then, in June 2009, Doukas convinced Bavelis that, although he had been negotiating with Qureshi to resolve the disputes over the Bavelis–Qureshi LLCs in a manner favorable to Bavelis, the negotiations had reached an impasse and that Doukas needed a greater stake in GMAQ in order to negotiate effectively with Qureshi. Doukas asked that Bavelis transfer his entire interest in GMAQ to R.P.M., and Bavelis did so, again based on Doukas's representation that the interest would be recon-

veyed to Bavelis once Doukas had successfully negotiated on his behalf with Qureshi. *See id.* at 275–76.

In June 2009, Doukas also offered to help Bavelis with his estate planning. *See id.* at 276. Given his age and the fact that his brother had just passed away, it was natural for Bavelis to be thinking about estate planning, and Doukas represented to Bavelis that he had the expertise to help him fund an estate planning trust that Bavelis had previously established but not adequately funded. *See id.* at 277. Based on Doukas's representations, Bavelis believed that he was issuing the QC Note as part of Doukas's estate planning efforts. Doukas advised Bavelis that no payments would be due under the QC Note and that the note, as well as an agreement granting Quick Capital a security interest in certain bank shares and securities, would be returned to him once the estate planning efforts were completed. *See id.* at 278–79.[21]

Doukas contended that the consideration for the QC Note included "buy[ing] out … Qureshi and indemnify[ing] … Bavelis" for the more than $20 million of debt of two of the Bavelis–Qureshi LLCs—FLOVEST, LLC and BMAQ, LLC—that Bavelis had personally guaranteed. *Id.* at 284. Doukas, however, never negotiated with Qureshi on behalf of Bavelis and never provided Bavelis any indemnification. *Id.* at 300. Instead, by telling Bavelis that he needed a greater stake in the companies in order to finalize the deal he was reaching

---

**20.** Doukas is the sole owner of Blair and the other Doukas Defendants. *See Bavelis I,* 490 B.R. at 283 n.10; *see also* Adv. Doc. 616 ¶ 20 (Doukas Defendants' proposed finding that "Doukas has owned and/or controlled each of the purported assignee entities at all relevant times"); Adv. Doc. 196 at 52 (Doukas testifying that: "I own all the companies so really I direct whatever companies are there. I'm the only sole owner. I don't have any partners.").

**21.** A few weeks after the execution of the QC note, Doukas had one of his attorneys send Bavelis an agreement by which Bavelis would have transferred certain of his interests in valuable Ohio-based partnerships to a Nevada corporation Doukas was forming. Bavelis, however, never signed that agreement. *See id.* at 277–78.

with Qureshi, in December 2009 Doukas duped Bavelis into assigning to Nemesis FLOHIO's 50% interest in FLOVEST and Bavelis Family's 50% interest in BMAQ.[22] He also induced Bavelis to assign once again—this time to Nemesis—his 50% interest in the very valuable GMAQ, a company that owned several million dollars in assets with no offsetting bank debt. *See Bavelis I*, 490 B.R. at 267. Again, Doukas promised Bavelis that he would return the Assignments to Bavelis once the deal with Qureshi was finalized. *See id.* at 273, 298–300. But just as he refused to return the QC Note, Doukas refused to return the Assignments despite Bavelis's repeated requests that he do so. *See id.* at 303–06. The reason, of course, was simple: "Doukas never intended to ... keep any of the promises he made to Mr. Bavelis, but instead intended to take advantage of Mr. Bavelis and deprive him of his assets." *Bavelis I*, 490 B.R. at 318.

**B. Findings Relevant to the Request in Count One for a Declaratory Judgment that Doukas Fraudulently Induced the Transfers to Blair and R.P.M.**

Count One relates to (1) the transfer Bavelis made to Blair of a portion of Bavelis's membership interest in GMAQ in March 2009[23] and (2) the transfer Bavelis

made to R.P.M. of his entire membership interest in GMAQ in June 2009.

**1. The March 2009 Transfer to Blair**

In Count One, Bavelis seeks a declaratory judgment that the March 2009 transfer to Blair—defined below as the "March Agreement"—was fraudulently induced. After spending years contending that he never defrauded Bavelis, in his own proposed findings of fact and conclusions of law, Doukas now concedes that "[i]n reference. [to] the Assignments, Mr. Doukas made statements that were not true about transfers from Mr. Bavelis to [the] Doukas entities." Adv. Doc. 677 at 28.[24] In addition, as the Court found in *Bavelis I*:

[By March 2009], the friendship between Mr. Bavelis and Mr. Doukas was based on several factors, including their common Greek heritage; their mutual entrustment of details about their personal lives and businesses; values they ostensibly held in common; and Mr. Bavelis's belief that Mr. Doukas had only his best interests at heart. In March 2009, Mr. Doukas informed Mr. Bavelis that, in order to advance those interests, he would need a 10% stake in GMAQ so as to be in a better position to negotiate with Mr. Qureshi. Tr. at 487. Mr. Bavelis, who by then had introduced Mr. Doukas to Mr. Qureshi, Debtor's Ex. 173 at

---

**22.** Bavelis also transferred his membership interest in George Real Estate Holdings, LLC to Nemesis, but he is not seeking to unwind that transfer. *See* Tr. I at 65 (stating that "the original complaint had identified issues associated with transfers involving George Real Estate Company but as we noted at a prior status conference, given the financial condition of that company there is no necessity to consume this Court's resources addressing that issue" and that "[w]e've simply abandoned that claim").

**23.** As the Plaintiffs acknowledge, "[a]lthough the [Complaint] references other March 2009

assignments, it has become clear through other proceedings in this case that the only purported assignment that occurred in March 2009 was the transfer of 10–percent of Mr. Bavelis' interest in GMAQ to Blair." Adv. Doc. 609 at 7 n.2.

**24.** In their proposed findings of fact and conclusions of law, the Doukas Defendants refer to "the March, June, and December 2009 assignments [collectively] as the 'Assignments' or the 'subject Assignments.' " Adv. Doc. 677 at 5. The Court likewise is referring to those documents collectively as the "Assignments."

5:23, agreed.[25] On March 27, 2009, Mr. Bavelis (as a member of GMAQ), Mr. Doukas (on behalf of Blair) and Mr. Qureshi (as a member of GMAQ) signed an agreement entitled "GMAQ, LLC, Members, Transferor's and Transferee's Consent and Approval of Transfer of Ownership" ("March Agreement"). Debtor's Ex. 130. By that agreement, Mr. Bavelis transferred to Blair 10% of his membership interest in GMAQ, with Mr. Qureshi consenting to the transfer. Mr. Doukas promised Mr. Bavelis that, as soon as a resolution was reached with Mr. Qureshi, he would return the March Agreement and reconvey the 10% interest back to Mr. Bavelis. Tr. at 490. Mrs. Bavelis confirmed that Mr. Doukas so advised her husband. Tr. at 430:11–27 ("We didn't question Ted, we trusted Ted Doukas. He told us, he told George he was going to bring the 10% back .... It was given to him so he can negotiate with Qureshi and as soon as he did that he would give this 10% back. I didn't think anything of it.").

*Bavelis I*, 490 B.R. at 272–73.

Again, Doukas did not intend to keep any of the promises he made to Bavelis. *See id.* at 318. Based on all these findings, the Court further finds that: (i) Doukas made false statements concerning material facts (i.e., his intent to negotiate with Qureshi on Bavelis's behalf and his intent to return the March Agreement); (ii) Doukas knew his statement was false, because he did not intend to negotiate with Qureshi on behalf of Bavelis and did not intend to ever return the March Agreement; (iii) Doukas intended his misrepresentations to induce Bavelis to execute the March Agreement;

(iv) in light of Doukas's efforts to cultivate the appearance of a relationship of trust and friendship with Bavelis, Bavelis justifiably relied on Doukas's representation; and (v) Bavelis was injured as a result of losing a portion of his interest in GMAQ. Doukas therefore fraudulently induced Bavelis to execute the March Agreement.

**2. The June 2009 Transfer to R.P.M.**

In Count One, Bavelis also seeks a declaratory judgment that the June 2009 transfer to R.P.M.—defined in *Bavelis I* as the "R.P.M. Agreement," because Bavelis signed other agreements in June 2009—was fraudulently induced. Again, Doukas admits that "[i]n reference [to] the Assignments, Mr. Doukas made statements that were not true about transfers from Mr. Bavelis to [the] Doukas entities." Adv. Doc. 677 at 28. And as the Court previously found:

Mr. Doukas had led Mr. Bavelis to believe that he was negotiating with Mr. Qureshi to resolve the disputes over the Bavelis–Qureshi LLCs in a manner favorable to Mr. Bavelis, but that his negotiations had failed to reach such a resolution because Mr. Qureshi "was not taking [Mr. Doukas] seriously," Tr. at 707:6–7, and that he therefore needed more authority to negotiate with Mr. Qureshi. Tr. at 568; 706–07. On or about June 21, 2009, Mr. Doukas presented Mr. Bavelis with an agreement ("R.P.M. Agreement") by which Mr. Bavelis would, in return for $50,000, transfer his "50% interest in GMAQ" to ... R.P.M., a New York corporation of which Mr. Doukas was president.[26] Debtor's Ex.

---

**25.** The exhibit and transcript references in the quotation from *Bavelis I* are to the exhibits previously admitted into evidence in conjunction with *Bavelis I* and the transcript for the trial in *Bavelis I*.

**26.** The Court previously found that, consistent with his belief that the R.P.M. Agreement would be returned, any payment that Bavelis received under the R.P.M. Agreement was repaid by him within a month. *See Bavelis I*, 490 B.R. at 285–87.

131. When he signed the R.P.M. Agreement, Mr. Bavelis believed that he was giving "him a larger percentage so that [Mr. Doukas] can be able to be more effective." Tr. at 707:7–9. Mr. Bavelis's understanding when he signed the R.P.M. Agreement was that the agreement was temporary and would be "coming right back to me...." Tr. at 717:13. By signing such an agreement with the understanding that it would be returned to him, Mr. Bavelis demonstrated a high level of confidence in Mr. Doukas. According to Mr. Bavelis, at that time "I had already established a trust in Ted Doukas that we became very good friends and I would listen to him because he offered so many things that he was going to do for me." Tr. at 667:4–8. "He's going to help me in many respects. And I had no doubts about it at that time." Tr. at 667:8–9. "[H]e was my brother at the time. We had such a close relationship that I trusted Ted for anything he told me." Tr. at 685:23–686:1. As Mrs. Bavelis put it, "George and I had come to a point where anything he said we trusted him." Tr. at 391:20–21.

. . . .

In June 2009, Mr. Bavelis firmly believed that Mr. Doukas was on his side and considered him a friend and brother in whom he could place the utmost confidence and trust.

*Bavelis I*, 490 B.R. at 275–76 (footnote omitted).

Based on all these findings and the prior finding that Doukas never intended to keep any of the promises he made to Bavelis, *see id.* at 318, the Court further finds that: (i) Doukas made false statements concerning material facts (i.e., his intent to negotiate with Qureshi on Bavelis's behalf

and his intent to return the R.P.M. Agreement); (ii) Doukas knew his statements were false, because he did not intend to negotiate with Qureshi on behalf of Bavelis and did not intend to ever return the R.P.M. Agreement; (iii) Doukas intended his representations to induce Bavelis to execute the R.P.M. Agreement; (iv) in light of Doukas's efforts that led Bavelis to consider him a friend and brother in whom he could place the utmost confidence and trust, Bavelis justifiably relied on the representation; and (v) Bavelis was injured as a result of losing his 50% interest in GMAQ, a company that owned millions of dollars of assets. Thus, Doukas fraudulently induced Bavelis to execute the R.P.M. Agreement.

## C. Findings Relevant to the Request in Count Two for a Declaratory Judgment that Doukas Fraudulently Induced the Transfers to Nemesis

Count Two relates to the December Agreements by which Bavelis assigned membership interests in GMAQ, BMAQ and FLOVEST to Nemesis.[27] Bavelis entered into the December Agreements on behalf of himself with respect to the transfer of the membership interest in GMAQ and as the manager of Bavelis Family and FLOHIO with respect to the transfers of the membership interests in BMAQ and FLOVEST, respectively.

The Plaintiffs seek a declaratory judgment that the December Agreements were fraudulently induced. Again, it bears noting here that in his own proposed findings of fact and conclusions of law, Doukas concedes that "[i]n reference [to] the Assignments, Mr. Doukas made statements that were not true about transfers from Mr. Bavelis to [the] Doukas entities." Adv.

---

**27.** As noted above, the Court will refer to the March Agreement, the R.P.M. Agreement, and

the December Agreements collectively as the "Assignments."

Doc. 677 at 28. In addition, as the Court found in *Bavelis I*:

> Th[e] relationship of trust and confidence [that Bavelis placed in Doukas] did not merely exist in Mr. Bavelis's mind. Mr. Doukas himself testified that Mr. Bavelis was entitled to trust him from March through December 2009.
>
> . . . .
>
> [In October 2009] Mr. Bavelis was ... dissatisfied with Mr. Doukas's lack of success in reaching a deal with Mr. Qureshi. . . .
>
> . . . .
>
> The confidence Mr. Bavelis previously had in Mr. Doukas apparently was momentarily restored when, in December 2009, Mr. Doukas advised Mr. Bavelis that a deal had been struck with Mr. Qureshi. Mr. Doukas told Mr. Bavelis that, in order to finalize the deal, Mr. Doukas would need an assignment to be made to Nemesis of the 50% interests that Mr. Bavelis, Bavelis Family and FLOHIO owned in the Bavelis–Qureshi LLCs, but that the assignments would be returned after Mr. Doukas had acquired the 50% interest held by Mr. Qureshi. . . . Mr. Doukas told Mr. Bavelis that he would return the assignments [the December Agreements] after the deal with Mr. Qureshi was finalized. Mrs. Bavelis confirmed that Mr. Doukas made such a representation to her husband[.]
>
> . . . .
>
> Unbeknownst to Mr. Bavelis, however, in December 2009 Mr. Doukas was attempting to purchase on his own behalf the 50% interest in the Bavelis–Qureshi LLCs owned by Mr. Qureshi or his affiliated entities. Debtor's Ex. 173 at 18:21; 19:16.1.
>
> . . . .
>
> In late January 2010 ... Mr. Bavelis made desperate—and ultimately futile—attempts to convince Mr. Doukas to return the December Agreements. . . .

*Bavelis I*, 490 B.R. at 297–300, 304, 318, 325 (footnote omitted).

During his Phase II testimony, Bavelis explained why he continued to trust Doukas as late as December 2009:

> So I really had a lot of trust in him, a lot of trust in him, because he was convincing me, even though at some point I had some second thoughts. But after I had the second thoughts, he would come back to my house, we would have dinner, and he would talk to make you always justify. And then I would say: "Well, why am I worried about this guy? He is—he's still a genuine guy. He will help. He will do everything I need to get me out of Qureshi and help me with [Sterling Bank]."

Tr. II at 130; *see also id.* at 145 (Bavelis testifying that he believed Doukas's representations that he had reached a deal with Qureshi and that the December Agreements would be returned to him; "It was a done deal, finished. There was nothing to worry about anymore. He was going straight to Mr. Qureshi to get the signature and we were done.").

Based on the findings from *Bavelis I* and Bavelis's testimony during Phase II, the Court finds that: (i) Doukas made false statements concerning material facts (i.e., his intent to negotiate with Qureshi on Bavelis's behalf and his intent to return the December Agreements once the negotiations were successful); (ii) Doukas knew his statements were false, because he did not intend to negotiate with Qureshi on behalf of Bavelis and did not intend to ever return the December Agreements; (iii) Doukas intended his misrepresentations to induce Bavelis to execute the December Agreements; (iv) Bavelis justifiably relied on the representations; and (v) Bavelis was injured as a result, including by losing

his indirect interests in BMAQ and FLO-VEST and his personal 50% interest in GMAQ, a company that owned millions of dollars of assets at the time.

### D. Findings Relevant to the Request for Rescission in Counts One and Two

In Counts One and Two, Bavelis also asks the Court to rescind the Assignments as a result of Doukas's fraudulent inducement. In order to prevail on a claim for rescission, Bavelis must show not only that the Assignments were fraudulently induced, but also that he did not retain any benefits under the Assignments. Bavelis in fact did not retain any such benefits. As the Court previously found, "Bavelis received no cash or any other remuneration in exchange for the December Agreements.... Mr. Bavelis never received indemnification or anything else in exchange for the transfer of interests in the Bavelis–Qureshi LLCs (other than the $50,000 under the R.P.M. Agreement, which Mr. Bavelis repaid [within a month after receiving it] )." *Bavelis I*, 490 B.R. at 296, 300. In fact, the Doukas Defendants have admitted that no consideration was provided to any person or entity—which would include FLOHIO and Bavelis Family—for the December Agreements. *See* Adv. Doc. 616 ¶ 31 (Doukas Defendants' proposed finding that "[i]n their response to Mr. Bavelis' requests for admission, Defendants Doukas, Quick Capital, Nemesis, R.P.M.... and Leftheris admitted that no consideration was provided to any person or entity pursuant to the December 2009 assignments); *see also* Phase I Ex. 37 at 5–7 (responses to requests for admission and interrogatories).

### E. Findings Relevant to Count Four

Count Four relates to subsequent transfers that Nemesis made based on the fraudulently induced December Agreements. As the Court found above, Doukas used Nemesis to obtain the Plaintiffs' membership interests in the Bavelis–Qureshi LLCs—including their interests in GMAQ and FLOVEST—by means of the December Agreements. After doing so, Doukas then caused Nemesis, in its capacity as the purported managing member of GMAQ and FLOVEST, to make transfers of property owned by them to Leftheris, his solely owned company.[28] In particular, in June 2010, Doukas, acting in his capacity as the president of Nemesis, executed two quit claim deeds identifying FLOVEST as the grantor of parcels of real property in Orange County, Florida and Leftheris as the grantee. The quit claim deeds were recorded in Orange County in September 2010. Phase I Ex. 51. The next month, Doukas—again in his capacity as the president of Nemesis—executed an Assignment of Mortgage identifying GMAQ as the assignor and Leftheris as the assignee of a mortgage "by Noel Stephen O'Brien ... in favor of GMAQ, LLC on lands in the County of Palm Beach, State of Florida." Phase I Ex. 52. The Assignment of Mortgage was recorded in Palm Beach County on July 9, 2010. *Id.* The Court will refer to these transfers and any others that Nemesis and Leftheris made of assets owned by GMAQ, BMAQ and FLOVEST collectively as the "Subsequent Transfers."[29]

As discussed above, the transfers of the membership interests in GMAQ and FLO-

---

**28.** In Count Four, the Plaintiffs also asserted claims for relief with respect to a mortgage assignment to BNK and a quitclaim deed to Financial Lending, but those claims were re-

solved by means of the settlement agreement with Qureshi and his affiliated entities.

**29.** After extensive efforts by Bavelis's counsel, Doukas eventually signed a stipulation and

VEST to Nemesis were fraudulently induced. Furthermore, the Subsequent Transfers were founded on the fraudulently induced December Agreements with Nemesis. Moreover, rescinding the Subsequent Transfers is necessary in order to restore the status quo of the parties before the transfers took place.

## F. Findings Relevant to Count Eleven

In Count Eleven, the Plaintiffs seek a judgment for damages they incurred as a result of the fraudulent inducement of the QC Note and the Assignments. The findings the Court made above as to the fraudulent inducement of the Assignments support an award of damages incurred as a result of Doukas's fraudulent inducement of those agreements. With respect to the fraudulent inducement of the QC Note, the Court previously found that:

> [i]n the summer of 2009, Mr. Bavelis believed that he did not have the ability to service any more debt. Tr. at 602. Consistent with that belief, before he signed the QC Loan Documents, Mr. Bavelis obtained a promise from Mr. Doukas that he would not be required to make payments on the QC Note. As Mr. Bavelis testified: "[W]hen I gave him this note for $14,000,000 I said, 'Ted, you don't expect me to make payments for this thing?' He said, 'No, no, no, you don't need to make payments.'" Tr. at 598:22–25.

*Bavelis I*, 490 B.R. at 278.[30]

In *Bavelis I*, the Court made additional extensive findings that led it to conclude that "Doukas made several representations that fraudulently induced Mr. Bavelis to sign the QC Loan Documents [including the QC Note]," *Bavelis I*, 490 B.R. at 284, and to ultimately conclude that Bavelis "established each of the elements of fraudulent inducement with respect to the [QC Note]," *id.* at 327. Thus, Bavelis also is entitled to damages incurred as a result of Doukas's fraudulent inducement of the QC Note.

## G. Findings Relevant to Bavelis's Contention that Doukas Is Liable for Nearly All of the Costs Incurred During the Bankruptcy Case

According to Bavelis, Doukas should pay him:

- the amount that Doukas received from Socal when he caused Quick Capital to assign the QC Note and related loan documents to Socal, Adv. Doc. 674 at 17;[31]

- $1,801,273 of interest that Bavelis says he was "forced to pay on certain pre-bankruptcy loans, due to his bankruptcy filing, that he could have otherwise avoided," Adv. Doc. 674 at 18;

- with only limited exceptions, all of the fees and expenses that his attorneys incurred in connection with the bankruptcy case, *id.* at 18–19;

- U.S. Trustee fees in the amount of approximately $121,000, *id.* at 19; and

that there would be no expectation of repayment.

---

agreed order agreeing that Leftheris would facilitate the issuance of title to the property that was the subject of the GMAQ Mortgage to GMAQ. Adv. Doc. 284.

**30.** Earlier in its findings of fact, the Court summarized the reasons for Bavelis's willingness to issue Quick Capital a $14 million promissory note based on Doukas's promise

**31.** The circumstances of the assignment to Socal are described in detail in the Sanctions Opinion. Doukas conceded that he received $1.3 million from Socal, and he may have received as much as $1.8 million. Phase II Tr. at 7.

- the $35,400 in fees incurred by Bavelis's financial advisor in connection with the preparation of his monthly operating reports, *id.* at 20.

The Court finds that the evidence and the law do not support an award of these amounts. As explained in the proposed conclusions of law, the legal doctrine on which Bavelis relies in support of his contention that Doukas should pay him the amount that he received from Socal—disgorgement—does not support Bavelis's position. Moreover, the argument on which Bavelis grounds his purported entitlement to the other amounts he seeks—that he would have resolved his financial distress outside of bankruptcy if Doukas had not fraudulently induced him to execute the Assignments—is too speculative to support an award of damages.

There are several reasons why a finding that Bavelis could have avoided bankruptcy were it not for Doukas's prepetition fraudulent conduct would be speculative. First, at the time he filed his bankruptcy case, Bavelis had recently lost his substantial investment in Sterling BancGroup Inc. ("Sterling Holding"). As the Court found in *Bavelis I*:

> Mr. Bavelis was a director of [Sterling Bank of Palm Beach County, Florida ("Sterling Bank")] and also was the chairman of the board, chief executive officer and president of its parent, Sterling Holding. At one point, Mr. Bavelis and members of the Bavelis family, directly and through trusts, owned somewhere between 52–55% of Sterling Holding.
>
> [In the second quarter of 2009] Sterling Bank and Sterling Holding, like Mr. Bavelis, were having financial difficulty. At least part of Sterling Bank's prob-

lems stemmed from nonperforming loans resulting from the distressed economy and depressed real estate values in Florida.

> On June 10, 2010, the Board of Governors of the Federal Reserve System ... determined that, as of April 30, 2010, Sterling Bank was "significantly undercapitalized" and issued a prompt corrective action directive providing the bank 30 days from date of directive to become adequately capitalized. Sterling Bank could not do so, and, in July 2010, Sterling Bank was taken over by the FDIC.... On July 20, 2010, Mr. Bavelis filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

*Bavelis I*, 490 B.R. at 266, 274, 307 (citations and footnote omitted).

Given the 30–day corrective action issued by the Board of Governors on June 10, 2010, Bavelis would have known on the Petition Date that Sterling Bank was going to be taken over by the FDIC.[32] And Bavelis would have realized on the Petition Date that he was about to lose "$18–$20 million" as a result of the failure of Sterling Bank. Phase II Tr. at 132. Further, Bavelis concedes that Doukas did not cause the problems at Sterling Bank. Phase II Tr. at 131–32. Rather, according to Bavelis, Sterling Bank failed "because of the situation in Florida." Bavelis testified that "it was a catastrophe at the time, my bank went under along with 88 other banks in the year 2010." Phase II Tr. at 101; *id.* at 134 ("What happened with Sterling Bank is the real estate market collapsed. The real estate, commercial properties went down 57 percent").

The imminent loss of his investment in Sterling Bank was only one of Bavelis's

---

**32.** Sterling Bank was closed and taken over by the FDIC on July 23, 2010. Adv. Doc. 197

(*Bavelis I* Tr.) at 456–57.

many financial problems existing on the Petition Date that Doukas had no hand in creating. During the Claim Objection Hearing, Bavelis testified that by the time he signed the QC Note "there was no way [he] ... personally ... would ... be able to borrow any more money." *Bavelis I*, 490 B.R. at 301. In fact, Bavelis already owed a significant amount of debt to institutional lenders by the time Doukas entered the picture. As the Court previously found:

> In order to finance ... projects, Mr. Bavelis and Mr. Qureshi caused FLO-VEST and BMAQ to obtain loans from various lenders, including Fifth Third Bank, First Southern Bank, Colonial Bank, N.A. and Heartland Bank ... The aggregate principal amount of the debt owed by FLOVEST and BMAQ to ... [these] banks was approximately $21 million. Of this amount, the vast majority (more than $18 million) was the debt of FLOVEST. Mr. Bavelis personally guaranteed (or otherwise had personal liability on) all of this debt.

*Bavelis I*, 490 B.R. at 267–268 (citations omitted). Bavelis's exposure on the loan to FLOVEST for which Colonial Bank was the principal obligor was approximately $13 million, and his liability on the guarantee of debt to First Southern Bank was around $6.4 million. Phase II Tr. at 77. That is, Bavelis had at least $20 million of liability on his personal guarantees of the debt of FLOVEST and BMAQ in favor of Colonial Bank and First Southern Bank. And Bavelis executed those guarantees, as well as other guarantees to Fifth Third Bank from March 2006 to February 2007, Claim Objection Hr'g Exs. 19–25, long before he was first introduced to Doukas in December 2008, *Bavelis I*, 490 B.R. at 270.

One of Bavelis's most pressing problems on the Petition Date arose from his obligations to Fifth Third. Bavelis "had two direct obligations to Fifth Third Bank" that "totaled approximately $9 or $9.5 million." Phase II Tr. at 79. Although Bavelis was current on the debt to Fifth Third on which he was primarily liable, he also had guarantor liability on loans that Fifth Third made to BMAQ and FLOVEST, and those loans were in default. Phase II Tr. at 79–80. Bavelis's liability to Fifth Third on the guarantees was approximately $3.6 million. Doc. 40 (Schedule F) at 19.

According to Stovall, Bavelis's bankruptcy counsel, Bavelis's concern about actions that Fifth Third might take was a primary factor bearing on his decision to file a Chapter 11 case:

> They subsequently went into default, being both the—I'll call it the Fifth Third–Flovest obligation and the Fifth Third–BMAQ obligation, for clarity. And as a result of Mr. Bavelis's other direct obligations, which were secured by a securities account held at Fifth Third Securities, Fifth Third threatened, if you will—and we engaged in negotiations with Fifth Third to try and resolve this—but threatened to call into default the other obligations of Mr. Bavelis, the direct obligations by virtue of cross-default provisions, and satisfy the entirety of the BMAQ and [FLOVEST] Fifth Third obligations, as well as the direct obligations out of the securities account.

Phase II Tr. at 80. Stovall also testified that Bavelis "needed at that point the jurisdiction of a bankruptcy court—this bankruptcy court—because of the [automatic] stay that we needed with regard to the threats of Fifth Third, which were looming very rapidly and very large." Phase II Tr. at 83.

Stovall's testimony was consistent with Bavelis's representations in his disclosure statement for his Chapter 11 plan regarding the reason he decided to file his bankruptcy case:

[Bavelis had granted] a security interest in those stocks and securities maintained in a [securities] account ... with Fifth Third Securities .... Fifth Third Bank threatened to exercise its alleged remedies against [Bavelis's] [s]ecurities [a]ccount to satisfy the BMAQ and [FLO-VEST] obligations, all of which were personally guaranteed by [Bavelis]. [Bavelis] was unable to resolve matters with Fifth Third Bank, Qureshi and Doukas. Thus, in order to protect his personal assets and attempt to restructure payments to lenders, he filed this chapter 11 bankruptcy proceeding on July 20, 2010.

Doc. 748 at 23–24. Bavelis valued the stocks and securities in the securities account at around $12 million as of the Petition Date and nearly $21 million by the time the disclosure statement was filed. *See* Doc. 748 at 42. In short, Bavelis commenced his bankruptcy case in order to prevent Fifth Third from seizing the valuable securities account maintained at the bank.

Bavelis contends that, were it not for Doukas's fraudulent inducement of the Assignments, he could have addressed his multi-million dollar obligations to Fifth Third and the other banks without filing a bankruptcy case. *See* Phase II Tr. at 132 ("I could have worked out with the banks whatever I owed them. I was financially to the point that the banks trusted me because they extended—I could work out with the banks. Even Fifth Third, there was no problem."). But after examining how Bavelis and his counsel suggest he would have done this, it becomes clear that their assumption that bankruptcy was avoidable were it not for the fraudulently inducement Assignments is entirely too speculative.

Bavelis's proposed approach focused on first working out a deal with Qureshi. During the Phase II trial, Bavelis testified that by early 2009 he realized that he and Qureshi had fundamentally different business philosophies. *See* Phase II Tr. at 127 ("I didn't want to be with him anymore, because we had difficulties in understanding each other in the business world."); *id.* at 142 ("[A]t the beginning of [2009] I had some disagreements [with Qureshi], but then the disagreements progressed. And it was coming to the point that I just didn't want to be a partner with him, because our philosophies of doing business were starting to be different."). Given the differences between Bavelis and Qureshi—differences that pre-dated Doukas's relationship with Bavelis—there is no reason to believe that Bavelis and Qureshi and their respective affiliates would have negotiated a consensual deal that would have addressed FLO-VEST's and BMAQ's debt and Bavelis's guaranty obligations with respect to that debt. Bavelis nonetheless testified that he could have worked something out with Qureshi were it not for the Assignments. Phase II Tr. at 136 ("I would have been able to work something out with Qureshi, even if I offered him some money to get out."). But Bavelis had attempted to work out a deal with Qureshi in the summer and fall of 2009 on his own without the involvement of Doukas, and the attempts had failed. *Bavelis I*, 490 B.R. at 296–97; *see also* Phase II Tr. at 142–43 (describing the failed negotiations).[33]

In support of their argument that bankruptcy was avoidable if it were not for

---

**33.** During the Phase II trial, Bavelis's litigation counsel (Marion Little) asked his bankruptcy counsel (Stovall) whether he was "able to cut any type of deals with lenders of securing a release of the guarantor liability in exchange for the turnover of the underlying assets held by the companies?" Phase II Tr. at 82. "No," Stovall testified, stating that "[t]he obstacle we had was, for lack of a better term, the standing issue. The obstacle that we had was the inability to bring any sort of consensus through the ownership group in the [Ba-

Doukas and the Assignments, Bavelis and his counsel also pointed to Bavelis's efforts to dissolve FLOVEST and/or seek the appointment of a receiver who could sell FLOVEST's assets in order to pay its debts. Phase II Tr. at 82–83. But there are several reasons why the Court cannot rely on those efforts to credit Bavelis's argument that he could have avoided bankruptcy were it not for Doukas. For one, back in 2009, another individual with an interest in FLOHIO (the 50% owner of FLOVEST)[34] expressed the view that Qureshi might well stand in the way of any attempt to use a state court proceeding to resolve their differences with him:

> In November 2009, Mr. Bavelis's attorney, Mr. Schaeffer, sent a letter to Mr. Bavelis and certain principals of the other members of FLOHIO (i.e., Yessios Limited Partnership and Vakaleris Family Limited Partnership). Debtor's Ex. 127. In response to the letter from Mr. Schaeffer, one of those principals stated in an email: "I vote to proceed with the ... dissolution [of FLOVEST], even though I have a strong suspicion that [Mr. Qureshi] will find a way to maneuver around this as well. I see this as a last resort and if it does not work the consequences should be obvious." Debtor's Ex. 127 at TD 000119. In response, Mr. Bavelis stated that he "would prefer to see what the possibility is of working [this] out with the plaintiff's lawyer and possibly the judge before we jump into dissolution."

*Bavelis I*, 490 B.R. at 297.

In addition, Stovall testified about the difficulty Bavelis would have in obtaining

the appointment of a receiver in the Florida courts. And when he was asked about that testimony, Bavelis did not attempt to argue that the state court proceeding would have resulted in a resolution of the FLOVEST problems. To the contrary, he confirmed Stovall's testimony about the problems they saw with the state-court approach, stating that "the [state court] judge said that he had about ... 50,000 cases to resolve and to go and to file a case in Florida would have taken several years before anything was [resolved]." Phase II Tr. at 148. Bavelis was then asked: "[i]f that were the case ... even if you had not made the assignments of the interest, would you have been able to address your problems with Mr. Qureshi through the Florida court system and avoid bankruptcy?" In response, Bavelis did not provide testimony in support of his argument that the dissolution/receivership proceeding would have been successful. Instead, he repeated only that he "would have been able to work something out with Qureshi, even if [he] offered him some money to get out." *Id.* Again, however, Bavelis had tried on his own to reach a consensual resolution with Qureshi without Doukas's involvement and had been unsuccessful. Moreover, Qureshi and his companies opposed the dissolution and appointment of a receiver, and there is no reason to believe that he would have opposed them any less if the Assignments had not been made. Nor is it evident that a receiver for FLOVEST would have been appointed over Qureshi's objections even if Bavelis had not caused FLOHIO to assign its interest in FLOVEST to Nemesis.

---

velis–Qureshi LLCs] to effect that." Phase II Tr. at 82. That is no doubt true. But given the pre-existing disputes between Bavelis and Qureshi, a lack of consensus within the group that owned the Bavelis–Qureshi LLCs had existed long before the Assignments were made.

**34.** Mr. Bavelis's interest in FLOVEST was indirect—a 50% interest was held by FLOHIO, and a one-third membership interest in FLOHIO was held by Bavelis Family, in which Mr. Bavelis held an interest.

Bavelis appears to assume that he could have avoided bankruptcy if a receiver were appointed and the assets of FLOVEST were made available to pay its bank debt. But there is insufficient evidence to support that assumption, for he did not provide any testimony about the value of assets owned by FLOVEST. *Id.* at 105–06. And as the Court found in *Bavelis I*:

> [W]ith respect to the Bavelis–Qureshi LLCs, FLOVEST was the most pressing problem. Among the properties it owned, only two of them—the office building and the gas station—were producing income, meaning that it was becoming increasingly difficult for FLOVEST to make its mortgage payments. With an outstanding balance in excess of $10 million, the loan for the Lake Mary Project matured, and in May 2009 Colonial Bank notified FLOVEST that it would not renew the loan. Colonial Bank eventually initiated foreclosure proceedings and sought the appointment of a receiver for FLOVEST.

*Bavelis I*, 490 B.R. at 273 (citations omitted).

As already discussed, Bavelis had more than $18 million of exposure on his guarantees of the debt of FLOVEST alone. The evidence does not support a finding that the assets that might have been available if a receiver were appointed for FLOVEST would have been sufficient to satisfy that debt and thereby relieve Bavelis of his guarantee obligations.[35] In sum, there is no evidence that the assets of FLOVEST would have been sufficient to satisfy all of the bank debt and therefore prevent what Bavelis says led him to file his bankruptcy

case in the first place—the fear that Fifth Third Bank would make good on its threat to seize his multi-million dollar securities account maintained at the bank after declaring a default on his debt.

To summarize: As of the Petition Date, Bavelis was about to lose an $18–$20 million investment in Sterling Bank while at the same time owing approximately that same amount to several other banks, including one [Fifth Third] that was threatening to seize valuable assets held by Bavelis in order to pay the debt owed it. Furthermore, there is no reason to believe that the solutions posited by Bavelis—a workout with Qureshi and/or a receivership proceeding in Florida—would have resolved his financial difficulties outside of bankruptcy had Doukas not fraudulently induced the Assignments. For all the reasons set forth above, Bavelis's contention that he would have stayed out of bankruptcy were it not for Doukas's fraudulent inducement is too speculative to form a basis for awarding him the interest payments he was required to make after the Petition Date and all of his U.S. Trustee and professional fees he paid during the bankruptcy case.

## V. Conclusions of Law

### A. Applicability of *Bavelis I*'s Findings

Because the Court is basing these proposed findings of fact and conclusions of law in large part on the findings of fact set forth in *Bavelis I,* an explanation of why it is doing so is appropriate. *Bavelis I*'s findings were grounded on the evidence presented during the Claim Objec-

---

**35.** Bavelis testified that GMAQ had approximately $6 million of assets in the form of loan payments that it was owed by third parties, Phase II Tr. at 105–06, but GMAQ was not an obligor on the bank debt. *See Bavelis I*, 490 B.R. at 267. In addition, Bavelis testified that in 2010 "BMAQ owned four gas stations, all

of them operating well. And at the time they had a net equity over $2 million." Phase II Tr. at 103. Bavelis, however, also had guarantee liability with respect to BMAQ itself, and there is no evidence that the assets of BMAQ and FLOVEST together would have been enough to satisfy all the debt they owed.

tion Hearing. And before the Phase II trial commenced, Bavelis and each of the Doukas Defendants "stipulate[d] to the admissibility of (a) all testimony offered as part of the [Claim Objection Hearing] that was not excluded or stricken based on a sustained objection, and (b) the exhibits previously admitted into evidence by this Court in conjunction with [the Claim Objection Hearing]." Adv. Doc. 654. Count Eleven, on which the Court is recommending that the District Court enter judgment in the amount of the damages incurred as a result of the fraudulent inducement of the QC Note and the Assignments, was tried at Phase II. It therefore is appropriate to incorporate *Bavelis I*'s findings into these proposed findings of fact and conclusions of law as to Count Eleven. *See, e.g., Levin v. S.C. Dep't of Health & Human Servs.*, No. 3:12–cv–0007–JFA, 2015 WL 4545931, at *1 n.3 (D.S.C. July 28, 2015) (holding that, because the parties "agreed that relevant testimony provided at the first bench trial would be considered in ruling on the merits of Plaintiffs' claim for the second bench trial … the findings of fact and conclusions of law rendered in the Court's prior order … are deemed incorporated herein").

The parties' stipulation also applies to the claims for relief that were tried at Phase I on which the Court is recommending the District Court enter final judgment (Counts One, Two and Four). In Counts One and Two, the Plaintiffs seek to unwind the Assignments based on Doukas's fraudulent inducement. It would be disingenuous for the Doukas Defendants to consent to the Court's using the findings from the Claim Objection Hearing in connection with the request in Count Eleven for dam-

ages based on fraudulent inducement, but then decline to agree to the application of those findings in connection with the adjudication of the requests in Counts One and Two for a judgment that the Assignments were fraudulently induced. Furthermore, as explained in the procedural history, the Doukas Defendants themselves previously asked the Court to use the evidence presented during the Claim Objection Hearing to rule on Bavelis's request to unwind the Assignments. For these reasons, it is appropriate to incorporate the findings of fact from *Bavelis I* for the purpose of ruling on the Counts of the Complaint (Counts One and Two) that seek to unwind the Assignments.

The same also is true of Count Four. In that count, the Plaintiffs seek to unwind the transfers that Doukas caused Nemesis to make to Leftheris. Evidence presented during the Phase I trial established that Nemesis's purported authority to make the transfers to Leftheris was based on the fraudulently induced December Agreements. Again, it would be disingenuous for the Doukas Defendants to agree that evidence from the Claim Objection Hearing could be used for purposes of concluding that the December Agreements had been fraudulently induced, but then argue that those findings could not be used to invalidate the transfers that Nemesis made to Leftheris based on the fraudulently induced December Agreements. It therefore is appropriate to apply the Doukas Defendants' stipulation to Count Four as well. In short, despite the timing of the stipulation, the Court concludes that it applies to all the counts of the Complaint on which judgment should be entered against the Doukas Defendants.[36]

---

**36.** Moreover, even if the Doukas Defendants had not stipulated to the admissibility of the evidence presented in connection with the Claim Objection Hearing, the doctrine of is-

sue preclusion would render the Court's findings in *Bavelis I* binding here. "The preclusive effect of a federal-court judgment is determined by federal common law," and "[p]art

## B. Law Governing the Plaintiffs' Tort Claims

 "Where the [Bankruptcy] Code [or other federal law] does not specifically address an issue ... bankruptcy court[s] look[ ] to state law, to the extent that it does not conflict with the [B]ankruptcy [C]ode[.]" *Reinhardt v. Vanderbilt Mortg. & Fin., Inc. (In re Reinhardt)*, 563 F.3d 558, 563 (6th Cir. 2009) (internal quotation marks omitted)). The question, then, is which state's law applies here.

The Sixth Circuit has not resolved the issue of whether federal common law or the law of the forum state (Ohio) provides the applicable choice-of-law principles in a bankruptcy case. *See State Bank of Florence v. Miller (In re Miller)*, 513 Fed. Appx. 566, 572 (6th Cir. 2013) ("[T]he federal circuits are split on whether state or federal law supplies the choice-of-law rules in bankruptcy cases."). But just as in *Miller*, the Court "need not resolve that issue here," because both the Ohio Supreme Court and the Sixth Circuit follow the approach of the Restatement (Second) of Conflict of Laws. *See Morgan v. Biro Mfg. Co.*, 15 Ohio St.3d 339, 474 N.E.2d 286, 288–89 (1984) (applying the Restatement approach, stating that "[w]e hereby adopt the theory stated in the Restatement of the Law of Conflicts, as it is more reflective of our past decisions and also provides sufficient guidelines for future litigation."); *Hauf v. Life Extension Found.*, 454 Fed. Appx. 425, 430 n.2 (6th Cir. 2011) ("[F]ederal common law ... follow[s] the Restatement (Second) of Conflict of Laws." (citing *Med. Mut. of Ohio v. deSoto*, 245 F.3d 561, 570 (6th Cir. 2001))).

Section 145 of the Restatement governs the law that applies to a tort action such as a claim of fraudulent inducement. Section 145 states: "The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Restatement § 145(1).

of that federal common law is the doctrine of issue preclusion," which "bars repetitive litigation of the same issue between the same parties," so that "if two parties actually litigated an issue in a prior case, and a court necessarily decided the issue pursuant to entry of a final judgment, then the losing party cannot relitigate the issue against the winner in a later case." *Amos v. PPG Indus., Inc.*, 699 F.3d 448, 451 (6th Cir. 2012). *Bavelis I* is a final, non-appealable judgment. The issues in *Bavelis I* were actually litigated and necessarily decided as part of an adjudication that Doukas fraudulently induced Bavelis to sign the QC Note and that the proofs of claim filed by Quick Capital based on the QC Note should be disallowed. As a party to the Claim Objection Hearing, Quick Capital clearly is bound by the findings in *Bavelis I*. In addition, "a nonparty may be bound by a judgment because [he] was adequately represented by someone with the same interests who was a party to the suit." *Id.* at 452 (quoting *Taylor v. Sturgell*, 553 U.S. 880, 894, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008). Adequate representation exists if: (1) the nonparty had notice of the original proceeding; (2) the interests of the nonparty and the party were aligned; and (3) either (i) the prior proceeding included "special procedures to protect the nonparties' interests," or (ii) there was "an understanding by the concerned parties that the first suit was brought in a representative capacity." *Id.* As the Court previously found, Doukas owned and controlled each of the Doukas Defendants at all relevant times. Accordingly, Doukas and the other Doukas Defendants had notice of the Claim Objection Hearing, and the interests of Doukas and the other Doukas Defendants were aligned. Moreover, Defendants Doukas, Nemesis, R.P.M. and Quick Capital had an express understanding that Doukas's and Quick Capital's involvement and participation in the Claim Objection Hearing was in a representative capacity. After all, they submitted proposed findings of fact and conclusions of law after the Claim Objection Hearing, and they also asked the Court to make findings of fact regarding the transfer Bavelis made to Blair.

In determining which state has the most significant relationship under the principles stated in Restatement § 6,[37] a court should consider "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id.* § 145(2). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

Applying these factors here, it is clear that the state with the most significant relationship to the Plaintiffs' tort claims against Doukas is Florida. Bavelis and Doukas both maintained residences in Florida, their relationship began and developed there, and Doukas engaged in his fraudulent conduct while he and Bavelis were in Florida. *See Bavelis I*, 490 B.R. at 271. Furthermore, the Assignments transferred interests in Florida limited liability companies whose principal place of business was Florida. *See* Claim Objection Hr'g Exs. 14–16 (operating agreements for FLOVEST, BMAQ and GMAQ). Accordingly, Florida law governs the Plaintiffs' tort claims.

**37.** Restatement § 6 provides:
(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,

## C. Fraudulent Inducement

### 1. The Elements of a Fraudulent Inducement Claim Under Florida Law

In order to succeed on a fraudulent inducement claim under Florida law, a plaintiff must prove: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation." *Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010) (quoting *Johnson v. Davis*, 480 So.2d 625, 627 (Fla. 1985)). Promises of future performance such as Doukas's promises to negotiate with Qureshi on Bavelis's behalf and to return the Assignments once the negotiations were completed constitute fraudulent misrepresentations if they are "made with no intention of performing or with a positive intention not to perform." *Thor Bear, Inc. v. Crocker Mizner Park, Inc.*, 648 So.2d 168, 172 (Fla. Dist. Ct. App. 1994); *Houri v. Boaziz*, 196 So.3d 383, 392–93 (Fla. Dist. Ct. App. 2016), *pet. denied*, 2016 WL 6902819 (Nov. 22, 2016).[38]

### 2. Doukas Fraudulently Induced Bavelis to Execute the Assignments.

Based on the findings of fact proposed in Sections IV.A, IV.B and IV.C, the

·(c) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

**38.** Although plaintiffs have the burden of proving fraudulent inducement in Florida by only a preponderance of the evidence, *see Wieczoreck v. H & H Builders, Inc.*, 475 So.2d 227, 228 (Fla. 1985), Bavelis would have met his burden even if clear and convincing evidence were required.

Plaintiffs have established the required elements of their fraudulent inducement claims under *Butler*. Again, "Doukas ... perpetrated a scheme designed to deprive ... Bavelis of substantially all of his assets." *Bavelis I*, 490 B.R. at 265. Acting in accordance with this scheme, Doukas did everything that needed to be done to give rise to a fraudulent inducement claim under Florida law. He made false statements concerning material facts, including that he would negotiate with Qureshi on Bavelis's behalf and that he would return the Assignments once a resolution with Qureshi was reached. Further, Doukas knew his representations to Bavelis were false, because he of course was aware of his intent not to negotiate with Qureshi on Bavelis's behalf, but to instead keep the Assignments for himself. In fact, "Doukas never intended to fulfill his promise" to Bavelis of "working to resolve matters with ... Qureshi in a manner favorable to ... Bavelis, nor for that matter, did he intend to keep any of the promises," he made to him, but instead "intended to take advantage of ... Bavelis and deprive him of his assets." *Id.* at 318. Doukas clearly intended his misrepresentations to induce Bavelis to execute the Assignments. Finally, the Plaintiffs were injured as a result of their reliance on Doukas's false representations. FLOHIO lost its 50% interest in FLOVEST, and Bavelis Family lost its 50% interest in BMAQ. For his part, Bavelis lost his indirect ownership of BMAQ and FLOVEST, and he also lost his personal 50% membership interest in GMAQ—a company with no bank debt that instead owned millions of dollars of assets. And as a result of Doukas's refusal to return the Assignments, Bavelis was forced to incur substantial attorneys' fees litigating with Doukas—attorneys' fees that, for the reasons explained below, Bavelis cannot recover as damages under Florida law. The Plaintiffs therefore clearly were injured as a result of the reliance on Doukas's false promises.

### 3. The Reliance Requirement

Conceding that he "made statements that were not true about transfers from Mr. Bavelis to [the] Doukas entities," Adv. Doc. 677 at 33, Doukas asserts only one defense to the Plaintiffs' fraudulent inducement claims—that Bavelis "was not justified in relying on Mr. Doukas' representations." *Id.* at 35. For the reasons explained below, this defense must fail.

In *Butler*, the Florida Supreme Court stated that "[j]ustifiable reliance is not a necessary element of fraudulent misrepresentation." *Butler*, 44 So.3d at 105. Relying on this statement, Bavelis contends that Florida law does not require a party's reliance to be justifiable. But despite the seemingly clear pronouncement in *Butler*, Florida law in fact is ambiguous on this point. In the context of misrepresentations of existing facts, the Florida Supreme Court—including the *Butler* court—has repeatedly reaffirmed that "a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him." *Id.* (quoting *Besett v. Basnett*, 389 So.2d 995, 998 (Fla. 1980)); *see also, e.g.*, *M/I Schottenstein Homes v. Azam*, 813 So.2d 91, 94–95 (Fla. 2002) ("[I]f the recipient 'knows that [the statement] is false or its falsity is obvious to him,' his reliance is improper, and there can be no cause of action for fraudulent misrepresentation.") (quoting *Besett*, 389 So.2d at 997). Importantly, this is precisely the standard for justifiable reliance: "The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him." Restatement (Second) of Torts § 541 (1977); *see also*

Restatement (Second) of Torts § 540 ("The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation."). Moreover, prior Florida Supreme Court cases expressly adopted the Restatement's justifiable reliance provisions. *See Besett,* 389 So.2d at 997 ("The principle of law which we adopt is expressed in Sections 540 and 541 of Restatement[.]"); *Gilchrist Timber Co. v. ITT Rayonier, Inc.,* 696 So.2d 334, 336 (Fla. 1997) ("[In *Besett,*] we specifically adopted the Restatement of Torts' position contained in sections 540 and 541[.]").

Given all this, a lower Florida appellate court has noted the uncertainty raised by the *Butler* decision. Construing *Butler* in the context of the prior Florida Supreme Court decisions, the court questioned whether *Butler* truly eliminated justifiable reliance as a requirement, because "[Florida's] high court does not overrule itself *sub silentio.*" *Billington v. Ginn–La Pine Island, Ltd.,* 192 So.3d 77, 81–82 n.4 (Fla. Dist. Ct. App. 2016).

### 4. Bavelis's Reliance was Justifiable.

That said, it is unnecessary to determine whether Florida law requires justifiable reliance rather than mere reliance, because Bavelis in fact was justified in relying on Doukas's misrepresentations. While Bavelis would not have been justified in relying upon Doukas's representations regarding his intent if Bavelis had known the representations were false or their falsity had been obvious to him, Bavelis clearly did not know that Doukas's promises in December 2009 were false, nor was it obvious to Bavelis that Doukas was lying to him. Furthermore, "[t]he recipient of a fraudulent misrepresentation of intention is justified in relying upon it if the existence of the intention is material and the

recipient has reason to believe that it will be carried out." Restatement § 544. And "[w]hether the recipient has reason for this belief depends upon the circumstances under which the statement was made, including the fact that it was made for the purpose of inducing the recipient to act in reliance upon it and the form and manner in which it was expressed." *Id.* cmt. a. Under the circumstances, Bavelis was justified in relying upon Doukas's false representation of his intention. The existence of Doukas's intention to carry out his promises—including the promise to negotiate a resolution with Qureshi and then return the Assignments—was material to Bavelis's decision to execute the Assignments, and Bavelis had reason to believe that Doukas would return the Assignments and fulfill his other promises. The Court reaches this conclusion after considering the circumstances under which Doukas's statements were made—including the fact that they were made for the purpose of inducing Bavelis to act in reliance upon them— and after considering the form and manner in which Doukas expressed his intention. In particular, as explained in the Court's proposed findings of fact, Doukas made his promises after engaging in sustained efforts to cultivate the appearance of a relationship of trust and friendship with Bavelis.

Bavelis's reliance was justifiable not only when he signed the March Agreement and the R.P.M. Agreement, but also when he signed the December Agreements. As discussed in Section IV.C above, Bavelis adequately explained why he continued to trust Doukas in December 2009:

So I really had a lot of trust in him, a lot of trust in him, because he was convincing me, even though at some point I had some second thoughts. But after I had the second thoughts, he would come back to my house, we would have dinner, and he would talk to make you always

justify. And then I would say: "Well, why am I worried about this guy? He is—he's still a genuine guy. He will help. He will do everything I need to get me out of Qureshi and help me with the bank." And I was going overboard not to upset him in any way.

Phase II Tr. at 130–31. Given Doukas's reassurances, Bavelis believed Doukas's representations that he had reached a deal with Qureshi and that the December Agreements would be returned to him. *See id.* at 145 ("It was a done deal, finished. There was nothing to worry about anymore. He was going straight to Mr. Qureshi to get the signature and we were done.").

Should Bavelis have been more careful? Certainly. As pointed out in *Bavelis I*: "In hindsight, Mr. Bavelis no doubt would agree that he should have done things differently. A businessman of his experience and stature clearly should not have turned to Mr. Doukas—or relied on his machinations—to resolve his financial difficulties, including his disputes with Mr. Qureshi." *Bavelis I*, 490 B.R. at 304. But as the Supreme Court of Florida has held:

> A person guilty of fraud should not be permitted to use the law as his shield. Nor should the law encourage negligence. However, when the choice is between the two—fraud and negligence— negligence is less objectionable than fraud. Though one should not be inattentive to one's business affairs, the law should not permit an inattentive person to suffer loss at the hands of a misrepresenter.

*Besett*, 389 So.2d at 998.

For all the reasons explained above, the Court concludes that, under Florida law, Bavelis's reliance on Doukas's promises throughout 2009 was justifiable and that Doukas fraudulently induced Bavelis to execute the Assignments.

## D. Rescission

 "Assignments are contracts." *Slorp v. Lerner, Sampson & Rothfuss*, 587 Fed.Appx. 249, 254 (6th Cir. 2014). As with other contracts, rescission of an assignment is appropriate when "at the time of the execution ... the party promising to perform an act in the future has a secret undisclosed intent not to carry it out but fraudulently represents that he will perform as an inducement to the other party to enter into the contract ...." *Steak House, Inc. v. Barnett*, 65 So.2d 736, 738 (Fla. 1953); *Royal v. Parado*, 462 So.2d 849, 855 (Fla. Dist. Ct. App. 1985). Because Doukas induced Bavelis to execute the Assignments by promising to perform acts that Doukas had no intention of performing, the Assignments should be rescinded.

 In order to succeed on a claim for rescission under Florida law, a plaintiff must demonstrate:

(1) The character or relationship of the parties;

(2) The making of the contract;

(3) The existence of fraud, mutual mistake, false representations, impossibility of performance, or other ground for rescission or cancellation;

(4) That the party seeking rescission has rescinded the contract and notified the other party to the contract of such rescission;

(5) If the moving party has received benefits from the contract, he should further allege an offer to restore these benefits to the party furnishing them, if restoration is possible;

(6) Lastly, that the moving party has no adequate remedy at law.

*Crown Ice Mach. Leasing Co. v. Sam Senter Farms, Inc.*, 174 So.2d 614, 617 (Fla. Dist. Ct. App. 1965); *see also Lawyers*

*Title & Escrow, Inc. v. S. States Inv. Corp.*, No. 98–5472, 1999 WL 993932, at *3 (6th Cir. Oct. 20, 1999) (quoting *Crown Ice*, 174 So.2d at 617).[39]

▮ The Plaintiffs have established all of these elements with respect to the Assignments. As explained above in Sections IV.A, IV.B and IV.C, the evidence demonstrates the relationship that existed between Doukas and Bavelis and how Doukas used that relationship to defraud Bavelis into executing the Assignments. Bavelis made repeated requests that Doukas return the Assignments, which effectively was a demand and notice of rescission of the Assignments. Further, Bavelis has not retained any benefits under the Assignments. And as stated above in Section IV.D, Bavelis received no ˙ benefits from the March Agreement or the December Agreements, and he quickly (within a month) repaid the $50,000 that he received under the R.P.M. Agreement. Finally, failure to rescind the fraudulently induced Assignments would leave the Doukas Defendants in a position to further harm Bavelis by using assets of GMAQ, BMAQ and FLOVEST that they have no right to use. Thus, anything short of rescission would be an inadequate remedy. For all these reasons, the Assignments must be rescinded.[40]

▮ That leaves the Subsequent Transfers. Under Florida law, "[t]he prime object of rescission is 'to undo the original

transaction and restore the former status' of the parties." *Billian v. Mobil Corp.*, 710 So.2d 984, 990 (Fla. Dist. Ct. App. 1998) (quoting *Willis v. Fowler*, 102 Fla. 35, 136 So. 358, 369 (1931)). If rescission of a transfer is warranted as a result of fraud, a court:

> may set aside all transactions founded on [the transfer], however they may have been effected, and notwithstanding any contrivance by which it may have been attempted to protect them, and may also treat acts as having been done which ought to have been done, and convert the party who has committed a fraud and profited by it into a trustee for the injured party.

*Id.* (quoting *Willis*, 136 So. at 368).

The Subsequent Transfers were founded on the fraudulently induced December Agreements, and they must be rescinded in order to restore the parties to the status quo existing before the December Agreements were executed. The judgment in favor of the Plaintiffs therefore should provide for rescission of the Subsequent Transfers.

**E. Tortious Interference**

In Count Five, Bavelis asserts a tortious interference claim against Doukas with respect to certain guarantees Bavelis executed before the Petition Date (the "Guarantees") "as an inducement for the extension of credit" to the Bavelis–Qureshi LLCs. Adv. Doc. 490 ¶ 41. In particular, Bavelis

**39.** "Traditionally ... Florida law require[d] 'clear and convincing evidence' to cancel, rescind, or reform a written document or deny its enforcement." *Wieczoreck*, 475 So.2d at 228 (Overton, J., dissenting). The Supreme Court of Florida reversed course in *Wieczoreck*, holding that the appropriate standard was a preponderance of the evidence. *Id.* In any event, all of the Court's proposed findings here and throughout this opinion are supported by clear and convincing evidence.

**40.** Given the Court's proposed conclusions of law regarding fraudulent inducement and rescission, the Plaintiffs' claims for relief based on failure of consideration are of no practical significance. The Plaintiffs' claims based on failure of consideration accordingly should be dismissed as moot.

executed a Guaranty in favor of Colonial Bank, an Absolute Unconditional and Continuing Guaranty in favor of First Southern Bank, and six guarantees—a Continuing Guaranty Agreement, an Unconditional Guaranty of Payment and Performance, a Cognovit Guaranty, and three documents entitled Unconditional and Continuing Guaranty—in favor of Fifth Third Bank. *Id.* ¶¶ 43–50. Bavelis also includes among the Guarantees a promissory note he issued "to enable FLOVEST to secure financing from Heartland Bank." *Id.* ¶ 42.[41]

Bavelis contends that Doukas "interfered with the Guarantees by . . . engaging in acts which caused the [Bavelis–Qureshi LLCs] to default on the[ ] loans" they received from Colonial Bank, First Southern and Fifth Third. Adv. Doc. 490 ¶ 161. In his proposed findings of fact and conclusions of law, Bavelis argues in more detail that:

> Doukas, either individually or through his assignee entities, is directly liable for tortiously interfering with Mr. Bavelis' personal guarantees of the [Bavelis–Qureshi LLC's] debt. . . . [I]n fraudulently inducing the [Assignments] but refusing—based upon such assignments—to participate/aid in the marshalling and preservation of assets for the [Bavelis–Qureshi LLCs'] creditors, Doukas intentionally and directly interfered with Mr. Bavelis' personal guarantees.

Adv. Doc. 674 at 33.

■ In support of his tortious interference claim, Bavelis relies on Restatement (Second) of Torts § 766. *See* Adv. Doc. 674 at 34. Florida law recognizes the cause of action for tortious interference with contractual relations under that section of the Restatement. *See Gossard v. Adia Servs.,*

*Inc.,* 723 So.2d 182, 184 (Fla. 1998). The section provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766.

This section applies if the defendant caused a third party to breach its contract with the plaintiff. *See Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.,* 40 F.3d 63, 66 (3d Cir.1994) (holding that Section 766 applies where "the defendant causes the promisor to breach its contract with the plaintiff"). In the context of the Guarantees, Section 766 might have applied if Doukas had caused the banks to breach promises they made to Bavelis (e.g., their promise to loan money) in connection with Bavelis's execution of the Guarantees. Bavelis, however, does not allege that Doukas caused the banks or any other third party to breach any contract with Bavelis. Section 766 therefore does not apply. Put differently, Bavelis contends that Doukas should be liable for tortious interference with the Guarantees because Doukas caused the parties who were primarily liable on the obligations guaranteed by Bavelis (i.e., the Bavelis–Qureshi LLCs) to default, but the default on which Bavelis relies is a default by the Bavelis–Qureshi LLCs' on their obligations to the banks, *not on any obligation the Bavelis–Qureshi LLCs had to Bavelis.* Again, Section 766 does not apply

---

41. Copies of the Guarantees were admitted during the Claim Objection Hearing as Exhibits 19–26. *See Bavelis I,* 490 B.R. at 267.

here, because that section "addresses disruptions caused by an act directed not at the plaintiff, but at a third person: the defendant causes the promisor to breach its contract with the plaintiff." *Gemini Physical Therapy*, 40 F.3d at 66 (3d Cir. 1994) (quoting *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 660 (3d Cir.1993)). Section 766 is inapplicable given that Bavelis does not allege that Doukas caused a third party to breach its contract with Bavelis.

Bavelis appears to be suggesting that Doukas caused his performance under the Guarantees to be more burdensome—for example, by causing the Bavelis–Qureshi LLCs to default on their primary obligations to the banks and thus forcing him to tap his own resources to satisfy his obligations under the Guarantees. There is a section of the Restatement that addresses situations where "the defendant prevents or impedes the plaintiff's own performance." *Gemini*, 40 F.3d at 66 (quoting *Windsor Sec.*, 986 F.2d at 660). This section of the Restatement, Section 766A, provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract *or causing his performance to be more expensive or burdensome*, is subject to liability to the other for the pecuniary loss resulting to him.

Restatement (Second) of Torts § 766A (emphasis added).

Florida, however, does not recognize a cause of action for tortious interference with contractual relations under Section 766A. *See KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1323 (11th Cir. 2004) (holding that, because the plaintiffs "were seeking relief under § 776A of the Restatement (Second) of Torts and ... because the Florida courts have not adopted § 766A, their claim failed").[42] In short, the facts alleged by the Plaintiffs do not state a tortious interference claim under Florida law. Bavelis's tortious interference claim therefore should be dismissed.

## F. Breach of Fiduciary Duty

### 1. Doukas

In Count Seven, Bavelis contends that Doukas breached fiduciary duties he owed Bavelis. Adv. Doc. 490 ¶¶ 170–71. Adjudicating this claim is unnecessary because the only remedy that Bavelis seeks based on the alleged breach of fiduciary duty that he is not already receiving based on fraudulent inducement is the equitable remedy of disgorgement and, as explained in Section V.I.3 below, it would not be equitable to order disgorgement under the circumstances of this case. For this reason, Count Seven against Doukas should be dismissed as moot.

### 2. Stravato

In Count Eight, Bavelis seeks to hold Stravato culpable for breach of fiduciary duty based on the following state-

---

**42.** *See also Gemini*, 40 F.3d at 66 ("In *Price v. Sorrell*, 784 P.2d 614 (Wyo. 1989) ... the Supreme Court of Wyoming directly faced the application of section 766A of the Restatement: the defendant's interference made the plaintiff's performance of a contract more costly. Although the court had previously adopted §§ 766 and 766B of the Restatement, it refused to adopt § 766A. It reasoned, and we agree, that causing performance of a contract to be more costly 'as an element of proof is too speculative and subject to abuse to provide a meaningful basis for a cause of action.' 784 P.2d at 616. Thus, we are not persuaded that the Pennsylvania Supreme Court would adopt section 766A, and we see no error in the district court's dismissal of Gemini's section 766A claim.").

ments in the Complaint, which Bavelis contends Stravato has admitted:

1. "At all times herein, Defendant Stravato was a co-conspirator, aider and abettor and/or agent for Defendants Doukas, Nemesis, and Quick Capital." Adv. Doc. 490 ¶ 11.

2. "Defendant Stravato prepared the [QC] Note, and in doing so served in a dual agency capacity by representing Defendants Quick Capital and Doukas and George Bavelis. George Bavelis paid Defendant Stravato for the legal services rendered." *Id.* ¶ 78.

3. "Defendant Stravato served as legal counsel for George Bavelis, and as such owed him a duty of good faith and to act without conflict." *Id.* ¶ 174.

4. Defendant Stravato violated the duty of care owed as an attorney, and violated his fiduciary duty, by, among other items, (a) acting as a dual agent; (b) his preparation of the [QC] Note; and (c) failure to adequately advise his client and otherwise disclose information material to his client. *Id.* ¶ 175.

Bavelis did not introduce evidence in support of these allegations, but instead relies entirely on Stravato's purported admissions. Stravato, however, filed an answer to the original complaint, which contained the same allegations regarding him as those set forth above. Adv. Doc. 1 ¶¶ 9, 71, 160–61. In his answer, Stravato stated:

I have never met the plaintiff George Bavelis and the only services I have performed for him were indirectly, related to a project involving medical technology and early detection of breast cancer. Mr. Bavelis and Mr. Doukas were to invest jointly and for that reason I received $2,500 from Mr. Bavelis and $2,500 from Mr. Doukas to review material related to this project. All of my contact was with Mr. Doukas with the exception of a single email where I was providing contact information so that I could receive 50% of the Retainer Mr. Bavelis was to contribute. I had no conversations or discussions with Mr. Bavelis. I would not recognize him if I saw him.... At Mr. Bavelis' direction and because of my prior relationship with Mr. Doukas, I chose to communicate solely to Mr. Doukas.

Nearly a year later I was retained by Quick Capital of Long Island Corp. to collect on a Promissory Note executed by Mr. Bavelis.

Adv. Doc. 84 ¶¶ 12–13.

Thus, Stravato has not admitted that he represented Bavelis in connection with the QC Note or that he had a fiduciary duty to him. Despite Stravato's filing of an answer to the original complaint, Bavelis argues that the entry of default against Stravato means that he is deemed to have admitted the allegations of the Complaint. This argument, however, is contrary to controlling Sixth Circuit law. Because Stravato filed an answer to Bavelis's original complaint, and because neither the first amended complaint nor the Complaint itself included any allegations as to Stravato that were not already set forth in the original complaint, Stravato has not admitted the allegations concerning his purported breach of fiduciary duty. *See Nouri v. Cnty. of Oakland*, 615 Fed.Appx. 291, 297 (6th Cir. 2015) (holding that the allegations of the amended complaint were denied because the defendant denied substantially the same allegations in its answer to an earlier complaint) (citing *LaGorga v. Kroger Co.*, 407 F.2d 671, 673 (3d Cir. 1969)). Thus, Count Eight must be dismissed.

**G. Conspiracy**

In Count Fourteen of the Complaint, the Plaintiffs allege:

With the exception of the [Bavelis–Qureshi LLCs], Defendants, through their conduct described [in the Complaint], intentionally and maliciously conspired with each other, aided and abetted each other, and/or acted as principals/agents of each other, in an effort to intentionally and willfully breach fiduciary duties owed to George Bavelis, commit fraud, and/or commit fraudulent conveyances in the manner set forth [earlier in the Complaint].

Adv. Doc. 490 ¶ 206.

■ "Conspiracy is not a separate or independent tort but is a vehicle for imputing the tortious acts of one coconspirator to another to establish joint and several liability." *Ford v. Rowland*, 562 So.2d 731, 735 n.2 (Fla. Dist. Ct. App. 1990). Once again, Bavelis relies solely on the purported admissions of Stravato and the corporate Doukas Defendants in order to make them culpable for the acts of Doukas. *See* Adv. Doc. 674 at 36 (arguing that "[t]he result [of the defaults of Stravato and the corporate Doukas Defendants] is that [they] are deemed to be conspirators with Doukas, and are jointly and severally liable for the damages awarded to Mr. Bavelis based on fraud").

### 1. Stravato

■ Again, however, Stravato filed an answer to the original complaint, and that complaint contained the same allegations regarding conspiracy as the Complaint does. *See* Adv. Doc. 1 ¶¶ 9, 21, 192 & Adv. Doc. 490 ¶¶ 11, 24, 206. Thus, under Sixth Circuit law, Stravato cannot be deemed to have admitted the conspiracy-related allegations of the Complaint. In addition, there is no evidence in the record that Stravato conspired with Doukas. Indeed, Bavelis concedes that liability for conspiracy requires knowledge of the conspiracy. Adv. Doc. 674 at 37. Yet there is absolutely

no evidence that Stravato had knowledge of the conspiracy in which Bavelis contends the Doukas Defendants engaged. For these reasons, dismissal of Count Fourteen as to Stravato is appropriate.

### 2. The Corporate Doukas Defendants

That leaves Doukas's solely owned companies. As discussed in the procedural history, Quick Capital, Nemesis, R.P.M. and Leftheris filed an answer but, after the attorney who filed it on their behalf withdrew from the representation, they were deemed to be in default based on their failure to retain new counsel by the deadline set by the Court. The Plaintiffs contend that the consequence of the deemed default by these corporate Doukas Defendants should be an admission that they conspired with Doukas. But those corporate Doukas Defendants (as well as Blair, which also joined in the answer to the Complaint) eventually retained counsel who prosecuted this matter on their behalf, including by participating at trial and filing proposed findings of fact and conclusions of law. Bavelis cites no case law—and the Court is unaware of any—where a defendant was deemed to have admitted the allegations of a complaint after filing an answer and retaining counsel (albeit in an untimely fashion) to litigate the issues, and it thus is far from clear that the corporate Doukas Defendants should be deemed to have admitted the allegations of the Complaint.

■ In any event, under Florida law, the corporate Doukas Defendants are legally incapable of conspiring with their sole owner, Doukas, and also are incapable of conspiring with one another. A civil conspiracy exists where there is: "(1) an agreement between two or more parties; (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspir-

acy; and (4) damage to plaintiff as a result of the acts done under the conspiracy." *Philip Morris USA, Inc. v. Russo*, 175 So.3d 681, 686 n.9 (Fla. 2015). Under the intracorporate conspiracy doctrine, a company and its sole owner are not considered separate parties for purposes of conspiracy, and federal district courts applying this doctrine in cases governed by Florida law therefore have held that an individual defendant cannot, as a matter of law, conspire with a company that he wholly owns. *See Vivid Entm't, LLC v. J & B PB, LLC*, No. 2:13–cv–524, 2015 WL 144352, at *4 (M.D. Fla. Jan. 12, 2015) ("Pursuant to the intracorporate conspiracy doctrine, McCarty cannot conspire with Vivid as McCarty is the sole owner of [Vivid]."); *Bryant Heating & Air Conditioning Corp. v. Carrier Corp.*, 597 F.Supp. 1045, 1054 (S.D. Fla. 1984) ("Florida case law holds that members of a single economic unit, such as [a corporation and] its wholly owned subsidiary . . . cannot constitute the requisite combination of 'separate economic groups or forces' necessary to establish the Florida tort of conspiracy." (citing *Buckner v. Lower Fla. Keys Hosp. Dist.*, 403 So.2d 1025, 1029 (Fla. Dist. Ct. App. 1981))); *see also Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (holding that parent corporation and its wholly owned subsidiary are not legally capable of conspiring with each other under § 1 of the Sherman Act because "a parent and subsidiary have not . . . two separate corporate consciousnesses, but one").

The intracorporate conspiracy doctrine also has been extended to companies with common ownership. *See Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.*, 833 F.2d 606, 611 (6th Cir. 1987) ("Here we have two subsidiaries which are wholly-owned by the same parent and are likewise not separate enterprises. We agree . . . that *Copperweld* precludes a finding that

two wholly-owned sibling corporations can combine for the purposes of section 1 [of the Sherman Act]."); *Perry v. Patriot Mfg, Inc.*, No. 1:05CV153LMB, 2006 WL 2707361, at *3 (E.D. Mo. Sept. 19, 2006) ("Two subsidiaries of the same parent corporation cannot conspire." (citations omitted)). In light of all the foregoing, the Court cannot conclude that the corporate Doukas Defendants conspired with Doukas or with one another. And because conspiracy is the sole legal theory on which Bavelis seeks a monetary award against the corporate Doukas Defendants in this adversary proceeding, a money judgment should be entered against Doukas only.

## H. Moot Claims

In light of the Court's determination that the Assignments were fraudulently induced and should be rescinded and that judgment should be entered in favor of the Plaintiffs on Counts One and Two on the basis of fraudulent inducement, certain other counts and portions of counts of the Complaint are no longer of practical significance and therefore are moot. *See Finstad v. Florida, Dep't of Bus. & Prof'l Regulation*, 295 Fed.Appx. 352, 353 (11th Cir. 2008) ("A complaint becomes moot when it no longer presents a 'live' controversy or a ruling on the issues would have no practical significance."), *cert. denied*, 558 U.S. 824, 130 S.Ct. 145, 175 L.Ed.2d 36 (2009). In particular, the following claims for relief are moot as a result of the proposed rulings on Counts One and Two: Count One subparts (b)–(g) (additional grounds for unwinding the March Agreement and the R.P.M. Agreement, including failure of consideration); Count Two subparts (b)–(g) (additional grounds for unwinding the December Agreements, including failure of consideration); Count Ten (request to avoid the Assignments as fraudulent transfers); Count Twelve (neg-

ligent misrepresentation claim against Doukas with respect to the Assignments); and Count Thirteen (promissory estoppel against Doukas with respect to the Assignments). In addition, as already discussed, adjudicating Count Seven (the breach of fiduciary duty claim against Doukas) is unnecessary given that the only remedy that Bavelis seeks based on the alleged breach of fiduciary duty that he is not already receiving based on fraudulent inducement is disgorgement, a remedy to which he is not entitled. Because these proposed findings of fact and conclusions of law are intended to adjudicate all of the remaining claims in this adversary proceeding, the claims discussed above (the "Moot Claims") should be dismissed as moot.

## I. Amount of the Judgment

### 1. Unreturned Checks

 Based on the equitable doctrine of unjust enrichment, Bavelis seeks "to recover $116,600, which is the amount of [two] checks written to Quick Capital that Doukas promised to return to ... Bavelis, but did not." Adv. Doc. 674 at 43. Under the Restatement (Second) of Conflict of Laws § 221, recovery based on a claim of unjust enrichment is governed by "the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties," and the determination of the relevant state law is determined after taking into consideration the following factors:

(a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,

(b) the place where the benefit or enrichment was received,

(c) the place where the act conferring the benefit or enrichment was done,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties; and

(e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

Restatement (Second) of Conflict of Laws § 221 (1971).

Application of these factors here makes it clear that the state with the most significant relationship to Bavelis's unjust enrichment claim is Florida. Again, the relationship between Bavelis and Doukas was centered in Florida. Furthermore, the receipt of the $116,600 was substantially related to their relationship, and the checks were issued by Bavelis and received by Doukas while the two men were at Bavelis's Florida home. *See Bavelis I*, 490 B.R. at 287. Florida law therefore applies to Bavelis's unjust enrichment claim.

 "The elements of an unjust enrichment claim are 'a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof.' " *Fla. Power Corp. v. City of Winter Park*, 887 So.2d 1237, 1241 n.4 (Fla. 2004) (quoting *Ruck Bros. Brick, Inc. v. Kellogg & Kimsey, Inc.*, 668 So.2d 205, 207 (Fla. Dist. Ct. App. 1995)). Those elements are satisfied here. At Doukas's request, in the summer of 2009 Bavelis issued Quick Capital two checks, each in the amount of $58,300. Bavelis believed that the checks related to his estate planning,[43] and Doukas advised

---

**43.** In its findings of fact, the Court summarized the evidence regarding Doukas's representations regarding his estate planning expertise, his offer to assist Bavelis with his

him that he would return the checks. Doukas, however, never returned the checks. *Bavelis I*, 490 B.R. at 327. When Bavelis gave Doukas the checks and Doukas failed to keep his promise to return them, Doukas was enriched at Bavelis's expense, and it would be inequitable to permit Doukas and Quick Capital to retain the funds. The judgment entered in favor of Bavelis accordingly should include the $116,600 aggregate amount of the checks.

### 2. Fees and Expenses Incurred in Litigating With Doukas

[32, 33] Bavelis contends that applicable state law entitles him to a judgment for the attorneys' fees he incurred in litigating with the Doukas Defendants. As discussed above, Florida law applies here. Acknowledging Florida's adoption of the "American Rule,"[44] under which "attorney fees may be awarded by a court only when authorized by statute or by agreement of the parties," *Fla. Patient's Comp. Fund v. Rowe*, 472 So.2d 1145, 1148 (Fla. 1985),[45] Bavelis primarily relies on Florida's bad-faith exception to the American Rule. Adv. Doc. 674 at 49.[46] The Supreme Court of Florida indeed has recognized an exception to the American Rule—which it calls the "inequitable conduct doctrine"—in cases in which a party "acted in bad faith" in connection with litigation. *Bitterman v. Bitterman*, 714 So.2d 356, 365 (Fla. 1998).

In *Bitterman*, the Supreme Court of Florida stated that the bad-faith exception "is rarely applicable." *Id.* Attempting to persuade the Court that this is the rare case in which the exception applies, Bavelis first points to Doukas's fraudulent conduct on which the Complaint is based. Adv. Doc. 674 at 49. But equating the underlying fraudulent conduct with bad faith effectively would render fraud an exception to the American Rule. Florida, however, does not recognize an exception to the American Rule for fraud claims. *See Martin v. Paskow*, 339 So.2d 266, 268 (Fla. Dist. Ct. App. 1976); *Weisenberg v. Carlton*, 233 So.2d 659, 661 (Fla. Dist. Ct. App. 1970); *Butler v. Wright*, No. 8:06–CV–165–T–17TBM, 2010 WL 599387, at *4 (M.D. Fla. Feb. 16, 2010) ("Upon careful consideration of the parties' arguments and applicable state case law, I am unable to find that an award of attorney fees on grounds of inequitable conduct and/or bad faith is warranted. The jury's findings with respect to fraud, breach of fiduciary duty,

---

estate planning needs, and the reasons Bavelis believed that the issuance of the checks related to Doukas's efforts to help him fund a trust as part of the estate plan.

**44.** The American Rule provides that "the prevailing party may not recover attorneys' fees as costs or otherwise" unless they are authorized by statute or the parties' agreement. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 245, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

**45.** Because Bavelis does not base his request for attorneys' fees on a provision of a statute or agreement, the Doukas Defendants argue that the American Rule bars an award of attorneys' fees in his favor. Adv. Doc. 677 at 45.

**46.** Although Bavelis also cites an exception to the American Rule applicable under Ohio law in cases in which punitive damages are appropriate, Adv. Doc. 674 at 49, the only connection between Bavelis's claims for relief and the State of Ohio is that Bavelis happened to sign the QC Note while he was there. But as explained above, the state with the most significant relationship to Bavelis's claims against Doukas is Florida, because Bavelis and Doukas maintained residences in Florida, their relationship began and developed there, and Doukas both defrauded Bavelis and was unjustly enriched while he and Bavelis were in Florida. Thus, the mere fact that Bavelis happened to sign the QC Note while he was in Ohio would be too slender a reed on which to conclude that Ohio law applies to Bavelis's claims.

and punitive damages, while troubling, do not alone allow for such an award under Florida law."); *Fin. Bus. Equip. Sols., Inc. v. Quality Data Sys., Inc.*, No. 08–60769–CIV, 2008 WL 4753710, at *5 (S.D. Fla. Oct. 27, 2008).[47]

Furthermore, if the fraud that gave rise to the plaintiff's claim constituted bad faith, then the exception that the *Bitterman* court described as "rarely applicable" would not be so rare—it instead would apply in every case in which a defendant is held liable for fraud. *Cf. Ass'n of Flight Attendants, AFL–CIO v. Horizon Air Indus., Inc.*, 976 F.2d 541, 550 (9th Cir. 1992) (holding that "expanding the [bad faith] exception to encompass cases in which the only bad faith alleged is an element of the cause of action" would improperly "justify an award of fees in every fraud case"). Thus, no Florida court has relied on the fraud that gave rise to the underlying claim as a basis for finding bad faith and awarding attorneys' fees. Indeed, doing so would effectively nullify Florida's adoption of the American Rule. *Cf. Shimman v.*

*Int'l Union of Operating Eng'rs, Local 18*, 744 F.2d 1226, 1232 n.9 (6th Cir. 1984) (en banc) (holding that "[t]he effect of a fee award based on bad faith in the initial wrongdoing would be to punish that conduct," which would not be permissible under the American Rule).

In support of his argument that Doukas's underlying fraud supports an award of attorneys' fees, Bavelis relies on the *Bitterman* court's statement that "[b]ad faith may be found not only in the actions that led to the lawsuit, but also in the conduct of the litigation." Adv. Doc. 674 at 49 (quoting *Bitterman*, 714 So.2d at 365). But given that Florida does not recognize fraud as an exception to the American Rule, it is clear that the phrase "actions that led to the lawsuit" refers to something other than the conduct that gave rise to the plaintiff's claims for relief. *Cf. Horizon Air*, 976 F.2d at 550 (holding that the bad-faith exception for "actions that led to the lawsuit" does not permit "shifting attorney's fees based solely upon a finding of

47. The only context in which a court has suggested that Florida might apply the bad faith exception based on fraud is the probate/family law context. *See Butler*, 2010 WL 599387, at *4 n.3 ("My review of Florida case law fails to reveal any cases in which a jury's finding that a defendant committed fraud and/or breached a fiduciary duty in a real estate transaction resulted in an award of fees based on the defendant's bad conduct. Rather, cases in which inequitable conduct has been found to support such an award appear to be primarily in cases involving probate or family law matters."). That said, the Court is not aware of any Florida decision in which the fraud that gave rise to the underlying claim has been counted as bad faith for purposes of the bad faith exception to the American Rule. In *Bitterman*, on which the party seeking attorneys' fees in *Butler* relied, the Supreme Court of Florida upheld an award against a probate estate of $20,000 of attorneys' fees that a law firm incurred in connection with their efforts to collect the approximately $80,000 of attorneys' fees and

expenses that they were owed as a result of the services they provided to a co-representative of the estate. During the probate case, the co-representative had improperly thwarted settlement attempts, threatened to bring bar complaints against the attorneys and asked them to attempt to void a provision of a will even though he acknowledged that the provision was clear and unambiguous. *See Bitterman*, 714 So.2d at 360–65. The party seeking attorneys' fees in *Butler* relied on two other cases. In one, the contract between the parties provided for the payment of attorneys' fees to the prevailing party. *Johnson v. Davis*, 480 So.2d 625, 626 (Fla. 1986). In the other, the court held that a probate estate was entitled to reasonable attorneys' fees to be paid by a party who filed a forged will with the probate court. *Hoegh v. Estate of Johnson*, 985 So.2d 1185, 1186 (Fla. Dist. Ct. App. 2008) ("Hoegh's attempt to perpetrate a fraud on the court by knowingly seeking to have a forged will admitted to probate constituted egregious conduct.").

bad faith as an element of the cause of action presented in the underlying suit"); *Shimman*, 744 F.2d at 1233 (holding that the bad-faith exception for "actions that led to the lawsuit" does not "allow an award of attorney fees based only on bad faith in the conduct giving rise to the underlying claim").

The phrase "actions that led to the lawsuit" instead encompasses conduct such as "bad faith conduct in filing a frivolous or vexatious lawsuit," *Horizon Air*, 976 F.2d at 550, as well as other "bad faith [that occurs] after the original claim arises" but before the lawsuit is filed, *Shimman*, 744 F.2d at 1232. Bavelis does not specify any such conduct. Instead, the only conduct in which Doukas engaged (after committing his underlying fraud) that Bavelis specifies and attempts to tie to his attorneys' fees is the sanctionable conduct addressed in the Sanctions Opinion. *See* Adv. Doc. 674 at 49 (stating that Doukas's "post-litigation bad faith consisted of, among other things," the conduct that is the subject of the Sanctions Opinion). Other than those misdeeds, Bavelis vaguely mentions only that Doukas engaged in "other" misconduct. But Florida law requires a court to make "an express finding of bad faith conduct . . . supported by detailed factual findings describing the specific acts of bad faith conduct that resulted in the unnecessary incurrence of attorneys' fees." *Moakley v. Smallwood*, 826 So.2d 221, 227 (Fla. 2002). Thus, by merely alluding to unspecified conduct with the use of the phrase "among other things," Bavelis has not provided the Court with the evidence it would need in order to propose factual findings supporting an award of attorneys' fees for bad

faith with the "high degree of specificity" required by Florida law. *Id.* at 227.[48]

■ Following a hearing, Doukas, Quick Capital and Goldstein will be ordered to pay the attorneys' fees that Bavelis incurred as a result of the specific misconduct addressed in the Sanctions Opinion. There is no reason to do so separately here, and the only other conduct on which Bavelis relies for an award of attorneys' fees is the fraud that led to his underlying claims for relief. Thus, including attorneys' fees in a judgment in this adversary proceeding effectively would be awarding attorneys' fees based on the fraudulent conduct itself, in contravention of the Florida decisional authority adopting the American Rule.

### 3. Additional Amounts Sought by Bavelis

■ In seeking compensation for certain interest payments he made after the Petition Date as well as his U.S. Trustee fees and almost all of the professional fees he incurred in connection with his bankruptcy case, Bavelis argues that he would not have needed to file a bankruptcy case were it not for Doukas. But as previously discussed, this argument is too speculative to support an award of damages. *See Grantham & Mann, Inc. v. Am. Safety Prods., Inc.*, 831 F.2d 596, 601–02 (6th Cir. 1987) (holding that the rule against awarding speculative damages "preclude[s] recovery . . . where the damage claimed is not the certain result of the wrong"). Bavelis therefore is not entitled to an award for the additional amounts he seeks.

---

**48.** "Although *Moakley* involved the imposition of fees against an attorney, the procedures described in the case are equally applicable to the assessment of fees against a party." *T/F Sys., Inc. v. Malt*, 814 So.2d 511, 513 (Fla. Dist. Ct. App. 2002); *accord Bank of New York*

*Mellon v. Mestre*, 159 So.3d 953, 957 (Fla. Dist. Ct. App. 2015) (applying *Moakley* to an award of sanctions against a party); *Nedd v. Gary*, 35 So.3d 1028, 1030 (Fla. Dist. Ct. App. 2010) (same).

Bavelis also argues that, as a result of Doukas's fraud and breach of fiduciary duty, he is entitled to recover the amount that Doukas or Quick Capital received from Socal for the assignment of the Quick Capital claim.[49] In so arguing, Bavelis relies on the "doctrine of disgorgement." Adv. Doc. 674 at 38. As Bavelis acknowledges, disgorgement is an equitable remedy. Id. (citing S.E.C. v. Monterosso, 756 F.3d 1326, 1337 (11th Cir. 2014), for the proposition that "[d]isgorgement is an equitable remedy intended to prevent unjust enrichment"). "It is a cardinal principle that the granting of an equitable remedy is ordinarily a matter of discretion, not an arbitrary, capricious discretion, but a sound judicial discretion, controlled by established principles of equity, and exercised upon a consideration of all of the circumstances of each particular case." Valentine Gardens Co-op., Inc. v. Ober-

man, 237 N.Y.S.2d 535, 537 (N.Y. Sup. Ct. 1963). Thus, courts have "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1474–75 (2d Cir. 1996).

Here, it would not be equitable to order disgorgement. In each of the cases cited by Bavelis in which the court actually decided whether disgorgement was appropriate, the defendant's fraud or breach of fiduciary duty deprived the plaintiff of an asset, business opportunity or benefit that should have resulted in a profit for the plaintiff rather than the defendant.[50] That is, the defendant's fraudulent conduct or breach of fiduciary duty deprived the plaintiff of something that, but for the misconduct, might have redounded to the

49. As noted above, Doukas conceded that he received $1.3 million from Socal, and he may have received as much as $1.8 million. Phase II Tr. at 7.

50. See S.E.C. v. Monterosso, 756 F.3d 1326 (11th Cir. 2014) (upholding order directing disgorgement of compensation and other benefits that officer of company received as a result of his fraudulent conduct); Parke v. First Reliance Standard Life Ins. Co., 368 F.3d 999 (8th Cir. 2004) (affirming disgorgement of interest that ERISA plan administrator earned on account of long term disability benefits wrongfully withheld from plaintiffs); Nelson v. Serwold, 576 F.2d 1332 (9th Cir. 1978) (affirming disgorgement of the profit realized by two controlling shareholders upon asset sale of company because they had purchased stock for an artificially low price as a result of their failure to disclose material information in violation of the Securities Exchange Act and SEC Rule 10b–5); Janigan v. Taylor, 344 F.2d 781, 786 (1st Cir. 1965) (holding that, because "the profit was the proximate consequence of the fraud," it was appropriate to order disgorgement of profit realized by president of company upon sale of stock that he had purchased from parties to whom he had made a fraudulent representa-

tion bearing on the value of the stock in violation of the Securities Exchange Act and SEC Rule 10b–5); S.E.C. v. Kamardin, No. 8:07–cv–159–T–24–MAP, 2007 WL 1789113, at *1 (M.D. Fla. June 19, 2007) (ordering disgorgement of profits realized by defendant who "used the internet to participate in a scheme whereby he bought shares of thinly-traded issues while others, acting in concert, surreptitiously usurped the online trading accounts of victim investors at various broker-dealers, liquidated the investors' existing equity positions, and then used the resulting proceeds to purchase thinly-traded stocks in the investors' accounts in order to create the appearance of trading activity and to inflate the price of the stocks"); Daniel v. Falcon Interest Realty Corp., 190 S.W.3d 177 (Tex. Ct. App. 2005) (affirming order directing project manager to disgorge profits he received after failing to disclose to his general contractor that a subcontractor he hired was owned by his family members and that he personally profited from the subcontractor's operations); Phillips Chem. Co. v. Morgan, 440 So.2d 1292, 1293 (Fla. Dist. Ct. App. 1983) (ordering disgorgement of profits that employee received as a result of "transactions he secretly effected between his [employer] and a co-participant [as part of a kickback] scheme").

benefit of the plaintiff. *See, e.g., Nelson,* 576 F.2d at 1340 ("[I]t is appropriate to require the fraudulent buyer to account for his 'ill-gotten profits' derived from an increase in the value of the stock following his acquisition of the stock.... Only in this manner can the seller be put in the position he occupied before the contract was made." (quoting *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1342 (9th Cir. 1976))). The courts applied the disgorgement doctrine in these cases because it both "provides full compensation for injury caused by fraudulent conduct" and "removes all incentive to engage in such conduct." *Id.* at 1338. By contrast, when Doukas fraudulently induced Bavelis to execute the QC Note, he did not deprive Bavelis of an asset; he instead fraudulently caused Bavelis to incur an obligation. Bavelis cites no case authority for the proposition that the remedy of disgorgement should be ordered by a court in this context—that is, when the plaintiff incurred an obligation rather than lost an asset or other benefit.

The QC Note is not an asset that Bavelis could have sold to Socal or any other third party, and thus he did not lose out on the possibility of making a profit from its sale. For this reason, it would not be equitable to order disgorgement under the circumstances of this case.

### 4. Punitive Damages

■ Punitive damages, however, are appropriate here. Bavelis seeks an award of punitive damages based on Doukas's fraudulent conduct. Adv. Doc. 674 at 46–48. The issue of whether punitive damages should be imposed is determined by the law of the state whose substantive law applies to the plaintiff's underlying claim for relief. *See Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 278, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (holding that in any "lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question ... are questions of state law"). Here, the applicable state law is the law of Florida.

As the victim of Doukas's fraud, Bavelis is entitled to punitive damages under Florida law, which provides:

A defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence. As used in this section, the term:

(a) "Intentional misconduct" means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.

Fla. Stat. § 768.72(2).

■ The statutory requisites for the imposition of punitive damages have been met here, as Bavelis has shown by clear and convincing evidence that Doukas was personally guilty of intentional misconduct. Doukas's misconduct included the fraudulent representation that he would return the two checks in the aggregate amount of $116,600 and the fraudulent representations that he would return the Assignments once a deal with Qureshi was finalized. Furthermore, Doukas engaged in this misconduct intentionally within the meaning of Florida law. That is, he possessed actual knowledge of the wrongfulness of his conduct, and he was aware of the high probability that injury or damage to Bavelis would result—in fact, Doukas intended the injury. *See Bavelis I,* 490 B.R. at 318. Despite his knowledge of the wrongfulness of his actions and the harm to Bavelis that

was certain to result from it, Doukas intentionally pursued a scheme to take Bavelis's assets. This misconduct caused Bavelis injury, including the loss of $116,600 and the even greater loss of his indirect membership interests in BMAQ and FLOVEST and his personal 50% membership interest in GMAQ, a limited liability company that owned several million dollars in assets. *See Bavelis I*, 490 B.R. at 267. Given all this, Doukas's fraudulent scheme clearly is sufficient to support an award of punitive damages under Florida law. *See W.R. Grace & Co. v. Waters*, 638 So.2d 502, 503 (Fla. 1994) ("Punitive damages are appropriate when a defendant engages in conduct which is fraudulent[.]").

Doukas's only argument against the imposition of punitive damages is this: "To the extent that Plaintiff argues that Mr. Doukas attempted to defraud Mr. Bavelis, there is nothing in evidence to suggest that such fraud would have been anything other than a self-interested business strategy." Adv. Doc. 677 at 46. Of course, fraud is not a business strategy. And the fact that a defendant's fraudulent conduct is based on self-interest—which is almost always the case—is not a defense to an award of punitive damages.

■■■■ The next question is the amount of punitive damages that should be imposed. In determining the appropriate amount of punitive damages, the Court recognizes that "the purpose of punitive damages is not to further compensate the plaintiff, but to punish the defendant for its wrongful conduct and to deter similar

misconduct by it and other actors in the future." *Owens–Corning Fiberglas Corp. v. Ballard*, 749 So.2d 483, 486 (Fla.1999). Doukas has said that his business is "creat[ing] a leverage that you can negotiate so it will make money" and that he "take[s] [his] chances and always win[s]." *Bavelis I*, 490 B.R. at 268, 274. In order to be sufficiently deterred, Doukas must be made to understand that fraud and confidence games—including those based on ethnic and purported religious affinity—are not winning strategies.[51] Nothing less than a substantial punitive damages award will achieve that goal. Thus, the Court concludes that a punitive damages award of at least $1 million is appropriate and will serve the requisite deterrent purpose. In addition, for the reasons explained below, an award of $1 million in punitive damages is proper under Florida law.

Although Florida law imposes caps on punitive damages under certain circumstances, Fla. Stat. § 768.73(1)(a)–(b), it imposes no cap "[w]here the fact finder determines that at the time of injury the defendant had a specific intent to harm the claimant and determines that the defendant's conduct did in fact harm the claimant." Fla. Stat. § 768.73(1)(c). Doukas no doubt intended to harm Bavelis, for, as the Court found in *Bavelis I*, he "intended to take advantage of Mr. Bavelis and deprive him of his assets." *Bavelis I*, 490 B.R. at 318. In addition, Doukas's conduct did in fact harm Bavelis by depriving him of $116,600, as well as his indirect interests in BMAQ and FLOVEST and his

---

**51.** Bavelis and the other Plaintiffs are not the only targets of Doukas's fraudulent conduct. As noted above, Doukas not only engaged in confidence schemes with Bavelis, he also attempted to do so with Qureshi. *See Bavelis I*, 490 B.R. at 271 n.5 ("Doukas took a similar approach during negotiations that he later undertook with ... Qureshi. Among other things ... Doukas advised ... Bavelis that he

was praying with ... Qureshi ... and learning the Koran, stating [about] ... Qureshi that 'he thinks him and me are together.' "). And as discussed in the Sanctions Opinion, Doukas permitted his counsel to mislead an attorney for another creditor, Independent Bankers' Bank of Florida ("IBB"), during negotiations over R.P.M.'s purchase of IBB's claim against Bavelis.

direct interest in GMAQ. On top of those significant economic injuries, the trust and confidence Bavelis placed in Doukas was betrayed. *See id.* at 305.

 Under these circumstances, the punitive damages available under Florida law are uncapped, and a punitive damages award of $1 million is appropriate.[52] *See Flying Fish Bikes, Inc. v. Giant Bicycle, Inc.*, 181 F.Supp.3d 957 (M.D. Fla. 2016). In *Flying Fish Bikes*, the district court held that Florida law imposed no cap on punitive damages and that an award of $3 million in punitive damages was appropriate in a case where the defendant "tactically and deceptively" induced the plaintiff to purchase goods from the defendant by "pledging continued loyalty" to the plaintiff while "simultaneously scheming" to take actions that would undermine the plaintiff's business. *Id.* at 961, 974. Doukas's fraudulent scheme was no less egregious.

 Finally, the Court must assess whether a $1 million punitive damages award would be considered excessive from a federal constitutional standpoint, that is whether it is "so 'grossly excessive' as to violate the Due Process Clause of the Fourteenth Amendment." *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 458,

113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); *see also Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1218–23 (11th Cir. 2010) (applying the Supreme Court's approach to evaluating excessiveness); *Engle*, 945 So.2d at 1263–64 (adopting the federal approach for the purpose of evaluating the excessiveness of punitive damages in Florida). The Supreme Court has adopted three guideposts for evaluating whether an award is grossly excessive: "the degree of reprehensibility of the [defendant's actions]; the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *B.M.W. of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

 The guidepost of reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award[.]" *Id.* at 575, 116 S.Ct. 1589. The factors that are relevant to that guidepost are whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had finan-

---

**52.** Under Florida law, "evidence of financial worth is admissible [as to the] determination of the amount to be awarded as punitive damages, but evidence of worth is not a requisite to such award." *Rinaldi v. Aaron*, 314 So.2d 762, 765 (Fla. 1975). Thus, it is incumbent on the defendant to produce evidence that a punitive damages award would exceed his ability to pay. *See id.; Bould v. Touchette*, 349 So.2d 1181, 1187 (Fla. 1977) ("In the absence of any evidence as to the net worth of [the defendant], we cannot say that the [punitive damages] award was excessive"). Doukas did not present any such evidence. Furthermore, under Florida law, although "a finding of liability is required before entitlement to punitive damages can be determined," a

"finding of entitlement to punitive damages is not dependent on a finding that a plaintiff suffered a specific injury" and "an award of compensatory damages [therefore] need not precede a determination of entitlement to punitive damages." *Engle v. Liggett Grp., Inc.*, 945 So.2d 1246, 1263 (Fla. 2006). That said, the Court has determined that Bavelis is entitled to compensatory damages in the amount of $116,600 and also anticipates that Bavelis will be entitled to a substantial award of attorneys' fees following the hearing on the amount of sanctions that should be imposed against Doukas, Quick Capital and Goldstein as a result of the conduct described in the Sanctions Opinion.

cial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

Applying these factors, there can be no doubt that Doukas's conduct was sufficiently reprehensible to support the conclusion that a punitive damages award of $1 million is not excessive. While the harm Bavelis experienced was primarily economic in nature, Doukas did exhibit indifference towards Bavelis's health. After all, Doukas continued on his fraudulent course even after acknowledging that the stress Bavelis was under was going to make Bavelis "sick." *Bavelis I*, 490 B.R. at 272. Moreover, the harm Doukas inflicted on Bavelis was the result of intentional malice and fraud. The Supreme Court has upheld large punitive damages awards in such cases. *See TXO*, 509 U.S. at 462, 113 S.Ct. 2711 (upholding $10 million punitive damages award in case involving a "pattern of fraud, trickery and deceit").

The second guidepost—the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award—also supports a substantial award of punitive damages. Doukas misappropriated Bavelis's indirect interests in three of the Bavelis–Qureshi LLCs and his personal 50% stake in a company—GMAQ—that was the owner of millions of dollars of assets at the time Doukas fraudulently induced Bavelis to assign his interest in GMAQ to R.P.M. and Nemesis. Moreover, "punitive damages awards can match the scale of the attempted swindle," *Willow Inn, Inc. v. Public Serv. Mut. Ins. Co.*, 399 F.3d 224, 234 (3d Cir. 2005), and the harm to Bavelis could have been even greater, for Doukas attempted (albeit unsuccessful-

ly) to induce Bavelis to execute an agreement transferring his interest in more than 20 partnerships of which Bavelis was a partner to a Nevada corporation that Doukas was proposing to form with directors that Bavelis did not know. *Bavelis I*, 490 B.R. at 278, 288. And although Bavelis is not able to recover his attorneys' fees under Florida law for the reasons stated above, the actual harm to Bavelis in fact also includes the substantial fees that Bavelis has paid his attorneys litigating with Doukas in the bankruptcy case and the adversary proceeding. Thus, the punitive damages award does not exceed the harm suffered by Bavelis and the potential harm that Doukas attempted to inflict on him—it is, in fact, much less. Finally, because it does not appear that civil penalties are imposed in fraud cases such as this under Florida law, the third Supreme Court guidepost is inapplicable. *Cf. Adidas Am., Inc. v. Payless Shoesource, Inc.*, No. CV 01–1655–KI, 2008 WL 4279812, at * 16 (D. Ore. Sept. 12, 2008) ("The parties both agree that the … guidepost [of] civil penalties in comparable cases, does not apply because there are no statutory penalties for trademark infringement."). In short, ordering Doukas to pay $1 million dollars in punitive damages serves the deterrent purpose of such damages and is consistent with the Federal Constitution and Florida law. Accordingly, a judgment requiring Doukas to pay Bavelis $1 million in punitive damages should be entered.

## VI. Conclusion and Notice

Based on the foregoing, the Court recommends that the District Court enter a final judgment in favor of the Plaintiffs: (a) declaring that the Assignments were fraudulently induced by Doukas, (b) rescinding the Assignments and the Subsequent Transfers; (c) awarding Bavelis compensatory damages in the amount of $116,600 and punitive damages in the

amount of $1 million; and (d) dismissing Count Five, Count Eight, Count Fourteen and the Moot Claims.

In accordance with Bankruptcy Rule 9033(a), the Clerk shall cause copies of these proposed findings of fact and conclusions of law to be served on all parties to the adversary proceeding by mail and shall note the date of mailing on the docket. Under Bankruptcy Rule 9033(b), "a party may serve and file with the [C]lerk written objections which identify the specific proposed findings or conclusions objected to and state the grounds for such objection," and must, unless a request for an extension is timely made and granted under Bankruptcy Rule 9033(c), do so "[w]ithin 14 days after being served with a copy of the proposed findings of fact and conclusions of law." Fed. R. Bankr. P. 9033(b). Failure to file objections within the specified 14–day time period may constitute a waiver of the right to appeal an order of the District Court regarding this Court's proposed findings of fact and conclusions of law. *See Monge v. Rojas (In re Monge),* 826 F.3d 250, 255 (5th Cir. 2016); *Nantahala Vill., Inc. v. NCNB Nat'l Bank of Fla. (In re Nantahala Vill., Inc.),* 976 F.2d 876, 880 (4th Cir.1992). If any objections are filed, "[a] party may respond to another party's objections within 14 days after being served with a copy thereof." Fed. R. Bankr. P. 9033(b).

The Clerk is hereby directed to transmit these proposed findings of fact and conclusions of law to the Clerk of the District Court for the Southern District of Ohio, Eastern Division, for assignment to a District Judge. The Clerk shall defer transmittal of the proposed findings of fact and conclusions of law to the District Court until such time as they have been served upon all parties and the objection and response periods prescribed by Bankruptcy Rule 9033 have expired.

**IT IS SO ORDERED.**

### APPENDIX A

*Bavelis v. Doukas (In re Bavelis),* 490 B.R. 258 (Bankr. S.D. Ohio 2013)

will be made in the context of an adversary proceeding.

SO ORDERED.

**In re George A. BAVELIS, Debtor.**

**George A. Bavelis, Plaintiff,**

v.

**Ted Doukas, et al., Defendants.**

**Bankruptcy No. 10–58583.**

**Adversary No. 10–2508.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

March 28, 2013.

**Background:** Individual Chapter 11 debtor objected to proofs of claim filed by former friend, and sought to have claims disallowed on lack of consideration, payment, failure of consideration, and fraudulent inducement theories.

**Holdings:** The Bankruptcy Court, John E. Hoffman Jr., J., held that:

(1) evidence that individual Chapter 11 debtor had repaid the entire amount loaned prepetition by creditor filing proof of claim based on their prepetition loan agreement, albeit by payment coming from company account rather than from debtor personally, was sufficient to establish affirmative defense of payment;

(2) evidence also supported failure of consideration defense;

(3) evidence supported inference that creditor never intended to perform as promised and, to extent that debtor justifiably relied thereon to his detriment, would support disallowance of creditor's claim on fraud in the inducement theory; and

(4) creditor stood in "fiduciary" relationship with debtor, such that debtor had no obligation to conduct any investigation in order to justifiably rely on creditor's promises.

Claims disallowed.

**1. Bankruptcy ⟨⟩2926, 2928**

Proof of claim executed and filed in accordance with Bankruptcy Rules is prima facie evidence of validity and amount of claim, and initial burden of making a colorable challenge to properly filed proof of claim is on objecting party. Fed.Rules Bankr.Proc.Rule 3001(f), 11 U.S.C.A.

**2. Bankruptcy ⟨⟩2926**

Generally, once objecting party has overcome prima facie effect of properly filed proof of claim, burden of going forward shifts to creditor, and creditor also bears ultimate burden of persuasion. Fed. Rules Bankr.Proc.Rule 3001(f), 11 U.S.C.A.

**3. Bankruptcy ⟨⟩2926**

If debtor's objection to proof of claim is based on affirmative defense for which debtor would have burden of proof outside bankruptcy, debtor must carry that same burden of proof in prosecuting claim objection.

**4. Bankruptcy ⟨⟩2002**

When the Bankruptcy Code does not specifically address issue that arises in bankruptcy, bankruptcy court looks to state law, to extent that it does not conflict with the Code.

**5. Contracts ⟨⟩15, 47**

Under both New York and Ohio law, formation of contract requires a manifestation of mutual assent and consideration.

**6. Contracts ⟨⟩15**

Under Ohio law, "manifestation of mutual assent," of kind required for formation of contract, means that each party either must make a promise, or begin or render a performance.

See publication Words and Phrases for other judicial constructions and definitions.

**7. Contracts ⟨⟩15**

Under both New York and Ohio law, "manifestation of mutual assent," of kind required for formation of contract, may be made wholly or partly by written or spoken words, or by other acts, or by failure to act.

**8. Secured Transactions ⟨⟩50**

Parties' execution of loan documents, pursuant to which one party agreed to lend $200,000 to the other, and their execution of security agreement to secure other party's implicit promise to repay sums lent, together with their subsequent performance in advancing and repaying funds, was sufficient manifestation of their mutual assent to enter into loan transaction, as required under both New York and Ohio law to give rise to binding contract between them.

**9. Bills and Notes ⟨⟩92(10)**

Under both New York and Ohio law, one party's promise to advance at least $200,000 to the other, and other party's implied promise to repay any amounts ac-

tually advanced, as well to enter into security agreement, were mutual promises constituting "consideration," of kind required to support promissory note and loan agreement.

**10. Contracts ⟷47**

Under both New York and Ohio law, gratuitous promises are not enforceable as contracts, because there is no consideration.

**11. Contracts ⟷50**

Under both New York and Ohio law, desire to help cannot be "consideration" for contract; rather, it is merely a motive.

> See publication Words and Phrases for other judicial constructions and definitions.

**12. Bankruptcy ⟷2926, 2927**

Individual Chapter 11 debtor, as party objecting to contract-based claim by asserting affirmative defense of payment, bore burden of proof thereon, and had to carry that burden by preponderance of evidence.

**13. Bankruptcy ⟷2825, 2927**

Evidence that individual Chapter 11 debtor had repaid the entire amount loaned prepetition by creditor filing proof of claim based on their prepetition loan agreement, albeit by payment coming from company account rather than from debtor personally, was sufficient to establish affirmative defense of payment and to thus require disallowance of creditor's proof of claim as unenforceable under applicable nonbankruptcy law. 11 U.S.C.A. § 502(b)(1).

**14. Bankruptcy ⟷2926, 2927**

Individual Chapter 11 debtor, as party objecting to contract-based claim by asserting affirmative defense of failure of consideration, bore burden of proof thereon, and had to satisfy that burden by preponderance of evidence.

**15. Contracts ⟷83**

Under both New York and Ohio law, "failure of consideration" exists when promise has been made to support contract, but that promise has not been performed.

> See publication Words and Phrases for other judicial constructions and definitions.

**16. Contracts ⟷86**

Under both New York and Ohio law, when there is failure of consideration, other party to contract is excused from further performance.

**17. Bankruptcy ⟷2825, 2927**

Evidence that, while promising to make his assets available to acquire nonperforming loans of individual Chapter 11 debtor's closely owned bank and to assist debtor in restructuring his affairs, and while also promising to assist debtor with estate planning and in negotiating dispute with debtor's business partner on terms favorable to debtor, individual had never acquired these nonperforming loans or provided assistance with any such restructuring and that assets which he proposed to make available for these purposes were inadequate in any event, that individual was not qualified to provide estate planning services and did not in fact do so, and that he used promises of assistance in negotiating with business partner to convince debtor to grant him interests in the businesses, ostensibly so that business partner would take him seriously during

negotiations, supported failure of consideration defense, and required disallowance of proof of claim based upon $14 million note that debtor had executed in exchange for these unperformed promises of assistance, as unenforceable under applicable nonbankruptcy law. 11 U.S.C.A. § 502(b)(1).

**18. Fraud ⊛3**

Under New York law, elements of fraudulent inducement claim are a representation of material fact, falsity of that representation, knowledge by party who made representation that it was false when made, justifiable reliance by plaintiff, and resulting injury.

**19. Contracts ⊛328(1)**

Under Ohio law, elements of defense of fraudulent inducement to contract-based claim are: (1) actual or implied false representation concerning a fact or, when there is duty to disclose, concealment of fact, (2) which is material to transaction; (3) knowledge of falsity of that representation or such recklessness or utter disregard for its truthfulness that knowledge may be inferred; (4) intent to induce reliance on representation; (5) justifiable reliance; and (6) injury proximately caused by that reliance.

**20. Fraud ⊛50, 58(1)**

Under both New York and Ohio law, burden of proof, by clear and convincing evidence, rests with party asserting fraudulent inducement.

**21. Fraud ⊛30, 32**

Under New York law, false representation, of kind required to support fraudulent inducement claim, can be made by party to contract or by person acting on behalf of party.

**22. Contracts ⊛94(1)**

Under Ohio law, promise made with present intention not to perform is misrepresentation of existing fact, and if such a false representation induces other party to enter into contract, then contract may be voided.

**23. Bills and Notes ⊛103(1)**

Under both New York and Ohio law, fraudulent inducement is valid defense to action by holder of negotiable instrument to enforce the instrument.

**24. Fraud ⊛12**

Under New York law, statement of present intention is deemed a statement of material existing fact, sufficient to support fraud action.

**25. Fraud ⊛32**

Under New York law, false promise can support fraud claim only if promise was collateral or extraneous to terms of parties' agreement, that is, if promise involves duty separate from, or in addition to, that imposed by contract.

**26. Bankruptcy ⊛2825, 2926**

Evidence presented in contested matter arising out of individual Chapter 11 debtor's objection to creditor's proof of claim, that assets which creditor promised to make available to assist debtor in restructuring his debts were wholly inadequate for that purpose and would not have been accepted as such by any reasonable lender, that creditor was also unqualified to provide estate planning services that he promised and had never provided such services in past, and that creditor, far from representing debtor in negotiations with business partner in manner resulting in favorable resolution for debtor, had used these promises of assistance to induce debtor to

grant him interests in debtor's businesses, ostensibly so that business partner would take him seriously during negotiations, supported inference that creditor never intended to perform as promised and, to extent that creditor's promises were material and debtor justifiably relied thereon to his detriment, would support fraud in the inducement defense to proof of claim based on $14 million promissory note that debtor executed in exchange for these unperformed promises. 11 U.S.C.A. § 502(b)(1).

**27. Fraud ⊕⫸12**

Inference that promisor never intended to fulfill his promise, such as will support promissory fraud claim under New York law, should not be based solely on assertion that the promise was not, in fact, fulfilled, but nonfulfillment of promise is factor to be considered.

**28. Fraud ⊕⫸12**

Under both New York and Ohio law, present intention not to fulfill promise, of kind required to support promissory fraud claim, is generally inferred from surrounding circumstances, since people do not ordinarily acknowledge that they are lying.

**29. Fraud ⊕⫸18**

Under New York law, there is both an objective and subjective component of analysis into whether false representation was material, as required to support fraudulent inducement claim.

**30. Fraud ⊕⫸18**

Under Ohio law of fraud in the inducement, fact is "material" if it is likely, under the circumstances, to affect conduct of reasonable person with reference to transaction, unless the individual responsible for misrepresentation is aware that the recipient is peculiarly disposed to attach impor-

tance to a particular subject, in which case misrepresentation should be deemed "material," regardless of its significance to a reasonable person under similar circumstances.

See publication Words and Phrases for other judicial constructions and definitions.

**31. Fraud ⊕⫸18**

Regardless of whether putative friend's false promises of assistance in making his assets available to acquire nonperforming loans of closely held bank, and to assist bank's owner in restructuring his affairs, in estate planning, and in negotiating with his partner in other businesses, would have affected conduct of reasonable individual, by inducing him to grant this putative friend an interest in his businesses and to execute promissory note in friend's favor, false promises had to be deemed "material," as required under New York and Ohio law to support fraudulent inducement claim, given putative friend's awareness of precarious financial condition of bank and of importance to bank owner of preserving bank.

**32. Fraud ⊕⫸20**

Under both New York and Ohio law, determining whether a party's reliance on alleged fraudulent misrepresentation was justifiable requires review of all the facts and circumstances.

**33. Fraud ⊕⫸23**

Factors considered by New York courts when conducting justifiable-reliance analysis in fraud action include level of sophistication of parties, relationship between them, and information available at time of the operative decision.

**34. Fraud ⊸20, 23**

In conducting justifiable-reliance analysis in fraud case, Ohio courts consider the various circumstances involved, such as nature of transaction, form and materiality of representation, relationship of parties, their respective intelligence, experience, age, and mental and physical condition, and their respective knowledge and means of knowledge.

**35. Fraud ⊸23**

Financially troubled individual who was faced with loss of bank that he owned as result of several nonperforming loans "justifiably relied" on promises by putative friend and business advisor to provide assistance by making his assets available to acquire these nonperforming loans and to assist with restructuring of debts and negotiations with business partner, when he agreed to execute promissory note in favor of friend and to gratuitously grant friend a part interest in his businesses, which friend had requested so that business partner would take friend seriously during negotiations; while this reliance may not have been justifiable, as required to support fraudulent inducement claim, if parties were dealing at arm's length, putative friend had cultivated a close personal relationship based on parties' common Greek heritage and persuaded individual to rely on his purported experience and expertise in restructuring debts, as corroborated by his apparent wealth.

See publication Words and Phrases for other judicial constructions and definitions.

**36. Fraud ⊸22(1)**

Under New York law, in order for a party's reliance on alleged fraudulent misrepresentation to be considered "justifiable," there is generally duty to review documents or other information to which party has access.

See publication Words and Phrases for other judicial constructions and definitions.

**37. Fraud ⊸22(1)**

Under New York, there is no duty to investigate as prerequisite to establishing the justifiable reliance that is required for fraud claim if there is fiduciary relationship between parties.

**38. Fraud ⊸7**

Under New York law, "fiduciary" relationship is one founded upon trust or confidence reposed by one person in integrity and fidelity of another.

See publication Words and Phrases for other judicial constructions and definitions.

**39. Fraud ⊸7**

Under New York law, "fiduciary" relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed.

**40. Fraud ⊸7**

Under New York law, "fiduciary" relationships include both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another.

**41. Fraud ⊸7**

Under Ohio law, "fiduciary" relationship is one in which special confidence and trust is reposed in integrity and fidelity of another, and there is a resulting position of superiority or influence, acquired by virtue of this special trust.

**42. Fraud ⊕⊸7**

Under Ohio law, "fiduciary" relationship need not be created by contract, but may arise out of informal relationship in which both parties understand that special trust or confidence has been reposed.

**43. Fraud ⊕⊸7**

Under both New York and Ohio law, defining qualities of "fiduciary" relationship are the trust and confidence that one party places in another and resulting influence exercised by person in whom the trust and confidence is placed.

**44. Fraud ⊕⊸64(1)**

Question of whether fiduciary relationship exists between two parties is issue of fact under both New York and Ohio law.

**45. Fraud ⊕⊸22(1)**

Promisor, having cultivated close personal relationship with promisee based upon their common Greek heritage and purportedly similar religious beliefs, such that parties regularly held themselves out as "brothers," and having persuaded promisee to rely on his purported expertise and extensive experience in restructuring debts, as corroborated by his ability to deposit large sums of money in promisee's bank, had to be regarded as standing in "fiduciary" relationship to promisee, so that promisee had no obligation under either New York or Ohio law to conduct any investigation prior to agreeing, in exchange for promisor's putative assistance in restructuring his financial affairs and in negotiating dispute with business partner, to execute $14 million promissory note in promisor's favor and to grant him interest in promisee's businesses, ostensibly to assist during negotiations with business partner.

**46. Fraud ⊕⊸7**

While close friendship or personal connections between parties are themselves insufficient to create "fiduciary" relationship under New York law, such a close connection is a factor to be considered in determining whether fiduciary relationship exists.

**47. Fraud ⊕⊸22(1)**

Even assuming that parties' close personal relationship and first party's reliance on second party's purported experience and financial expertise was insufficient to place them in "fiduciary" relationship, nature of second party's allegedly fraudulent misrepresentations, in promising to provide future assistance to first party with restructuring his debts and in negotiating favorable resolution of dispute with business partner, were such that first party had no obligation to investigate as prerequisite to justifiably relying thereon; no documents or other information available to first party would have revealed that second party did not intend to keep these promises.

**48. Fraud ⊕⊸22(1)**

Under New York fraud law, plaintiff's failure to investigate will not preclude finding of "reasonable reliance" where the facts allegedly misrepresented are peculiarly within defendant's knowledge, and plaintiff has no independent means of ascertaining the truth; in such circumstances, reasonable reliance may be found even where the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty.

See publication Words and Phrases for other judicial constructions and definitions.

**49. Bankruptcy ⟨⟩2825, 2927**

Evidence presented in contested matter arising out of individual Chapter 11 debtor's objection to creditor's proof of claim, that debtor executed $14 million promissory note in justifiable reliance on promises made by putative friend and business advisor who had assiduously cultivated close relationship with debtor and his wife, sufficiently established resulting injury, and supported disallowance of proof of claim that was based on this note, as unenforceable under nonbankruptcy law on fraudulent inducement theory. 11 U.S.C.A. § 502(b)(1).

**50. Securities Regulation ⟨⟩299**

Three-day right of rescission available under Florida law to purchasers of securities exempt from registration began to run on purchaser's receipt of letter notifying him of his right to rescind after he had tendered funds to acquire stock in closely owned bank holding company, and not from date that he later received stock certificate. West's F.S.A. § 517.061(11)(a)(5).

Marion H. Little, Jr., Zeiger, Tigges & Little LLP, Columbus, OH, for Plaintiff.

Gary A. Goldstein, Baltimore, MD, Steven Newburgh, Steven S. Newburgh, P.A., West Palm Beach, FL, for Defendant.

John M. Stravato, Melville, NY, pro se.

*MEMORANDUM OPINION ON DEBTOR'S OBJECTION TO PROOFS OF CLAIM OF QUICK CAPITAL OF L.I. CORP.*

JOHN E. HOFFMAN JR., Bankruptcy Judge.

## I. Introduction

The issue before the Court is whether Quick Capital of L.I. Corp. ("Quick Capital") or any entity affiliated with it holds a claim against the Chapter 11 bankruptcy estate of George A. Bavelis ("Mr. Bavelis" or "Debtor"). Ted Doukas, a/k/a Leftheris Doukas ("Mr. Doukas"), the president and sole shareholder of Quick Capital, asserts that Quick Capital has a secured claim against Mr. Bavelis based on a promissory note ("QC Note"), a loan agreement ("QC Loan Agreement") and a security agreement ("QC Security Agreement" and, together with the QC Note and the QC Loan Agreement, "QC Loan Documents") that Mr. Bavelis signed in June 2009. Quick Capital filed an original proof of claim for a lesser amount ("Original Proof of Claim"), but then filed an amended proof of claim, Claim No. 49–2 ("Amended Proof of Claim" and, together with the Original Proof of Claim, "Proofs of Claim"), in the amount of $14 million plus interest.

Although claims based on promissory notes and loan agreements are relatively commonplace in bankruptcy, there is nothing ordinary about the facts that gave rise to Quick Capital's purported claim. Mr. Doukas himself concedes that Quick Capital lent Mr. Bavelis no funds. Rather, he contends that the consideration provided for the QC Loan Documents was fourfold: (1) a $200,000 loan provided by means of a check that one of Mr. Doukas's other companies, Nemesis of L.I. Corp. ("Nemesis"), issued to Mr. Bavelis; (2) approximately $1.4 million of funds that Mr. Doukas transferred from certain bank accounts to purchase stock in Sterling BancGroup Inc. ("Sterling Holding"), allegedly on behalf of Mr. Bavelis; (3) Mr. Doukas's promise to pledge his assets to help resolve Mr. Bavelis's financial problems and to purchase nonperforming loans of Sterling Holding's banking subsidiary, Sterling Bank of Palm Beach County, Florida ("Sterling Bank"); and (4) Mr. Doukas's promise to provide consulting and management services to

Mr. Bavelis, including attempting to resolve disputes with one of Mr. Bavelis's business partners, Mahammad A. Qureshi ("Mr. Qureshi"), in a manner that would be in the best interests of Mr. Bavelis. In the alternative, Quick Capital argues that, if Mr. Doukas in fact purchased the shares of stock in Sterling Holding on his own behalf and not on behalf of Mr. Bavelis, then Mr. Doukas personally has a claim against Mr. Bavelis under Florida state law regulating the sale of securities.

Mr. Bavelis takes the position that he owes nothing to Mr. Doukas or his companies. According to Mr. Bavelis, Mr. Doukas took advantage of, among other things, their shared Greek heritage; the close friendship that quickly developed between Mr. Doukas and Mr. Bavelis and his wife, Georgia Gia Bavelis ("Mrs. Bavelis"), after they first met Mr. Doukas in early 2009; Mr. Bavelis's need to complete his estate planning; and the desire on Mr. Bavelis's part to save the failing Sterling Bank and to extricate himself from the strained business relationship with Mr. Qureshi.

Based on the documentary evidence and the testimony of multiple witnesses, the Court concludes that the Proofs of Claim must be disallowed and that neither Mr. Doukas nor any of his companies has a claim against Mr. Bavelis or his bankruptcy estate. First, Mr. Bavelis repaid the funds that Nemesis advanced to him. Second, neither Mr. Doukas nor any of his companies provided the other consideration allegedly supporting the QC Loan Documents. In this regard, the Court finds that Mr. Doukas purchased shares in Sterling Holding on his own behalf, not on behalf of Mr. Bavelis; that the assets that Mr. Doukas purportedly made available to

restructure Mr. Bavelis's financial situation and/or to purchase nonperforming loans of Sterling Bank were never effectively used for that purpose; and that neither Mr. Doukas nor his companies ever provided consulting, management or estate planning services of any value, but instead perpetrated a scheme designed to deprive Mr. Bavelis of substantially all of his assets. In fact, Mr. Doukas made several representations that fraudulently induced Mr. Bavelis to sign the QC Loan Documents. Finally, the argument that Mr. Doukas personally has a claim against Mr. Bavelis based on Mr. Doukas's purchase of stock in Sterling Holding is without merit.

This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the Court's findings of fact are determined to be conclusions of law, they are adopted as such; likewise, to the extent any of the Court's conclusions of law are determined to be findings of fact, they are adopted as such.

## II. Jurisdiction

The Court has jurisdiction to hear and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(B).

## III. Findings of Fact

Based on the evidence adduced at trial,[1] including the documentary evidence and the testimony presented, and having considered the demeanor and credibility of the witnesses, the Court makes the findings of fact set forth below.

1. The trial spanned four days, and its transcript exceeds 1,000 pages. The transcript was filed in four parts: pages 1–378 at Doc. 196, pages 379–639 at Doc. 197, pages 640–971 at Doc. 198 and pages 972–1,138 at Doc. 199.

## A. Events Occurring Before the Execution of the QC Loan Documents

### 1. Mr. Bavelis's Real Estate and Banking Businesses

This is the story of how Mr. Bavelis came to trust Mr. Doukas enough to issue one of his companies a multimillion dollar promissory note and how Mr. Doukas later took advantage of that trust. It is difficult to understand why Mr. Bavelis allowed himself to become so closely involved with Mr. Doukas without knowing something of Mr. Bavelis's background before the two men met. Mr. Bavelis was born in Greece in 1937 and emigrated to the United States in 1958. Tr. at 451–52. After obtaining a scholarship and earning a degree from the University of Arkansas in mechanical engineering, he began working as an engineer in Arkansas. Tr. at 452–53. He and Mrs. Bavelis (who also was born in Greece) married in 1964 and moved in 1969 to Columbus, Ohio, where Mr. Bavelis continued his work as an engineer. Tr. at 380; 453. In 1971, he began subleasing rental properties and thereafter purchased apartment buildings to lease. Tr. at 453–54; 493. In 1973, he became a real estate broker. Tr. at 454.

By sometime in 1975, Mr. Bavelis no longer worked as an engineer, but instead was engaged full time in the real estate business. Tr. at 454. He organized Pella Company, a Columbus real estate investment and management company, Debtor's Ex. 118 at 6, and over the years formed more than 30 real estate investment partnerships operating in Columbus ("Ohio Partnerships"). Tr. at 454–55. Mr. Bavelis personally guaranteed the mortgage debt incurred by the Ohio Partnerships. Tr. at 465–66.

In 1996, Mr. Bavelis and other investors acquired Sterling Bank. Tr. at 226–27; 456; Debtor's Ex. 118, Confidential Memorandum Summary at 1. A federally-chartered savings bank, Sterling Bank converted into a commercial bank chartered by the State of Florida in 2004. Debtor's Ex. 118 at 1. Mr. Bavelis was a director of Sterling Bank and also was the chairman of the board, chief executive officer and president of its parent, Sterling Holding. Debtor's Ex. 118 at 6. At one point, Mr. Bavelis and members of the Bavelis family, directly and through trusts, owned somewhere between 52–55% of Sterling Holding. Tr. at 177; 458.

### 2. The Debtor's Relationship with Mr. Qureshi

In the early 2000s, a Sterling Bank lending officer suggested that Mr. Bavelis meet Mr. Qureshi, a customer of Sterling Bank, because Mr. Bavelis owned interests in six or seven gas stations, and Mr. Qureshi held interests in over 100 gas stations. Tr. at 458–59. The meeting went well, and the two men decided to go into business together. Tr. at 459. As Mr. Bavelis put it, "[Mr. Qureshi] came to my office and we met and we talked about what he was doing and what I was doing in the gas stations." Tr. at 459:11–13. "And we hit it [off] pretty well there, I thought he was a very nice guy and we kept talking and at some point we said, 'Why don't we just buy some gas stations together, invest some money together.' And we decided to get into the partnerships." Tr. at 459:13–18. From 2004 to 2007, Mr. Bavelis and Mr. Qureshi worked together to form limited liability companies for the purpose of investing in not only gas stations, but also office buildings and mixed-use real estate developments.

The result was an alphabet soup of companies. First, there was FLOMAQ, LLC ("FLOMAQ"), which was owned 50% by FLOHIO, LLC ("FLOHIO"), an Ohio lim-

ited liability company in which Mr. Bavelis had an indirect interest, and 50% by MAQ Management, Inc. ("MAQ Management"), named with the initials of its president, Mr. Qureshi. Tr. at 459–60. The successor in interest to FLOMAQ was FLOVEST, LLC ("FLOVEST"), formed in 2004 by equal members MAQ Management and FLOHIO. Tr. 461; Debtor's Ex. 14. The members of FLOHIO were Bavelis Family, LLC ("Bavelis Family"), Yessios Limited Partnership and Vakaleris Family Limited Partnership, with each owning one-third of FLOHIO. The Bavelises' three daughters each owned 30% of Bavelis Family, with Mr. Bavelis and Mrs. Bavelis each owning 5%. Mr. Bavelis was the manager of FLOHIO. Tr. at 460.

After FLOVEST came BMAQ, LLC ("BMAQ"), formed in 2005 by equal members Bavelis Family and Qureshi Family, LLC ("Qureshi Family"), of which Mr. Qureshi was a manager. Debtor's Ex. 15; Tr. at 461. Next there was GMAQ, LLC ("GMAQ"), formed in 2006 by equal members Mr. Bavelis and Mr. Qureshi. Debtor's Ex. 16; Tr. at 461. Finally, George Real Estate Holdings, LLC ("George Real Estate") was formed. Tr. at 461–62. The original members of George Real Estate were Mr. Bavelis and an individual affiliated with Mr. Qureshi. However, an unsigned, amended and restated operating agreement submitted by the parties suggests that GMAQ later became the sole member of George Real Estate. Debtor's Ex. 17. The limited liability companies formed by Mr. Bavelis and Mr. Qureshi will be collectively referred to as the "Bavelis–Qureshi LLCs."

FLOVEST eventually became the owner of several properties, including a gas station in Indiana, a truck stop in Ohio and an office building and several parcels of land in Florida. It also began developing a shopping center in Lake Mary, Florida that the parties referred to as the "Lake Mary Project." Tr. at 463. BMAQ acquired four gas stations as well as land in Florida and Georgia. Tr. at 462–63. In order to finance these projects, Mr. Bavelis and Mr. Qureshi caused FLOVEST and BMAQ to obtain loans from various lenders, Tr. at 463–64, including Fifth Third Bank ("Fifth Third"), First Southern Bank ("First Southern"), Colonial Bank, N.A. ("Colonial Bank") and Heartland Bank. The aggregate principal amount of the debt owed by FLOVEST and BMAQ to those banks was approximately $21 million. Of this amount, the vast majority (more than $18 million) was the debt of FLOVEST.

Mr. Bavelis personally guaranteed (or otherwise had personal liability on) all of this debt, Debtor's Exs. 19–26,[2] Tr. at 464–65, and Mr. Qureshi personally guaranteed at least some of it. Debtor's Exs. 23, 26. GMAQ had no bank debt, so Mr. Bavelis had no guarantee obligations with respect to that company. Tr. at 462. Likewise, there is no evidence that Mr. Bavelis guaranteed any debt of George Real Estate or that it had any debt.

The relationship between Mr. Bavelis and Mr. Qureshi was good for several years, but it began to deteriorate after Mr. Bavelis came to believe that Mr. Qureshi and MAQ Management were not providing a sufficient share of the funds to service the debt of BMAQ and FLOVEST. Tr. at 467–68.[3] In order to service that debt, Mr.

---

**2.** Debtor's Ex. 26 is a promissory note, not a guarantee, issued by Mr. Bavelis, Mr. Qureshi and FLOMAQ. The other referenced exhibits are copies of guarantees.

**3.** Mr. Qureshi disagrees with Mr. Bavelis's assessment of his efforts to service the debt of the Bavelis–Qureshi LLCs. Debtor's Ex. 173 at 66–69; Quick Capital Ex. N at BAV 00040. Nothing in this opinion should be construed as a finding regarding the relative merits of

Bavelis borrowed money from FLOHIO and Pella Company. Tr. at 467–68; 472.

### 3. The Debtor's Relationship with Mr. Doukas

Mr. Bavelis was about to meet a different sort of businessman in Mr. Doukas. According to a biography he provided to Mr. Bavelis, Mr. Doukas was born in Greece and was educated in medicine at the University of Pisa in Italy and in business at the New York Institute of Technology. He began, the bio stated, his "investment career" in Long Island, New York, leading to a self-proclaimed "very successful career as a financier and real estate developer." Debtor's Ex. 46 at GB 000790. Mr. Doukas's business, by his own account, was "creat[ing] a leverage that you can negotiate so it will make money...." Tr. at 843:22–23. "I buy things ... that are dead...." Tr. at 843:23–24. "[T]hese days they call me undertaker because I buy things that are finished, they don't have any life and I'm trying to bring life out of it." Tr. at 843:24–25–844:1–2. Consistent with that approach, in October 2008, a company that Mr. Doukas owned—Blair International, Inc., a Nevada corporation ("Blair")—took quitclaim deeds to over 50 parcels of real property located in Fort Lauderdale, Florida. The grantor was a company ("Glenn Wright Co.") operated by Glenn Wright ("Mr. Wright"), a Fort Lauderdale home builder. Debtor's Ex. 46 at GB 000791; Tr. at 841; 912. Sterling Bank held mortgages on seven of the parcels securing loans it had made to Glenn Wright Co. for the construction of single-family homes. Tr. at 913. At the time Glenn Wright Co. delivered the deeds to Blair, the loans from Sterling Bank were in default, Tr. at 643–44; 842, and Mr. Doukas was aware that the properties

were subject to Sterling Bank's liens. Tr. at 297. In addition, the homes on the lots were uncompleted, with buyers ready, willing and able to purchase at least some of the homes upon completion. Tr. at 231–32; 247–48.

Mr. Wright informed Sterling Bank of the transfers to Mr. Doukas, who was then contacted by representatives of the bank. Tr. at 644–45. It would soon become apparent to those representatives that Mr. Doukas's goal was to receive payment in exchange for deeds in lieu of foreclosure. Tr. at 843. Mr. Doukas's description of the negotiations with those representatives—including David Albright ("Mr. Albright"), the president and chief executive officer of Sterling Bank—is revealing with respect to Mr. Doukas's thought process at the time:

> [T]hey were trying to negotiate with me. So at that point they had, the bank had two loans that they had to close by December 31 st, the same year, 2008. And what happened, these loans were very substantial, there was about 1.5 million dollars every loan, about that number. And what will happen is the bank will have a big problem because if they were not closing these loans was the end of the fourth quarter and then they will have to put the capital into the, into the bank because for reserves, because that loan was in default. So there were two buyers previously and this was a very unique thing, that had already signed a contract with a higher price. Now if they would lose these two buyers, the new buyer would never even touch these two houses, they will be empty forever. And that was the big thing that was going down with the bank, they were trying to negotiate with me.

Mr. Bavelis's and Mr. Qureshi's beliefs in this regard.

So they came to the office and I told them, listen, I will work with you but, you know, I have to get paid and I have, you know, what is for me because I didn't do this for nothing, so what is for me, what am I going to get? So we argue and we're going back and forth and we didn't have very good, a very good meeting. As a matter of fact I told them I would not make any deal. I'm done.

So they were very desperate and then they called me again and I hung up on them. I said, "Listen, I'm not going to do any deal with you guys if you're not reasonable and what you're going to give me as a bank and to go and sign the deeds back to you, whatever, cooperate with you so you don't lose the two buyers.

Tr. at 842:12–843:19.

Mr. Bavelis was not involved in the negotiations on behalf of Sterling Bank at that point. Because the negotiations were not going well, and because Mr. Bavelis was, like Mr. Doukas, of Greek descent, Mr. Albright contacted Mr. Bavelis in November 2008 to inquire if he knew Mr. Doukas. Tr. at 642. Mr. Bavelis did not know him, Tr. at 473, and was reluctant to become involved due to other pressing matters, including the terminal illness of his brother. Tr. at 474. Mr. Albright persisted, Tr. at 645, and Mr. Bavelis ultimately agreed to help. As Mr. Bavelis describes it:

And in fact [Mr. Albright] told me that he and ... another employee ... apparently went to his office and then he, Ted Doukas was very belligerent with them. He, I guess he cussed them out and all this kind of things. And I said, "David, please I have so many other things" and that was a time when my brother was very sick and unfortunately

passed away the 23 of December of 2008. And I just said, "Please, work things out. I just don't have the time." But then he proceeded to call me again and I said, "Okay, I'll call him." So I called Ted Doukas on the phone and I talked to him and I told him that "I understand there were some problems here, what, what can we do to resolve, Ted?" And he said, "Are you a Greek?" I said, "Yes, I'm a Greek." "I'm a Greek, too." I said, "Well, great." So we spoke for a while and we hit it [off] very well. I was really very happy that we got somebody to finally communicate and hopefully the bank resolve some problems.

Tr. at 474:9–475:2.

Thomas A. Vogel ("Mr. Vogel"), a director of Sterling Bank and Sterling Holding, Tr. at 230, held a dim view of Mr. Doukas's involvement with the properties. According to Mr. Vogel, Mr. Doukas made the process more difficult for Sterling Bank:

[W]e didn't have control, Glenn Wright Construction is out of town, Glenn Wright takes off and we're dealing with Mr. Doukas. So we struggled our way, the plans all of a sudden [were] missing, permits we couldn't find. We brought in a contractor as the bank to try and just finish them up. We started dealing with the owners or the prospective owners of the homes to get them enough done to where we could get them closed. And it was a very difficult process.

. . . .

We had to discount the prices. And we got out of them but it was a loss.

Tr. at 233:9–234:2.

Mr. Bavelis testified that he was advised at some point that "because of the delays while [Mr. Doukas] was the owner of Blair International[,] the bank had to concede to the buyers." Tr. at 650:22–24. "And instead

of the buyer having to do certain improvements, the bank accepted the responsibility to do it and pay for it so that they can close the loans before the end of the year." Tr. at 650:25–651:3. At the time, however, Mr. Bavelis did not share Mr. Vogel's views of Mr. Doukas's involvement. "It was very important for the bank to close the two loans," Mr. Bavelis testified. "[I]t was the 30th or 31st of December and [Mr. Doukas] was available on the phone. I think he was in Naples at the time to assist the bank in signing whatever paperwork was necessary to close those two loans." Tr. at 649:25–650:4. From Mr. Bavelis's perspective, Mr. Doukas, "[o]nce he found out that I was a Greek and we talked a little bit about background then he was cooperative with David Albright to close the loan." Tr. at 650:8–11. As distasteful as Mr. Doukas's involvement was to Mr. Albright and Mr. Vogel, Mr. Doukas's decision to cooperate after Mr. Bavelis became involved was a springboard for a relationship of trust and confidence that developed between Mr. Bavelis and Mr. Doukas.

A close relationship rapidly formed between Mr. Bavelis and Mr. Doukas. After speaking on the telephone just the month before, they met in person for the first time in early January 2009 during a dinner at which they "talked about [their] heritage, about [their] life in Greece and so on...." Tr. at 478:15–17. By February 2009, Mr. Bavelis considered Mr. Doukas to be a very good friend. Tr. at 478–80. And Mr. Doukas began referring to Mr. Bavelis—whose own brother had died in December 2008—as his "brother." Tr. at 391–92; 492–93. As Mr. Bavelis testified, "I just lost my brother and I find another brother." Tr. at 492:25–26. In the supposed fraternity that formed between the two men, Mr. Bavelis would have been the elder of the two. Mr. Doukas's bio stated that he had restructured companies "throughout the past 25 years," Debtor's Ex. 46 at GB 000791, a time line that likely would place him in his mid–50s, and he appears to be a decade or two younger than Mr. Bavelis, who is in his mid–70s.

Mr. Bavelis had known Mr. Vogel long before he knew Mr. Doukas. In fact, Mr. Vogel had known Mr. Bavelis since the mid–1990s, considered him a friend, Tr. at 227, 230, had "never seen George ever do anything inappropriate," Tr. at 230:5–6, and believed him to be "extremely truthful." Tr. at 230:19. When Mr. Vogel raised his concerns about Mr. Doukas, stating to the effect that Mr. Doukas was "going to be a problem," Tr. at 239:2–3, "Mr. Bavelis was very much kind of adamant that he was, he used the word brother and a friend [with respect to Mr. Doukas] and it was that he was going to help us and it was going to be good." Tr. at 239:14–17. Mr. Bavelis's views in this regard were confirmed by Richard Moyle Fritz, Jr., the chief financial officer of Sterling Bank and Sterling Holding, Tr. at 143, who testified that Mr. Bavelis placed "great value [on Mr. Doukas's] being Greek and, you know, he was very trusting." Tr. at 171:21–22. "He said trust him like a brother. And put great value and emphasis on the fact of they both being [of] Greek ... heritage." Tr. at 171:22–25.

Whether or not Mr. Doukas initially shared Mr. Bavelis's feelings, he acted as though he did and even referenced their friendship when writing to Mr. Bavelis in business-related emails. For example, when corresponding with Mr. Bavelis about five other lots that Glenn Wright Co. had quitclaimed to Blair and on which Sterling Bank held mortgages securing notes that were in default, Tr. at 477; 651–52, Mr. Doukas sent Mr. Bavelis an email on February 12, 2009 stating as follows: "i

didn't forgot about the houses that we have to finish. I have already 3 or 4 bids and we will take the best one that we can save you money. *i want you to minimize your loses and i am doing this because we are friends for life."* Debtor's Ex. 44 at GB 000834 (emphasis added).[4]

An apparent friendship also developed between Mr. Doukas and Mrs. Bavelis. The first time she met Mr. Doukas was sometime in late February or early March 2009, when the Bavelises had dinner with Mr. Doukas at the Greek Islands restaurant in Fort Lauderdale, Florida. Tr. at 384–88; 482. As Mrs. Bavelis testified, Mr. Doukas divulged personal information about his ex-wife and children during the dinner conversation:

> [W]e connected very, very fast because [Mr. Doukas] just told us everything about himself and about his family, about his divorce.
>
> T
>
> He told me how horrible his wife was. How horrible his daughters were. They took everything from him. He told me the whole night he was going on and on about his personal life, about his home, about his—how he lived with his wife all these years and how bad she was. And his daughters were calling him names and I thought ... how can a child do this to the father. And I, I just felt terrible for him.

Tr. at 385:6–27. The Bavelises, who maintained homes in Columbus, Ohio and Boca Raton, Florida, would see Mr. Doukas fre-

quently during their time in Florida, with Mr. Doukas often coming to their home for dinner. Tr. at 388. During the summer of 2009, Mr. Doukas, who had a residence on the Gulf Coast of Florida, Tr. at 848–49, would sometimes stay in another condominium the Bavelises owned in the same building in which they lived in Boca Raton (which is on Florida's Atlantic coast), so that Mr. Doukas would not have to travel so frequently back and forth between the east and west coasts of Florida. Tr. at 410; 848–49.

During these visits, in addition to sharing intimate details about his ex-wife and children, Mr. Doukas endeared himself to the Bavelises in other ways. He told them that he had helped his family in Greece financially, as Mr. Bavelis had helped his family. Tr. at 389. He led them to believe that he shared the Bavelises' religious beliefs, that he was a member of a Greek Orthodox church and participated regularly in its services. Tr. at 389–90.[5] He presented them with a religious icon that he said was from Greece. Tr. at 390. Mr. Doukas told Mrs. Bavelis that the purpose of this icon was to "protect your house and to bless you." Tr. at 390:1–2. "And that made me feel even more comfortable about him," Mrs. Bavelis said. Tr. at 390:2–3. "I kept telling George, look at this man, I mean he is such a good man, how can he, how can his wife and his family do all of these things to him." Tr. at 390:4–6.

By the spring of 2009, Mr. Bavelis was "working around the clock," Tr. at 479:16–17, and was taking prescription medication to alleviate anxiety. Tr. at 383. Mr. Bavelis

---

**4.** In an effort to enhance this opinion's readability, the Court generally will set forth all passages from written correspondence as they appear in the original without using "sic" or brackets to indicate the need for corrections.

**5.** According to text messages he sent to Mr. Bavelis in December 2009, Mr. Doukas took a similar approach during negotiations that he

later undertook with Mr. Qureshi. Among other things, Mr. Doukas advised Mr. Bavelis that he was praying with Mr. Qureshi, Tr. at 621, and learning the Koran, Tr. at 779, stating that Mr. Qureshi "he thinks him and me are together." Debtor's Ex. 67 at GB 004054, GB 004056.

and Mr. Doukas would discuss the causes of Mr. Bavelis's stress, including, among other things, the "problems with Qureshi." Tr. at 388:13–14. Mr. Doukas promised Mr. Bavelis that he would negotiate with Mr. Qureshi in an attempt to resolve those problems in a manner favorable to Mr. Bavelis. Tr. at 393, 482–83. Mr. Doukas also made similar representations to Mrs. Bavelis. In so doing, Mr. Doukas referenced the fraternity he purportedly felt with Mr. Bavelis when he told Mrs. Bavelis that "the only reason he's doing this [is] to help George ... because he's his brother...." Tr. at 396:7–8. Mr. Doukas also advised Mrs. Bavelis that he was not seeking remuneration in exchange for his services. "He told me a couple of times, 'Did I ever ask for anything? Did I ever ask for money? I don't want anything. I just want to help George because I cannot see him stressing so much. He's going to get sick.' " Tr. at 396:16–20. "[H]e told me that he was retired and the only reason he's doing this to help George is because he's his brother and he wants to help him to take care of Qureshi's business," Tr. at 396:6–9, and that Mr. Doukas "doesn't have to work, he doesn't need the money. He has money, he doesn't have to work." Tr. at 396:9–11. These conversations typically would occur while Mr. Bavelis was working at his computer, with Mrs. Bavelis and Mr. Doukas sitting nearby. Tr. at 393.

The conversations would sometimes take on a more ominous tone. Mr. Doukas even advised Mrs. Bavelis "at one point that [Mr. Qureshi is] around bad people and he can have someone kill George." Tr. at 397:5–6. Of course, she "was really shaken by that." Tr. at 397:6. "But then he just calm me down somehow." Tr. at 397:6–7. "He told us that he [Mr. Doukas] was working with the FBI...." Tr. at 397:10–11. "And he told us, you know, all these

things. 'I'm going to get Qureshi, he cannot get away. He's doing all these bad things and he's trying to ruin you. And I'm going to take care of all these problems.' " Tr. at 397:16–20. Not only did Mr. Doukas make these statements, Mrs. Bavelis believed them. Tr. at 397–98. There is no evidence, however, that any of the things Mr. Doukas told the Bavelises about Mr. Qureshi were even remotely true.

At that point, the friendship between Mr. Bavelis and Mr. Doukas was based on several factors, including their common Greek heritage; their mutual entrustment of details about their personal lives and businesses; values they ostensibly held in common; and Mr. Bavelis's belief that Mr. Doukas had only his best interests at heart. In March 2009, Mr. Doukas informed Mr. Bavelis that, in order to advance those interests, he would need a 10% stake in GMAQ so as to be in a better position to negotiate with Mr. Qureshi. Tr. at 487. Mr. Bavelis, who by then had introduced Mr. Doukas to Mr. Qureshi, Debtor's Ex. 173 at 5:23, agreed. On March 27, 2009, Mr. Bavelis (as a member of GMAQ), Mr. Doukas (on behalf of Blair) and Mr. Qureshi (as a member of GMAQ) signed an agreement entitled "GMAQ, LLC, Members, Transferor's and Transferee's Consent and Approval of Transfer of Ownership" ("March Agreement"). Debtor's Ex. 130. By that agreement, Mr. Bavelis transferred to Blair 10% of his membership interest in GMAQ, with Mr. Qureshi consenting to the transfer. Mr. Doukas promised Mr. Bavelis that, as soon as a resolution was reached with Mr. Qureshi, he would return the March Agreement and reconvey the 10% interest back to Mr. Bavelis. Tr. at 490. Mrs. Bavelis confirmed that Mr. Doukas so advised her husband. Tr. at 430:11–27 ("We didn't question Ted, we trusted Ted Doukas. He told us, he told George he was going to bring the 10%

back.... It was given to him so he can negotiate with Qureshi and as soon as he did that he would give this 10% back. I didn't think anything of it.").

In addition to talking about the problems with the Bavelis–Qureshi LLCs, Mr. Bavelis and Mr. Doukas discussed the banking business. Mr. Bavelis asked Mr. Doukas if he would be interested in purchasing shares in Sterling Holding, and Mr. Doukas said that he would purchase shares. Tr. at 485. Consistent with that representation, in March 2009, Mr. Doukas paid over $200,000 to purchase 1,200 shares of stock in Sterling Holding. Tr. at 204; 485; 603–04; 848. This appeared to have further deepened Mr. Bavelis's trust in Mr. Doukas. On March 27, 2009, Mr. Bavelis sent a letter to Mr. Doukas enclosing a stock certificate for those shares. Debtor's Ex. 119 at BAV 00256.

The two men also discussed the idea of Mr. Doukas depositing funds in Sterling Bank. After Mr. Doukas advised Mr. Bavelis "that he had a lot of money in New York[,]" Tr. at 492:5, Mr. Bavelis suggested that Mr. Doukas begin depositing money in Sterling Bank. And I said, "Ted, why don't you move it? You move down here to Florida, why don't you move your money here?" He said, "Yeah, George, I will do that." Tr. at 492:6–8. On April 24, 2009, Mr. Doukas sent Mr. Bavelis an email attaching a letter from New York Commercial Bank ("NYCB") stating that Mr. Doukas had been banking with NYCB since February 15, 2000, identifying four accounts that Mr. Doukas maintained at NYCB and stating that he "maintains the highest level of trust with New York Commercial Bank." Debtor's Ex. 45 at GB 000817. That same day, Mr. Bavelis forwarded the NYCB letter to Regina Waterhouse, the chief retail banking officer of Sterling Bank, asking her to "help in open-ing the [accounts] that Ted needs so that he can transfer his money into Sterling Bank[,]" and to "keep in mind that Ted is a very close friend of mine and a substantial shareholder." Debtor's Ex. 45 at GB 000814. Ms. Waterhouse began working to help Mr. Doukas open the accounts. Debtor's Ex. 50 at GB 000709.

On April 24, 2009, Mr. Doukas emailed Mr. Bavelis a biography and a list of selected accomplishments. That biography painted a picture consistent with the independently wealthy individual Mr. Doukas previously had portrayed to the Bavelises. Among other things, the list of selected accomplishments stated that Mr. Doukas was the "[o]wner of approximately $30,000,000 of private stock...." Debtor's Ex. 46 at GB 000791.

Meanwhile, with respect to the Bavelis–Qureshi LLCs, FLOVEST was the most pressing problem. Among the properties it owned, only two of them—the office building and the gas station—were producing income, meaning that it was becoming increasingly difficult for FLOVEST to make its mortgage payments. With an outstanding balance in excess of $10 million, the loan for the Lake Mary Project matured, and in May 2009 Colonial Bank notified FLOVEST that it would not renew the loan. Tr. at 468–71. Colonial Bank eventually initiated foreclosure proceedings and sought the appointment of a receiver for FLOVEST. Tr. at 472. Sometime in the second quarter of 2009, before the execution of the QC Note, conversations occurred in which Mr. Doukas promised Mr. Bavelis that he would acquire certain debt that Mr. Bavelis had guaranteed—including the $3.7 million debt held by First Southern and the more than $10 million debt held by Colonial Bank with respect to the Lake Mary Project. Mr. Doukas advised Mr. Bavelis that this would help

alleviate Mr. Bavelis's stress arising from his dealings with the banks. Tr. at 500–02.

At that time, Sterling Bank and Sterling Holding, like Mr. Bavelis, were having financial difficulty. Tr. at 143–49; 174–75. At least part of Sterling Bank's problems stemmed from nonperforming loans resulting from the distressed economy and depressed real estate values in Florida. Tr. at 144–45; 187. Sometime before October 2008, state and federal regulators had recommended that Sterling Bank improve the quality of its assets. Tr. at 172–75. In June 2009, Sterling Holding would be required by the regulators to raise additional capital, Tr. at 145–46, and by August 2009 the board of directors of Sterling Holding would approve a plan to raise $12.6 million of capital. Tr. at 149–50. Aware of Sterling Bank's financial problems, in May 2009, Mr. Doukas promised Mr. Bavelis that he would assist Sterling Bank by purchasing certain of its nonperforming loans. Tr. at 504–05; 510; 890–92. In the biography he had presented Mr. Bavelis, Mr. Doukas had noted his "ability to negotiate and restructure large debts." Debtor's Ex. 46 at GB 000790.

At least as early as May 2009, Mr. Bavelis and Mr. Doukas had conversations in which they broached the idea of Mr. Doukas becoming a substantial investor in Sterling Holding. Tr. at 507. As Mr. Bavelis put it: "[Mr. Doukas] got very interested in the banking business and … at some point we talked about the two of us owning the majority of the bank. And he was willing to invest a lot of money in the bank. He said he had a lot of money and he was willing to invest it." Tr. at 507:21–26. Mr. Bavelis cautioned Mr. Doukas in this regard:

> I talked to him all along where we stood with the bank and that we had to raise capital and we had to raise 12 million

dollars in capital by June 2010. And we talked about this very specifically and I said, "We either invest the 12 million dollars or we don't invest any money at all because we're going to lose it." And he said, "George, don't worry about it. I have enough money of my own and I have enough friends and I have enough contacts, don't worry about it. I'll take care of that, I'll find the money.

Tr. at 508:18–509:1. Mrs. Bavelis also expressed concern about Mr. Doukas purchasing the stock, telling him that she did not "want anything to happen to [his] money." Tr. at 408:3. In response, Mr. Doukas told her that he was going to purchase more stock on his own behalf and allayed her concerns by saying: "Don't worry, don't worry, everything is okay. I take my chances and I always win." Tr. at 408:4–5. Sometime in May 2009, Mr. Doukas advised Mr. Bavelis that he might make additional stock purchases in Sterling Holding of $3 million. Tr. at 680–81.

In a move that enhanced Mr. Bavelis's trust and confidence in his friend, Mr. Doukas caused $2 million to be deposited into accounts maintained at Sterling Bank. Tr. at 131; 676; 944; 951–55. In particular, on May 22, 2009, Nemesis deposited two checks—one in the amount of $270,000 and another in the amount of $1,730,000, for a total amount of $2 million—into accounts maintained at Sterling Bank. Debtor's Ex. 98 at IB/DOU 00072; IB/DOU 00074. Those amounts came from Mr. Doukas's divorce proceeding. Tr. at 944. With those amounts already deposited, Mr. Doukas promised Mr. Bavelis that he would deposit an additional $80,000 to $120,000 every month in Sterling Bank from income that he or his companies received. Tr. at 1058–59. Based on these representations regarding the purchase of stock and the deposits in Sterling Bank, on May 23,

2009, Mr. Bavelis sent Mr. Albright an email in which he stated:

I have Ted's tax returns in the # 1 fire proof drawer

When you talk to Ted please talk to him as a friend of the bank, a very good friend of mine and a prospective investor in the bank of three million dollars. Without Ted's investment it will be very difficult for us to raise the required capital. As you are well aware he has deposited in the bank about two million dollars and he will be depositing his receivable rent checks of 80–120 thousand dollars a month in our bank.

Debtor's Ex. 56 at GB 000656. As this email shows, Mr. Bavelis had obtained Mr. Doukas's tax returns for Mr. Albright to review. Before leaving them in the drawer for Mr. Albright, Mr. Bavelis did not review the tax returns. Tr. at 679–80.

In May 2009, Sterling Bank was still attempting to sell five of the lots that Glenn Wright Co. had quitclaimed to Blair in October 2008. At the time Blair received the quitclaim deeds, Mr. Doukas knew the five lots were subject to Sterling Bank's liens. Tr. at 297. Mr. Doukas ultimately placed deeds to the five lots in escrow while Sterling Bank worked to finish the homes by using another contractor. Tr. at 251–52. According to Mr. Vogel, "the homes took twice as long as it would have taken ... if [they were not] quit claimed out." Tr. 252:24–25.[6] Mr. Doukas's approach to the deal, though, did not harm the relationship between Mr. Bavelis and Mr. Doukas, who previously had told Mr. Bavelis that he was handling the transaction in the manner he was "because we are friends for life." Debtor's Ex. 44 at GB 000834.

Mr. Bavelis not only thought of Mr. Doukas as a close friend and brother, he also considered him a trusted business advisor. With respect to one real estate project in Florida, in May 2009, Mr. Bavelis sent an email to another man stating that Mr. Doukas was his "special friend and partner" and requested that the man speak to Mr. Doukas to hear Mr. Doukas's "strategy he plans for us to succeed." Debtor's Ex. 51 at GB 000707. Also in May 2009, Mr. Bavelis advised Mr. Albright that "the time has come that you need to utilize Ted's help to try to clear up as [many] of these [nonperforming] loans ASAP." Debtor's Ex. 52 at GB 000704. With respect to other transactions, Mr. Doukas was advising Mr. Bavelis that "I know I can handle it this is my cup of tea" and "these are the kind of deals I work all day." Debtor's Ex. 55 at GB 000675. An email that Mr. Bavelis sent to an attorney involved with Sterling Bank litigation in early July 2009 is indicative of how Mr. Bavelis viewed Mr. Doukas's role in June 2009. In that email, Mr. Bavelis referred to Mr. Doukas as "a friend and advisor of mine" and requested that the attorney speak to Mr. Doukas so that "he can understand the case." Debtor's Ex. 58 at GB 000039.

Mr. Doukas had led Mr. Bavelis to believe that he was negotiating with Mr. Qureshi to resolve the disputes over the Bavelis–Qureshi LLCs in a manner favorable to Mr. Bavelis, but that his negotiations had failed to reach such a resolution because Mr. Qureshi "was not taking [Mr. Doukas] seriously," Tr. at 707:6–7, and that he therefore needed more authority to negotiate with Mr. Qureshi. Tr. at 568; 706–07. On or about June 21, 2009, Mr. Doukas presented Mr. Bavelis with an agreement ("R.P.M. Agreement") by which Mr. Bavelis would, in return for $50,000,

---

**6.** Ultimately, Sterling Bank failed before the homes were finished. Tr. at 251–52.

transfer his "50% interest in GMAQ" to R.P.M. Recoveries, Inc. ("R.P.M."), a New York corporation of which Mr. Doukas was president. Debtor's Ex. 131.[7] When he signed the R.P.M. Agreement, Mr. Bavelis believed that he was giving "him a larger percentage so that [Mr. Doukas] can be able to be more effective." Tr. at 707:7–9. Mr. Bavelis's understanding when he signed the R.P.M. Agreement was that the agreement was temporary and would be "coming right back to me...." Tr. at 717:13. By signing such an agreement with the understanding that it would be returned to him, Mr. Bavelis demonstrated a high level of confidence in Mr. Doukas. According to Mr. Bavelis, at that time "I had already established a trust in Ted Doukas that we became very good friends and I would listen to him because he offered so many things that he was going to do for me." Tr. at 667:4–8. "He's going to help me in many respects. And I had no doubts about it at that time." Tr. at 667:8–9. "[H]e was my brother at the time. We had such a close relationship that I trusted Ted for anything he told me." Tr. at 685:23–686:1. As Mrs. Bavelis put it, "George and I had come to a point where anything he said we trusted him." Tr. at 391:20–21. Although Mr. Bavelis knew that Mr. Doukas—at least from the perspective of Mr. Albright and Mr. Vogel—had the potential to be a difficult person with whom to transact business, Mr. Doukas had not given Mr. Bavelis any reason not to trust him. In fact, by June 2009, Mr. Doukas had done two things he had told Mr. Bavelis that he would do—purchase approximately $200,000 of stock in Sterling Holding and deposit $2 million in Sterling Bank.

## B. The QC Loan Documents

### 1. Representations Prior to Their Execution

In June 2009, Mr. Bavelis firmly believed that Mr. Doukas was on his side and considered him a friend and brother in whom he could place the utmost confidence and trust. In fact, Mr. Bavelis trusted Mr. Doukas enough to sign and deliver a multimillion dollar promissory note—the QC Note—and the QC Loan Agreement and QC Security Agreement even though Quick Capital was lending Mr. Bavelis no funds.

Before Mr. Bavelis signed and delivered the QC Loan Documents, Mr. Doukas had promised that he would deposit $80,000 to $120,000 a month in Sterling Bank (in addition to the $2 million that he had deposited from his divorce). As Mr. Bavelis testified, this promise induced him to sign the QC Loan Documents. Tr. at 1059–60. Mr. Doukas's other promises—that he would work on Mr. Bavelis's behalf to resolve the issues with Mr. Qureshi and that he would purchase nonperforming Sterling Bank loans as well as the Colonial Bank and First Southern loans guaranteed by Mr. Bavelis—factored into the inducement as well. Tr. at 736.

Mr. Doukas also promised Mr. Bavelis that he would help finalize Mr. Bavelis's estate planning. As Mr. Bavelis testified:

> [Mr. Doukas] was going to plan my estate.... [H]e needed about three to four months to try to help me to plan my estate. I had told him before ... that I have a trust but I have not funded it with any money. And he said, "George, I have done this before and I can help you with this thing." I said,

---

**7.** The R.P.M. Agreement also provided that "Bavelis shall have the right to use the assets of MD Stat LLC an New York limited liability company and Leftheris Properties Corp. a Florida Corporation for collateralizing any loans or financing that he may require." Debtor's Ex. 131 at BAV 00191. *See also* Tr. at 126–27.

"Yes, fine, Ted. I will need some help because I did my trust about six, seven years ago and I don't have, I mean I have not done the second or third part because there were two more parts to do that." ... And then he said, "I can help you with this, I have done it." Not as a lawyer but as an individual to tell me what to do and how to put assets into this company, into this trust.

Tr. at 582:26–583:13. *See also* Tr. at 698:2–4 ("[H]e said he had a lot of experience about that and he's going to help me to plan my estate and finish up what needed to be done."). Because Mr. Doukas was not an estate planning attorney or other estate planning professional, the clear implication was that, at a minimum, Mr. Doukas had planned his own estate in the manner he was suggesting for Mr. Bavelis.

In addition to discussing estate planning generally, Mr. Doukas was specific, telling Mr. Bavelis that "it was going to be for the future, for my grandkids and my great-grandkids, I would form this perpetuity, perpetual something, I can keep my assets and not have to be planned from thereon. It was going to be done once and forever and he was going to help me do all those things." Tr. at 785:9–15. As Mr. Bavelis testified, the George A. Bavelis Trust ("Trust") was not funded "with any money," Tr. at 583:3, only with shares of stock of Sterling Holding. Tr. at 698–99.

Given Mr. Bavelis's awareness that Mr. Doukas was not an estate planning attorney or other estate planning professional, the idea that Mr. Bavelis would turn to Mr. Doukas for assistance in completing his estate plan might seem implausible. But it is not improbable that Mr. Bavelis, whose brother had died just six months before, would be thinking about estate planning in June 2009. And there is considerable evidence (in addition to Mr. Bavel-is's testimony) that Mr. Doukas did promise to help finalize Mr. Bavelis's estate plan. Mrs. Bavelis confirmed her husband's testimony that Mr. Doukas promised to assist Mr. Bavelis in this manner. Tr. at 394:3–8 ("[T]hey were talking one day and because they always talk about different things and George told him that he was planning his estate and he didn't have everything done. And Doukas volunteer that, 'Oh, I've done this before. I can, I can take care of that.' "). Mrs. Bavelis was specific that the offer was made "around June[,]" Tr. at 394:19, and that it occurred in connection with the QC Note. Tr. at 403:13–17 ("Yes, the note he was, George told him something about our estate that he had not finished and he said, 'Oh, don't worry, I've done that before, I can finish it up for you and you don't have to do anything, I'll take care of it.' "); 428:24–26 ("And then he also told him to sign a promissory note for his estate planning"). Mr. Bavelis gave Mr. Doukas a copy of The George A. Bavelis Revocable Trust Agreement dated October 18, 2004 ("Trust Agreement"), Quick Capital Ex. XX; Tr. at 583–85, and the Trust became a party to the QC Loan Documents, facts that are consistent with the notion that the QC Loan Documents related to estate planning.

Mr. Doukas advised Mr. Bavelis that, as part of the estate planning, he was "going to form a Nevada corporation because there were some advantages that Nevada corporations have[,]" Tr. at 584:16–17, including that "somehow people can't go and find out who the shareholders are or something like that." Tr. at 585:17–19. A few weeks after the execution of the QC Loan Documents, one of Mr. Doukas's attorneys sent Mr. Bavelis an agreement that, if Mr. Bavelis had signed it, would have transferred certain of his interests in the Ohio Partnerships to the Nevada corporation

that Mr. Doukas was proposing to form. It was not until after he signed the QC Loan Documents, however, that Mr. Bavelis received the proposed agreement transferring assets to the Nevada corporation and thus became uncomfortable with the concept of the particular Nevada corporation Mr. Doukas was suggesting.

In the summer of 2009, Mr. Bavelis believed that he did not have the ability to service any more debt. Tr. at 602. Consistent with that belief, before he signed the QC Loan Documents, Mr. Bavelis obtained a promise from Mr. Doukas that he would not be required to make payments on the QC Note. As Mr. Bavelis testified: "[W]hen I gave him this note for $14,000,000 I said, "Ted, you don't expect me to make payments for this thing?" He said, "No, no, no, you don't need to make payments." Tr. at 598:22–25.

Before Mr. Bavelis signed the documents, Mr. Doukas also represented to Mr. Bavelis that the QC Loan Documents would be returned when the estate planning was finalized. "He told me it would take three to four months when I signed this note, it would take me three to four months and then I give those papers back to you, George." Tr. at 584:9–12. Like the other representations Mr. Doukas had made to Mr. Bavelis up to that point, Mr. Doukas's statements that he would not seek payment and would return the QC Loan Documents after Mr. Bavelis's estate planning was completed were intended to induce Mr. Bavelis to sign the QC Loan Documents.

Mr. Doukas persuaded Mr. Bavelis not to consult his own attorney before signing the QC Loan Documents, which had been prepared by Mr. Doukas's Florida attorney and reviewed by another of Mr. Doukas's attorneys, John Stravato. Tr. at 274–75. Mr. Stravato and Mr. Doukas sent Mr. Bavelis a copy of the QC Loan Documents for his signature via email:

> I remember receiving an email from John Stravato and another email from Doukas while I was in Columbus, Ohio. And they wanted to have this in a hurry. And I believe I signed them and I notarized them on Monday and overnight[ed] them directly to him on that day and he received them the next day.

Tr. at 718:7–13.

Mr. Bavelis did not consult his own longtime attorney, Michael Schaeffer, before he signed the QC Loan Documents, because Mr. Doukas advised him that he did not need to do so:

> I had so much trust and faith in what Ted was telling me and I just felt he had done it so many times. In fact he told me he had an in-house lawyer in New York for about 10 years and he has learned a lot of those things. "George, I can help you with those things." Those are small little things I can take care of. You don't need to talk to your lawyer." And [I] took it for granted that he really was trying to help me and I was his brother, he would not do any harm to his brother.

Tr. at 590:14–23.

Mrs. Bavelis confirmed that her husband would not have sought his own attorney's advice under these circumstances. "At one point I remember George wasn't sure about something, I can't recall exactly what it was, and Ted said, 'Oh, don't worry, you don't need an attorney. I've done this before, I can, I can take care of it.' " Tr. at 400:25–27. "And I told George, I said, 'Well, if he's done all this he can do that also, you don't have to ask anybody.' I trusted the man." Tr. at 400:23–401:2.

## 2. The Contents of the QC Loan Documents

### a. The QC Note

Mr. Bavelis signed the QC Note in Columbus on June 22, 2009. Debtor's Ex. 73. He signed it twice, the first time in his individual capacity, the second as the trustee of the Trust. At the top, under the word "Note," appears the following text:

$14,000,000.00 June 21, 2009 Franklin County, Ohio.

The QC Note identifies the consideration as "FOR VALUE RECEIVED." It inconsistently states that the interest rate is "fourteen (5%) per annum" and then provides that the amount of interest is $58,333.33 per month, which equates to 5% per annum. The principal balance of $14 million was to be due on June 21, 2014. The QC Note states that it "may not be changed or terminated orally" and also contains the following text, which falls short of being a sentence: "IT IS EXPRESSLY AGREED, that the said principal sum secured by this Note shall become due at the option of the holder hereof on the happening of any default or event by which, under the terms of the Security Agreement securing this Note." Debtors's Ex. 73 at GB 003826.

As already discussed, the evidence presented at trial established that Mr. Doukas had represented to Mr. Bavelis that he would not be required to make the monthly interest payments or the $14 million principal payment due under the QC Note.

### b. The QC Loan Agreement

Mr. Doukas signed the QC Loan Agreement, Debtor's Ex. 76, as the president of Quick Capital. Mr. Bavelis signed it both in his individual capacity and as the trustee of the Trust, and it defines Mr. Bavelis in this dual role collectively as "GAB," After naming the parties, the QC Loan Agreement sets forth two recitals:

Whereas Quick has provided and will continue to provide consulting and management services in an effort to restructure various liabilities and troubled assets owned directly or indirectly by GAB; and

Whereas GAB as security for the payment of these services rendered and to be rendered agrees to provide a security interest for Quick in various securities in the amount of Fourteen Million ($14,000,000) Dollars[.]

Debtor's Ex. 76 at GB 004059. The QC Loan Agreement does not refer to the QC Note. The only reference in the QC Loan Agreement itself to any payment by GAB is the phrase "the payment of these services rendered and to be rendered," which appears in the second recital set forth above.

Following the recitals, Quick Capital "represents that it will make available to GAB the following corporations which can be used to collateralize loans during the restructuring and refinancing process: 4 Louden Ave Corp., Raelaur LLC, 2 Lisa Court Corp. and Aries Capital of L.I. Corp." Debtor's Ex. 76 ¶ 1.

In addition, the QC Loan Agreement states that Quick Capital "shall tender the sum of Two hundred Thousand ($200,000) Dollars to George A. Bavelis which he will accept on behalf of himself and as trustee of George A. Bavelis Trust No. 1, dated October 18, 2004." Debtor's Ex. 76 ¶ 2. There was no evidence presented during the trial establishing that the $200,000 sum would not actually be advanced or that Mr. Bavelis would not be required to repay any amount he actually borrowed.

The QC Loan Agreement provides that the parties would enter into the QC Security Agreement. It also states that "[i]t is acknowledged by the parties that all fees have been earned on a flat rate basis, the

sufficiency of the consideration by all parties is hereby acknowledged." Debtor's Ex. 76 ¶ 3. It contains a few boilerplate provisions, Debtor's Ex. 76 ¶ 4, 5, 8, a confidentiality clause, Debtor's Ex. 76 ¶ 6, and a provision making New York law the governing law, Debtor's Ex. 76 ¶ 7, followed by the signatures and notary blocks. That is all that is contained within the four corners of the QC Loan Agreement. Mr. Doukas, though, contends that the QC Loan Agreement also includes the following Schedule A:

## Schedule A

### Disbursements

Upon execution of Agreement—$200,000 downpayment

By December 31, 2009—not less than 10% of note (not including downpayment) must be advanced as cash.

Debtor's Ex. 76 at GB 004061; Tr. at 279.

Mr. Doukas's testimony regarding the existence of a Schedule A to the QC Loan Agreement lacks credibility for several reasons. First, the drafter of the QC Loan Documents clearly knew how to reference attached schedules. In fact, the QC Security Agreement—a separate document presented to Mr. Bavelis for signature at the same time he signed the QC Loan Agreement—included a reference to a different Schedule A than the one Mr. Doukas alleges was attached to the QC Loan Agreement. In this regard, the QC Security Agreement provided that Mr. Bavelis individually and as trustee of the Trust was granting to Quick Capital a security interest in 80,000 shares in Sterling Holding and 30 securities "annexed in schedule 'A'." QC Security Agreement ¶ 4. Despite the fact that the drafter of the QC Loan Documents knew how to refer to attached schedules in the text of agreements, the QC Loan Agreement does not reference Schedule A.

Second, the text of the QC Loan Agreement provides that Quick Capital shall tender $200,000, but says nothing about at least 10% of $14 million ($1.4 million) being advanced as cash. It is unlikely that parties would reference a $200,000 payment in the text of a loan agreement but leave a $1.4 million payment to a schedule that is not even referenced in the agreement.

Third, the two unsigned copies of the QC Loan Agreement that Mr. Stravato and Mr. Doukas sent to Mr. Bavelis the day before Mr. Bavelis signed it do not include a Schedule A. Debtor's Ex. 74–A; 74–B; Tr. at 277–279; 580–81. When confronted with this fact during the trial, Mr. Doukas suggested that he sent the QC Loan Documents to Mr. Bavelis for signature via Federal Express or some other overnight service, but he provided no evidence that he had done so. Tr. at 279–82. Fourth, the "not less that 10%" of the QC Note (i.e., not less than $1.4 million) all too conveniently approximates the $1,464,725 of funds that Mr. Doukas transferred from certain bank accounts maintained at Sterling Bank for the purchase of additional stock in Sterling Holding in September 2009 (of which more below)—transfers that Mr. Doukas now says were on behalf of Mr. Bavelis even though all the evidence is to the contrary. Mr. Bavelis characterized the contention that Schedule A was part of the QC Loan Agreement as "the big lie of the century." Tr. at 579. While the Court need not go that far, it finds that Mr. Doukas's testimony that the QC Loan Agreement included Schedule A was false.

In an attempt to call Mr. Bavelis's credibility into question, Mr. Doukas also made a false statement regarding Schedule A in his proposed findings of fact and conclusions of law ("Doukas Findings & Conclusions") (Doc. 245). He alleged that the purported existence of Schedule A shows

that Mr. Bavelis filed a misleading declaration in connection with a state court lawsuit that Quick Capital commenced in 2010 against Mr. Bavelis in the Supreme Court of New York, County of Nassau ("New York State Court") for amounts allegedly due under the QC Note ("Quick Capital Lawsuit"). Mr. Bavelis filed a notice of removal of the Quick Capital Lawsuit to the United States District Court for the Eastern District of New York ("New York Federal Court"). On June 23, 2010, Mr. Bavelis signed a declaration ("Bavelis Declaration") in which he stated, among other things, that he had "reviewed the Note and Security Agreement that are attached as Exhibit 1 to [his] Notice of Removal filed in this action." Quick Capital Ex. GG ¶ 2. Exhibit 1 to that notice of removal was the notice of motion for summary judgment in lieu of complaint that Quick Capital had filed in the New York State Court; attached to that notice of motion for summary judgment in lieu of complaint was an affidavit by Mr. Doukas in which he referenced the QC Note and the QC Security Agreement (which were attached as exhibits to the affidavit), but did not reference or attach as an exhibit the QC Loan Agreement. *See* docket of New York Federal Court, Case No. 10–2759 (Doc. 1 at 10–22).[8] Mr. Bavelis did not state in the Bavelis Declaration that he had reviewed the QC Loan Agreement. That makes sense, because the QC Loan Agreement was not attached to Quick Capital's notice

of motion for summary judgment in lieu of complaint and therefore was not attached as Exhibit 1 to Mr. Bavelis's notice of removal. Despite this, in his proposed findings, Mr. Doukas makes much of that fact that "[t]he June 23, 2010 Affidavit [that is, the Bavelis Declaration] did not contain any mention of the defense raised in this Court that the Loan Agreement . . . did not contain Schedule A." Doukas Findings & Conclusions ¶ 16.

Mr. Doukas then stated in his proposed findings that "the Loan Agreement that was filed as an Exhibit to the Complaint did, in fact, contain Schedule A, as an exhibit to the Loan Agreement." Doukas Findings & Conclusions ¶ 17. This statement is not true. As noted above, the document Mr. Doukas filed in the New York State Court was a motion for summary judgment in lieu of a complaint, not a complaint. Much more importantly, that motion did not include the QC Loan Agreement as an exhibit. A motion that Mr. Doukas later filed (on July 6, 2010) in the Quick Capital Lawsuit did include an affidavit that in turn included a copy of the QC Loan Agreement with a Schedule A attached. *See* docket of New York Federal Court, Case No. 10–2759 (Doc. 5, Attachment 2, Ex. E). The Bavelis Declaration, however, was dated June 23, 2010 and therefore clearly was in response to the notice of motion for summary judgment in lieu of a complaint, which did not include the QC Loan Agreement.[9]

---

**8.** Although the notice of motion for summary judgment in lieu of complaint and the later motion filed by Quick Capital in the Quick Capital Lawsuit were not submitted by the parties as exhibits during the trial, the Court may take judicial notice of the contents of the record of the New York Federal Court in the Quick Capital Lawsuit. *See In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 213 n. 7 (Bankr. S.D.Ohio 2008); *Schafer v. Rapp (In re Rapp)*,

375 B.R. 421, 426 n. 4 (Bankr.S.D.Ohio 2007).

**9.** Mr. Bavelis's proposed findings of fact and conclusions of law ("Bavelis Findings & Conclusions") (Doc. 246) are themselves not without error. For example, those findings state that Mr. Doukas promised, among other things, to contribute funds "to capitalize Sterling Bank," Bavelis Findings & Conclusions ¶ 63, and then states that "[n]one of these promises were ever fulfilled," *id.* ¶ 65 and

Mr. Doukas also attempted to paint the Bavelis Declaration as misleading because in it Mr. Bavelis stated that Mr. Doukas "represented to me that my assets would be protected if I executed the Security Agreement and the Note," Quick Capital Ex. GG ¶ 11, while saying nothing about estate planning. However, although the Bavelis Declaration did not mention estate planning, the Bavelis Declaration is not inconsistent with Mr. Bavelis's testimony during the trial that the QC Loan Documents related to the planning of his estate. Tr. at 784–85. In short, Mr. Bavelis did not file a false declaration in the Quick Capital Lawsuit, and Mr. Doukas's suggestion otherwise is itself misleading.

### c. The QC Security Agreement

Mr. Bavelis signed the QC Security Agreement on his own behalf and on behalf of the Trust on June 22, 2009. Debtor's Ex. 77. The QC Security Agreement states that "[f]or value received" Mr. Bavelis individually and as trustee of the Trust grants to Quick Capital a security interest in certain shares in Sterling Holding and securities referenced in a schedule that is referred to as Schedule A. QC Security Agreement ¶¶ 2, 4. The QC Security Agreement states that it "secures the payment and performance of: (a) all obligations pursuant to [the QC Loan Agreement and the QC Note]." QC Security Agreement ¶ 3. Defaults would include, among other things, "another secured party or judgment creditor exercis[ing], or attempt[ing] to exercise or giv[ing] notice of its intention to exercise its rights against the Collateral." Id. ¶ 9. It was not inconceivable that such a default might occur given that the assets subject to the QC Security Agreement had previously

been pledged to other entities. Tr. at 585. In particular, the securities identified on the Schedule A to the QC Security Agreement were pledged as collateral for the various credit facilities extended by Fifth Third, Tr. at 586, and the shares in Sterling Holding had been pledged to another lender. Tr. at 586.

### 3. The Consideration for the QC Loan Documents

Mr. Doukas contends that, in addition to the $200,000 and "not less than" $14 million of cash, the consideration for the QC Note included other promises, some of which are mentioned in the QC Loan Agreement and some of which are not. First, there was the promise to make assets available to secure loans to effectuate a restructuring of Mr. Bavelis's liabilities and the troubled assets owned by Mr. Bavelis and the Trust. Mr. Bavelis believed that he did not have the ability to service any more debt, Tr. at 602, so the parties' understanding was that Mr. Doukas himself would use the assets to obtain loans in his own name in order to purchase the Colonial Bank and First Southern loans, as well as the Sterling Bank nonperforming loans. Tr. at 109:24–25 (Mr. Doukas characterizing the QC Loan Agreement as imposing "my obligations on the note to pledge as many assets as I can"). As explained in the next section, no such benefit materialized.

Mr. Doukas was, he testified, personally obligated to make all of his assets—not just those that were the subject of the QC Loan Agreement—available to Mr. Bavelis:

> Q. Mr. Doukas, were assets made available to Mr. Bavelis that . . . were not

that "Ted Doukas never did anything, other than continually making promises that he would at some future point." Id. ¶ 82. As

explained below, in September 2009, Mr. Doukas purchased approximately $1.4 million of stock in Sterling Bank on his own behalf.

included in this QC Loan Agreement of June 21st, 809?

A. Yes.

Q. And tell us what any of those assets were?

A. Anything I have on the financial statements, anything that I own because I own all these companies 100%.

Q. And did you tell that to Mr. Doukas, excuse me, Mr. Bavelis?

A. Yes, he knew about that.

Tr. at 889:1–13. *See also* Tr. at 109:24–25 (Mr. Doukas characterizing the QC Loan Agreement as imposing "my obligations on the note to pledge as many assets as I can"). Mr. Doukas also testified that he was prohibited by his agreement with Mr. Bavelis from pledging his assets for any purpose other than assisting Mr. Bavelis. However, as Mr. Doukas himself conceded, Tr. at 269–72, the QC Loan Agreement did not impose that restriction.

Mr. Doukas himself had no binding obligation to make assets available under the QC Loan Agreement. The only entity affiliated with Mr. Doukas that was a party to the agreement—Quick Capital—owned none of the assets that were to be made available to Mr. Bavelis. Tr. at 44. Those assets—the corporations 4 Louden Ave. Corp. ("Louden"), Raelaur LLC ("Raelaur"), 2 Lisa Court Corp. ("Lisa Court") and Aries Capital of L.I. Corp. ("Aries Capital")—were solely owned by Mr. Doukas, Debtor's Ex. 241; Tr. 39–44; 50–51, but Mr. Doukas personally was not a party to the QC Loan Agreement. That also was the case with the R.P.M. Agreement, under which the assets of MD Stat LLC and Leftheris Properties Corp. were pledged. Debtor's Ex. 131. Mr. Doukas owned R.P.M. (the only Doukas party to the R.P.M. Agreement), Debtor's Ex. 241, but R.P.M. did not own MD Stat LLC or Leftheris Properties Corp. Those corporations were solely owned by Mr. Doukas, Debtor's Ex. 241; Tr. 39–44; 50–51, who was not a party to the R.P.M. Agreement. In other words, under the QC Loan Agreement, as well as the R.P.M. Agreement, Mr. Bavelis purportedly had the right to use assets based on an agreement with an entity that did not own the assets, while the owner of the assets—Mr. Doukas—personally had no contractual obligation to make them available.[10]

In addition to providing funds and making assets available, his obligations under the QC Loan Agreement, Mr. Doukas testified, included purchasing nonperforming loans held by Sterling Bank:

[I]t was the agreement that we had, you know, how to raise money for the, you know, for the bank. But to get the nonperforming loans that was even more important because the banks if you take the nonperforming loans out then you're increasing the capital and then you don't have a lot of problems. That was a big issue. And what we were doing we were pledging this, these assets that were taking nonperforming loans and now we have the bank to, direction to go up.

Q. And was that the overall intent of all these agreements in June of 809?

A. Yes.

Tr. at 891:21–892:9.

Furthermore, Mr. Doukas testified that the consideration under the QC Loan Agreement included his promise to provide

---

10. Mr. Doukas is the sole shareholder/member of Lisa Court; Louden; Aries Capital; Blair; Leftheris Properties Corporation; M.D. Stat, LLC, Quick Capital; R.P.M. and Raelaur. In turn, Aries Capital is the sole shareholder of Efastos Corp., Opa Opa and WKYA Holdings Corp. ("WKYA"). The sole shareholder of Nemesis is either Ted Doukas or Aries Capital. Debtor's Ex. 241; Tr. at 39–44; 50–51.

consulting and management services, which he valued at approximately $500,000, even though the QC Loan Agreement does not specify the value. Tr. at 327–28. Mr. Doukas also testified that the consulting services were for three items: (1) to restructure the loans with Colonial Bank and First Southern, Tr. at 285; (2) to acquire nonperforming loans from Sterling Bank; and (3) to buy out Mr. Qureshi and indemnify Mr. Bavelis. Tr. at 290.

## C. Events Occurring After the Execution of the QC Loan Documents

Events occurring (or failing to occur) during the seven months after the QC Loan Documents were signed make it clear that Mr. Bavelis repaid the funds that Nemesis advanced to him; that neither Mr. Doukas nor any of his companies provided the other consideration allegedly supporting the QC Loan Documents; that Mr. Doukas made several representations that fraudulently induced Mr. Bavelis to sign the QC Loan Documents; and that Mr. Doukas personally has no claim against Mr. Bavelis based on Mr. Doukas's purchase of stock in Sterling Holding.

### 1. The Repayment of All Amounts Actually Advanced

After a dinner at the Bavelises' Florida home that took place in early July 2009, Mr. Doukas gave Mr. Bavelis a $250,000 check dated June 21, 2009. Debtor's Ex. 102; Tr. at 720. Mr. Doukas testified that the amount of the check included the $200,000 that was to be advanced under the QC Loan Agreement, Tr. at 49:19–22, as well as $50,000 under the R.P.M. Agreement. Tr. at 861. In the Bavelis Findings & Conclusions, Mr. Bavelis states that "the circumstances under, and purposes for which, Ted Doukas elected to deliver a check in the amount of $250,000, from

Nemesis, to Mr. Bavelis are peculiar to stay the least," Bavelis Findings & Conclusions ¶ 169, presumably in part because "[t]he check itself was dated June 21, but the record is undisputed that it was not delivered during that time frame." *Id.* There was nothing peculiar about the timing. The R.P.M. Agreement and the QC Loan Agreement were dated June 21, 2009. It appears that Mr. Doukas, rather than mailing the check to Mr. Bavelis (who was in Ohio when he signed the R.P.M. Agreement and the QC Loan Documents), simply waited to deliver the check in person.

The check was drawn on an account maintained not by Quick Capital or R.P.M., but instead on an account maintained by Nemesis. Mr. Bavelis apparently was surprised when Mr. Doukas gave him the $250,000 check, because Mr. Doukas had represented that no payments would be due under the QC Note and had promised that the QC Loan Documents and the R.P.M. Agreement would be returned. Mr. Bavelis's surprise was not entirely warranted. After all, there was no evidence of an agreement that the $50,000 payment under the R.P.M. Agreement would not be made. Likewise, although Mr. Doukas had promised Mr. Bavelis that he would not be required to make the monthly interest payments or the principal payment due under the QC Note, there was no testimony establishing that $200,000 would not be borrowed under the QC Loan Agreement or that Mr. Bavelis would not be required to repay any amount actually advanced.

Consistent with an understanding that $200,000 would be advanced under the QC Loan Agreement, on the memo line of the check Mr. Doukas wrote words that, although difficult to read, appear to be "Consideration on the Note." Mr. Bavelis attempted to refuse the check, but Mr. Doukas insisted he take it. Mr. Bavelis

accepted the $250,000 check and deposited it into one of his accounts. Tr. at 594. He then promptly repaid it:

> Later on within a month or so, I went back and wrote two checks, again we had dinner at my house, I told him, "Ted, here is the money that you loaned me." He said, "George, don't worry about it, don't worry about it." I said, "Ted" in fact I said, [in Greek] . . . the good transactions make the good friends. And I told him that in Greek. And I said, "Please take the money." He said, "No, George, don't worry about it, don't worry about it." So I was bothered by that statement, don't worry about it, don't worry about it. So I went to the bank and I gave the checks to the bank and I said, "Please deposit into his account." And I wrote on the checks, "Loan return." I return the loan.

Tr. at 720:18–721:8. To be more precise, Mr. Bavelis issued Mr. Doukas a check drawn on the account of Pella Financial Services in the amount of $100,000; the check was dated July 14, 2009 and posted on July 27, 2009. The memo line indeed states "Return Loan." *See* Debtor's Ex. 96, IB/DOU 0004; Debtor's Ex. 107. Mr. Bavelis also issued Mr. Doukas a check drawn on the account of Pella Financial Services in the amount of $150,000; that check was dated July 27, 2009 and posted on August 17, 2009. The memo line on that check also states "Return Loan." Debtor's Ex. 96, IB/DOU 0006; Debtor's Ex. 103 at GB 003837; Debtor's Ex. 108; Tr. at 595–98. Mr. Doukas refused to accept the checks personally, but Mr. Bavelis caused them to be posted to an account Mr. Doukas maintained at Sterling Bank. Tr. at 594–98; Debtor's Ex. 102. To be clear, even though Mr. Bavelis was the party to the QC Loan Agreement, he repaid the loan using funds borrowed from Pella Fi-

nancial Services, the issuer of the checks, Tr. at 774–76, just as Mr. Doukas had made the loan through an entity (Nemesis) that was not a party to the QC Loan Agreement.

Mr. Doukas asserts that the $250,000 payment Mr. Bavelis made to him by means of the two checks had nothing to do with the QC Note, that instead the payment fulfilled an oral side deal under which Mr. Bavelis agreed to pay Blair $50,000 per deed for the five Glenn Wright Co. lots that had not yet been sold. Tr. at 76–77; 296–300; 899–901. In support of this assertion, Mr. Doukas testified that, because Glenn Wright Co.'s loan with Sterling Bank was nonperforming, on March 30, 2009, Blair became the obligor on a $3,567,000 promissory note (representing the amount owed by Glenn Wright Co.) and that Mr. Doukas guaranteed Blair's obligations under the note. Tr. at 895:7–900:14; 931:6–12; 933. Quick Capital offered Exhibits BBBBB and FFFFF in support of Mr. Doukas's testimony. According to Mr. Doukas, Exhibit BBBBB, in the words of his counsel, "purports to be an amended and restated promissory note dated March 30, 2009 in the amount of $3,567,000[,]" Tr. at 895:7–13, a note that included a signature by Mr. Doukas on behalf of Blair and a guarantee by Mr. Doukas. Tr. at 896:15–897:6. Exhibit FFFFF, Mr. Doukas contends, is, again in the words of his counsel, "an escrow agreement purportedly between Blair International as borrower, mortgagor, Sterling bank and a law firm in Ft. Lauderdale, Florida." Tr. at 897:10–14. The escrow agreement purportedly was signed by Mr. Doukas and Mr. Albright, Tr. at 897:18; 898:2–6, and allegedly provided for the quitclaim deeds to the five Glenn Wright Co. lots to be placed into escrow. Tr. at 898:15–18. By an agreed order entered after the trial (Doc. 201) ("Agreed Order"), the parties agreed that the Court would

reserve ruling on the admissibility of Exhibits BBBBB and FFFFF to allow Quick Capital an opportunity to obtain certified copies of the exhibits; the certified copies were intended to establish that the Blair note and escrow agreement were served on Mr. Doukas in connection with litigation pending in a Florida state court, that such service was made only shortly before the trial on the Proofs of Claim had commenced, and that the exhibits therefore should be admitted into evidence despite not being produced to Mr. Bavelis prior to trial. Quick Capital did not file certified copies of the documents, leaving Mr. Doukas's testimony as the only evidence of the note issued by Blair and the guarantee provided by Mr. Doukas.

Quick Capital contends that "[t]he only rational reason Doukas/Blair would be willing to undertake liability on a $3,567,000 construction loan" while "relinquish[ing] all control of construction and profit at sale" and "simultaneously deed[ing] the five homes to a bank representative at closing would be that Doukas/Blair had an agreement to be paid for these transactions." Doukas Findings & Conclusions ¶ 146. If so, that is not how Mr. Doukas represented the transaction to Mr. Bavelis. In February 2009, Mr. Doukas had sent Mr. Bavelis an email regarding the five Glenn Wright Co. lots, stating that Mr. Doukas's actions with respect to the matter were motivated by the fact that "we are friends for life." Debtor's Ex. 44. Mr. Bavelis testified, and the Court finds, that Mr. Bavelis was unaware of the purported note and guarantee until Mr. Doukas stated during the trial that Blair had issued the note and that Mr. Doukas had guaranteed it. Tr. at 660:9–24. Thus, there would have been no reason for Mr. Bavelis to believe that Mr. Doukas expected to be compensated for his involvement in the Glenn Wright Co.

matter, and certainly no reason for Mr. Bavelis to believe that Mr. Doukas expected any such compensation to come from Mr. Bavelis.

Quick Capital further argues that Mr. Bavelis's "testimony requires the Court to conclude that Doukas/Blair actions were virtually philanthropic in nature—done for no consideration, provided no 'upside' profit potential, and incurring only 'downside liability' on the loan." Id. ¶ 147. But any such "downside liability" was perhaps less so if Mr. Doukas never intended that he or Blair would satisfy the liability. In this regard, it bears noting that a deficiency judgment in excess of $3 million based on the liability under the note eventually was entered against Blair. Tr. at 902:16–20. In the end, even if Mr. Doukas's testimony regarding Blair's liability on the note and the subsequent deficiency judgment is accurate, that testimony is not in Quick Capital's favor, but instead provides another example of a situation in which Mr. Doukas and one of his companies failed to perform.

There simply is no evidence supporting Mr. Doukas's assertion that Mr. Bavelis paid $250,000 in order to satisfy an oral side agreement between Mr. Doukas and Mr. Bavelis with respect to the five Glenn Wright Co. lots. Indeed, all the evidence is to the contrary. The memo lines on both of Mr. Bavelis's checks state "Return Loan." Mr. Bavelis adamantly denied that the checks were in payment for the Glenn Wright Co. deeds, Tr. at 476–481, testifying that there were no discussions along those lines and that he would never make such payments. Tr. at 481:9–13 ("Absolutely not. The first time I saw something like $50,000 for a house was back in 2010. I never heard of anything like that. A director in my position to bribe someone, that's unheard that, that's absurd."). See also Tr. at 512. Mr. Doukas testified that

receiving $250,000 from Mr. Bavelis in exchange for the fives deeds "was a business transaction," Tr. at 901:17, even though in February 2009 he had sent Mr. Bavelis an email stating "i want you to minimize your loses and i am doing this because we are friends for life." Debtor's Ex. 44 at GB 000834. In fact, an email Mr. Doukas had sent on June 2, 2009 advising Mr. Bavelis that "all the liens were settled with the five houses," Debtor's Ex. 57 at GB 000501, was forwarded by Mr. Bavelis to another person, and in the forwarding email Mr. Bavelis referred to Mr. Doukas as his "friend" three times. Debtor's Ex. 57 at GB 000501; Tr. at 571. It seems improbable that the close relationship between Mr. Bavelis and Mr. Doukas would have continued if Mr. Doukas had requested $250,000 from Mr. Bavelis personally in exchange for deeds on properties securing defaulted loans held by Sterling Bank.

Moreover, the notion that the $250,000 was income to Blair is inconsistent with the evidence produced at trial with respect to the non-filing of income tax returns. Mr. Doukas never produced any evidence that he, Blair or any of his other companies reported $250,000 of income on any income tax returns on account of a transaction with Mr. Bavelis. Tr. at 76–77. Nor is there any evidence that Mr. Doukas or any of his companies reported on any tax returns the interest income he testified he received from Mr. Bavelis when, at Mr. Doukas's request, Mr. Bavelis issued Quick Capital two checks drawn on the account of Bavelis Financial Services, one dated July 28, 2009, the other dated August 28, 2009, each in the amount of $58,300. *See* Debtor's Ex. 104.

Mr. Bavelis described the $58,300 checks as follows:

[A]fter Mr. Doukas apparently received his monthly statement he saw that I did deposit the money in there. He came to my house, we had dinner. And before he left, again we got up for him to leave, he said, "By the way, George, give me a couple of checks." I said, "How much?" He said "$58,300 each." So I gave him two checks, [$]58,–300. And I didn't think, I thought it was just planning of my estate. That's what I considered it to be. I didn't ask any questions.

Tr. at 598:7–16. Mr. Doukas advised Mr. Bavelis that he would return the checks, Tr. at 598–99, but there is no evidence that he ever did.

Mr. Doukas characterized the two $58,300 payments as interest payments under the QC Note. But while conceding that Quick Capital should have reported this purported interest income on its tax return for 2009, Tr. at 75–76, Mr. Doukas provided no evidence that it had been so reported. He did not produce a tax return for Quick Capital for 2009, instead stating only that he would have produced it if it had been prepared and suggesting that he still (in 2012) had an extension for the filing of Quick Capital's 2009 tax return. Although Mr. Doukas represented to the Bavelises that he was working directly with the FBI and, as explained below, the Federal Deposit Insurance Corporation ("FDIC"), he apparently left any contacts with the IRS to his accountant. He testified that he needed to ask his accountant to confirm that Quick Capital still had an extension in 2012 to file its 2009 tax return, but Mr. Doukas never provided such confirmation on the record. Tr. at 75–76.

In sum, the Court concludes that, whether it was $200,000 or $250,000, the entire amount that Nemesis lent to Mr. Bavelis was repaid and that any payment that Nemesis made on behalf of R.P.M. under the R.P.M. Agreement also was repaid.

## 2. The Nevada Corporation

As already discussed, Mr. Doukas first mentioned the formation of a Nevada corporation to Mr. Bavelis in connection with estate planning and the execution of the QC Loan Documents. Tr. at 584–85. The name of the corporation was TNS Holding Corp. ("TNS"). Tr. at 309. During the trial, Mr. Doukas disclaimed knowledge of TNS. Tr. at 309–12. There is abundant evidence, however, that Mr. Doukas was intimately aware of and interested in TNS. A few weeks after the QC Loan Documents were signed, one of Mr. Doukas's attorneys, Mr. Stravato, sent an email to Mr. Doukas and Mr. Bavelis attaching an agreement entitled Assignment of Interests in Partnerships. Had he signed that agreement ("TNS Agreement"), Mr. Bavelis would have assigned his interests in 22 of the Ohio Partnerships to TNS. Debtor's Ex. 87; Tr. at 587. Mr. Doukas also forwarded the same email to Mr. Bavelis. Debtor's Ex. 87; Tr. at 309–311. Mrs. Bavelis confirmed that it was not her husband, but instead was Mr. Doukas, who wanted Mr. Bavelis to form TNS and transfer assets to it. Tr. at 409. On the draft of the articles of incorporation for TNS, the Florida address for Mr. Doukas appeared in the box for the incorporator even though the incorporator was identified as Mrs. Bavelis. Debtor's Ex. 83 at GB000042; Tr. at 313:4–9; 314:1–15; 586. Mr. Bavelis did not know the persons identified as the directors of TNS. Tr. at 588–89.

On November 21, 2009, Mr. Doukas forwarded to Mr. Bavelis an email that had been sent to Mr. Doukas on July 6, 2009 regarding the incorporation of TNS. Debtor's Ex. 92 at GB 001264. With respect to that email, Mr. Doukas testified as follows:

Q. Look at Exhibit 92 please and . . . there's two emails, the one at the bottom appears to be an email from Fran Autumn to among others Ted Doukas, right?

A. Yes.

Q. Dated July 6, 2009, correct?

A. Yes.

Q. And the subject of that email is TNS Holding Corporation, correct?

A. Yes.

Q. It says, "Ted, still waiting for the signed page to be sent back to me for filings." Do you see that?

A. Yes.

. . . .

Q. So Fran Autumn has a company that allows you to establish corporations?

A. Yes and I gave the name to anybody when they open a corporation. I said she's very good. She's doing the job very well. So, yes, I know Fran.

Q. And then the email that is dated July 6, 2009 you had reforwarded to Mr. Bavelis on November 21, 2009 at 10:16 a.m., do you see that?

A. What is that, what exhibit?

Q. At the top of the page.

A. I forwarded to Mr. Bavelis, yes.

Q. Okay, so you apparently gave the name to—of this lady to Mr. Bavelis plus you sent reminder notices to Mr. Bavelis about the formation of TNS Holding Corporation, the company you said you knew nothing about?

A. He wanted to, he wanted to have a corporation, so I gave the name to order a corporation and that lady sent me a copy. It was not my corporation, it was his corporation, so I don't know anything about TNS Holding, what's it doing or anything, it was his business.

Q. So it wasn't important for you that it was getting filed?

A. For me it was he sent an email and I sent it back to say look at what she send me here. She wanted to sign some pa-

pers but it was not my business, it was not my corporation.

Q. Okay, not your business, not your corporation. Did you care one way or the other whether Mr. Bavelis actually signed that document then, apparently not, right?

A. He ordered a corporation so it was, they sent me a copy of that email and I forwarded it to him, there's nothing wrong with that.

Q. Okay. My question is did it matter to you one way or the other whether or not Mr. Bavelis proceeded forward in completing the incorporation of the Nevada corporation?

A. It was his business. It was his decision, it was not mine.

Q. Did it make any difference to you?

A. No difference.

Tr. at 314:17–317:9. *See also* Debtor's Ex. 92. Mr. Doukas provided no explanation for why it occurred to him on November 21, 2009 to forward an email that he had received more than four months earlier regarding a subject that purportedly meant nothing to him. On December 8, 2009, Mr. Doukas sent another text message to Mr. Bavelis forwarding an email he received that same day regarding the filing of TNS in Nevada, stating "George follow up with this to be file." Debtor's Ex. 93 at GB 001262. *See also* Tr. at 317–18. Mrs. Bavelis recalled that Mr. Doukas pushed the formation of TNS and reminded her husband to take the steps necessary to form the company. Tr. at 409–10.

Mr. Bavelis was uncomfortable with the idea of signing the TNS Agreement because he did not recognize the names of the proposed directors and because Mr. Doukas's home address was used for the address of the incorporator. Tr. at 588–89. For the first time, he decided not to do something suggested by Mr. Doukas. He did not, however, advise Mr. Doukas of this decision, but instead "was postponing as much as I could." Tr. at 589:4–5. Over the course of the next several months, Mr. Bavelis would have other reasons to be uncomfortable with Mr. Doukas.

### 3. The Promised Deposits

The parties did not testify that monthly deposits of $80,000 to $120,000 formed part of the consideration for the QC Loan Documents, but those promised deposits were part of the inducement that persuaded Mr. Bavelis to sign the documents. Tr. at 1059–60. Mr. Doukas, however, never deposited $80,000 to $120,000 a month into accounts maintained at Sterling Bank. He conceded that he failed to do so, Tr. at 951, and the evidence shows that any deposits he made of income from his companies were relatively small. Tr. at 960–62. In an effort to make it appear that he deposited substantial income from his companies into Sterling Bank, Mr. Doukas testified that Nemesis deposited $270,000 of rent checks into accounts maintained at Sterling Bank on May 22, 2009. Having previously testified that this amount was entirely from his divorce, Tr. at 944, he revised his testimony to state that this amount was from income received by one of his companies, Efastos Corp. He did not, however, produce a federal income tax return substantiating such income. Tr. at 951–55. Faced with these discrepancies, Mr. Doukas testified that he in fact was depositing funds into accounts maintained at banks other than Sterling Bank. Tr. at 962–67.

The evidence also demonstrates that neither Mr. Doukas nor his companies had the ability to make deposits at the promised level. A deposit of $80,000 per month for the six remaining months of 2009 after the QC Loan Documents were executed would have equated to a deposit of

$480,000 in 2009. The tax returns that Mr. Doukas and his companies produced, however, demonstrate that the net income (after cash expenses) for Mr. Doukas and his companies was approximately $176,630 for the entire year of 2009. Debtor's Exs. 186, 188, 192, 195, 198, 209, 213 & 218. In other words, at the time Mr. Doukas promised to cause deposits of $80,000–$120,000 a month to be made into Sterling Bank, he knew that he had no ability to fulfill the promise. Like Mr. Doukas's tax returns for 2009, tax returns for 2008 would have revealed an inability to make the promised deposits. Debtor's Ex. 187, 191, 197, 206, 212, 217; Tr. at 679–80. But Mr. Bavelis did not know in June 2009 that Mr. Doukas lacked the ability to make the promised deposits, because Mr. Bavelis did not review the tax returns that Mr. Doukas had delivered to him to give to Mr. Albright.

### 4. The Purchase of Additional Shares in Sterling Holding

Mr. Doukas contends that he performed under the QC Loan Agreement by purchasing more than $1.4 million of stock in Sterling Holding on Mr. Bavelis's behalf. The evidence shows, however, that Mr. Doukas purchased the stock on his own behalf. As already discussed, Mr. Doukas had purchased more than $200,000 of shares in Sterling Holding in March 2009, and in May of that year advised Mr. Bavelis that he might invest as much as an additional $3 million, resulting in warnings from both of the Bavelises and a statement by Mr. Doukas to Mrs. Bavelis that "I take my chances and I always win." Tr. at 408:5.

The efforts to increase the capital of Sterling Bank were continuing in July 2009. On July 29, 2009, Mr. Albright sent an email to Mr. Bavelis and the other directors of Sterling Bank regarding a potential investment of capital by two people who were not shareholders at that time. In that email, Mr. Albright stated that he felt "strongly that having them part of the Sterling Bank family would be very positive for all of us[,]" while recognizing "that dilution is not good for any of us." Debtor's Ex. 59 at GB 001447–48. The next day, Mr. Bavelis forwarded the email to Mr. Doukas and made the following plea:

> Please take a look at what David is trying to do; he is trying to take our bank and give it to his friend. Leftheri, you have helped me a lot so far and I will never forget it. I NEED YOUR HELP TO STOP HIM SHORT of his selfish action. I have no use for his 25 million to make this a great bank and get back to where we were before this financial downturn. I would need your help to raise at least 10 million this year but not less than 5 million in August and middle of September. If we can raise the total amount of 10 million before the end of September it will help a lot. Then we can take our time and raise 2–3 million before June of next year. I sincerely believe that [with] that much capital the bank will be on its way back to where I am used to operating my banking business. Please let me know if I need to meet with you and or any one else any where in the world to stop David short from bringing his friend in and taking over the bank that I worked so hard to create. I can assure you the potential is great with this bank and there is a lot of money to be made here on it if I get the capital that I need.

Debtor's Ex. 59 at GB 001447.

That same day, Mr. Doukas responded to Mr. Bavelis regarding Mr. Albright: "george my brother we will not let anybody take our bank. i knew he was not a good person and he wanted to take you

out. i will not let him me and you we have to get him out. i will call you tomorrow. i went to greece for ten days. . . ." Debtor's. Ex. 59 at GB 001447. Mr. Bavelis explained Mr. Doukas's reference to "our bank" as follows:

[W]e had long conversations and long discussions with him that we were going to take the majority of this bank, probably 80 or 90% between the two of us. Because we were going to put a lot of money when the bank needed the money, approximately, I'm saying here 10,–000,000 but we're talking about 12,000,–000, what the regulators told us to do. In fact we talked about him becoming as much shareholder as I am.

Tr. at 574:21–575:8.

On August 7, 2009, Mr. Bavelis, as chairman of the board of Sterling Holding, sent a letter to its shareholders (including Mr. Doukas), stating in part as follows:

Sterling Bank, like a high majority of the banks in Florida, has been coping with the troubled loans so far and a written agreement has been reached between the Bank, the Federal Reserve and the State of Florida that we must reserve additional funds for reserves and further increase our capital ratios even though we have always been in the "well capitalized" category. In an effort to comply with the regulators requests and increase our regulatory ratios to the unprecedented higher ratios, the Board of Directors unanimously approved raising $12,600,000 new capital, primarily from the existing shareholder[s] through the end of the month, on a prorata basis at $100 per share for Class A and $80 per share of Class B and any shareholder may purchase any additional Common Shares of Class A or Class B for the same pro rata after August 31, 2009. Class A Shares are voting and Class B Shares are non-voting but the shareholder distributions of both classes of shares will be the same as soon as our bank begins distributing money again with the permission of our regulators which we hope to be sometime in a year or two.

Debtor's Ex. 116. Along with the letter Mr. Bavelis sent a subscription agreement (Debtor's Ex. 117), a confidential private placement memorandum (Debtor's Ex. 118) and an annual report (Debtor's Ex. 120). Tr. at 149–151. Like the other shareholders of Sterling Holding, Mr. Doukas was sent a copy of these materials, including the private placement memorandum. Tr. at 150–51; 745:14–25. Mr. Bavelis also gave Mr. Doukas a copy of the private placement memorandum, Tr. at 745:14–25, and Mr. Bavelis discussed the private placement memorandum with Mr. Doukas. Tr. at 746:3–14. The private placement memorandum provided a "Notice to Florida Residents" stating that the securities had not been registered and that all persons purchasing the securities in Florida had a three-day right of rescission under Fla. Stat. Ann. § 517.061(11)(a)(5). Debtor's Ex. 118 at iv.

Although Mr. Doukas did not sign a subscription agreement, during a telephone call on the morning of September 23, 2009, he informed Mr. Fritz that he wished to purchase stock in Sterling Holding, referencing the price for the Class B shares. Tr. at 149–56; 199–201. He did not state that he was purchasing the stock on behalf of Mr. Bavelis or anyone else, Tr. at 154:12–16, or that he was making a loan to Mr. Bavelis. Tr. at 154:17–19. Around noon that same day, Mr. Fritz sent Mr. Doukas an email confirming the substance of this conversation. Tr. at 154–58. The email stated as follows:

Mr. Doukas:

Please confirm the following based on our phone conversation this morning.

I am transferring monies from the following accounts into Sterling BancGroup, Inc. in order to buy company stock on your behalf.

$45,600 from ... Leftheris Properties Corp.

$199,275 from ... Leftheris Ted Doukas

$919,095 from ... Nemesis of L.I. Corp.

$500,030 from [a certificate of deposit issued to] ... WKYA Holdings Corp (This CD is currently pledged for a line of credit that will now be closed based on using the funds from this CD for purchasing company stock)

The total amount being transferred into Sterling BancGroup, Inc. to purchase stock is: $1,664,000.00

Please confirm that you agree and approve all of the above transactions.

Thank you

Moyle Fritz

Debtor's Ex. 121 at GB004014. *See also* Tr. at 57–60.

In his email, Mr. Fritz twice stated that Mr. Doukas's funds were being transferred into a Sterling Holding account; Mr. Fritz in no way indicated that the funds were being transferred on Mr. Bavelis's behalf. Mr. Fritz also twice stated that the funds were being transferred for the purpose of purchasing stock in Sterling Holding; in one of those instances Mr. Fritz made clear that the purpose was to "to buy company stock on your behalf." Mr. Fritz made no reference to a stock purchase on behalf of Mr. Bavelis. In response, Mr. Doukas sent the following email:

Hi moyle I authorize you to transferred the all the monies today except on my personal account you hold it for now so transferred everything else except the personal and next week I will wire more money try to sent me the wire instructions too thanks confirm you received that email thanks Ted

Debtor's Ex. 121 at GB 004014. Mr. Doukas was instructing Mr. Fritz not to transfer $199,275 from his personal account, so that the amount of funds being transferred would be $1,464,725. Mr. Doukas raised no issue with the statements in Mr. Fritz's email to the effect that the funds were being transferred to Sterling Holding for the purpose of purchasing stock on behalf of Mr. Doukas. Tr. at 157:15–158:5. The $1,464,725 of funds were transferred to an account named "Sterling BancGroup, Inc." Debtor's Ex. 121 at GB 004015–GB 004021; Tr. at 159–61. This amount closely approximates the "not less that 10%" of the alleged Schedule A to the QC Loan Agreement. Although Mr. Doukas purchased the shares in September 2009, he requested that the issuance of stock certificates be deferred until after he formed a trust similar to Mr. Bavelis's, at which time the certificates would be placed in the name of Mr. Doukas's trust. Tr. at 608. This request no doubt would have taken Mr. Bavelis by surprise in light of Mr. Doukas's representation of his extensive estate-planning experience—presumably gained from planning his own estate-prior to the execution of the QC Loan Agreements.

In order to explain the inconsistency between the foregoing and his argument that the funds were being provided for Mr. Bavelis's benefit, Mr. Doukas alleged the existence of a confidential agreement with Mr. Bavelis under which the transfer of the funds was to purchase stock on behalf of Mr. Bavelis. Tr. 60:24–61:19. Mr. Doukas did not produce the agreement before trial. During trial, he stated to Mr. Bavelis's attorney that "[y]ou can read the agreement. You will see it there. Confidentiality." Tr. at 61:16–17. The alleged agree-

ment, however, was never produced. Other than Mr. Doukas's self-serving testimony, there is no evidence that such an agreement ever existed.

By contrast, Mr. Bavelis testified that there was no such agreement, Tr. at 604, and his testimony was supported by actions taken by himself and his family. Mr. Bavelis stated that if he or members of his family were going to purchase additional shares in Sterling Holding he would place the stock certificates in the name of the person who provided the funds for the purchase. Tr. at 605. And that is precisely what he and members of his family did. In September 2009, Mrs. Bavelis purchased shares in Sterling Holding on behalf of a trust, and one of the Bavelises' daughters purchased shares on her own behalf. Later that same year, in December, Mr. Bavelis purchased additional shares in Sterling Holding on behalf of the Trust. Tr. at 605–06; Debtor's Ex. 122.

Mr. Doukas himself purchased additional stock in Sterling Holding near the end of September 30, 2009. He signed a letter stating that the proceeds of a $500,000 loan from Sterling Bank (secured by an asset owned by Leftheris Properties Corp., Tr. at 862–63) should be transferred into "my Leftheris Properties Corp. account" and $7,000 from "my Leftheris Ted Doukas account . . . to my Leftheris Properties Corp. account" and that "$500,000 of funds in my Leftheris Properties Corp. account [should be used] to purchase Ster-

ling BancGroup stock." Debtor's Ex. 121 at GB 004033; Tr. at 105–08. The account statement that Sterling Bank sent Mr. Doukas for the period ending September 30, 2009 referenced the $500,000 amount and stated that it was to "PURCHASE 6250 SHARES SBG STK." Debtor's Ex. 121 at GB 004034; Tr. at 109; 202–03; 206; 862–63. In other words, Mr. Doukas obtained a loan from Sterling Bank for the purpose of purchasing stock in Sterling Holding. In November 2009, representatives of Sterling Bank came to believe that it was impermissible for the bank to make a loan for the purpose of purchasing stock in Sterling Holding and therefore rescinded the transaction, resulting in a repayment of the loan and reimbursement of interest and closing costs paid by Mr. Doukas. Tr. at 162–66; 210–13; 927–29; Debtor's Ex. 121 at GB 004003; GB 004035–36; Debtor's Ex. 124 at TD 000109.

On October 20, 2009 (before the September 30 stock purchase was rescinded), Mr. Doukas himself provided information to Mr. Bavelis that was to be included in a personal financial statement for Mr. Doukas. Tr. at 871. The second page of that financial statement stated that Mr. Doukas was the 100% owner of 25,759 Class A and B Sterling Holding shares. Debtor's Ex. 48 at GB 003913. That number of shares is equivalent to the sum of the shares Mr. Doukas purchased in March 2009 (1,200), on September 23, 2009 (18,309) and on September 30, 2009 (6,250).[11]

11. Mr. Doukas's personal financial statement is enlightening in at least one additional respect. In the financial statement, he listed the value of shares owned by Aries Capital in a company called Regulon at $6,250,000, Debtor's Ex. 48 at GB 003913, even though in the list of selected accomplishments he presented to Mr. Bavelis in April 2009 Mr. Doukas, in referring to the Regulon shares, represented that he was the "[o]wner of approximately $30,000,000 of private stock. . . ." Debtor's

Ex. 46 at GB 000791. Not only that, but when Mr. Bavelis's attorney pointed out that Aries Capital "is a company that every year reports to the IRS that [it] has less than $250,000 in value," Tr. at 132, Mr. Doukas first attempted to explain this by stating "[t]hat stock is not traded stock," Tr. at 132, and then backtracked by stating that what he actually owned were stock options. Tr. at 133. Changing his story yet again, he then stated that he owned stock and stock options in Regulon. Tr.

For the foregoing reasons, the Court finds that the stock Mr. Doukas purchased in Sterling Holding in September 2009 was purchased on his own behalf, not on behalf of Mr. Bavelis.

### 5. The Colonial Bank and First Southern Loans Guaranteed by Mr. Bavelis

Mr. Doukas also testified that the consideration provided for the QC Note included the restructuring of the Colonial Bank and First Southern loans that Mr. Bavelis had guaranteed. Tr. at 285. No such restructuring ever occurred, and the responsibility for the failure lies with Mr. Doukas. On September 24, 2009, Mr. Doukas sent Mr. Bavelis a text message regarding Colonial Bank and the Lake Mary Project. Debtor's Ex. 67 at GB 004052. Mr. Bavelis explained the text as follows:

> [H]e was going to buy the bank notes so I would not have to have this pressure on me to make the payments. And that's what he was referring to, the Colonial Bank was taking over by BB & T and at that time I think it was in transition between BB & T and FDIC. We're not quite sure as to who the owner of the note is going to be. And in fact he told me he had a friend at FDIC and he was going to work with FDIC and this note from Colonial Bank will not go into BB & T. His friend will help him to keep it so he can buy it.

Tr. at 576:27–577:10. As Mr. Bavelis testified, this "[n]ever happened." Tr. at 577:12.[12]

Mrs. Bavelis confirmed that Mr. Doukas said he was working with someone at the FDIC to purchase the notes. Tr. at 405. In fact, Mr. Doukas staged a scene to make it appear that he was working on acquiring the notes. As Mrs. Bavelis testified:

> In my kitchen ... Ted Doukas he dialed a number and he had this guy on a speaker phone and he asked him, "What's happening with the notes?" And this guy, whoever the guy was said, "Oh, don't worry, by Thursday I'll have the notes." And that was going on for many, many months. But that night this man whoever the man was told Ted Doukas that the notes would be finalized by Thursday.

Tr. at 406:4–12.

They never were. Nor was a deal reached with First Southern. As Mr. Bavelis testified, the lack of success was a result of Mr. Doukas's failure to do what would have been required. Tr. at 627:15–24 ("[Mr. Doukas], apparently he was telling me that he was talking to the banks to buy the notes. And at some point I remember

---

at 134. The value of the stock and options was never established. Tr. at 872–75.

Mr. Doukas's conflicting statements concerning the nature and value of his Regulon stock holdings illustrate why the Court found his trial testimony to be so lacking in credibility. Over several days of cross-examination, Mr. Doukas exhibited a remarkable pattern of evasiveness. During his cross-examination, Mr. Doukas suffered one convenient memory lapse after another. Yet, when recounting facts that might support his version of events, his recollections were unclouded. Moreover, documents admitted into evidence that he prepared or that were prepared on his be-half—such as his tax returns and personal financial statement—were riddled with inconsistencies. In short, Mr. Doukas's trial testimony—as well as his out-of-court statements that were admitted as evidence—had a chameléon-like quality, shifting as necessary to suit his purposes at a given time.

**12.** Branch Banking and Trust Company ("BB & T") acquired the assets of Colonial Bank from the FDIC as Receiver of Colonial Bank. BB & T filed a proof of claim against Mr. Bavelis in the liquidated amount of $13,375,450.12, plus unliquidated amounts. Case No. 10–58583, proof of claim number 9.

talking to Chuck whom I knew, he was executive vice president of First Southern Bank. And I asked him, 'Chuck, why does it take you so long for you to get this note sold to Ted Doukas?' He said, 'George, I asked him to send me financials and other papers and he never did do anything, I didn't get anything, so I'm not working on it.' "). Mr. Doukas failed to provide financial statements and other documents because he had never had any prepared. Tr. at 68–69. Mr. Bavelis never received anything in writing showing that Mr. Doukas had reached an agreement with these lenders. Tr. at 627–28. In fact, Mr. Doukas conceded that no restructuring was ever accomplished and that a term sheet was never even signed. Tr. at 286–89.

### 6. The Request to Return the QC Loan Documents

Before Mr. Bavelis signed the QC Loan Documents in June 2009, Mr. Doukas told him that he would return the documents within three to four months. Tr. at 584:9–12. In late October 2009, after Mr. Doukas failed to return the QC Loan Documents in that time frame, Mr. Bavelis suggested that the poor relationship Mr. Doukas had with his daughters counseled in favor of returning them:

> I think it was close to the end of October when I specifically asked him, I said, in fact my wife was there at the time and I said, "Ted, you know, you're flying back and forth to New York and you're flying a lot all over the place, and God forbid if something happens to you what is going to happen to this note, this $14,000,000 note. I feel very uncomfortable because if your daughters get a hold of this note where would I be with the $14,000,000 note." He said, "Don't worry about it. I'll give it back to you. I'll give it back to you." That was his answer. And in fact

the rest of the papers, every time I ask for, "I will give them back to you. I will give them back to you."

Tr. at 591:10–23. Mrs. Bavelis remembered the conversation the same way:

> [T]hey were in the living room talking and George told Ted, he said, "You know, Ted, I feel a little uneasy because you travel so much and you have this $14,000,000 note and you're telling me, you know, your children, your daughters are, you don't have relationship. If something happens to you how am I going to deal with the girls?" And he said, "Oh, okay, I'll just give it to you. Don't worry, I'll give it to you."

Tr. at 403:27–404:8. In other words, Mr. Bavelis realized that it would not be apparent to the beneficiaries of Mr. Doukas's estate that no payments were to be made under the QC Note. His request to return the QC Note—as well as Mr. Doukas's statement that he would do so—is consistent with Mr. Bavelis's testimony that no payments were expected under the QC Note and that the QC Loan Documents would be returned.

### 7. The Bavelis–Qureshi LLCs

At some point, Mr. Bavelis and Mr. Doukas discussed the possibility of Mr. Bavelis causing an assignment to be made of the 50% interests in the Bavelis–Qureshi LLCs (held by him, Bavelis Family and FLOHIO) to Mr. Doukas or one of his companies. Quick Capital Ex. T. Mr. Doukas testified that he made Mr. Bavelis aware of his desire to purchase those interests on his own behalf prior to the execution of the QC Loan Documents in June 2009, Tr. at 852, and that the agreement was that as part of the deal he or one of his companies would agree to provide Mr. Bavelis indemnification on account of Mr. Bavelis's guarantees of the bank debt of the Bavelis–Qureshi LLCs. Tr. at 290. To the contrary, the evidence suggests

that the discussions, if any, that Mr. Bavelis and Mr. Doukas had regarding Mr. Doukas or one of his companies obtaining interests in the Bavelis–Qureshi LLCs on a permanent basis occurred in the fall of 2009. Quick Capital Ex. T. In fact, before Mr. Bavelis assigned 10% of his interest in GMAQ to Blair and his entire interest in GMAQ to R.P.M., Mr. Doukas promised Mr. Bavelis that the assignments would be returned once the negotiations with Mr. Qureshi were finalized, which apparently would have resulted in neither Mr. Doukas nor any entity affiliated with him permanently retaining any interest in the Bavelis–Qureshi LLCs.

The Court, however, need not decide whose recollection of the timing is accurate. Before the execution of the QC Loan Documents, Mr. Doukas promised that he would negotiate with Mr. Qureshi in such a manner that any resolution of the disputes with respect to the Bavelis–Qureshi LLCs would be in the best interests of Mr. Bavelis. As explained below, Mr. Doukas contends that Nemesis now owns the 50% interest in the Bavelis–Qureshi LLCs once owned by Mr. Bavelis, Bavelis Family and FLOHIO, without any indemnification being provided to Mr. Bavelis—a result that clearly is not in the best interests of Mr. Bavelis. In other words, whether the specific promise made by Mr. Doukas prior to the execution of the QC Loan Documents was the one described by Mr. Bavelis or the one set forth by Mr. Doukas, Mr. Doukas kept neither. In fact, Mr. Bavelis never received indemnification or anything else in exchange for the transfer of interests in the Bavelis–Qureshi LLCs (other than the $50,000 under the R.P.M. Agreement, which Mr. Bavelis repaid).

In addition to the false promises that Mr. Doukas made before the execution of the QC Loan Documents, a series of

events that occurred in the fall and winter of 2009 led to this outcome. By the fall of 2009, Mr. Bavelis's FLOVEST problems included personal guarantee obligations in excess of $13.7 million ($3.7 million held by First Southern and approximately $10 million held by Colonial Bank), as well as a state court action by Colonial Bank seeking foreclosure and the appointment of a receiver with respect to the Lake Mary Project. Before the execution of the QC Loan Documents, Mr. Doukas had promised Mr. Bavelis that he would acquire this debt as well as work to resolve the issues with Mr. Qureshi in a manner consistent with the best interests of Mr. Bavelis. Even if Mr. Bavelis had desired to rely solely on Mr. Doukas to resolve those issues, Mr. Bavelis was not in a position to rely solely on Mr. Doukas when it came to FLOVEST. The equal members of FLOVEST were MAQ Management and FLOHIO. Thus, Mr. Bavelis's interest in FLOVEST was indirect—a 50% interest was held by FLOHIO, and a one-third membership interest in FLOHIO was held by Bavelis Family, in which Mr. Bavelis held an interest. The principals of the other members of FLOHIO were, of course, interested in resolving the FLOVEST issues, including the Colonial Bank foreclosure action.

In the summer and fall of 2009, Mr. Bavelis and Mr. Qureshi had a number of meetings to discuss FLOVEST and to address the possibility of one of them buying the other's interests in the Bavelis–Qureshi LLCs. Debtor's Ex. 173 at 123–25; Quick Capital Exs. M; T. The last of those meetings occurred sometime in the fall of 2009. Debtor's Ex. 173 at 123:3–9. On October 21, 2009, Mr. Bavelis sent a letter on behalf of FLOHIO to MAQ Management and Mr. Qureshi, Quick Capital Ex. M; Tr. at 609–10, offering to sell FLOHIO's 50% interest in FLOVEST to MAQ Manage-

ment in exchange for $100,000 and a release of FLOHIO's and Mr. Bavelis's liabilities on the bank debt. Alternatively, FLOHIO would purchase MAQ Management's 50% interest in FLOVEST for $100,000. Mr. Bavelis was at that point dissatisfied with Mr. Doukas's lack of success in reaching a deal with Mr. Qureshi. He explained the purpose of the letter as follows:

> [B]ecause of not being able to accomplish what Ted Doukas was promising me he would accomplish, my partners and I were getting so uneasy about it and we decided one way to split this partnership, this LLC, is to go ahead and make [Mr. Qureshi] an offer, either we buy him out or he buys us out. And this is what this is in reference to. My other two partners, The Vakaleris Family LLC and the Yessios Family LLC agreed for us to write this letter.

Tr. at 610:7–16. In response, on October 29, 2009, Mr. Qureshi (on behalf of MAQ Management) sent a letter to Mr. Bavelis purporting to accept FLOHIO's offer to sell its membership interest to MAQ Management for $100,000, provided that Mr. Bavelis's guarantees would remain in place. Quick Capital Ex. N; Tr. 610–11. That letter was followed by one from Mr. Bavelis to Mr. Qureshi on November 4, 2009 stating that the release of Mr. Bavelis's guarantee obligations was an "integral part of the offer," characterizing Mr. Qureshi's letter as a counteroffer and rejecting that counteroffer on behalf of FLOHIO. Quick Capital Ex. O. On November 12, 2009, Mr. Qureshi sent Mr. Bavelis a letter

reiterating MAQ Management's position that it had properly accepted FLOHIO's original offer. Quick Capital Ex. P. Those letters did not result in a resolution, and the problems with FLOVEST continued.[13]

In November 2009, Mr. Bavelis's attorney, Mr. Schaeffer, sent a letter to Mr. Bavelis and certain principals of the other members of FLOHIO (i.e., Yessios Limited Partnership and Vakaleris Family Limited Partnership). Debtor's Ex. 127. In response to the letter from Mr. Schaeffer, one of those principals stated in an email: "I vote to proceed with the . . . dissolution [of FLOVEST], even though I have a strong suspicion that [Mr. Qureshi] will find a way to maneuver around this as well. I see this as a last resort and if it does not work the consequences should be obvious." Debtor's Ex. 127 at TD 000119. In response, Mr. Bavelis stated that he "would prefer to see what the possibility is of working out with the plaintiff's lawyer and possibly the judge before we jump into dissolution. I believe Mahammad is getting desperate more and more every day. I hope to hear something this coming week regarding the Notes." Debtor's Ex. 127 at TD 000118. In an email he sent to Mr. Bavelis and others with an interest in FLOHIO on November 30, 2009, Mr. Schaeffer recommended the filing of a dissolution complaint. Debtor's Ex. 127 at TD 000117. That same day, Mr. Bavelis forwarded Mr. Schaeffer's email to Mr. Doukas. Debtor's Ex. 127 at TD 000117.

Mr. Bavelis did not inform Mr. Schaeffer of what happened next until after the fact. The confidence Mr. Bavelis previously had in Mr. Doukas apparently was momen-

---

**13.** Mr. Qureshi's recollection of the sequence and timing of events is not entirely accurate. During his deposition, Mr. Qureshi recalled that Mr. Bavelis made the offer to sell 50% of the interests in the Bavelis–Qureshi LLCs for $100,000 (or, alternatively, to purchase the 50% interest held by Mr. Qureshi and his companies) after the December Agreements were executed. Debtor's Ex. 173 at 127:17–20. To the contrary, the October and November 2009 dates of the letters sent by Mr. Bavelis clearly show that he made the offer before he signed the December Agreements.

tarily restored when, in December 2009, Mr. Doukas advised Mr. Bavelis that a deal had been struck with Mr. Qureshi. Mr. Doukas told Mr. Bavelis that, in order to finalize the deal, Mr. Doukas would need an assignment to be made to Nemesis of the 50% interests that Mr. Bavelis, Bavelis Family and FLOHIO owned in the Bavelis–Qureshi LLCs, but that the assignments would be returned after Mr. Doukas had acquired the 50% interest held by Mr. Qureshi. That is, as he had with the QC Loan Documents, Mr. Doukas told Mr. Bavelis that he would return the assignments after the deal with Mr. Qureshi was finalized.[14] Mrs. Bavelis confirmed that Mr. Doukas made such a representation to her husband:

Q. Did you hear any discussions between your husband and Mr. Doukas about your husband assigning any interest in any of the Florida operating companies and I define those as BMAQ, GMAQ, Flovest or George Real Estate?

A. Yes, I did.

Q. And please explain to the Court—

A. Yes.

Q.—what you recall hearing in that regard.

A. I did hear them discussing that and I heard Doukas telling George, "You know, you give me, you sign these documents I will negotiate with Mahammad and after everything is done I'll just give you back the papers. It's a matter of dealing with this man and after I do that I'll just return the papers back." As a matter of fact he used a term, a Greek term ... which means it's just between us, I'll just give it back to you.

. . . .

Q. And when you say he indicated he would return the paper, return the paper when?

A. After he had finished dealing with Mahammad Qureshi.

Tr. at 401:21–402:22. *See also* Tr. at 412; 428–32. Unbeknownst to Mr. Bavelis, however, in December 2009 Mr. Doukas was attempting to purchase on his own behalf the 50% interest in the Bavelis–Qureshi LLCs owned by Mr. Qureshi or his affiliated entities. Debtor's Ex. 173 at 18:21; 19:16.[15]

On the afternoon of December 16, 2009, Mr. Bavelis and Mr. Doukas met at a shopping center in Boca Raton. Mr. Bavelis describes the meeting as follows:

So in fact we met around 5:30 I remember at Starbucks Café. And he said, "Once we sign this I'm going to straight to [Mr. Qureshi's] house and it's done. It's a done deal, George." He took this paper from the back of his pocket along with some other pieces of paper and I was so relieved, finally we got it, a resolution here.

Tr. at 569:21–27. *See also* Tr. at 615–17. And so, on December 16, 2009, Mr. Doukas handed Mr. Bavelis—and Mr. Bavelis signed—four agreements purporting to transfer membership interests in the Bavelis–Qureshi LLCs to Nemesis. In partic-

14. Each of the certificates of acknowledgment on the agreements Mr. Bavelis signed in December 2009 ("December Agreements") states that they were signed on January 20, 2010, but the parties agree that they were signed on December 16, 2009.

15. During the trial, Mr. Bavelis objected to the admission of this portion of Mr. Qureshi's deposition and others based on Mr. Qureshi's refusal to comment on the financial terms of the alleged deal between Mr. Qureshi and Mr. Doukas. The assertion of confidentiality, however, was merely with respect to the financial terms of the deal, Debtor's Ex. 173 at 25:7–10; 29:21–25; 30:1–10, not to the existence of an offer or agreement between Mr. Qureshi and Mr. Doukas.

ular, Mr. Bavelis (on his own behalf and as a member of GMAQ) and Mr. Doukas (on behalf of Nemesis) signed an agreement entitled "GMAQ, LLC, Members, Transferor's and Transferee's Consent and Approval of Transfer of Ownership" ("December GMAQ Agreement"). Debtor's Ex. 139. By the December GMAQ Agreement, Mr. Bavelis transferred to Nemesis all of his membership interest in GMAQ, even though he had already transferred 10% of that interest to Blair in March and 50% of that interest to R.P.M. in June 2009. Mr. Qureshi was named as a party on the first page of the December GMAQ Agreement, but he did not sign it—only Mr. Bavelis and Mr. Doukas signed. In light of the fact that GMAQ had no bank debt and owned approximately several million dollars in assets, Tr. at 767, 1004–06, Mr. Bavelis arguably had once again signed an agreement purporting to transfer his interest in the most valuable of the Bavelis–Qureshi LLCs.

At that same meeting, Mr. Bavelis (as the manager of Bavelis Family) and Mr. Doukas (on behalf of Nemesis) signed an agreement entitled "BMAQ, LLC, Members, Transferor's and Transferee's Consent and Approval of Transfer of Ownership" ("December BMAQ Agreement"). Debtor's Ex. 140. By the December BMAQ Agreement, Mr. Bavelis purported to transfer to Nemesis all of Bavelis Family's right, title and interest in 100% of its membership interest in BMAQ. Qureshi Family was named as a party on the first page of the December BMAQ Agreement, but neither Mr. Qureshi nor anyone else signed the December BMAQ Agreement on behalf of Qureshi Family.

In addition, Mr. Bavelis and Mr. Doukas signed an agreement entitled "George Real Estate Holdings, LLC Members, Transferor's and Transferee's Consent and Approval of Transfer of Ownership" ("De-cember George Real Estate Agreement") Debtor's Ex. 141. Under the December George Real Estate Agreement, Mr. Bavelis purported to transfer a membership interest in George Real Estate to Nemesis. Mr. Qureshi was named as a party on the first page of the December George Real Estate Agreement, but he did not sign the agreement.

Finally, Mr. Bavelis (as the manager of FLOHIO) and Mr. Doukas (as the president of Nemesis) signed an agreement entitled "FLOVEST LLC, Members, Transferor's and Transferee's Consent and Approval of Transfer of Ownership" ("December FLOVEST Agreement"). Debtor's Ex. 142. By the December FLOVEST Agreement, Mr. Bavelis purported to transfer to Nemesis all of FLOHIO's right, title and interest in 100% of its membership interest in FLOVEST. The other member of FLOVEST—MAQ Management—was named on the first page of the December FLOVEST Agreement for the purpose of providing consent, but neither Mr. Qureshi nor anyone else signed the December FLOVEST Agreement on behalf of MAQ Management. Mr. Bavelis did not make Mr. Qureshi aware of the December Agreements, and Mr. Qureshi did not learn of them until some time later. Debtor's Ex. 173 at 57–58.

A few hours after Mr. Doukas left the shopping center in Boca Raton, he sent Mr. Bavelis a text message indicating that he was going to visit Mr. Qureshi to finalize the deal. Debtor's Ex. 67 at GB 004055. In another text message he sent that same night, Mr. Doukas told Mr. Bavelis: "I promise I will finish [Mr. Qureshi] and he will lose everything[.] I will be there all the time now and I will get the note from First Southern bank[.] I don't want Anything to happened to you[.] I an entering his house now . . . ." Debtor's Ex. 67 at GB 004055.

Mr. Doukas later returned to the Bavelises' home to obtain financial information regarding the Bavelis–Qureshi LLCs. As Mrs. Bavelis testified, "he came back to our house and he asked George to give him all the financial information about all these companies he had with Qureshi." Tr. at 412:18–21. "And I remember [Mr. Bavelis] had a stack of papers that, you know, whatever he asked of George he would just give it to him." Tr. at 412:21–23. "So he took the papers and he said, "I struck a deal with Mahammad, this is it, we're finished. I'm going to take this to him so he can sign it and then I'll bring your papers and we're done." Tr. at 412:23–27.

Mr. Bavelis received no cash or any other remuneration in exchange for the December Agreements. "The only thing he wants is to be indemnified," Mr. Doukas testified. Tr. at 852:10. Yet neither Mr. Doukas nor any of his companies ever provided Mr. Bavelis any effective indemnification for his potential liability arising from his guarantees of the debts of the Bavelis–Qureshi LLCs. GMAQ had no bank debt, so Mr. Bavelis had no exposure on any guarantee of such debt with respect to GMAQ. It is convenient for Mr. Doukas, therefore, that the only agreement that arguably provided Mr. Bavelis any indemnification on account of his guarantees appears in the December GMAQ Agreement, which states that Nemesis "agrees to indemnify George A. Bavelis and hold him harmless with respect to any and all claims incurred as a result of his being a member of GMAQ, LLC." GMAQ Agreement at 2. *See also* Tr. at 1006.

With respect to those Bavelis–Qureshi LLCs that actually had bank debt guaranteed by Mr. Bavelis—BMAQ and FLOVEST—the indemnification language is either much more limited or nonexistent. The December BMAQ Agreement states: "Nemesis agrees to indemnify and hold

harmless Bavelis Family LLC from all liabilities arising out of this Agreement." December BMAQ Agreement at 2. That language provides absolutely no indemnification to Mr. Bavelis personally, and the indemnification it does provide is only for those liabilities arising out of the December BMAQ Agreement, which clearly would not include liability on Mr. Bavelis's guarantees of BMAQ's debt. Tr. at 1007–08. Mr. Bavelis also was a guarantor of the substantial debt of FLOVEST, yet the December FLOVEST Agreement included no indemnification provision at all. Tr. at 1009; Debtor's Ex. 142. In sum, neither Mr. Doukas nor any of his companies provided Mr. Bavelis indemnification or any other value in exchange for the transfer of the membership interests in the Bavelis–Qureshi LLCs.

### 8. Sterling Bank's Nonperforming Loans

Mr. Doukas also testified that the consideration under the QC Loan Agreement included making all his assets available to secure financing so that he could purchase nonperforming loans of Sterling Bank. Tr. at 926. The idea, according to Mr. Doukas, was "to make [Sterling Bank's] nonperforming notes performing because they would get my loans and I would get theirs." Tr. at 933:18–20. *See also* Tr. at 934:12–19 ("[I] [w]ould take the performing notes that I had, the mortgages, the 6.7, the $3,000,000, there was another note then, I don't remember what it was, and give it to them, sign it to them, and give me non-performing loans. So that would make the bank to have performing loans with income and I would get the nonperforming loans. And that was one of the situations that we were dealing with … Mr. Albright."). Or, as Mr. Fritz put it, Mr. Doukas "was suggesting that we take [the loans on which his companies were the payees] as collateral to allow him to [ob-

372

tain] a loan from [Sterling Bank] and he would use the monies from that loan to turn around and buy [Sterling Bank's] non-performing assets." Tr. at 190:12–16.

On January 13, 2010, Mr. Doukas presented a proposal to Mr. Bavelis and Mr. Albright and other members of Sterling Bank's senior management team regarding Mr. Doukas's acquisition of certain of Sterling Bank's nonperforming loans. Debtor's Ex. 47. The next day, Mr. Albright sent Mr. Doukas an email stating that "[a]fter discussing the proposal you presented to George and me yesterday with my Senior Management Team it seems your request has merit as long as each transaction can be underwritten and the Sponsors can demonstrate the capacity to repay the debt service as determined by us." Debtor's Ex. 47. According to Mr. Albright, Sterling Bank "must be able to properly document the source of funds that will be available to meet all the terms and conditions of our loans" and "complete financial information on all our sponsors (tax returns, current personal financial statements, current liquidity statements, etc.) in order to determine whether or not we can proceed." Debtor's Ex. 47; Quick Capital Ex. WW. As it turns out, there was insufficient value in the assets Mr. Doukas was proposing to use to purchase the loans. Tr. at 168–69; 216. Mr. Doukas conceded that he never acquired any of Sterling Bank's nonperforming loans. Tr. at 290:7–10.[16]

### 9. Mr. Doukas's Assets

In fact, none of the assets owned by Mr. Doukas or his companies were ever effectively used by either Mr. Bavelis or Mr. Doukas on Mr. Bavelis's behalf. Mr. Bavelis himself could not have used them because, as Mr. Bavelis testified, "there was no way [he] ... personally ... would ... be able to borrow any more money." Tr. at 635:27–636:2. Even if Mr. Bavelis had been able to obtain a loan in order to restructure his finances, he could not have done so based on the assets purportedly made available by Mr. Doukas under the QC Loan Agreement. In this regard, Mr. Bavelis called Alan Parkinson as an expert witness "with respect to the credit process[,] ... the advancement of money based upon assets being pledged, as well as the process that's undertaken as part of the underwriting process to evaluate whether to extend credit." Tr. at 799:18–23. Mr. Doukas did not object to Mr. Parkinson testifying as an expert witness on those matters, Tr. at 803:1–4, and the Court found Mr. Parkinson to be a well-qualified and credible expert witness.

Mr. Parkinson testified that no reasonable lender would have lent money to Mr. Bavelis based on the assets purportedly being made available by Mr. Doukas under the QC Loan Agreement. The reasons no lender would do so, Mr. Parkinson testified, included Mr. Doukas's failure to provide sufficient financial information about the value of the assets purportedly being made available to Mr. Bavelis and the nominal value of the assets as reflected on income tax returns of Louden, Raelaur, Lisa Court and Aries Capital. Tr. at 807:6–11; 810:23–811:17; 815:2–816:8; 819:8–24; 823:3–18; 831:20–832:4. Based on Mr. Par-

16. As discussed above, Mr. Doukas contends that Blair became obligated on the debt owed by Glenn Wright Co. Even if true, this occurred before the QC Note was executed, and Mr. Bavelis was unaware of Blair's becoming obligated on the debt. Tr. at 660:9–24. In addition, although an asset owned by Leftheris Properties Corp. eventually was used by Mr. Doukas as collateral for a loan by Sterling Bank to purchase stock in Sterling Holding, it was so used on behalf of Mr. Doukas (not Mr. Bavelis), and that transaction was later unwound. Tr. at 862–63.

kinson's testimony, the Court finds that no reasonable lender would have lent funds to Mr. Bavelis in exchange for a security interest in the assets made available under the QC Loan Agreement.

Because he could not borrow any more funds, Mr. Bavelis believed that Mr. Doukas would work to obtain a loan secured by the assets on Mr. Bavelis's behalf. Tr. at 636:3–7. Likewise, Mr. Doukas suggested that it was he or his companies that would pledge the assets and obtain loans for Mr. Bavelis. Tr. at 129–30. Yet no assets owned by Mr. Doukas or his companies were used by Mr. Doukas to assist Mr. Bavelis's restructuring efforts. Tr. at 126–27; 599; 863–69. And the evidence shows that the assets purportedly being made available by Mr. Doukas would not have supported an asset-based loan of sufficient size to allow Mr. Doukas to purchase the nonperforming loans of Sterling Bank or the loans guaranteed by Mr. Bavelis. Again, the companies mentioned in the QC Loan Agreement were Louden, Raelaur, Lisa Court and Aries Capital. Mr. Doukas testified that Louden owned a small office building and received income from a lease on land in Amityville, New York, Tr. at 880–82; that Lisa Court owned a gasoline storage terminal in Meridian, Mississippi that needed work to address environmental issues and issues relating to the condition of the tanks. Tr. at 878; and that Aries Capital owned stock and stock options in Regulon, the value of which he never established. Tr. at 872–75. Raelaur apparently owned Mr. Doukas's residence in Syosset, New York. Tr. at 542. On federal income tax returns filed for the tax year 2009, Louden, Lisa Court and Raelaur reported the value of their total assets as $0, Debtor's Ex. 192, 196 & 209, and Aries Capital reported its total assets as $2,500.

The other entities for which Mr. Doukas produced 2009 income tax returns reported total assets of $0 (Nemesis and R.P.M.), Debtor's Exs. 186 & 188, and $6,788,298 (WKYA). Debtor's Ex. 218. The asset reported by WKYA was a promissory note it held secured by real estate in New York. Tr. at 98–99; 101; 864–65. Despite monthly payments under the note of approximately $30,000, Tr. at 99; 865, WKYA reported only $24,130 of taxable annual income after deducting compensation to officers and other cash expenses. Debtor's Ex. 218. In connection with a potential refinancing of his debt to Fifth Third, Mr. Bavelis sent a copy of the WKYA note to a representative of Merrill Lynch. Debtor's Ex. 82 at TD 000015. The Merrill Lynch representative was interested in advancing funds for the refinancing based on securities owned by Mr. Bavelis, but was uninterested in the WKYA note. Tr. at 601. Based on all the evidence, the Court finds that Mr. Doukas knew that the assets he purportedly was making available would not support his purchase of the nonperforming Sterling Bank loans or the bank loans guaranteed by Mr. Bavelis. Furthermore, by Mr. Doukas's own admission, none of his companies had prepared any sort of financial statements, Tr. at 68–69, which would have made it unlikely that he could have obtained a loan using those assets. Tr. at 815, 819.

Mr. Doukas conceded that he never lost ownership of any of his assets as a result of purportedly making them available to Mr. Bavelis. Tr. at 126–27. Although Mr. Doukas testified that he lost opportunities to use the assets for his own purposes as a result of his purported agreement to pledge his assets on behalf of Mr. Bavelis, Tr. at 127; 262–69, he provided no evidence to back up his claim, and the Court therefore finds that he lost no such opportunities.

### 10. Consulting and Management Services/Estate Planning

The QC Loan Agreement stated that "Quick has provided and will continue to provide consulting and management services in an effort to restructure various liabilities and troubled assets owned directly or indirectly by GAB" and provided for entry into the QC Security Agreement "as security for the payment of these services rendered and to be rendered. . . ." Debtor's Ex. 76 at GB 004059. As discussed above, Mr. Doukas testified that the consulting and management services to be provided were to restructure the Colonial Bank and First Southern loans, to acquire nonperforming loans from Sterling Bank and to resolve the issues with Mr. Qureshi and indemnify Mr. Bavelis. As the evidence already set forth demonstrates, Mr. Doukas never performed any of those services, either before or after the execution of the QC Loan Documents.

Mr. Doukas also never helped finalize Mr. Bavelis's estate planning. And there is evidence that Mr. Doukas never intended to do so. His lack of intent in this regard is evidenced by his lack of estate-planning experience. The evidence for Mr. Doukas's lack of experience in estate planning includes the fact that, whenever Mr. Bavelis would inquire regarding the manner in which Mr. Doukas wished to take title to the shares of stock he purchased in Sterling Holding in September 2009, Mr. Doukas would request that the issuance of the certificates for the shares be deferred until after Mr. Doukas formed a trust similar to Mr. Bavelis's. Tr. at 608; 746–47. Mr. Doukas's extensive estate-planning experience presumably would have included involvement in preparing his own trust. Yet when Mr. Doukas made the promise in June 2009 that he would help finalize Mr. Bavelis's estate planning, Mr. Doukas had not even done such estate planning for himself. Moreover, there is no evidence that Mr. Doukas had performed estate-planning services for anyone else. Thus, at the time Mr. Doukas made the representations to Mr. Doukas regarding estate planning—representations that induced Mr. Bavelis to sign the Quick Capital Loan Documents—Mr. Doukas knew that the representations were false and that he would not be assisting Mr. Bavelis with estate planning.

### 11. The Fallout

On January 25, 2010, Mr. Doukas sent a text message to Mr. Bavelis again indicating that he was close to resolving the disputes with Mr. Qureshi, Debtor's Ex. 67 at GB 004058, but he still did not return the December Agreements. Acting on the advice of Mr. Schaeffer (who was unaware of the December Agreements, Tr. at 618–19), Mr. Bavelis had, on December 18, 2009, signed a verified complaint for dissolution of FLOVEST in which he stated that FLOHIO was a 50% owner of FLOVEST even though he had signed the FLOVEST Agreement, purporting to transfer FLOHIO's interest in FLOVEST to Nemesis. Doc. 46 Ex. 2. The complaint, as well as a motion to appoint a receiver, were filed in a Florida state court on behalf of FLOHIO on December 21, 2009. Debtor's Ex. 144. Afterward, Mr. Schaeffer, as well as Mr. Bavelis's Florida litigation attorney, learned about the December FLOVEST Agreement and raised a concern about the representation Mr. Bavelis had made in the verified complaint regarding the ownership of FLOVEST. As a result, Mr. Bavelis "was desperate to get [Mr. Doukas] . . . to give me these papers because Michael Schaeffer was coming Sunday [and] my local attorney said, 'George, I've prepared a document for you and you signed it and you didn't tell me about these papers.'" Tr. at 630:3–9.

"Which is true, I didn't because I never thought of them being anything, [Mr. Doukas] was going to give them right back to me. And on that basis we were trying to appoint a receiver to try to finalize something with Flovest because we were getting nowhere." Tr. at 630:9–14.

In hindsight, Mr. Bavelis no doubt would agree that he should have done things differently. A businessman of his experience and stature clearly should not have turned to Mr. Doukas—or relied on his machinations—to resolve his financial difficulties, including his disputes with Mr. Qureshi. Mr. Bavelis also should have been more forthright with his attorneys and Mr. Qureshi regarding the existence and nature of the December Agreements, as well as the prior agreements transferring his interest in GMAQ. Based on Mr. Doukas's previous failures to deliver on his promises to return the QC Loan Documents, Mr. Bavelis should have suspected that the December FLOVEST Agreement might not be promptly returned. Accordingly, making a statement in the verified complaint filed in the Florida state court action regarding the ownership of FLOVEST that might be construed as strictly true only if and when the December FLOVEST Agreement was returned was certainly ill advised. Mr. Doukas uses this as a basis to attack Mr. Bavelis's credibility. Doukas Findings & Conclusions ¶¶ 2–5. Nonetheless, in light of the entirety of the evidence presented, the Court finds Mr. Bavelis to be a much more credible witness than Mr.

Doukas.[17] Indeed, as previously stated, see n. 11, supra, based on his evasiveness on cross-examination and the many inconsistencies in his testimony, the Court finds Mr. Doukas to be an utterly unreliable witness.

In late January 2010, the die was cast, and Mr. Bavelis made desperate—and ultimately futile—attempts to convince Mr. Doukas to return the December Agreements. On January 29, 2010, Mr. Bavelis called Mr. Doukas in an attempt to persuade him to deliver the documents:

I will never forget those days by the way, the 29 of January that I knew that I had to get those papers back. And I called him Friday afternoon around 4:30 and I said, "Ted, I need those papers back please." Well, maybe I called him a little bit earlier and he called me back around 4:30. And he said, "George, I'm with the—I was all day with other people." Meaning the FBI. "And I have to go back within about an hour." And I said, "Ted, fine I can come. Where are you? I can come and pick up those papers." He said, "George, no, no, no, George. I have to go real quick, I have to·eat something and go back to the FBI." And he said, "I will bring those papers back to you at 1:00 tomorrow, Saturday at your house." So I waited 1:00, I waited 2:00, I waited almost 3:00, no papers. I called him, left him messages, no answers, to call me back, there were no answers. Then I was so, so upset my wife started crying and say, "What has this man done to us?" And I

17. Earlier in the Chapter 11 case, Quick Capital filed a motion requesting the appointment of a Chapter 11 trustee (Case No. 10–58583, Doc. 280), as did First Southern (Case No. 10–58583, Doc. 326). The FDIC, as Receiver of Sterling Bank, filed a joinder to Quick Capital's motion (Doc. 317), but later withdrew it. See Doc. 341. The evidence presented during the trial would not come even remotely close to constituting cause to grant a request for the appointment of a trustee under § 1104 of the Bankruptcy Code. Accordingly, unless a party in interest has evidence in addition to that presented by Quick Capital and Mr. Doukas during the trial, its request for the appointment of a trustee would be denied.

said, "Gia, I know now what I didn't know before and I'm ashamed of myself not being able to recognize this individual, what kind of a con artist he is." In fact, if I remember correctly I told my wife, "He's a criminal." I told her just like that. And I just was losing it. My wife was so upset and started crying.... And we have heard nothing from this guy. Nothing. I knew I wanted to get those papers back because Michael Schaeffer was coming that weekend on Sunday and we had a meeting at 9:00 with Gary O'Donnell at his office and I had no papers. Of course I had explained to Michael what those papers were and what was happening and I have no papers back from him. And I knew then that I'm in trouble with this guy. I am not, he's not the guy that he presented me that he is. He is a con artist, nothing else.... And again I've very embarrassed to sit here today that say that I didn't recognize what kind of a person I was dealing with him for so long. I've been in business for 40 years and I think I had a pretty good sense of getting a message of whom I'm dealing with but I didn't, this guy mislead me. He's professional in his field.

Tr. at 760:1–762:7. As this testimony shows, Mr. Bavelis realized on January 29, 2010 that he should have heeded the occasional discomfort and dissatisfaction he felt with respect to Mr. Doukas based on events occurring (or failing to occur) after the execution of the QC Loan Documents. *See also* Tr. at 620:11–13 ("And I asked him to call me, he wouldn't call me. And at that time I got the message that I'm dealing with some con artist here.").

Mr. Bavelis then pleaded with Mr. Doukas in a voice message he left on the afternoon of January 30, 2010, a portion of which is reproduced below:

Yes, Leftheri, please call me. If you don't have the time to come I will be more than happy to come and pick up those papers because Michael is coming and I am paying two days of lawyers from Columbus to come in because (phone rings over voice) call me because it is extremely important because he still feels, I talked to him again today, and yesterday, again signed documents (starts speaking Greek) there are chances that they might put me into jail because I signed the papers for the affidavit and then signed papers also to you which are lies, he says to me that I'm going to lose, I'm going to lose everything. I'm not going to have any credibility neither and now they are going to take me to the courts and they will not take any notice to what I say or not say. I have to take the papers. I have to have the papers, [it's] imperative I have the paperwork because I have said to you he is coming tomorrow afternoon so we can have a meeting 9am on Monday and I must have those papers because they are going to come with the other attorney who wants to quit.... [S]o please call me because I've been very very upset and I really need your help, I don't know what else to do and I don't have anyone else to help me. Tell me where it is, give me your address and I will come and get them, I am pleading with you call me, ok.

Debtor's Ex. 151. *See also* Tr. at 630–31.

Mrs. Bavelis then offered to try to reach Mr. Doukas. "George, I will call him too because maybe he will listen to me," she told her husband. Tr. at 761. That same day, Mrs. Bavelis left the following voice mail for Mr. Doukas:

Yes, Leftheris, Michael [Schaeffer] just called me and I call him because he is coming tomorrow, and yesterday George told him that you were planning to come

here to give him those papers and I had a long conversation, Leftheri, and he told me that this is fraud and maybe George will go to jail. Leftheri I know we are inconveniencing you a lot, please bring those papers and come over so you can tell us what to do because he is going to come tomorrow and George is a mess and I do not know what to do he doesn't deserve, at this age, to go through hell, please Leftheri let us do something because he is coming tomorrow and we have to have something in our hands so the story is going to be over, please, please, Leftheri, please call me, bye bye.

Debtor's Ex. 152. During her testimony, Mrs. Bavelis conceded that she had not spoken to Mr. Schaeffer about the matter and that she "just told [Mr. Doukas these things] to convince him because I just could not comprehend that a human being would do this to someone, to make friends, to lie to them while they took him into their house for months and months and to do this to us, I could not believe it." Tr. at 435:3–7. Based on her demeanor and testimony, the Court found Mrs. Bavelis to be a credible witness, and the fact that she made a misrepresentation in a voice mail left for Mr. Doukas after she realized his perfidy does not change the Court's view that she is a fundamentally honest person who was distraught at being duped by someone she had trusted completely.

On February 1, 2010, Mr. Doukas stated in a text message to Mr. Bavelis that he could not talk. Although Mr. Doukas purchased the shares in Sterling Holding in September 2009, he repeatedly requested that the issuance of stock certificates be deferred until after he formed a trust similar to Mr. Bavelis's. Tr. at 608; 746. Mr. Doukas's delay tactics made Mr. Bavelis "a little bit uneasy," Tr. at 608:15, but after the events of late January 2010, Mr. Bavelis decided he could wait no longer. Tr. at 750. "I told Linda Eppenga, 'Go ahead and send the certificate in his name and when he gets the trust ready then I will go ahead and change the certificates. I'll issue new certificates and get the old ones back.' " Tr. at 608:15–20.[18] *See also* Tr. at 746–48.

On or about February 4, 2010, Mr. Bavelis sent Mr. Doukas a transmittal letter dated September 23, 2009 enclosing a stock certificate—also dated September 23—for 18,309 Class B shares in Sterling BancGroup, Inc. Quick Capital Ex. KK at GB 004008–12; Tr. at 748. The date was consistent with the correspondence of that same date indicating that Mr. Doukas was purchasing shares in Sterling Holding. The date of the letter and the certificate was appropriate. According to Ms. Eppenga, the dates placed on transmittal letters, as well as the certificates themselves, were the date the funds for the shares had been received. Debtor's Ex. 174 at 14; 24–25. In the instance of Mr. Doukas's stock, that date was September 23, 2009.

Mr. Doukas received the transmittal letter and stock certificate on February 8, 2010. Quick Capital Ex. KK at GB 004011. A week later, on February 15, 2010, Mr. Doukas sent the following letter to Mr. Bavelis:

Dear Mr. Bavelis:

I am in receipt of your certified letter dated September 23, 2009 via certified mail which was *actually mailed* on February 4, 2010 and received on February 8, 2010. Enclosed was a Stock Certifi-

---

**18.** Ms. Eppenga was the controller of Sterling Bank and assistant corporate secretary who in the years 2009 and 2010 also had responsibility for the issuance of certificates of stock in Sterling Holding. Debtors's Ex. 174 at 11.

cate from Sterling Bank Group purporting to convey to me 18,–309 shares of class B stock.

This is NOT my stock, I never requested any stock nor would I ever accept any stock from Sterling Bank Group. I sent you $1.7M which was part of the consideration for a Promissory Note dated June 21, 2009. As far as I am concerned this stock has absolutely no value. I have no interest in it whatever. You can't simply give me stock of your choosing and claim that it is in exchange for money which I loaned you. There are many formalities which must be complied with in issuing stock. Foremost I must want this stock.

I was lending you money so that you could show the regulators additional capital which was required. I only loaned this based upon the various agreements between Quick Capital and yourself, which protects my interests. This stock offers me absolutely no protection and I have no interest in it. The FDIC and various bank regulators have very clear conditions related to the sale of stock. Trying to give me this stock in exchange for the money that was tendered is an outrage. It was never given to purchase stock. I demand that you set the record straight immediately. Tell me where this stock should be returned to.

Quick Capital Ex. JJ.

There are inconsistencies between this letter and the facts. Mr. Doukas states he "never requested any stock nor would I ever accept any stock from Sterling Bank Group," and yet he did so in March 2009 and did so twice again in September 2009. Mr. Doukas states that he was lending Mr. Bavelis money, yet funds were transferred from his accounts to a Sterling Holding account, not to an account maintained in the name of Mr. Bavelis. On April 9, 2010, Mr. Doukas filed a complaint with Federal Reserve. That letter contains inconsistencies similar to those contained in the letter to Mr. Bavelis. Debtor's Ex. 121 at GB 004006. On May 27, 2010, Mr. Albright sent a letter to the Federal Reserve responding to the complaint filed by Mr. Doukas. Debtor's Ex. 121 at GB 004002.

The last time that Mr. Bavelis heard from Mr. Doukas was in a text message on February 22, 2010 stating: "Let's sit down and settle our differences I don't think you want me to loose my money." Debtor's Ex. 67 at GB 004058. *See also* Tr. at 907–08. Mr. Bavelis did not respond to that final text. Tr. at 908.

On June 10, 2010, the Board of Governors of the Federal Reserve System ("Board of Governors"), determined that, as of April 30, 2010, Sterling Bank was "significantly undercapitalized" and issued a prompt corrective action directive providing the bank 30 days from date of directive to become adequately capitalized. Quick Capital Ex. CCC. Sterling Bank could not do so, and, in July 2010, Sterling Bank was taken over by the FDIC. Tr. at 176; 456–57.

### D. The Chapter 11 Case and the Adversary Proceeding

On July 20, 2010, Mr. Bavelis filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Mr. Bavelis then commenced this adversary proceeding by filing a complaint ("Complaint") (Doc. 1) against several defendants, including Mr. Doukas, Nemesis, Quick Capital and R.P.M.[19] After Mr. Bavelis commenced

---

**19.** There are other defendants, including Mr. Qureshi and MAQ Management. Both Mr. Qureshi and MAQ Management commenced

Chapter 11 cases in the Southern District of Florida in July 2011, *see* Notice of Filing of Bankruptcy of Defendants Mahammad Qure-

the adversary proceeding, Quick Capital filed the Original Proof of Claim in the amount of $1,667,791.10 for "Money Loaned." ($200,000 plus $1,467,791.10) and later filed the Amended Proof of Claim in the amount of $14 million plus interest. Neither Mr. Doukas nor any of his companies other than Quick Capital filed a proof of claim against the Debtor's estate.

In Count Three of the Complaint, Mr. Bavelis requests, among other things, a declaratory judgment that the QC Note fails for lack of consideration, has been fully satisfied, is void and should be rescinded based on fraudulent inducement. The affirmative defenses asserted by the Debtor thus constitute objections to the Proof of Claim pursuant to § 502(b) of the Bankruptcy Code ("Proof of Claim Objections"). *See Bavelis v. Doukas (In re Bavelis)*, 453 B.R. 832, 847, 852 (Bankr. S.D.Ohio 2011).

After Mr. Bavelis filed a motion to bifurcate the adversary proceeding for hearing (Doc. 137), the Court entered an order (Doc. 153) bifurcating Count Three of the Complaint. Quick Capital filed a motion for summary judgment (Doc. 170) on Count Three (as well as other counts) of the Complaint. The Court entered an order (Doc. 190) deferring a ruling on the motion with respect to matters other than the Proof of Claim Objections and denying the motion with respect to the Proof of Claim Objections based on the existence of genuine disputes as to material facts.

The trial on the Proof of Claim Objections lasted four days. Following the trial, the parties submitted, and the Court entered, the Agreed Order, which governed, among other matters, the admission of exhibits.[20] The parties then submitted the Doukas Findings & Conclusions and the Bavelis Findings & Conclusions.

## IV. Legal Analysis

### A. Overview

 Under Federal Rule of Bankruptcy Procedure 3001(f), "[a] proof of claim executed and filed in accordance with the Federal Rules of Bankruptcy Procedure constitutes prima facie evidence of the validity and amount of the claim." *In re Tudor*, 342 B.R. 540, 550 (Bankr. S.D.Ohio 2005). "A debtor has the initial burden of making a colorable challenge to a properly filed proof of claim." *Id.* In general, "[o]nce the debtor has met this burden, the burden of going forward shifts to the creditor, and the creditor bears the ultimate burden of persuasion." *Id.* However, "the burden of proof is an essential element of the claim itself" [and] "one who asserts a claim is entitled to the burden of proof that normally comes with it." *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 21, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000). Thus, if a debtor's objection to a claim is based on an affirmative defense for which the debtor would have the burden of proof outside

---

shi and MAQ Management and Suggestion of Stay, Doc. 128, thereby staying the adversary proceeding against them pursuant to 11 U.S.C. § 362(a).

**20.** After the close of evidence, the parties were uncertain whether Quick Capital's Exhibits J and SS had been used during the trial. Tr. at 1110–12. Pursuant to the Agreed Order, the parties stipulated that the Court would reserve a ruling regarding the admissibility of those exhibits until after the Court reviewed the trial transcript to determine whether the exhibits "were actually used as part of the hearing." Agreed Order ¶ 8. After searching the transcript, the Court has not found that those exhibits were actually used during the trial. In any event, the Court has reviewed Quick Capital's Exhibits J and SS and has determined that there is nothing in those documents that would alter the Court's findings of fact or conclusions of law.

of bankruptcy, the debtor must carry that same burden of proof in prosecuting the objection. *See In re Ousley*, 92 B.R. 278, 282–83 (Bankr.S.D.Ohio 1988) ("[T]he [debtors'] defense of duress is an affirmative one which must be established by the party asserting it.").

It is undisputed that Mr. Bavelis signed the QC Note and that he did not pay Quick Capital $14 million. Mr. Bavelis, therefore, has the burden of proof with respect to the affirmative defenses that form the basis for his objection to the Proofs of Claim. *See McCabe v. Green*, 39 Misc.3d 270, 276–77, 961 N.Y.S.2d 841 (N.Y.Sup.Ct. 2013) ("Plaintiff sufficiently establishes a *prima facie* case that the four notes were signed by defendant, and constitute written instruments by which the defendant explicitly obligated himself to make a required payment of a sum certain.... Here, the allegation that defendant failed to pay the sums due under the notes is established, and undisputed.... Instead, defendant presents two defenses to nonpayment: fraudulent inducement and lack of consideration...."); *Schlup v. Inter-mark Int'l Inc.*, 1989 WL 35127, at *2 (Ohio Ct.App. Apr. 12, 1989) (holding that "a signed promissory note constitutes *prima facie* evidence of the amount due" and that it is the issuer who must carry the burden of proof with respect to the affirmative defenses).[21]

In addition to relying on an argument that there was no manifestation of mutual assent or consideration supporting the QC Loan Documents—an argument the Court rejects—Mr. Bavelis also relies on the affirmative defenses of payment, failure of consideration and fraudulent inducement. The Court concludes that each of those affirmative defenses applies here, making the QC Loan Documents unenforceable against Mr. Bavelis. Under § 502(b) of the Bankruptcy Code, if a party in interest objects to a proof of claim, the Court "shall allow such claim ... except to the extent that[,]" among other things, "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured[.]" 11 U.S.C. § 502(b)(1). Because Quick Capital's claim is unenforceable against Mr. Bavelis, the Proofs of Claim must be disallowed in their entirety. Neither Mr. Doukas nor any of his companies has an enforceable claim against Mr. Bavelis or his bankruptcy estate.

**21.** Where, as here, the Bankruptcy Code "does not specifically address an issue that arises in bankruptcy, the bankruptcy court looks to state law, to the extent that it does not conflict with the [B]ankruptcy [C]ode [.]" *Reinhardt v. Vanderbilt Mortg. & Fin., Inc. (In re Reinhardt)*, 563 F.3d 558, 563 (6th Cir. 2009) (internal quotation marks omitted). In reaching its conclusions of law, the Court relies on the law of the state identified in the governing law provision of the QC Loan Agreement (New York). Because the QC Note and the QC Loan Agreement do not refer to one another, the Court also relies on the law of the state in which Mr. Bavelis signed the QC Note (Ohio). The parties rely on the law of both states, and, although there are slight variations in New York and Ohio law bearing on the issues before the Court, the result is the same under the laws of both states, so the Court need not decide which state's law applies. *See Orix Credit Alliance v. CIT Grp. /Equip. Fin., Inc. (In re Hughes)*, 230 B.R. 213, 226 (Bankr.M.D.Ga.1998) ("Defendants argue that the contracts were entered into in Georgia. Moreover, Defendants assert that because the promissory notes do not contain a choice of law provision, the parties have not intended for the law of another forum, that is New York, to apply and therefore Georgia law would apply by default. However, ... the same result is achieved by applying either state's law. Accordingly, it is unnecessary for the court to determine which state's law applies.").

## B. Mutual Assent/Consideration

■ The formation of a contract requires a manifestation of mutual assent and consideration. *See Conception Bay, Inc. v. Koenig Iron Works, Inc.*, 27 Misc.3d 1230(A), 2010 WL 2217799, at *3 (N.Y.Sup. Ct. May 28, 2010); *Jenkins v. Huebner*, 2002 WL 255124, at *1 (Ohio Ct.App. Feb. 22, 2002). The Court concludes that, Mr. Bavelis's arguments to the contrary notwithstanding, *see* Bavelis Findings & Conclusions at 102–06, the parties' agreement lacked neither a manifestation of mutual assent nor consideration.[22]

### 1. Manifestation of Mutual Assent

■■ "Manifestation of mutual assent to an exchange requires that each party either make a promise or begin or render a performance." *McSweeney v. Jackson*, 117 Ohio App.3d 623, 691 N.E.2d 303, 308 (1996). "The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by the failure to act." *Id.See also Conception Bay*, 2010 WL 2217799, at *3 ("Assent may be implied when a party has conducted himself in such a manner that his assent may fairly be inferred." (internal quotation marks omitted)). Here, both parties not only made mutual promises, they conducted themselves in a manner that gives rise to an inference of assent.

■ The promises set forth in the QC Loan Documents included Quick Capital's agreement to lend $200,000 to Mr. Bavelis. There was no evidence establishing that Mr. Bavelis and Mr. Doukas (on behalf of Quick Capital) agreed that $200,000 would not be advanced. While there is no provi-

sion in the QC Loan Agreement expressly requiring Mr. Bavelis to repay the $200,000, there also was no evidence presented suggesting that Mr. Bavelis would not be required to repay any amount actually advanced, and the Court concludes that there was an implied promise on his part to repay the $200,000 loan. *See Donovan v. Burkowski*, 51 A.D.2d 878, 380 N.Y.S.2d 134, 136 (1976) ("[A]lthough the circumstances under which the money was given were somewhat equivocal and no notes or formal promises to pay were made by respondent, the trial court correctly found that these transactions constituted loans and that there was an implied promise to repay."). *See also Beverly v. Davis*, 79 Wash. 537, 140 P. 696, 698 (1914) ("If the circumstances show a loan, an implied promise to repay springs from that fact alone.").

Moreover, Mr. Bavelis and Quick Capital agreed to enter into the QC Security Agreement, which provided security for Mr. Bavelis's obligation to repay the $200,000 loan. The parties' subsequent conduct confirms their mutual assent. Consistent with the QC Loan Agreement, the parties entered into the QC Security Agreement, and the $200,000 loan was advanced and repaid. Citing the Restatement (Second) of Contracts, Mr. Bavelis contends that there was no mutual assent, because there is no such assent " '[w]here all the parties to what would otherwise be a bargain manifest an intention that the transaction is not to be taken seriously....'" Bavelis Findings & Conclusions at 103 (quoting Restatement (Second) of Contracts § 18 cmt. c). The example on which Mr. Bavelis relies refers to a "sham"

---

**22.** Both parties introduced parol evidence of the consideration for the QC Loan Documents. That was appropriate because parol evidence is admissible to demonstrate a lack of consideration. *See Ehrlich v. Am. Moninger*

*Greenhouse Mfg. Corp.*, 26 N.Y.2d 255, 309 N.Y.S.2d 341, 257 N.E.2d 890, 891 (1970); *Mangano v. Dawson*, 1995 WL 358685, at *4 (Ohio Ct.App. June 13, 1995).

or "jest" and illustrates the point by referencing parties who are joking or simulating a business transaction in a theater production. Restatement (Second) of Contracts § 18 cmt. c. That is not what happened here. Although Mr. Bavelis states in his proposed findings that "Ted Doukas further manifested to Mr. Bavelis that no actual funds were being lent pursuant [to the QC Loan Documents] and/or obligations incurred thereby," Bavelis Findings & Conclusions at 103, the evidence does not support that finding. Again, there is no evidence of any agreement not to lend or repay $200,000 or not to enter into the QC Security Agreement. In fact, the parties did each of those things.

## 2. Consideration

█ At a minimum, Quick Capital promised to advance $200,000. On Mr. Bavelis's part, there was an implied promise to repay any amount actually advanced, as well as the promise to enter into the QC Security Agreement. These mutual promises constitute consideration supporting the QC Note and the QC Loan Agreement. *See Kowalchuk v. Stroup*, 61 A.D.3d 118, 873 N.Y.S.2d 43, 49 (2009) ("[T]he consideration for a bilateral contract such as this one, in which promises are exchanged, consists of the acts mutually promised . . . ."); *Stewart v. Herron*, 77 Ohio St. 130, 82 N.E. 956, 959 (1907) ("Among the considerations recognized in law as sufficient to support a contract is that of mutual promises, or, as it is sometimes expressed, a promise for a promise.").

In addition, Mr. Doukas advanced funds using a check on which he wrote the words "Consideration on the Note." Mr. Bavelis accepted the check, deposited it into one of his bank accounts and later repaid the loan using checks that stated "Return Loan." Those forms of consideration having been provided, there was no lack of consider-

ation. *See Schron v. Grunstein*, 36 Misc.3d 1238(A), 2012 WL 3887665, at *10 (N.Y.Sup.Ct. Sept. 6, 2012) ("The court has found that the 2004 and 2006 loans were funded. Assuming, as defendants contend, that the loans were not fully funded, the loan agreements and notes would not be voided for lack of consideration. The general rule is that where a party has received some benefit, the adequacy of consideration is not a proper subject of judicial scrutiny . . . .") (internal quotation marks omitted); *McCabe*, 39 Misc.3d at 278, 961 N.Y.S.2d 841 ("The record indicates that the loan was funded, thereby defeating defendant's defense of lack of consideration . . . ."); *Williams v. Ormsby*, 131 Ohio St.3d 427, 966 N.E.2d 255, 259 (2012) ("We also have a long-established precedent that courts may not inquire into the adequacy of consideration, which is left to the parties as the sole judges of the benefits or advantages to be derived from their contracts." (internal quotation marks omitted)).

Mr. Bavelis contends that there was a lack of consideration for the QC Loan Documents because the parties did not bargain for the consideration. Citing the Restatement (Second) of Contracts § 71(2), Mr. Bavelis states that "[a] performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." *See* Bavelis Findings & Conclusions at 104. While that statement is true as far as it goes, it does not support a finding of lack of consideration here, because a promise to lend and a promise to repay, as well as a promise to enter into a security agreement to secure the repayment obligation, are sought in exchange for one another. *See European Am. Bank v. Cain*, 79 A.D.2d 158, 436 N.Y.S.2d 318, 321 (1981) ("The promise by the plaintiff to make a loan to Cain would

constitute sufficient consideration to support counter promises by Cain that he would repay the loan with interest and by Pepe Motors that it would perform its statutory duty to note the plaintiff's lien on the application for the certificate of title."); *Stonebridge Sec, LLC v. Devine,* 2007 WL 1464431, at *5 (Wash.Ct.App. May 21, 2007) (" 'To constitute consideration, a performance or a return promise must be bargained for' and '[a] performance or return promise is bargained for if it is sought by the promisor in exchange for that promise.' Restatement (Second) of Contracts, § 71 (1981). Here, the noteholders received consideration for their loans: VIB's promise to repay and, in the alternative, the noteholders' option to convert the notes to stock and the stock purchase warrants.' ").

 Mr. Bavelis also argues that Mr. Doukas's promises were gratuitous and that, accordingly, there was no consideration supporting the QC Loan Documents, which Mr. Bavelis contends were executed simply to facilitate what Mr. Bavelis believed to be Mr. Doukas's "promise of ongoing benevolent assistance." Bavelis Findings & Conclusions at 105. It is true that "[g]ratuitous promises are not enforceable as contracts, because there is no consideration." *Carlisle v. T & R Excavating, Inc.,* 123 Ohio App.3d 277, 704 N.E.2d 39, 43 (1997). *See also Loft Rest. Assocs., Ltd. v. McDonagh,* 209 A.D.2d 482, 619 N.Y.S.2d 57, 58 (1994) ("The record before us, including the deposition testimony of the plaintiff's own former counsel, unequivocally demonstrates that the memorandum executed by the defendant McDonagh constituted nothing more than a gratuitous and legally unenforceable promise which was unsupported by valid consideration."). It also is true that "a desire to help cannot be consideration for a contract; rather, it is merely a motive." *Carlisle,* 704 N.E.2d

at 43. *See also Pershall v. Elliott,* 249 N.Y. 183, 163 N.E. 554, 556 (1928) ("A motive is not consideration, either legal or equitable.").

Here, Mr. Doukas's motive was not benevolent. Even if it had been, benevolence and consideration may coexist; a promise cannot be discounted as consideration merely because it was made out of a benevolent motive. "For example, if A is induced by friendship to agree to move from one country to another and to build a house upon a site to be conveyed to him by B, although A's motive for entering into the transaction is friendship, if there is an actual bargain to this effect there will be a contract." 3 *Williston on Contracts* § 7:17 (4th ed. 2012). "A's motive or basis for entering into the bargain is of no significance." *Id.* Because Quick Capital's promise to lend and Mr. Bavelis's implied promise to repay, as well as the parties' promise to enter into the QC Security Agreement, were bargained for, the fact that Mr. Bavelis believed Mr. Doukas's motive to be benevolent is beside the point.

True, Quick Capital fulfilled its obligation to lend $200,000 through Nemesis, but that does not demonstrate a lack of consideration. *See Lipkowitz & Plaut v. Affrunti,* 95 Misc.2d 849, 407 N.Y.S.2d 1010, 1015 (N.Y.Sup.Ct.1978) ("It is well established that consideration for a negotiable instrument or a contract may be given or performed by a third party...."); *Sutta v. Lachman,* 13 N.Y.S.2d 779, 780 (N.Y.App. Term 1939) ("The claim that there was no consideration for the check is without merit. The obligations of the vendor under the contract of sale constituted ample consideration. It is not necessary that the consideration should pass from the promisee. Thus the maker's liability to the payee may be supported by a consideration coming from a third person who is not a party to the instrument." (internal

quotation marks omitted)); Restatement (Second) of Contracts § 71(4) ("The performance or return promise may be given to the promisor or to some other person. It may be given by the promisee or by some other person.").

## C. Payment

It is the affirmative defenses of payment, failure of consideration (in contrast to lack of consideration) and fraudulent inducement that carry the day for Mr. Bavelis. The Court will address each in turn. First, Mr. Bavelis relies on the affirmative defense that he repaid any loan made to him. *See* Bavelis Findings & Conclusions at 61–65. As the issuer of the QC Note, Mr. Bavelis bears the burden of proof on the affirmative defense of payment. *See CIT Grp./Factoring Mfrs. Hanover, Inc. v. Supermarkets General Corp.,* 183 A.D.2d 454, 583 N.Y.S.2d 422, 423 (1992) ("[A]lleged payment of an indebtedness must be set forth as an affirmative defense, and the burden is thus on the defendant to plead and prove it . . . ."); *Cadle Co. v. Toler,* 1991 WL 94437, at *1 (Ohio Ct.App. May 28, 1991) ("In an action on the note, the defending party has the burden of proving the affirmative defense of payment."). The burden of proof is by a preponderance of the evidence. *See Machowiak v. Sek,* 13 N.Y.S.2d 910, 911 (N.Y.City Ct.1939); *Blackwell v. Int'l Union, U.A.W.,* 21 Ohio App.3d 110, 487 N.E.2d 334, 337 (1984).

Based on the findings of fact regarding payment set forth above, the Court concludes by a preponderance of the evidence that the entire amount lent by Nemesis—whether $200,000 or $250,000—was repaid. Mr. Bavelis repaid the loan through Pella Financial Services, but that was of no more significance than Mr. Doukas using Nemesis to fulfill Quick Capital's obligation to lend the funds to Mr. Bavelis.

## D. Failure of Consideration

Of course, Mr. Doukas is seeking much more than two hundred thousand dollars under the QC Loan Agreement. He also seeks $14 million plus interest under the QC Note. Yet the evidence shows that, other than advancing $200,000 or $250,000 of funds in July 2009, Mr. Doukas and his companies completely failed to keep any of the promises that he represents to have been the consideration for the QC Loan Documents. The burden of proof on the issue of failure of consideration is on Mr. Bavelis. *See United Transp. Co. v. Glenn,* 225 A.D. 171, 232 N.Y.S. 373, 377 (1929); *Ohio Loan & Discount Co. v. Tyarks,* 173 Ohio St. 564, 184 N.E.2d 374, 376 (1962). The burden of proof is by a preponderance of the evidence. *See Berggren v. Berggren,* 96 N.Y.S.2d 435, 442 (N.Y.Sup.Ct.1948); *Dumas v. Mustric,* 1993 WL 379125, at *2 (Ohio Ct.App. Sept. 21, 1993).

Unlike a lack of consideration, which results in the failure to form a contract, "when there is a failure of consideration, there is originally a contract when the agreement is made, but because of some supervening cause, the promised performance fails." 3 *Williston on Contracts* § 7:11 (4th ed. 2012). That is, "[f]ailure of consideration exists when a promise has been made to support a contract, but that promise has not been performed. Where a failure of consideration exists, the other party is thereby excused from further performance." *Dawson Ins., Inc. v. Freund,* 2011 WL 1167487, at *5 (Ohio Ct.App. Mar. 31, 2011) (citations and internal quotation marks omitted). *See also* Ohio Revised Code Ann. § 1303.33(B) (West 2013) ("If an instrument is issued for a promise of performance, the issuer has a defense to the extent performance of the promise is due and the promise has not been performed."). New York law is to the same

effect. *See* N.Y. U.C.C. Law § 3–408 (McKinney 2013) ("Want or failure of consideration is a defense as against any person not having the rights of a holder in due course ... except that no consideration is necessary for an instrument or obligation thereon given in payment of or as security for an antecedent obligation of any kind.... Partial failure of consideration is a defense pro tanto whether or not the failure is in an ascertained or liquidated amount."); *Chase Nat'l Bank v. Chem. Corn Exch. Bank (In re Pascal's Estate)*, 3 Misc.2d 136, 146 N.Y.S.2d 364, 368 (N.Y.Sup.Ct.1955) (holding a note unenforceable due to failure of consideration).

 As the evidence shows, Mr. Doukas never purchased shares in Sterling Holding on behalf of Mr. Bavelis, but instead did so on his own behalf. Likewise, Mr. Doukas never purchased the Colonial Bank and First Southern loans or the nonperforming loans of Sterling Bank. The parties' understanding was that Mr. Doukas himself would use his assets to obtain loans in his name in order to purchase the Colonial Bank and First Southern loans, as well as the Sterling Bank nonperforming loans, but he never did so. Even if the deal had been that Mr. Bavelis could somehow pledge assets owned by Mr. Doukas or his companies, there would have been a failure of consideration because the evidence showed that no reasonable lender would have lent money to Mr. Bavelis based on the assets purportedly being made available by Mr. Doukas.

Mr. Doukas never indemnified Mr. Bavelis for his liability on the guarantees of the debt of the Bavelis–Qureshi LLCs or otherwise resolved the disputes with Mr. Qureshi in a manner favorable to Mr. Bavelis, never helped finalize Mr. Bavelis's estate planning and never provided any consulting and management services of value. The parties did not testify that monthly deposits of $80,000 to $120,000 formed part of the consideration for the QC Loan Documents, and even if they had done so, Mr. Doukas never made such deposits. Mr. Bavelis having repaid the funds actually advanced to him, any other obligation he would have had under the QC Loan Documents is unenforceable based on a failure of consideration.

## E. Fraudulent Inducement

 The affirmative defense of fraudulent inducement, which renders a contract "unenforceable by the culpable party," *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Grp.*, 19 A.D.3d 273, 798 N.Y.S.2d 14, 16 (2005),[23] applies here as well. In New York, the elements of fraudulent inducement are "a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury[.]" *Centro Empresarial Cempresa S.A. v. America Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 929 N.Y.S.2d 3, 952 N.E.2d 995, 1000 (2011).[24]

In Ohio, the elements of the defense of fraudulent inducement are the same:

**23.** *See also Plantner v. Hoke*, 122 N.E.2d 298, 299 (Ohio Ct.App.1954).

**24.** Mr. Bavelis and Mr. Doukas both introduced evidence other than the QC Loan Documents to support their view of the obligations thereunder. Thus, the QC Loan Documents clearly do not contain "a complete and unambiguous statement of the parties'

contractual intent," *Albrecht v. Marinas Int'l. Consol., L.P.*, 2010 WL 4866289, at *7 (Ohio Ct.App. Nov. 24, 2010) and they do not contain a "final and complete expression of the agreement." *Patrolmen's Benev. Ass'n of City of New York, Inc. v. City of New York*, 27 N.Y.2d 410, 318 N.Y.S.2d 477, 267 N.E.2d 259, 261 (1971) (internal quotation marks

(1) an actual or implied false representation concerning a fact or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction; (3) knowledge of the falsity of the representation or such recklessness or utter disregard for its truthfulness that knowledge may be inferred; (4) intent to induce reliance on the representation; (5) justifiable reliance; and (6) injury proximately caused by the reliance.

*Simon Prop. Grp., L.P. v. Kill*, 2010 WL 1266835, at *5 (Ohio Ct.App. Apr. 5, 2010). In both states, a burden of proof by clear and convincing evidence rests with the party asserting fraudulent inducement. *See Sung v. Ramirez*, 121 Misc.2d 313, 467 N.Y.S.2d 486, 489 (N.Y.Sup.Ct.1983); *Simon Prop. Grp.*, 2010 WL 1266835, at *5. Thus, as Mr. Doukas correctly points out, Doukas Findings & Conclusions at 34, Mr. Bavelis has the burden of proving the elements of fraudulent inducement by clear and convincing evidence. For the reasons explained below, the Court concludes that Mr. Bavelis has carried his burden.

### 1. False Representation

▆ Fraudulent inducement requires a representation of fact that is not only false,

but that the person making the representation knows to be false at the time it is made. The false representation can be made by the party to the contract or, as here, by a person acting on behalf of the party. *See Navigant Consulting, Inc. v. Kostakis*, 2007 WL 2907330, at *3 (E.D.N.Y. Oct. 4, 2007). Mr. Doukas made several representations to Mr. Bavelis that he knew to be false. First, Mr. Doukas represented to Mr. Bavelis that he had extensive estate-planning experience. Because Mr. Doukas was not an attorney or other estate-planning professional, the clear implication was that Mr. Doukas had at least planned his own estate in the manner he was suggesting for Mr. Bavelis. And yet after Mr. Doukas purchased stock in Sterling Holding in September 2009, he repeatedly requested that the issuance of stock certificates be deferred until after he formed a trust similar to Mr. Bavelis's. In other words, Mr. Doukas had never performed for himself the estate planning that he promised Mr. Bavelis he would do for him. In fact, there is no evidence that Mr. Doukas ever planned anyone's estate.

In addition, before Mr. Bavelis signed and delivered the QC Loan Documents, Mr. Doukas promised Mr. Bavelis, among other things, that he would work to resolve

omitted). The documents, therefore, are not integrated, and the parol evidence rule does not apply. In fact, both Mr. Bavelis and Mr. Doukas have conceded that the parol evidence rule does not apply. Doukas Findings & Conclusions at 37; Bavelis Findings & Conclusions at 100–01. *See also Galmish v. Cicchini*, 90 Ohio St.3d 22, 734 N.E.2d 782, 789–90 (2000) ("[T]he parol evidence rule does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement.... [T]he presence of an integration provision does not vitiate the principle that parol evidence is admissible to prove fraud."); *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906, 908–09 (1957) ("[T]he parol evi-

dence rule has no application in a suit brought to rescind a contract on the ground of fraud. In such a case, it is clear [that] evidence of the assertedly fraudulent oral misrepresentation may be introduced to avoid the agreement.... [J]ust as [the parol evidence] rule is ineffectual to exclude evidence of fraudulent representations, so [a merger] provision may not be invoked to keep out such proof. Indeed, if it were otherwise, a defendant would have it in his power to perpetrate a fraud with immunity, depriving the victim of all redress, if he simply has the foresight to include a merger clause in the agreement. Such, of course, is not the law.").

the issues with Mr. Qureshi in a manner favorable to Mr. Bavelis; that he would deposit $80,000 to $120,000 per month into accounts maintained at Sterling Bank; that he would purchase the Colonial Bank and First Southern loans guaranteed by Mr. Bavelis; that he would help finalize Mr. Bavelis's estate planning; and, while not seeking payment on the QC Note, would return the QC Loan Documents after the estate planning was finalized. As discussed in more detail below, at the time Mr. Doukas made these promises to Mr. Bavelis (either on his own behalf or on behalf of Quick Capital) he had no intention of keeping them.

 Under Ohio law, "a promise made with a present intention not to perform it is a misrepresentation of an existing fact— the speaker's present state of mind[,]" and "[i]f such a false representation induces the other party to enter into a contract, the contract may be voided." *Link v. Leadworks Corp.*, 79 Ohio App.3d 735, 607 N.E.2d 1140, 1145 (1992) (citations omitted). Thus, the promises that Mr. Doukas made with no intention of keeping them count as false representations for purposes of the Court's fraudulent-inducement analysis. Moreover, Mr. Doukas represented to Mr. Bavelis that he would not be required to make payments under the QC Note. Because Mr. Doukas intended to seek payment under the QC Note, the representation that no payments would be required provides an additional basis for a finding of fraudulent inducement under Ohio law. *See Rieck Mech. Elec. Servs., Inc. v. Warner*, 2002 WL 1252521, at *2 (Ohio Ct.App. June 7, 2002) ("Warner has alleged that Rieck told him that the cognovit note 'was merely paperwork and of no consequence and would be forgiven when the purchase of L.O. Warner, Inc. was completed.' This, if true, may be sufficient to establish a meritorious defense of fraudulent inducement....."); *Star Bank, N.A. v. Jackson*, 2000 WL 1760513, at *5 (Ohio Ct.App. Dec. 1, 2000) ("[I]f Jackson had alleged that the bank itself had told him that his signature on the note was merely perfunctory and that the bank had no intention of seeking payment from him, he might have alleged enough operative facts to support a defense of fraudulent inducement.").

 Although the result is the same under New York law, the law of that state is a bit more complex. As in Ohio, "[u]nder New York law, fraudulent inducement is a valid defense to an action by the holder of a negotiable instrument to enforce the instrument." *Thornock v. Kinderhill Corp.*, 749 F.Supp. 513, 518 (S.D.N.Y.1990). And a "person's intent, his state of mind, it has long been recognized, is capable of ascertainment and a statement of present intention is deemed a statement of a material existing fact, sufficient to support a fraud action." *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833, 836 (1958). But courts applying New York law have held that, in order to support a claim of fraudulent inducement, the inducement must be effectuated by a false promise other than the promise to perform the terms of the contract:

It is well settled under New York law that a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations.

It is equally well settled under state law that if a promise was made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of a material existing fact. And it is precisely such a misrepresentation which can serve as the basis for a claim of fraud.

Any apparent tension between the two aforementioned principles of New York law has been reconciled through a rule, widely adopted by the state and federal courts, pursuant to which a false promise can support a claim of fraud only where that promise was "collateral or extraneous" to the terms of an enforceable agreement in place between the parties. *See Int'l CableTel Inc. v. Le Groupe Videotron Ltee,* 978 F.Supp. 483, 486–87 (S.D.N.Y.1997) (citations and quotation marks omitted) (Sotomayor, J). In other words, the rule in New York is that a false promise can support a claim of fraud only where that promise was collateral or extraneous to the terms of the parties' agreement—that is, where the promise "involve[s] a duty separate from or in addition to that imposed by the contract." *Hawthorne Grp., LLC v. RRE Ventures,* 7 A.D.3d 320, 776 N.Y.S.2d 273, 276 (2004). It is unclear whether this rule applies only when a plaintiff is seeking affirmative relief by means of a tort claim for fraudulent inducement or whether it also applies when a defendant on a contract or note claim is asserting fraudulent inducement as an affirmative defense. At least one decision by a New York court suggests that the rule would apply to the affirmative defense. *See Hotel 71 Mezz Lender LLC v. Mitchell,* 63 A.D.3d 447, 880 N.Y.S.2d 67, 69 (2009) ("Mitchell's allegations supporting his defense of fraudulent inducement sound in failure to perform promises of future acts, which amounts simply to breach of contract. Mitchell does not allege that plaintiff breached any duty owed him separate and apart from the contractual duty. . . .").

The Court need not decide the issue here, because Mr. Doukas made promises separate from and in addition to those imposed by the QC Loan Documents. The only obligations expressly mentioned in the QC Loan Agreement are that *Quick Capital* will (a) provide "consulting and management services" (which is referenced only in a recital) (b) make certain assets available and (c) lend $200,000. There is nothing in the QC Loan Agreement about Mr. Doukas negotiating with Mr. Qureshi on behalf of Mr. Bavelis, or causing his companies to make monthly deposits of at least $80,000 in accounts maintained at Sterling Bank, or purchasing the Colonial Bank and First Southern loans guaranteed by Mr. Bavelis, or helping Mr. Bavelis finalize his estate planning. That is, Mr. Doukas made several promises that were separate from and in addition to those imposed by the QC Loan Documents and that therefore are "collateral or extraneous" to the terms of the QC Loan Documents.

In addition, Mr. Doukas's representation that no payments would be required under the QC Note was not a promise that Quick Capital would perform the terms of the QC Loan Agreement; instead, it was a promise that Mr. Bavelis would not be required to perform. As have Ohio courts, at least one New York court has held that a representation that no payments would be required under a promissory note could support a finding of fraudulent inducement if the payee in fact intended to seek payment. *See McCabe,* 39 Misc.3d 270, 277, 961 N.Y.S.2d 841 (N.Y.Sup.Ct. 2013) ("[D]efendant herein may pursue his fraudulent inducement claim premised on an oral misrepresentation to forego demanding repayment of the notes."). In sum, under both New York and Ohio law, Mr. Doukas made promises that, if he did not intend to keep them or cause one of his companies to keep them, constituted false representations of fact.

The question then becomes whether, at the time he made the promises, Mr. Doukas intended to keep them. The Court concludes that, at the time he made these promises to Mr. Bavelis, Mr. Doukas had no intention of fulfilling them, but instead intended to seek collection on the QC Note and to obtain control over Mr. Bavelis's assets. The record evidence of Mr. Doukas's intent is abundant. First, as already discussed, Mr. Doukas never kept the promises. True, "an inference that the promisor never intended to fulfill his promise should not be based solely upon the assertion that the promise was not, in fact, fulfilled," *Braddock v. Braddock*, 60 A.D.3d 84, 871 N.Y.S.2d 68, 72 (2009), but it is a factor to be considered. *See Adams v. Clark*, 239 N.Y. 403, 146 N.E. 642, 644 (1925) ("Proof of failure to keep a promise may tend to establish the intent not to keep it, but common experience teaches us that such proof is not conclusive; that the making of an unkept promise does not imply of necessity in all cases a present intention not to keep the promise.").

Moreover, "a present intention not to fulfill a promise is generally inferred from surrounding circumstances, since people do not ordinarily acknowledge that they are lying." *Braddock*, 871 N.Y.S.2d at 72. *See also Gelzer Sys. Co., Inc. v. Indus. Mach. & Supply Co.*, 1986 WL 2488, at *5 (Ohio Ct.App. Feb. 20, 1986) ("[A] fraudulent intent not to perform a promise cannot be inferred merely from the fact of nonperformance, although that fact may, when coupled with evidence of other pertinent circumstances, support an inference of lack of intent to perform at the time the promise was made." (internal quotation marks omitted)).

Taking Mr. Doukas's promises one at a time, the Court concludes that, in addition to the fact that he did not keep them, there is other evidence that at the time they were made Mr. Doukas did not intend to fulfill them and that he intended that his false representations would induce Mr. Bavelis to sign the QC Loan Documents. Before the QC Loan Documents were executed, Mr. Doukas promised that he would work to resolve the issues with respect to the Bavelis–Qureshi LLCs in a manner beneficial to Mr. Bavelis. Not only did Mr. Doukas not do so, one of his companies, Nemesis, received an assignment of the 50% interest in the Bavelis–Qureshi LLCs owned by Mr. Bavelis, Bavelis Family and FLOHIO without any indemnification being provided to Mr. Bavelis on his guarantees of the bank debt.[25] When Mr. Bavelis signed the QC Loan Agreements, he not only put himself in the position of being an obligor on a $14 million promissory note, he also, by signing the QC Security Agreement, gave what was essentially a second lien on certain of his shares in Sterling Holding and the securities previously pledged to Fifth Third. Mr. Bavelis would eventually transfer all of his interests and purport to transfer the interests owned by other entities in the Bavelis–Qureshi LLCs to Nemesis. In addition, if Mr. Bavelis had signed the TNS Agreement, he would have transferred his interests in most of the Ohio Partnerships to an entity with directors whom he did not know. "[T]he full range of the troubling series of events visited on" Mr. Bavelis, *Braddock*, 871 N.Y.S.2d at 73, leads the Court to conclude that Mr. Doukas never intended to fulfill his promise to Mr. Bavelis of working to resolve matters with Mr. Qureshi in a manner favorable to Mr. Bavelis, nor for that matter, did he intend to keep any of

**25.** This assumes without deciding that Mr. Bavelis had the authority to make the assignments on behalf of FLOHIO and Bavelis Family.

the promises he made to Mr. Bavelis, but instead intended to take advantage of Mr. Bavelis and deprive him of his assets. *See Braddock,* 871 N.Y.S.2d at 73 ("[T]he inference that David knew all along that he would not fulfill his promises to John may be drawn from the full range of the troubling series of events visited on John. Those events, viewed together, permit the conclusion that David conducted himself in bad faith, planning all along to take advantage of his cousin's trust in order to obtain from him, at a fraction of the usual cost, the crucial service of finding the necessary investor to provide the start-up capital, and that he planned that once the necessary investor was on board, he would remove John by degrees until he was excised from the company completely.").

In addition to Mr. Doukas's efforts to take advantage of Mr. Bavelis and the unfortunate events that befell Mr. Bavelis as a result, there is other evidence that Mr. Doukas did not intend to fulfill the promises that induced Mr. Bavelis to sign the QC Loan Documents. Prior to the execution of those documents, Mr. Doukas promised that he would cause monthly deposits of at least $80,000 to be made into accounts maintained at Sterling Bank and would purchase nonperforming loans of Sterling Bank. The evidence, however, demonstrates that neither Mr. Doukas nor his companies had the ability to make deposits at the promised level and that the values of his assets would not support the purchase of Sterling Bank's nonperforming loans. Accordingly, at the time Mr. Doukas made those promises, he knew that he had no ability to fulfill them. "[I]f a promisor had no reasonable ground to anticipate that his undertaking might be carried out, it seems that this fact may establish a prima facie case that the promise was not made in good faith." *Gelzer Sys. Co.,* 1986

WL 2488, at *5 (Ohio Ct.App. Feb. 20, 1986). *See also Bell v. Smith (In re Smith),* 232 B.R. 461, 466 (Bankr.D.Idaho 1998) ("A promise made with a positive intent not to perform or without a present intent to perform satisfies [Section] 523(a)(2)(A) ... as does a representation which the debtor knew or should have known was outside of the debtor's prospective ability to perform." (internal quotation marks omitted)).

Furthermore, Mr. Doukas promised that he would purchase the Colonial Bank and First Southern loans guaranteed by Mr. Bavelis. As Mr. Bavelis testified, not only did the purchase of the Colonial Bank and First Southern loans never occur, Mr. Doukas's failure to do what was required—provide documents requested by the banks to allow them to properly analyze Mr. Doukas's proposal—was the reason the purchase did not happen. That is, not only did Mr. Doukas not keep his promise, he failed to take the most basic steps that would have been necessary to be in a position to fulfill the promise. Accordingly, the Court concludes that Mr. Doukas never had any intention of fulfilling his promise of purchasing the Colonial Bank and First Southern loans in order to assist Mr. Bavelis. *See Gelzer Sys. Co.,* 1986 WL 2488, at *5 ("An intention not to perform may be inferred from the fact that, after performance by the promisee, the promisor does not even make a pretense of carrying out his promise, or evades and refuses to perform it.").

Then there was the estate planning. When Mr. Doukas's attorney asked him during the trial whether he had "ever had any discussions with Mr. Bavelis about planning his estate, and I'm talking about not matters of creditors but planning his estate for estate purposes, death," Tr. at 895:2–5, Mr. Doukas responded "No." Tr. at 895:6. To the contrary, as already dis-

cussed, there is considerable evidence that, before the QC Loan Documents were executed, Mr. Doukas promised that he would help finalize Mr. Bavelis's estate planning. The Bavelises both testified that Mr. Doukas had promised to assist Mr. Bavelis with estate planning, and they were much more credible witnesses than was Mr. Doukas, who denied that he offered to help Mr. Bavelis plan his estate. In addition to discussing estate planning generally, Mr. Doukas was specific, advising Mr. Bavelis that, in Mr. Bavelis's words, "it was going to be for the future, for my grandkids and my great-grandkids, I would form this perpetuity, perpetual something . . . ." Tr. at 785. That is, the estate planning services promised by Mr. Doukas related to planning Mr. Bavelis's estate for his eventual death.

Other than the fact that he never did so, what is the evidence that Mr. Doukas did not intend to perform estate planning services for Mr. Bavelis? Mr. Doukas represented that, in Mr. Bavelis's words, "George, I have done this before and I can help you with this thing" and "I can help you with this, I have done it." Tr. at 582–83. Yet Mr. Doukas had never even done for himself the estate planning that he had promised in June 2009 he would do for Mr. Bavelis, and there is no evidence that he ever helped plan anyone's estate. At the time he promised Mr. Bavelis that he would help finalize his estate planning, Mr. Doukas knew that he did not have the ability to do so, thus making his promise a false representation. *See Gelzer Sys. Co.,* 1986 WL 2488, at *5; *Smith,* 232 B.R. at 466.

Mr. Doukas promised that he would return the QC Loan Documents after the estate planning was finalized and that no payments would be required under the QC Note. But Mr. Doukas never intended to finalize Mr. Bavelis's estate planning, and it follows that he likewise never intended to return the QC Loan Documents. In fact, on at least two occasions—in October 2009 and January 2010, Mr. Bavelis requested that the QC Loan Documents be returned, but Mr. Doukas, while saying he would do so, put Mr. Bavelis off. Again, "[a]n intention not to perform may be inferred from the fact that, after performance by the promisee, the promisor does not even make a pretense of carrying out his promise, or evades and refuses to perform it." *Gelzer Sys. Co.,* 1986 WL 2488, at *5. In addition to all of the foregoing, the evidence that Mr. Doukas intended to seek payment under the QC Note despite representing to Mr. Bavelis that he would not do so includes the fact that, within a couple of months after the execution of the QC Note, Mr. Doukas requested that Mr. Bavelis issue Quick Capital two checks in the amount of $58,300, even though there was no change in circumstances since the time that Mr. Doukas had promised that no payments would be required. *Cf. United States v. Shah,* 44 F.3d 285, 293 n. 14 (5th Cir.1995) ("[W]here only a short time elapses between the making of the promise and the refusal to perform it, and there is no change in the circumstances, an intent not to perform when the promise was made may, in appropriate circumstances, be properly inferred.") (internal quotation marks omitted).

### 2. Materiality

██ ██ In order to support a finding of fraudulent inducement, a representation of fact must not only be false, it must be material. There is both an objective and a subjective component of the materiality analysis. *See Geer v. Union Mut. Life Ins. Co.,* 273 N.Y. 261, 7 N.E.2d 125, 127 (1937) ("The materiality of a representation may then depend upon the idiosyncrasies or the individuality of the person who acts upon

the representation, and often must be determined as a question of fact by the trier of the facts. Nevertheless at times, departure in a representation from an accurate statement of the truth may be so slight that we may confidently say that the difference could not affect [the] decision of any reasonable person. Then as a matter of law the misrepresentation is not material."). "A fact is material if it is likely, under the circumstances, to affect the conduct of a reasonable person with reference to the transaction." *Leal v. Holtvogt,* 123 Ohio App.3d 51, 702 N.E.2d 1246, 1262 (Ohio Ct.App.1998) (internal quotation marks omitted). "Although this standard is generally objective, an exception arises when the individual responsible for the misrepresentation is aware that the recipient is peculiarly disposed to attach importance to a particular subject; in such an instance the misrepresentation should be deemed material, regardless of its significance to a reasonable person under similar circumstances." *Market St. Grp. v. McComb,* 1998 WL 404478, at *3 (Ohio Ct.App. Mar. 27, 1998) (internal quotation marks omitted).

■ In light of the financial condition of Sterling Bank in June 2009, the false representations that Mr. Doukas made to Mr. Bavelis regarding his intent to make monthly deposits of at least $80,000 into accounts maintained at Sterling Bank and to purchase nonperforming Sterling Bank loans were objectively material from the standpoint of a reasonable person. Moreover, based on his conversations and other communications with Mr. Bavelis, Mr. Doukas knew that Mr. Bavelis was disposed to attach importance to those promises. In fact, Mr. Doukas conceded that he knew Sterling Bank was important to Mr. Bavelis, Tr. at 329:12, and testified specifically that his obtaining the nonperforming loans of Sterling Bank was "even more

important" than raising capital for the bank. Tr. at 891:24. Given Mr. Bavelis's financial situation and other circumstances in June 2009—including the recent death of his brother, the disputes with Mr. Qureshi and his multimillion dollar liability on bank debt—Mr. Doukas knew that his promises to resolve the issues with Mr. Qureshi, to purchase the Colonial Bank and First Southern loans, to help finalize Mr. Bavelis's estate planning and to return the QC Loan Documents after the estate planning was finalized were important to Mr. Bavelis. As Mr. Doukas testified, "[e]verything was important to him." Tr. at 329:9. Mr. Bavelis would not have signed the QC Loan Documents without these promises. Accordingly, the Court concludes that Mr. Doukas's false representations were material.

### 3. Justifiable Reliance

■ In agreeing to sign the QC Loan Documents, Mr. Bavelis actually relied on Mr. Doukas's false representations. A successful fraudulent-inducement defense, however, requires that the reliance be justifiable. Under New York and Ohio law, answering the question of whether reliance was justifiable requires a review of all the facts and circumstances. *See JP Morgan Chase Bank v. Winnick,* 350 F.Supp.2d 393, 406 (S.D.N.Y.2004) ("In assessing whether reliance on allegedly fraudulent misrepresentations is reasonable or justifiable, New York takes a contextual view...."); *Braddock,* 871 N.Y.S.2d at 72 ("[T]he element of justifiable reliance ... is generally one of fact...."); *Lepera v. Fuson,* 83 Ohio App.3d 17, 613 N.E.2d 1060, 1065 (1992) ("The question of justifiable reliance is one of fact....").

■ Factors considered by New York courts when conducting the justifiable-reliance analysis include "the level of sophistication of the parties, the relation-

ship between them, and the information available at the time of the operative decision." *Winnick,* 350 F.Supp.2d at 406. Likewise, Ohio courts also "consider the various circumstances involved, such as the nature of the transaction, the form and materiality of the representation, the relationship of the parties, the respective intelligence, experience, age, and mental and physical condition of the parties, and their respective knowledge and means of knowledge." *Feliciano v. Moore,* 64 Ohio App.2d 236, 412 N.E.2d 427, 430 (1979) (internal quotation marks omitted). Here, the most salient facts are the apparent close friendship between Mr. Bavelis and Mr. Doukas, the trust and confidence that Mr. Bavelis placed in Mr. Doukas, the promissory nature of certain of Mr. Doukas's misrepresentations and the inability of Mr. Bavelis to know Mr. Doukas's state of mind at the time he made his various promises prior to the execution of the QC Loan Documents.

As developed above in the Court's findings of fact, Mr. Doukas worked assiduously to foster a friendship and fraternity with Mr. Bavelis that appeared to be based on mutual trust and confidence. "[T]here are numerous cases finding that evidence of friendship or a close personal relationship weighs heavily in favor of finding at least justifiable reliance if not the higher level of reasonable reliance." *Lance v. Tillman (In re Tillman),* 197 B.R. 165, 171 (Bankr. D.C.1996) (decided in the § 523(a)(2)(A) context). "The courts reason that [people] are not to be faulted for relying on the honesty of close friends who take advantage of them." *Id. See also Montalto v. Sobel (In re Sobel),* 37 B.R. 780, 785 (Bankr.E.D.N.Y.1984) ("Because of the relationship of trust and confidence which had been built up between the younger people and the Sobels, it was easy for the former to credit Sobel's explanation. . . .

They are not to be faulted if they believed that their close friends and the godparents of one of their children would deal honestly with them."); *Dlouhy v. Frymier,* 92 Ohio App.3d 156, 634 N.E.2d 649, 652 (1993) (concluding that there was justifiable reliance on misrepresentations made to induce the entry into contracts where, among other things, the person who made the misrepresentations had "fostered a relationship of trust and friendship prior to presenting the contracts"). Based in part on the friendship and fraternity that Mr. Bavelis believed he had with Mr. Doukas and the trust and confidence that Mr. Bavelis placed in Mr. Doukas as a business advisor, the Court concludes that Mr. Bavelis's reliance on each of Mr. Doukas's false representations was justifiable.

This includes Mr. Bavelis's reliance on Mr. Doukas's representation that he had estate-planning experience. Mr. Doukas contends that Mr. Bavelis's reliance on any such representation was not justifiable, pointing out that the biography he presented to Mr. Bavelis "did not contain any representation that Mr. Doukas had ever planned an Estate." Doukas Findings & Conclusions ¶ 25. According to Mr. Doukas, Mr. Bavelis could not have "reasonably relied" on the representation that Mr. Doukas would help plan Mr. Bavelis's estate. Doukas Findings & Conclusions ¶ 34. The Court need not decide whether Mr. Bavelis's reliance was reasonable; the standard under New York and Ohio law is the lower standard of justifiable reliance. And Mr. Doukas's statement that "[a]ll of the evidence supports the factual conclusion" that, prior to signing the QC Loan Documents Mr. Bavelis "had actual knowledge . . . that Doukas had never been engaged in any activity as an estate planner," Doukas Findings & Conclusions ¶ 34, is simply not true. All of the evidence supports the finding that Mr. Doukas falsely

represented to the Bavelises that he had planned estates. The fact that he did not make that representation in his biography is beside the point.

Other than attacking Mr. Bavelis's reliance on the estate-planning representation, Mr. Doukas does not state in his proposed conclusions of law why he believes Mr. Bavelis's reliance was not justifiable, but he does argue that Mr. Bavelis has failed to carry his burden with respect to any of the elements of fraudulent inducement. Doukas Findings & Conclusions at 34. Hints of what Mr. Doukas may be thinking in this regard came out during the hearing. Counsel to Mr. Doukas asked questions of Mr. Bavelis that seemed to suggest that Mr. Bavelis's reliance on Mr. Doukas's various promises was not justifiable because he failed to conduct an investigation regarding Mr. Doukas's representations. Tr. at 665–93. If this is Mr. Doukas's position, as explained below, it is not well taken in light of the relationship between Mr. Bavelis and Mr. Doukas.

■ Generally speaking, under New York law, in order for reliance to be considered justifiable, there is a duty to review documents or other information to which a party has access. *See Giannacopoulos v. Credit Suisse*, 37 F.Supp.2d 626, 633 (S.D.N.Y.1999) ("The broad rule is that where parties have access to information that could expose a misrepresentation, courts will not find their reliance sufficiently justifiable to merit legal protection."). But a failure to investigate does not render reliance unjustifiable, or even unreasonable, if there is a fiduciary relationship between the parties. *See Frame v.*

*Maynard*, 83 A.D.3d 599, 922 N.Y.S.2d 48, 51 (2011) ("The trial court correctly found that Paulson and Guthrie, as beneficiaries of this fiduciary relationship, were entitled to rely on Maynard's representations and his complete, undivided loyalty and were not required to perform independent inquiries in order to reasonably rely on their fiduciary's representations . . . ." (citations and internal quotation marks omitted)); *Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C.*, 2013 WL 628533, at *14 (S.D.N.Y. Feb. 15, 2013) ("As was made clear by *Frame*, even a sophisticated party may justifiably rely upon a fiduciary to represent the truth and disclose all material facts.").

In Ohio, the law is not entirely clear regarding whether in general a party asserting fraud has a duty to investigate information to which he or she has access. On the one hand, at least where the representation is one regarding the income stream or other financial condition of a business, some Ohio courts have held that "[t]he recipient in a business transaction of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." *Steiner v. Roberts*, 131 N.E.2d 238, 242 (Ohio Ct.App.1955) (internal quotation marks omitted).[26]

■ Other courts applying Ohio law, however, have held that "[a] person has no right to rely on misrepresentations when the true facts are equally open to both parties." *Columbia Gas Transmission Corp. v. Ogle*, 51 F.Supp.2d 866, 875–76 (S.D.Ohio 1997), *aff'd*, 1998 WL 879583 (6th Cir. Nov. 25, 1998). Nonetheless, as in New York, there is no duty to investigate

---

**26.** Investigation may be required under Ohio law if the false representation relates to the physical condition of property. *See, e.g., Findlay Ford Lincoln–Mercury v. Huffman*, 2004 WL 231511, at *4 (Ohio Ct.App. Feb. 9, 2004); *Van Horn v. Peoples Banking Co.*, 64 Ohio App.3d 745, 582 N.E.2d 1099, 1101 (1990). Such a representation is not at issue here.

if there is a fiduciary relationship between the parties. *See Aetna Ins. Co. v. Reed,* 33 Ohio St. 283, 292 (Ohio 1877); *Finomore v. Epstein,* 18 Ohio App.3d 88, 481 N.E.2d 1193, 1196 (1984).

■■■ "[A] fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Penato v. George,* 52 A.D.2d 939, 383 N.Y.S.2d 900, 904 (1976). "It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *Id.* "The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another . . . ." *Id.* at 904–05. Likewise, under Ohio law, "[a] fiduciary relationship is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Stone v. Davis,* 66 Ohio St.2d 74, 419 N.E.2d 1094, 1097–98 (1981) (internal quotation marks omitted). "A fiduciary relationship need not be created by contract; it may arise out of an informal relationship where both parties understand that a special trust or confidence has been reposed." *Stone,* 419 N.E.2d at 1098 (Ohio 1981) (citation and internal quotation marks omitted).[27]

■■■ Under both New York and Ohio law, therefore, the defining qualities of a fiduciary relationship are the trust and confidence that one party places in another and the resulting influence exercised by the person in whom the trust and confidence is placed. The question of whether a fiduciary relationship exists between two parties is an issue of fact. *See EBC I, Inc. v. Goldman, Sachs & Co.,* 5 N.Y.3d 11, 799 N.Y.S.2d 170, 832 N.E.2d 26, 31 (2005); *Sacksteder v. Senney,* 2012 WL 4480695, at *18 (Ohio Ct.App. Sept. 28, 2012).

■■■ Based on its findings of fact, the Court concludes that, as of the date the QC Loan Documents were executed, Mr. Bavelis placed special confidence and trust in Mr. Doukas and that, as a result, Mr. Doukas exercised considerable influence over Mr. Bavelis. By the time Mr. Bavelis signed the QC Loan Documents, Mr. Doukas had made numerous representations that led Mr. Bavelis to believe that he and Mr. Doukas were close friends and "brothers" based in part on their shared values and common heritage. Although "personal connections of that sort alone" are insufficient to establish a fiduciary relationship between two parties, *Roni LLC v. Arfa,* 74 A.D.3d 442, 903 N.Y.S.2d 352, 355 (2010), *aff'd, Roni LLC v. Arfa,* 18 N.Y.3d 846, 939 N.Y.S.2d 746, 963 N.E.2d 123 (2011), such a close connection is a factor to be considered in determining whether a fiduciary relationship exists. *See Amusement Indus.,* 2013 WL 628533, at *10 ("In *Roni LLC,* the Court of Appeals considered the defendants playing upon the cultural identities and friendship of the plaintiffs—a circumstance present here as well—as one factor in favor of finding a fiduciary rela-

---

**27.** "[T]he term 'fiduciary relationship,' for purposes of § 523(a)(4), is determined by federal, not state, law[,]" and the Sixth Circuit "construes the term 'fiduciary capacity' found in the defalcation provision of § 523(a)(4) more narrowly than the term is used in other circumstances." *Commonwealth Land Title Co. v. Blaszak (In re Blaszak),* 397 F.3d 386, 390–91 (6th Cir.2005). Section 523(a)(4) is not at issue here, and it is applicable state law, not federal law, that determines whether a fiduciary relationship existed between Mr. Bavelis and Mr. Doukas at the time the Quick Capital Loan Documents were executed—and thus whether Mr. Bavelis had a duty to investigate Mr. Doukas's representations—for purposes of the fraudulent—inducement analysis.

tionship." (internal quotation marks omitted)); *Roni*, 939 N.Y.S.2d 746, 963 N.E.2d at 125 ("Moreover, plaintiffs contend that the promoter defendants assumed a position of trust and confidence, in part, by 'playing upon the cultural identities and friendship' of plaintiffs. Accepting the totality of these allegations to be true, as we must at this early stage of the litigation, the complaint adequately pleads a fiduciary relationship."). Mr. Bavelis provided clear and convincing evidence that, from the very beginning, Mr. Doukas used their shared cultural identity in order to create a close friendship between them.

Mr. Doukas also made statements to Mr. Bavelis regarding his expertise and extensive experiencing in restructuring debts, and those statements led Mr. Bavelis to believe that he could place trust and confidence in Mr. Doukas as a business advisor. As a result, Mr. Bavelis viewed Mr. Doukas as a trusted source of business and restructuring advice, referring to him to others as his "advisor," Debtor's Ex. 58 and "special friend and partner." Debtor's Ex. 51. Mr. Bavelis instructed others, including Mr. Albright and one of Sterling Bank's litigation attorneys, to rely on and consult with Mr. Doukas. In fact, based on Mr. Doukas's advice, Mr. Bavelis even declined at times to consult his own longtime counsel, relying instead on Mr. Doukas. The extent of Mr. Bavelis's reliance on Mr. Doukas supports the conclusion that a fiduciary relationship existed between Mr. Bavelis and Mr. Doukas. *See Manela v. Garantia Banking Ltd.*, 5 F.Supp.2d 165, 179 (S.D.N.Y.1998) ("Plaintiffs point to numerous facts capable of supporting the conclusion that the necessary relationship of trust and confidence existed between Manela and defendants. For example, plaintiffs point out that Manela spoke to Stallone on a near-daily basis and often acted in reliance on Stallone's advice, such as when he invested in the GDF.") (footnote omitted).

Furthermore, as of June 2009, Mr. Bavelis and Mr. Doukas had prior financial dealings that led Mr. Bavelis to trust Mr. Doukas and rely on him. After Mr. Bavelis became involved with the Glenn Wright matter, Mr. Doukas relented on his demands with respect to the lots he had received by quitclaim deed. By June 2009 Mr. Doukas had purchased approximately $200,000 of stock in Sterling Holding and had deposited $2 million from his divorce into accounts maintained at Sterling Bank. "Although it is true that friendship alone does not establish a confidential relationship ... fiduciary relationships have been found between close friends with prior business or financial dealings...." *Amusement Indus.*, 2013 WL 628533, at *10 (citation and internal quotation marks omitted). *See also Schwartz v. Houss*, 2005 WL 579152, at *4 (N.Y.Sup.Ct. Jan. 3, 2005) (holding that fiduciary relationship may exist between close friends with prior financial dealings such that they are not "merely social friends").

This relationship of trust and confidence did not merely exist in Mr. Bavelis's mind. Mr. Doukas himself testified that Mr. Bavelis was entitled to trust him from March through December 2009. Tr. at 939:10–14. Based on all the evidence, the Court concludes that, as of the date the QC Loan Documents were executed, a fiduciary relationship existed between Mr. Bavelis and Mr. Doukas, and Mr. Bavelis therefore had no duty to investigate Mr. Doukas's various representations.

As already discussed, Mr. Doukas promised Mr. Bavelis that he would make significant monthly deposits into accounts maintained at Sterling Bank and that he would purchase the nonperforming loans of Sterling Bank, as well as the loans

guaranteed by Mr. Bavelis. Although the Court would not include these promises as a basis for fraudulent inducement in the absence of a fiduciary relationship between Mr. Bavelis and Mr. Doukas (because an investigation of Mr. Doukas's tax returns would have revealed the inability of Mr. Doukas or his companies to fulfill the promises), the existence of a fiduciary relationship between Mr. Bavelis and Mr. Doukas renders Mr. Bavelis's reliance on Mr. Doukas's promises justifiable.

■ ■ Moreover, even if a fiduciary relationship had not existed between Mr. Bavelis and Mr. Doukas and, accordingly, Mr. Bavelis was required to review the documents to which he had access (such as the tax returns for Mr. Doukas and his companies), Mr. Bavelis's reliance on certain of Mr. Doukas's promises still would have been justifiable. "[A] plaintiff's failure to investigate will not preclude a finding of reasonable reliance where the facts allegedly misrepresented are peculiarly within the defendant's knowledge [and plaintiff] has no independent means of ascertaining the truth." *Doehla v. Wathne Ltd., Inc.*, 1999 WL 566311, at *13 (S.D.N.Y. Aug. 3, 1999).[28] "In such a case, reasonable reliance may be found even where the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty." *Id.* There is nothing more peculiarly within a person's knowledge than the state of his or her mind—until, as here, the person's subsequent actions reveal it. No documents or other information available to Mr. Bavelis would have revealed that Mr. Doukas did not intend to keep certain of his promises. In particular, absent an ability to read Mr. Doukas's mind, Mr. Bavelis would have had no way

of knowing at the time he signed the QC Loan Documents that Mr. Doukas did not intend to resolve the issues related to the Bavelis–Qureshi LLCs in a manner beneficial to Mr. Bavelis or that Mr. Doukas did not intend to help him finalize his estate planning. Thus, the promissory nature of Mr. Doukas's false representations also leads the Court to conclude that Mr. Bavelis's reliance was justifiable.

Aware of the conflict between Mr. Albright and Mr. Doukas, Mr. Bavelis knew that others viewed Mr. Doukas as a difficult person with whom to transact business. Mr. Bavelis would later say that he was "very embarrassed ... that I didn't recognize what kind of a person I was dealing with ... for so long." Tr. at 762. "I've been in business for 40 years and I think I had a pretty good sense of getting a message of whom I'm dealing with but I didn't, this guy [misled] me." Tr. at 762. After the execution of the QC Loan Documents, Mr. Bavelis had his doubts about Mr. Doukas from time to time. For example, Mr. Bavelis became uncomfortable with Mr. Doukas as a result of receiving the TNS Agreement in July 2009; as a result of Mr. Doukas's delay after September 2009 in identifying the entity that would be named on the stock certificate for the shares Mr. Doukas purchased in Sterling Holding, ostensibly because he was forming a trust like Mr. Bavelis's; as a result of Mr. Doukas's failure to return the QC Loan Documents notwithstanding Mr. Bavelis's request for their return in October 2009; and as a result of his lack of success in negotiating a deal with Mr. Qureshi up until the alleged breakthrough Mr. Doukas announced at the coffee shop in Boca Raton in December 2009. On the date he signed the QC Loan Documents, howev-

---

**28.** Although this case refers to "reasonable" reliance, it remains relevant given that justifi-

able reliance is a lower standard.

er, Mr. Doukas had not yet done anything to cause Mr. Bavelis's trust in him to wane.

The Court concludes that, in agreeing to sign the QC Loan Documents, Mr. Bavelis justifiably relied on Mr. Doukas's promises to make minimum monthly deposits of $80,000 into accounts maintained at Sterling Bank, to resolve the issues with Mr. Qureshi in a manner that would benefit Mr. Bavelis, to purchase the Colonial Bank and First Southern loans as well as the nonperforming Sterling Bank loans, to help finalize Mr. Bavelis's estate planning, to not seek payments under the QC Note and to return the QC Loan Documents after the estate planning was finalized.

### 4. Injury

█ Mr. Bavelis's justifiable reliance proximately caused him injury. As a result of Mr. Doukas's fraud, Mr. Bavelis became the ostensible obligor on a $14 million promissory note. Even though Mr. Doukas had represented to Mr. Bavelis that no payments would be due and that the QC Loan Documents would be returned, Mr. Bavelis (at Mr. Doukas's request approximately a month after the documents were signed), issued Quick Capital two checks, each in the amount of $58,300, which Mr. Bavelis believed related to his estate planning. Mr. Doukas advised Mr. Bavelis that he would return the checks, but he never did. Instead, Quick Capital filed a lawsuit against Mr. Bavelis in New York state court. In addition, the pursuit of the claim on the QC Note has caused Mr. Bavelis considerable time and expense litigating the matter in this Court. The Court, therefore, concludes that Mr. Bavelis has established each of the elements of fraudulent inducement with respect to the QC Loan Documents by the required standard of clear and convincing evidence.

### F. Mr. Doukas Has No Claim Against Mr. Bavelis Under Florida Law

█ Quick Capital has argued that, if Mr. Doukas in fact purchased the shares of stock in Sterling Holding on his own behalf, Mr. Doukas personally has a claim against Mr. Bavelis under Florida law. That argument has no legal basis. Quick Capital relies on two Florida statutes. First, Quick Capital relies on Fla. Stat. Ann. § 517.061(11). According to Quick Capital, this section "provided Doukas with a three-day right of recession [sic][,]" and Mr. Doukas "made a timely recession [sic] demand...." Doukas Findings & Conclusions ¶¶ 121, 123.

Any demand made by Mr. Doukas was untimely. If an issuer is offering securities exempt from registration under Fla. Stat. Ann. § 517.061(11) and the sale is to five or more persons in Florida (both of which was the case with Sterling Holding), then "any sale in this state made pursuant to this subsection is voidable by the purchaser in such sale either within 3 days after the first tender of consideration is made by such purchaser to the issuer, an agent of the issuer, or an escrow agent or within 3 days after the availability of that privilege is communicated to such purchaser, whichever occurs later." Fla. Stat. Ann. § 517.061(11)(a)(5). As the Court found above, Mr. Doukas received the private placement memorandum, which notified him of the right of rescission. Thereafter, on September 23, 2009, Mr. Doukas tendered the consideration to Sterling Holding. Mr. Doukas sent his letter that he now claims was a timely rescission demand nearly five months—not three days—after he tendered the consideration. The date he received the stock certificate is not relevant but, even if it were, he sent the letter seven days, not three days, after receiving the stock certificate.

Quick Capital also relies on Fla. Stat. Ann. § 517.211, regarding the remedies available in cases of sales of securities that are unlawful because, for example, they are not either exempt or registered. As already noted, Sterling Holding made an exempt securities offering. There is no evidence that the sale of securities was otherwise unlawful. Mr. Doukas, therefore, has no claim against Mr. Bavelis based on his purported right of rescission.

## V. Conclusion

For the reasons set forth above, the Court concludes that any claim asserted by Quick Capital claim should be disallowed and that neither Mr. Doukas nor any of his companies has any claim against Mr. Bavelis or his bankruptcy estate. Accordingly, the Proofs of Claim are disallowed in their entirety.

**IT IS SO ORDERED.**

### APPENDIX B

Sanctions Opinion

**This document has been electronically entered in the records of the United States Bankruptcy Court for the Southern District of Ohio.**

**IT IS SO ORDERED.**

**Dated: February 22, 2017**

**John E. Hoffman, Jr., United States Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF · OHIO, EASTERN DIVISION AT COLUMBUS**

*In re*: GEORGE A. BAVELIS, *Debtor*.

George A. Bavelis, *et al.*, *Plaintiffs*,

v. .

Ted Doukas, *et al.*, *Defendants*.

Case No. 10–58583

Chapter 11

Judge Hoffman

Adv. Pro. No. 10–2508

## OPINION AND ORDER (A) DETERMINING THAT GARY A. GOLDSTEIN, TED DOUKAS AND QUICK CAPITAL OF LONG ISLAND CORP. HAVE ENGAGED IN SANCTIONABLE MISCONDUCT AND (B) ESTABLISHING PROCEDURES FOR DETERMINING THE AMOUNT OF THE SANCTIONS

### I. Introduction

This matter is before the Court in the Chapter 11 case of George A. Bavelis and the adversary proceeding he commenced against several parties, including Ted Doukas. Earlier in the case, Doukas sought to establish that one of his wholly owned companies, Quick Capital of Long Island Corp. ("Quick Capital"), held a $14 million secured claim against Bavelis's bankruptcy estate. But unbeknownst to Bavelis, Doukas had already caused Quick Capital to assign its interest in the note and security agreement on which the claim was based to Socal Capital LLC ("Socal"), a company in which Doukas had no interest. Gary A. Goldstein, counsel for Doukas and Quick Capital, admits that he became aware of the assignment soon after Doukas executed it. .

Fully aware of the assignment, Goldstein, Doukas and Quick Capital (collectively, the "Respondents") engaged in a two-year long pattern of deception designed to conceal the assignment from Bavelis and the Court. They failed to produce the assignment in response to multiple document requests that should have elicited it, and they even sent Bavelis's counsel

discovery responses stating that no responsive documents existed. The Respondents concede that Quick Capital was no longer a creditor post-assignment, yet they filed several documents with the Court—including a motion seeking the appointment of a Chapter 11 trustee—that identified Quick Capital as a creditor after Doukas executed the assignment. The Respondents then participated in a four-day hearing in which they attempted, without once mentioning the assignment, to establish that Quick Capital held a secured claim.

Attempting to defend their conduct, the Respondents raise a slew of arguments, but they all fall flat. Withholding material evidence and lying to a party and the Court constitute bad faith and an affront to the judicial system that must be redressed. Accordingly, sanctions will be imposed against the Respondents for this bad faith misconduct under § 105(a) of the Bankruptcy Code and based on the Court's inherent authority. The sanctions will include attorneys' fees resulting from the Respondents' bad faith litigation conduct and also may include punitive damages. In addition, because Goldstein was admitted to practice law before the Court and his conduct multiplied these proceedings unreasonably and vexatiously, he also will be sanctioned under 28 U.S.C. § 1927.

## II. Jurisdiction

The Court has jurisdiction to hear and determine this matter under 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A) and (O).

## III. Procedural History

On July 20, 2010 (the "Petition Date"), Bavelis filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and three months later he commenced this adversary proceeding. The Court confirmed Bavelis's Chapter 11 plan, which provides for 100% payment of all creditors' claims, on December 12, 2014.

The parties brought this matter before the Court by filing:

1. the Motion of Debtor in Possession/Plaintiff George A. Bavelis for Order Requiring Defendants Quick Capital of LI, Inc., Ted Doukas, and Attorney Gary Goldstein to Show Cause as to Why They Should Not Be Sanctioned Under 11 U.S.C. § 105 and This Court's Inherent Authority (the "Motion") (Adv. Doc. 348, Doc. 559);[1] and

2. the response to the Motion filed by Doukas and Quick Capital (Adv. Doc. 366), Goldstein's joinder in the response (Adv. Doc. 367), and Bavel-

---

1. References to "Doc. ___" are to docket entries in Bavelis's bankruptcy case, Case No. 10–58583, and references to "Adv. Doc. ___" are to docket entries in this adversary proceeding, Adversary Proceeding No. 10–2508. The versions of the relevant documents filed in the bankruptcy case and the adversary proceeding are identical, so only the versions filed in the adversary proceeding will be referenced in the remainder of this opinion. For the convenience of the reader, documents that both appear on the docket and were admitted as exhibits will be referenced by the docket and exhibit number. The Court takes judicial notice of the docket in Bavelis's bankruptcy case, the claims register, the docket in this adversary proceeding, and the contents of the documents filed in the bankruptcy case and the adversary proceeding. *See In re Kmart Corp.*, 362 B.R. 361, 372 n.9 (Bankr. N.D. Ill. 2007) (taking judicial notice of entries on the court's docket and the contents of documents filed in the bankruptcy case, but not the truth of the facts asserted in those documents), *aff'd sub nom. Philip Morris Capital Corp. v. Kmart Corp.*, No. 07 C 1926, 2007 WL 3171316 (N.D. Ill. Oct. 24, 2007).

is's reply in support of the Motion (Adv. Doc. 375).

Bavelis seeks attorneys' fees and costs as well as punitive damages from the Respondents because they (a) failed to produce "clearly responsive documents in discovery that would have disclosed Quick Capital's true status as a non-creditor" and (b) filed documents that "included direct misrepresentations about Quick Capital's 'creditor' status." Mot. at 1–2. In light of the allegations in the Motion, the Court entered an order (a) directing the Respondents to appear and show cause why they should not be sanctioned under § 105(a) of the Bankruptcy Code and the Court's inherent authority and (b) directing Goldstein individually to appear and show cause why he should not be sanctioned under 28 U.S.C. § 1927 (Adv. Doc. 604). The show cause order provided the Respondents with more than three months' notice of the hearing on the Motion and the show cause order (the "Show Cause Hearing"). In addition, the Court entered an order (Adv. Doc. 606) establishing a discovery schedule and deadlines for filing stipulations and witness and exhibit lists.

The Show Cause Hearing was held over the course of two days. The transcript of the first day of the Show Cause Hearing (Adv. Doc. 664) will be referred to as "Transcript I," and the transcript of the second day (Adv. Doc. 666) as "Transcript II."[2] Goldstein and Doukas testified during the Show Cause Hearing, as did Richard

Stovall, bankruptcy counsel for Bavelis. In addition, Bavelis's Exhibits 206, 210, 215, 217–239, 242–249, 251–261, 264, and 269–279 were admitted into evidence without objection, Tr. II at 31–45, and Doukas's Exhibit K also was admitted into evidence without objection. Tr. II at 55. Doukas and Quick Capital were represented by counsel during the Show Cause Hearing. Acting pro se, Goldstein chose not to present a case in his defense, but instead rested solely on his testimony offered on cross examination. Tr. I at 172–76.

In accordance with an order that was amended multiple times at the request of the parties, Bavelis filed proposed findings of fact and conclusions of law (Adv. Doc. 675), as did Goldstein (Adv. Doc. 676) and Doukas and Quick Capital (Adv. Doc. 677).[3]

### IV. Findings of Fact

On December 3, 2010, Quick Capital filed a proof of claim asserting a secured claim in the amount of $1,667,791.10 based on a promissory note (the "Note") and a security agreement (the "Security Agreement") that Bavelis signed before the Petition Date. Claim 49–1. Several months later, Quick Capital filed an amended proof of claim based on the same loan documents, asserting a secured claim in the amount of $14 million (the "Claim"). Claim 49–2. The Court disallowed the Claim after finding, among other things, that Doukas fraudulently induced Bavelis to sign the Quick Capital loan documents. *Bavelis v. Doukas (In re Bavelis)*, 490 B.R. 258, 284

**2.** The entirety of Transcript I covers the first day of the Show Cause Hearing, while Pages 1 through 55 of Transcript II cover the second. The remainder of Transcript II covers the second phase of a trial on the remaining claims set forth in Bavelis's amended complaint (the "Amended Complaint") (Adv. Doc. 490). Because certain of the remaining claims in the Amended Complaint are non-core, the Court is not entering a final order as to them, but instead is transmitting proposed findings

of fact and conclusions of law to the District Court.

**3.** Doukas's and Quick Capital's proposed findings of fact and conclusions of law also relate to the remaining counts of the Amended Complaint. The portions relevant to the Show Cause Hearing are located at pages 46 through 54.

(Bankr. S.D. Ohio 2013) ("*Bavelis I*"), *aff'd*, No. 13–8015, 2013 WL 6672988 (6th Cir. BAP Dec. 19, 2013), *aff'd*, 773 F.3d 148 (6th Cir. 2014). *Bavelis I* is final and non-appealable. Leading up to that decision, however, the Respondents engaged in the dishonest conduct detailed below, which came to light only after the decision was issued. And it is this dishonest conduct by the Respondents following the Petition Date that warrants the imposition of sanctions.

## A. Background

Doukas is the sole shareholder and only officer of Quick Capital. Tr. I at 35–36. On April 6, 2011, he signed a document in his capacity as the President of Quick Capital entitled "Assignment and Assumption Agreement" (the "Assignment") (Ex. 218), thereby effectuating the sale of all of Quick Capital's "right, title, interest, claim or demand" in the Note and the Security Agreement to Socal for $1.8 million. Ex. 218. Under the terms of the Assignment, the first $2.7 million of any recovery on the Note was to be paid to Socal, and any recovery in excess of $2.7 million was to be paid 25% to Socal and 75% to the other party to the Assignment, an entity known as Avatara of NY Corp. *Id.* at 2–3. An individual named Ian Chen owned 99% of Socal, and Chen's brother owned the remaining 1%. Ex. 221 at 118–19. According to Chen, the only capital contributions made to Socal were made by his parents and certain of his aunts and uncles. *Id.* at 39–40. John Stravato, an attorney who had acted as counsel for Doukas and his companies from time to time, owned Avatara. Ex. 222 at 80, 83; Tr. II at 8–9.

There is no evidence that Doukas or Quick Capital had any ownership interest in Socal or Avatara or that Doukas or Quick Capital had any direct or indirect interest in a recovery on the Note. In fact, Doukas, Quick Capital and Socal later stipulated that the Assignment eliminated any interest that Quick Capital otherwise had as a creditor of Bavelis's bankruptcy estate. *See* Adv. Doc. 328 ¶ 13 ("With the assignment of the QC Loan Documents, Quick Capital has no claims against Mr. Bavelis or his estate and is not a party in interest as contemplated under Title 11 of the United State[s] Code for any purposes in the Chapter 11 Case."); *see also* Tr. I at 44. Goldstein likewise conceded that Quick Capital was not a creditor of the estate after it assigned the loan documents to Socal, Tr. I at 45–46, and he also admitted that Doukas—who had not even filed a proof of claim in Bavelis's bankruptcy case—personally would have recovered nothing on the Note post-Assignment. Tr. I at 46–47, 144–45. In short, as a result of the Assignment, neither Doukas nor Quick Capital was a creditor of Bavelis's estate, and thus neither party was entitled to any recovery on account of the Claim.

Goldstein had begun representing Doukas and Quick Capital in Bavelis's bankruptcy case and the adversary proceeding in January 2011. Tr. I at 28. While Goldstein contends that he did not represent Doukas and Quick Capital in connection with the execution of the Assignment, it is undisputed that he had become aware of the Assignment by early May 2011. Tr. I at 43. On or about May 5, 2011, Goldstein sent one of Socal's managers—John Stravato's son, Lennon Stravato—an engagement letter regarding Goldstein's representation of Socal in its capacity as the assignee of the Note and the Security Agreement (the "Engagement Letter") (Ex. 277). Goldstein stated in the Engagement Letter that he would continue to represent Quick Capital. The Engagement Letter did not disclose Goldstein's continued representation of Doukas, but it is

undisputed that Goldstein indeed continued to represent Doukas personally. It is also undisputed that Goldstein did not disclose any conflicts of interest arising from his joint representation of Doukas, Quick Capital and Socal in the Engagement Letter. Tr. I. at 139–40, 145–46.

Goldstein acknowledged in the Engagement Letter that the Federal Rules of Bankruptcy Procedure might require filing a notice of the Assignment. Ex. 277 at 3; Tr. I at 48, 57. But Goldstein nonetheless advised Lennon Stravato, who was Goldstein's only contact at Socal, Tr. I at 140, to "withhold filing the [A]ssignment," because "[t]hat way [Bavelis and his attorneys] must deal with Ted [Doukas] and can't get into how much Socal paid for the claim." Ex. 277 at 2.[4] The goal, Goldstein advised Stravato, was to "force a settlement or actually try the case someplace to secure the maximum amount of return of the $14,000,000 claim." *Id.*

The strategy, of course, could not succeed if the Respondents revealed the Assignment to Bavelis or the Court. In view of this strategy, the Respondents no doubt realized that they could not keep Bavelis in the dark about the Assignment and at the same time respond truthfully to discovery requests pertaining to it. And they also undoubtedly knew that Quick Capital would need to mislead the Court if it was going to litigate the validity of the Claim when it no longer had an interest in it. The Respondents would have been further aware of the need to double down on their duplicity if Quick Capital was going to seek affirmative relief based on its pur-

ported standing as a creditor. It also would have been readily apparent to them that Doukas would need to participate in the scheme indirectly as the President and sole owner of Quick Capital. Not only that, but Doukas would need to be involved directly in the deception if he was going to personally respond to discovery requests that called for the production of the Assignment and if documents that identified Quick Capital as a creditor were going to be filed on his behalf personally. As detailed below, in the course of events that followed the Assignment, the Respondents chose deceit at every turn.

## B. The Respondents' False Representations During Discovery

The Respondents' deceptiveness infected the discovery process. More than five months after Goldstein became aware of the Assignment, Quick Capital responded to an October 2011 document request by which Bavelis sought "all contracts or agreements, including but not limited to loan agreements, to which Quick Capital has been or is a party, for which the value exceeds $25,000 [since January 1, 2007]." Ex. 226 at 4. The Assignment is a document that clearly should have been produced in response to this request; it was an agreement to which Quick Capital was a party, it was entered into well after January 1, 2007, and the value to be received by Quick Capital far exceeded $25,000. Yet Quick Capital's response failed to mention the Assignment, stating only "[o]ther than the instant transaction [i.e., the Note and the Security Agreement] no documents." *Id.* This response was untrue and, given their knowledge of

4. The copy of the Engagement Letter that was initially produced to Bavelis was almost entirely redacted, and the second version that he received was redacted to conceal Goldstein's advice to withhold filing the Assignment. Exs. 271 & 274. Bavelis obtained an unredacted copy of the Engagement Letter only after Socal entered into a settlement agreement with Bavelis and Socal agreed to waive any attorney-client privilege with respect to its communications with Goldstein. Exs. 275–278 (Docs. 779 & 805).

the Assignment, Goldstein and Doukas knew it was untrue. Also untrue was Quick Capital's response to Bavelis's request for documents relating to "assets held by Quick Capital anytime from January 1, 2007 to the present, the status of the assets, the disposition of the same, and the timing of the disposition." *Id.* The Quick Capital loan documents had been personal property assets held by Quick Capital since the time Bavelis signed the documents in June 2009, and Quick Capital had disposed of its interest in these assets by way of the Assignment. Yet Quick Capital responded to this request by stating "NO Documents." *Id.* at 5. Goldstein concedes that the Assignment was not produced in response to Bavelis's October 2011 document requests. Tr. I at 75–77.

Acting in his personal capacity, Doukas joined Quick Capital in making additional false representations during discovery. In June 2013, Bavelis sought "documents sufficient to identify . . . assets held by [Quick Capital] anytime from January 1, 2007 to the present, the status of the assets, the disposition of the same, and the timing of the disposition." Ex. 239 at 12. Again, Doukas and Quick Capital clearly should have produced the Assignment in response to this request. But rather than doing so, they offered the following response: "Previously produced; no additional documents will be produced." *Id.* Bavelis also requested the production of "all documents sufficient to identify the recipient(s) (i.e., transferees) of any and all transfers of real or personal property . . . [by Quick Capital] since December 1, 2009," and he separately asked for "any agreements relating to any transfers of real or personal property . . . by [Quick Capital] since December 1,

2009." *Id.* at 14. The Assignment clearly was a document identifying the transferee (Socal) of a transfer of personal property of Quick Capital (its interest in the Quick Capital loan documents) entered into after December 1, 2009, yet this request likewise failed to elicit the Assignment.

Bavelis's counsel knew to ask about Socal because, in response to a question from Bavelis's counsel during a four-day hearing in April 2012 on Bavelis's objection to the Claim (the "Claim Objection Hearing") regarding "[any] claim [Doukas] assisted others in buying," Doukas identified the claim filed by Independent Bankers' Bank of Florida ("IBB") and Socal as its purchaser. Adv. Doc. 199 (Apr. 12, 2012 Tr.) at 1010–11. Bavelis therefore asked for "[a]ny form of agreement or contract entered into between or among" certain entities, including Socal and Quick Capital. *Id.* at 19; *see also id.* at 17. Although the Assignment clearly fit the bill—it was an agreement between Socal and Quick Capital—the Respondents again failed to identify or produce it in response to the June 2013 document requests. As he did with respect to the October 2011 document requests, Goldstein concedes that the Assignment was not produced in response to Bavelis's June 2013 document requests. Tr. I at 83. In short, Goldstein had been aware of the Assignment since at least May 2011, and he responded falsely to each of the document requests discussed above after that date. Furthermore, by the time Goldstein assisted Doukas and Quick Capital in responding to Bavelis's document requests in June 2013, he not only was aware of the Assignment, he admittedly had obtained a copy of the Assignment. *See* Tr. I at 42–43, 50, 80, 83–84, 90–91.[5] Goldstein signed all

5. Goldstein initially testified that he did not "remember ever seeing [the Assignment] . . . until [Bavelis's counsel] brought it to the Court's attention." Tr. I at 40. But after being confronted with testimony he had previously given during a deposition—testimony to the effect that he had received a copy of the Assignment and that it had been filed in 2012

of these discovery responses. He also provided copies of the discovery requests and discovery responses to Doukas. Tr. I at 59, 70–75.

In sum, time and time again the Respondents failed to produce the Assignment in response to document requests that clearly called for its production, and they even falsely stated that no responsive documents existed. If the Respondents had responded honestly during discovery, then Bavelis would have known that motions and other documents submitted in the name of Quick Capital instead should have been filed by Socal. Armed with that knowledge, Bavelis could have successfully argued that Quick Capital had no standing to file the documents. In addition, as explained below, many of the arguments that Doukas and Quick Capital made were directly contrary to Socal's interest as a creditor, and Socal almost certainly would not have made those arguments if it had been represented by counsel who was acting solely in its interest. In other words, as a result of the Respondents' deceitfulness during the discovery process, Bavelis incurred attorneys' fees and expenses responding to arguments that Socal would not have made if it had been represented by an attorney who had not also been representing Doukas and Quick Capital. The Respondents' bad-faith conduct during discovery therefore harmed Bavelis.

## C. The Respondents' False Representations in Documents Filed with the Court

The Respondents filed multiple documents in which they failed to disclose the Assignment and even went so far as to make the false representation that Quick Capital was a creditor of the bankruptcy estate post-Assignment:

- Doukas was acting both in his personal capacity and on behalf of Quick Capital in July 2011 when he filed an objection (the "Disclosure Statement Objection") (Ex. 224) (Doc. 243) to Bavelis's disclosure statement for his first amended plan of reorganization. In the Disclosure Statement Objection, Doukas and Quick Capital represented that Quick Capital was the "holder of a secured claim against the Debtor." Ex. 224 (Doc. 243) at 1. This representation was untrue, and Goldstein concedes that it was untrue. Tr. I at 65.

- Quick Capital filed a motion seeking the appointment of a Chapter 11 trustee in November 2011 (the "Trustee Motion") in which it stated that it was "a secured claim creditor." Ex. 227 (Doc. 280) at 1. As he must, Goldstein admits that this statement was false. Tr. I at 65–66.

- Also in November 2011, Quick Capital filed an objection to the Court's order extending Bavelis's exclusive period to solicit acceptances of his plan of reorganization (the "Exclusivity Extension Objection"), stating "[a]s a Creditor, Quick Capital desires to file a Plan." Ex. 229 (Doc. 282) at 12. Of course, Quick Capital was not a creditor at the time of that filing either.

- After Bavelis filed a motion requesting that the Court bifurcate his objection to Quick Capital's claim and hear that objection before holding a trial on the other aspects of his complaint, Quick Capital filed a response in November 2011 that repeatedly

in a lawsuit pending in Tennessee (not involving Bavelis) in which Goldstein served as counsel for Doukas—Goldstein admitted that he had possession of a copy of the Assignment before Bavelis's counsel made the Court aware of it. Tr. I at 42–43, 83–84.

referred to the claim as belonging to Quick Capital. Ex. 228 (Adv. Doc. 139).

- Quick Capital filed objections in November 2011 to the proofs of claim of certain third parties (Exs. 230 & 231) (Docs. 283 & 294). In doing so, Quick Capital represented that it was a creditor, a representation that Goldstein concedes was untrue. Tr. I at 67–68, 70.

- In February 2012, Quick Capital filed a motion for summary judgment (Ex. 236) (Adv. Doc. 170) in which it referred to the "secured claim of Quick Capital" and requested summary judgment in favor of itself, not Socal.

Goldstein admits that he improperly failed to identify Socal as the creditor in all of these documents. Adv. Doc. 676 at 4. And Doukas shares the blame for this failure. He received copies of all of the documents listed above from Goldstein. Tr. I at 59, 70–75. Further, Doukas was the principal of Quick Capital, and one of the documents was expressly filed by Goldstein on behalf of Doukas in his personal capacity. In addition, Doukas conceded that he has never asserted that any of the actions Goldstein undertook on his behalf were unauthorized. During a hearing on March 26, 2014, Doukas stated "no" in response to the question whether "Goldstein, to your knowledge, [took] any action on your behalf that after the fact that you said: 'Oh, you weren't supposed to do that.

You weren't authorized to say that'?" Tr. II at 19–20.[6]

Additional evidence demonstrates that Doukas actively participated in the concealment of the Assignment. Along with Goldstein, Doukas personally participated in a full-day settlement conference with Bavelis at the office of Bavelis's counsel in January 2012 for the purported purpose of resolving Bavelis's objection to the Claim (the "Claim Negotiations"). Tr. I at 161–65. At no point during the all-day settlement conference did Doukas or Goldstein disclose the Assignment. Tr. I at 161–62. Doukas also testified over the course of the four-day Claim Objection Hearing and did so without once mentioning Socal's purchase of the Claim even though he specifically referenced Socal's purchase of the claim held by IBB. It is inconceivable that Doukas would have failed to disclose the Assignment during the lengthy Claim Negotiations and the four-day Claim Objection Hearing unless he was fully complicit in the effort to keep Bavelis and the Court from becoming aware of it.

### D. The Conflicting Interests of Socal and Doukas/Quick Capital

According to the Respondents, Goldstein could have taken each of the documents discussed above, deleted any references to Doukas and Quick Capital, inserted "Socal" instead and then filed the documents on Socal's behalf. Adv. Doc. 366 at 5; Adv. Doc. 676 at 5, 8. In essence, the Respondents contend that Bavelis—and more importantly, the Court—should view this as a

---

**6.** Doukas testified during the Show Cause Hearing that "Goldstein was doing a lot of things, you know, by himself. I was not—I didn't know a lot of times what he was doing on the legal work. I didn't have a clue." Tr. II at 19. This testimony in no way establishes that Goldstein was unauthorized to act on Doukas's behalf on any particular matter. And to the extent that Doukas intended the testi-

mony to suggest that he did not authorize Goldstein to do all that he did on behalf of Doukas and Quick Capital, the Court points out once again that it finds Doukas's testimony to be completely lacking in credibility. *See Bavelis I,* 490 B.R. at 293–94 n.11 (describing Doukas's testimony as having "a chameleon-like quality, shifting as necessary to suit his purposes at a given time").

case of "no harm, no foul," because Socal would have conducted itself in Bavelis's Chapter 11 case in exactly the same manner that Doukas and Quick Capital did. But this argument will not wash. For even if the interests of Doukas/Quick Capital and Socal truly were identical, that would in no way justify the Respondents' lies to Bavelis and the Court.

Moreover, this argument fails because it ignores a critical fact that came to light during the Show Cause Hearing: Rather than being aligned, Socal's interest in Bavelis's bankruptcy and the interests of Doukas and Quick Capital were not the same.[7] Socal's only interest in Bavelis's bankruptcy case was in receiving the highest possible distribution on account of the Claim. By contrast, Quick Capital had no claim post-Assignment, and Doukas did not even file a proof of claim. Standing to receive no distribution from Bavelis's bankruptcy estate, Doukas and Quick Capital instead took three stances that conflicted with Socal's interests as a creditor.

First, Doukas asserted ownership interests in assets that Bavelis was attempting to recover—assets that might have been used to repay creditors such as Socal. By way of background, Doukas was the sole owner of R.P.M. Recoveries Inc. ("R.P.M.") and Nemesis of L.I. Corp. ("Nemesis"), entities that were also represented by Goldstein. Tr. I at 27. Before the Petition Date, Doukas had used R.P.M. and Nemesis to obtain assignments from Bavelis or Bavelis-owned entities of the

membership interests in the following four limited liability companies: (1) George Real Estate Holdings, LLC; (2) FLOVEST, LLC; (3) BMAQ, LLC; and (4) GMAQ, LLC. The Court will refer to George Real Estate, FLOVEST, BMAQ, and GMAQ collectively as the LLCs.[8] Bavelis commenced this adversary proceeding in part to ask the Court to unwind the transfers of the membership interests in the LLCs. As the owner of R.P.M. and Nemesis, Doukas had an obvious motivation to attempt to thwart those efforts so that his companies would retain the membership interests in the LLCs. In fact, Doukas strenuously contended that the transfers should not be unwound. But Doukas's position in this regard was in direct conflict with the financial interests of Bavelis's creditors. The creditors' interests would have been served if Bavelis were to prevail in his attempt to unwind the transfers, because in that event the value of Bavelis's direct or indirect interests in the LLCs might become available to satisfy creditors' claims. Thus, there was an obvious divergence of interests between noncreditors Doukas and Quick Capital and creditor Socal relating to the LLCs.

Second, Doukas, Quick Capital and his other companies also were attempting to derail Bavelis's claims against them in the adversary proceeding for monetary damages. To avoid paying damages, Doukas and his companies would have to successfully defend against Bavelis's claims, or else obtain the appointment of a Chapter

---

7. In its Second Order Directing Gary A. Goldstein to Appear and Show Cause Why His Admission *Pro Hac Vice* Should Not Be Revoked, the Court stated that "[i]t is impossible to ever know whether Socal would have taken the same positions as were taken by Quick Capital." Adv. Doc. 346 at 9. But that was before the evidence presented during the

Show Cause Hearing made clear that Doukas's and Quick Capital's interests were inconsistent with Socal's interests as a creditor.

8. Either Bavelis and his business partner, Mahammad A. Qureshi, or companies affiliated with them, owned the membership interests in all of the LLCs.

11 trustee who might dismiss or settle the adversary proceeding in a manner favorable to them. But given that a judgment in favor of Bavelis would constitute another source of funds for the repayment of creditors, Socal and other creditors had an interest in Bavelis succeeding on his claims against Doukas and his companies.

Third, apart from the adversary proceeding, Doukas was working to maximize the claim of the Federal Deposit Insurance Corporation (the "FDIC") in a way that could have significantly diluted the recovery of Socal and other creditors of Bavelis. Before the Petition Date, Doukas filed a complaint with the Federal Reserve against Sterling Bank of Palm Beach County, Florida, a bank Bavelis had been a director of before it failed and was taken over by the FDIC. *Bavelis I*, 490 B.R. at 266, 307. In its capacity as the receiver for Sterling Bank, the FDIC filed a proof of claim in Bavelis's bankruptcy case stating that it was acting "to protect the insured depositors and creditors of failed depository institutions." Claim 52–2. Perhaps Doukas believed that his complaint made him a creditor of Sterling Bank and that he therefore would benefit personally from the FDIC's receiving a large recovery from Bavelis. Or perhaps Doukas wanted the FDIC to support Quick Capital's request for the appointment of a Chapter 11 trustee so that Doukas could then attempt to persuade the trustee to either dismiss the adversary proceeding against him and his companies or settle it on terms favorable to them. Regardless of his motivation, Doukas permitted Goldstein to engage in unrelenting efforts to increase the amount of the FDIC's allowed claim, Ex. 279, all to the potential detriment of Socal and other creditors. It would not have been in Socal's interest as a creditor of the Bavelis bankruptcy estate to argue that the FDIC had a multi-million dollar claim that could significantly dilute its own recovery. This created yet another conflict between Socal on the one hand and Doukas and Quick Capital on the other.

Goldstein contends that Socal gave its consent to the actions he took on behalf of Doukas and his companies in the Bavelis bankruptcy case. Tr. I at 55. Of course, any consent that Socal gave would in no way justify the Respondents' lying to Bavelis and the Court. Moreover, each of the conflicting interests discussed above existed when Goldstein began representing Socal, yet Goldstein conceded that he made no disclosure of these conflicts to Socal at the time he filed the documents in the name of Doukas and Quick Capital. Tr. I. at 138–40, 145–46. Thus, even if it is true, as Goldstein contends, that Socal consented to the actions he took in the Bavelis bankruptcy case, Socal could not have given informed consent.

Motivated by his own financial interests, Doukas (and through him, Quick Capital) took several positions in this case that ran directly counter to Socal's interests as a creditor. For instance, in the Disclosure Statement Objection, Doukas and Quick Capital maintained that Bavelis should disclose whether Bavelis's execution of the Note and the Security Agreement was part of "a scheme on [his] part to divest himself of assets in order to defraud his other creditors." Ex. 224 (Doc. 243) at 6. If the fraudulent scheme suggested by Doukas and Quick Capital existed, it would have provided a basis for invalidating the Note as a fraudulently incurred obligation and unwinding the Security Agreement as a fraudulent transfer, thereby depriving Socal of any recovery on the Claim. Objecting to Bavelis's disclosure statement based on the suggestion that the Quick Capital loan documents were fraudulent are hardly steps that Socal—a creditor

seeking payment on the Note—would have had an interest in taking.

Furthermore, Quick Capital argued for the appointment of a Chapter 11 trustee in part so that the trustee could reassess the merits of Bavelis's request to avoid the transfer of the membership interests in the LLCs. Ex. 227 (Doc. 280) at 10. But Socal's interests would have been served if Bavelis were to prevail in his attempt to unwind the transfers, because in that event the value of Bavelis's direct or indirect interests in the LLCs might become available to satisfy the claims of Socal and other creditors.

Doukas and Quick Capital took other positions that clashed with the financial interest of Socal. They stated in the Disclosure Statement Objection that "Federal Regulators closed Sterling Bank; that the losses sustained by [the] FDIC exceeded $50,000,000 ... and that the breach of fiduciary duty and gross negligence claims of the FDIC [against Bavelis] are nondischargeable." Ex. 224 (Doc. 243) at 4. Quick Capital made essentially the same allegations in its Exclusivity Extension Objection, Ex. 229 (Doc. 282) at 5, and the Trustee Motion, where Quick Capital even alleged that Bavelis had "defrauded the FDIC," Ex. 227 (Doc. 280) at 14. The FDIC was not active in the Bavelis bankruptcy case at the time the Respondents filed these documents. Tr. I at 164. Goldstein, however, heavily lobbied the FDIC's counsel to maximize the FDIC's claim and to persuade it to join the Exclusivity Extension Objection and the Trustee Motion. Ex. 279; Tr. I at 93–98. After several unsuccessful attempts at persuading the FDIC to do so, Goldstein went so far as to state to the FDIC's counsel that "the failure to act by the FDIC would be gross negligence and it would be just as complicit in the loss of the public's money as was George Bavelis." Ex. 279 at 6.[9] Arguing that the FDIC had a $50 million nondischargeable fraud claim and strongly encouraging the FDIC to pursue the claim was inimical to the interests of Socal, whose recovery could have been significantly diluted by such a large claim.

For their part, Doukas and Quick Capital were merely defendants in the adversary proceeding, a status that afforded them no standing to assert the arguments they made.[10] And it would not have been in Socal's interest to make arguments that would have only benefitted Doukas and Quick Capital. Thus, if the Respondents had been truthful with Bavelis and the

---

**9.** A week after Goldstein made this allegation against the FDIC, it joined in the Trustee Motion, Doc. 317, but then withdrew the joinder a month later, Doc. 341. The FDIC and Bavelis ultimately entered into a Court-approved settlement agreement under which Bavelis's bankruptcy estate paid no funds to the FDIC. *See* Docs. 680, 690. Goldstein conceded that First Southern Bank, which also filed a motion for the appointment of a Chapter 11 trustee, did so only after receiving encouragement from him. Tr. I at 98–99. First Southern Bank ultimately declined to pursue its motion.

**10.** *See In re E.S. Bankest, L.C.*, 321 B.R. 590, 596–98 (Bankr. S.D. Fla. 2005) (holding that the movant's status as a defendant in an adversary proceeding did not make it a party in interest with standing to seek conversion or the appointment of a trustee because "[i]ts interest in defending itself in the Adversary Proceeding ... is antithetical to the interests of the legitimate creditors of the Debtor who have a direct interest in *maximizing* any recovery from [the defendant]"); *see also Moran v. LTV Steel Co. (In re LTV Steel Co.)*, 560 F.3d 449, 453 (6th Cir. 2009) ("[W]e are aware of no court that has held that the burden of defending a lawsuit, however onerous or unpleasant, is the sort of direct and immediate harm that makes a party 'aggrieved' so as to confer standing in a bankruptcy appeal.").

Court about the Assignment, Bavelis would not have been forced to incur the attorneys' fees required to respond to arguments that served only the interests of Doukas and Quick Capital.

## E. The Claim Negotiations

According to his bankruptcy counsel, Bavelis "was committed to getting out as quickly as possible of Chapter 11," so he was willing to attempt to resolve the dispute over the Claim "even though he believed that it was a claim that should have ultimately been disallowed." Tr. I at 166. Unfortunately, the Respondents' failure to disclose the Assignment thwarted Bavelis's efforts to reach a negotiated resolution of the Claim and caused him to incur unnecessary attorneys' fees engaging in those efforts.

As previously stated, the Claim Negotiations included a full-day settlement conference convened at the offices of Bavelis's litigation counsel in January 2012. Tr. I at 144. The Assignment of the Claim to Socal had taken place nine months earlier. Despite this, neither of the principals of Socal—Lennon Stravato and Ian Chen—attended the conference. Instead, only Doukas and Goldstein came to negotiate with Bavelis and his counsel. Conceding that neither Doukas nor Quick Capital had any interest in the Claim at that point, the Respondents contend that Doukas was participating in the Claim Negotiations as Socal's representative and that Goldstein was there as Socal's counsel. Adv. Doc. 677 at 50–51. But Goldstein admitted during the Show Cause Hearing that Doukas's interests were adverse to Socal's interest as a creditor, that the adversity was apparent at the time he was retained by Socal, and that he did not disclose the conflict of interest to Socal at the time the engagement began. Tr. I at 140–41, 145–46.[11]

The extent of the adversity between Doukas and Socal meant that the Claim Negotiations between Doukas and Bavelis had no chance of resolving the Claim. Doukas's goal in engaging in the Claim Negotiations with Bavelis would have been to retain the membership interests in one or more of the LLCs or to receive compensation for the transfer of those interests back to Bavelis and his affiliates. A settlement proposal that Goldstein sent to Bavelis's counsel following the conference reveals Doukas's purpose. The Claim Negotiations having failed, Goldstein sent the settlement proposal to Bavelis's counsel the next morning, stating that during "the 5 hour trip back to South Florida Ted [Doukas] and I had some time to really consider how to structure a settlement that may work for both of the parties ...." Ex. K at 1. Goldstein sent a blind carbon copy of the proposal to Doukas, but did not copy Lennon Stravato or anyone else affiliated with Socal. Tr. I at 149. When asked why he did not copy Stravato, Goldstein said only: "I don't know. I don't know." Id.

Under the first paragraph of the settlement proposed by Goldstein and Doukas, Bavelis would have paid $2 million to Quick Capital, and under the second paragraph, Doukas's company Nemesis would

11. Goldstein contends that he made Lennon Stravato aware shortly before the Claim Negotiations commenced of the adversity that existed between Socal and Doukas. Tr. I at 140–41, 145–46. Yet while admitting that "[n]ormally you would have a written record of a conflict [disclosure]," Tr. I at 148, Goldstein conceded that there was no documentary evidence establishing that he disclosed the conflict to Stravato. Tr. I at 138–39. And while Goldstein could have called Stravato as a witness to confirm his purported disclosure, he did not do so.

have assigned its interests in three of the four LLCs—GMAQ, BMAQ and George Real Estate—back to Bavelis or his affiliates. Ex. K at 1. But Doukas would "keep" Nemesis's membership interest in FLO-VEST. *Id.* at 1.[12] Of course, disclosing the Assignment would have reduced the leverage that Doukas was always seeking to maintain.[13] If Doukas had disclosed the Assignment, it would have been apparent to Bavelis that Doukas had nothing left to trade, and there would have been no reason for Bavelis to negotiate with Doukas regarding the Claim.

There is another reason that the failure to disclose the Assignment caused Bavelis to incur attorneys' fees unnecessarily. If the Respondents had disclosed the Assignment, Bavelis and his counsel would not have engaged in the Claim Negotiations with Doukas in the first place. After all, before the Petition Date, Doukas had led Bavelis to believe that he was negotiating with Bavelis's business partner, Qureshi, in order to resolve the disputes over the LLCs in a manner favorable to Bavelis, but Doukas instead perpetrated a scheme designed to deprive Bavelis of substantially all of his assets. *See Bavelis I*, 490 B.R. at 265, 275. Thus, Bavelis was well aware of the deception in which Doukas was inclined to engage when purportedly conducting negotiations on someone else's be-

half. Given this, if the Respondents had disclosed the Assignment, Bavelis rightly would have resisted any suggestion that he negotiate with Doukas with respect to the Claim, and Bavelis would not have expended resources conducting the Claim Negotiations with Doukas. For all these reasons, the Respondents should compensate Bavelis for the fees and expenses his counsel incurred preparing for and participating in the Claim Negotiations.

### F. The Respondents' Duplicity Comes to Light.

More than two years after Doukas executed the Assignment—and following the four-day Claim Objection Hearing at which the Respondents again failed to disclose it—Bavelis's counsel discovered the Assignment and brought it to the attention of the Court. Bavelis and his attorneys learned of the Assignment in July 2013 when they obtained documents "relating to other litigation [in Tennessee] involving Doukas-related entities" in which Bavelis was not involved. Ex. 275 at 3; Tr. I at 158–59. Counsel for Bavelis then made the Court aware of the Assignment during a status conference in early August 2013. Ex. 241; Tr. I at 160. After Bavelis's counsel brought the Assignment to the Court's attention, Goldstein claimed that he had previously made Bavelis's counsel aware of it, an assertion denied by Bavelis's bank-

---

**12.** During his testimony, Goldstein contended that Doukas intended to retain an interest in FLOVEST merely to help Bavelis negotiate a settlement with one of Bavelis's creditors, BB & T Bank. Tr. I at 151–52. But anyone familiar with the Bavelis bankruptcy case and the Court's factual findings in *Bavelis I* would immediately realize that Goldstein's testimony in this regard borders on the preposterous. In *Bavelis I*, which was issued before Goldstein testified during the Show Cause Hearing, the Court concluded that "Doukas never intended . . . to keep any of the promises he made to Mr. Bavelis" before the Petition Date—includ-

ing that Doukas would negotiate deals on his behalf—but that he "instead intended to take advantage of Mr. Bavelis and deprive him of his assets." *Bavelis I*, 490 B.R. at 318. It is therefore impossible to believe Goldstein's testimony that Doukas wanted to retain an interest in FLOVEST simply to assist Bavelis by negotiating a deal on his behalf.

**13.** *See Bavelis I*, 490 B.R. at 268 (Doukas testifying that his approach to business was "creat[ing] a leverage that you can negotiate so it will make money").

ruptcy attorney, Stovall. Tr. I at 160. Finding Stovall's testimony to be highly credible—and, by contrast, Goldstein's mendacity to be rivaled only by Doukas's—the Court concludes that Goldstein never made Bavelis or his counsel aware of the Assignment. That is, Goldstein lied during the status conference when he represented that he previously had disclosed the Assignment to Bavelis's counsel.

As a result of the concealment of the Assignment, Bavelis was required to obtain an order substituting Socal for Quick Capital as the real party in interest with respect to Bavelis's objection to the Claim.[14] To do so, Bavelis filed a motion requesting that Socal be joined as a party defendant, Adv. Doc. 316, and the Court entered an agreed order joining Socal as a defendant and certifying the matter for immediate appeal under Civil Rule 54(b). Adv. Doc. 328. In short, once Bavelis learned about the Assignment, his counsel incurred additional attorneys' fees and expenses taking steps to address the manner in which the concealment of the Assignment had muddled and disrupted the litigation over the Claim.

---

**14.** After the Court issued *Bavelis I*, Doukas and Quick Capital appealed, and the Bankruptcy Appellate Panel of the Sixth Circuit entered an order holding that it lacked appellate jurisdiction to consider the appeal of *Bavelis I* absent a certification from this Court under Federal Rule of Civil Procedure 54(b).

**15.** This authority is not unlimited, and the Court must "exercise caution in invoking its inherent power" so as to "comply with the mandates of due process ....." *Chambers*, 501 U.S. at 50, 111 S.Ct. 2123. The Respondents initially contended that sanctions could be imposed against them only after the Debtor commenced an adversary proceeding seeking sanctions. *See* Adv. Doc. 366 at 2; Adv. Doc. 367 at 1. But this contention is contrary to the law of this circuit. *See, e.g., Royal*

## V. Conclusions of Law

### A. Section 105(a) and the Court's Inherent Authority

Under § 105(a) of the Bankruptcy Code, a bankruptcy court may "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a). This section grants "broad authority ... to bankruptcy judges to take any action that is necessary or appropriate to prevent an abuse of process." *Marrama v. Citizens Bank*, 549 U.S. 365, 375, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007). In addition, the United States Supreme Court has recognized the inherent authority of federal courts to sanction conduct that "abuses the judicial process." *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).[15]

In *Chambers*, the Supreme Court upheld a court's use of its inherent authority to sanction bad faith conduct in the form of "acts which degrade the judicial system," including "misleading and lying to the court." *Chambers*, 501 U.S. at 42, 111 S.Ct. 2123; *see also Graham v. Dallas Indep. Sch. Dist.*, No. 3:04–CV–2461–B, 2006 WL

---

*Manor*, 652 Fed.Appx. at 339 (affirming sanctions imposed under § 105(a), the inherent authority of the sanctioning bankruptcy court, and 28 U.S.C. § 1927 upon motion and show cause order). Furthermore, even if an adversary proceeding had been required, the Respondents were not prejudiced by proceeding on motion and a show cause order, because they received ample notice of the Show Cause Hearing and were afforded all of the opportunities for discovery and the other procedural protections that are available in an adversary proceeding. *See Tully Constr. Co. v. Cannonsburg Envtl. Assocs., Ltd. (In re Cannonsburg Envtl. Assocs., Ltd.)*, 72 F.3d 1260, 1264–65 (6th Cir. 1996); *Hines v. Hines (In re Hines)*, No. 05–8065, 2006 WL 3956493, at *5 (6th Cir. BAP 2006).

507944, at \*4 (N.D. Tex. Jan. 10, 2006) ("It goes without saying that lying to the court constitutes bad faith." (citing *Chambers*, 501 U.S. at 42, 46, 50–51, 111 S.Ct. 2123)). For example, knowingly misrepresenting facts in a motion or other document is indicative of bad faith. *See Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 146 (2d Cir. 2012). A party also "shows bad faith by delaying or disrupting the litigation." *Chambers*, 501 U.S. at 46, 111 S.Ct. 2123 (quoting *Hutto v. Finney*, 437 U.S. 678, 689 n.14, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)). And withholding material evidence disrupts and delays litigation. *See First Bank of Marietta*, 307 F.3d at 525 (finding bad faith where plaintiff withheld a document that it knew undermined its cause of action); *accord Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011).[16]

The Respondents filed multiple documents with the Court stating that Quick Capital was a creditor when they knew that this contention was false. In addition, Goldstein made yet other misrepresentations when he repeatedly took the position that he did not intend to mislead Bavelis or the Court. As explained above, the evidence definitively demonstrates that Goldstein and the other Respondents intentionally misrepresented Quick Capital's creditor status in filings with the Court for the purpose of misleading Bavelis about the identity of the creditor that held the Claim. Moreover, the evidence shows that the Respondents' deceit enabled non-

creditors Doukas and Quick Capital to take positions—including that a Chapter 11 trustee should be appointed—designed to derail Bavelis's claims against Doukas and his companies. Of course, misleading the Court was part and parcel of the Respondents' strategy, because telling the truth to the Court would have revealed it to Bavelis.

By failing to produce the Assignment and stating that no responsive documents existed even though the Assignment was clearly responsive, the Respondents disrupted and delayed the course of the Bavelis bankruptcy case and the adversary proceeding. If the Assignment had been produced in October 2011 when Bavelis made the first document request that should have elicited it, then Quick Capital would not have been able to pursue the Trustee Motion. Furthermore, Bavelis would not have negotiated with Doukas regarding the objection to the Claim, which instead may well have been resolved through negotiations with Socal. The Respondents also delayed and disrupted Bavelis's bankruptcy case by making arguments that Doukas and Quick Capital, as noncreditors, lacked standing to make. *See In re Royal Manor Mgmt., Inc.*, No. 08–50421, 2013 WL 6229151, at \*3 (Bankr. N.D. Ohio Dec. 2, 2013) (finding that the filing of documents while lacking standing to do so delayed the proceedings), *aff'd*, 525 B.R. 338 (6th Cir. BAP 2015), *aff'd*, 652 Fed.Appx. 330 (6th Cir. 2016). Because the Respondents knew about the existence

---

**16.** Doukas and Quick Capital cite a three-part test for bad faith that is used when a frivolous lawsuit is filed, Adv. Doc. 366 at 3 n.6, and Goldstein also alludes to this test when he contends that the Trustee Motion and other documents he filed in Doukas's and Quick Capital's name were not "frivolous," Adv. Doc. 676 at 3. Under this test, bad faith exists if "[1] ... the claims advanced were meritless, [2] ... counsel knew or should have

known this, and [3] ... the motive for filing the suit was for an improper purpose." *Williamson v. Recovery Ltd. P'ship*, 826 F.3d 297, 301–02 (6th Cir. 2016) (quoting *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 524 (6th Cir. 2002)). The test, however, "is not applicable to this case, which involves a motion for sanctions against a stonewalling [and deceptive] attorney and [his clients]." *Id.* at 302.

of the Assignment "when [they] made [their] misrepresentations to the [C]ourt" and Bavelis, their "repeated misrepresentations [are not] innocent," but instead show that they intentionally deceived Bavelis and the Court. *Williamson*, 826 F.3d at 303. In sum, the Court finds by clear and convincing evidence that the Respondents engaged in egregious, bad-faith conduct in multiple ways.[17]

### B. Section 1927 of the Judicial Code

In addition to its inherent authority and its authority under § 105(a), the Court also has the authority to sanction Goldstein under 28 U.S.C. § 1927. *See Royal Manor*, 652 Fed.Appx. at 341–42. Section 1927 of the Judicial Code states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

Before his admission *pro hac vice* was revoked, Goldstein was an attorney admitted to practice before the Court. "Section 1927 sanctions are warranted when an attorney objectively 'falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.'" *Royal Manor*, 652 Fed.Appx. at 337 (quoting *Red Carpet Studios v. Sater*, 465 F.3d 642, 646 (6th Cir. 2007)). Goldstein owed a duty of candor to the Court, and he objectively fell far short of that obligation each time he knowingly misrepresented Quick Capital's status as a creditor in documents filed with the Court. *See Red Carpet Studios*, 465 F.3d at 646 (holding that attorney's "failure to join a necessary party and the several attendant misrepresentations" constituted "vexatious conduct"). In addition, failing to produce the Assignment and making misrepresentations to Bavelis about its existence in the responses to discovery he prepared on behalf of his clients also constitute unreasonable and vexatious litigation tactics that warrant the imposition of sanctions under § 1927. *See Jones v. Ill. Central R.R. Co.*, 617 F.3d 843, 854–55 (6th Cir. 2010) (affirming district court's imposition of sanction under § 1927 for attorney's withholding responsive documents and making misrepresentations regarding their existence).

As a result of Goldstein's misconduct, Bavelis incurred additional attorneys' fees and expenses. And because his conduct "multiplie[d] the proceedings" in Bavelis's bankruptcy case and this adversary proceeding "unreasonably and vexatiously," Goldstein will be required to "satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct," 28 U.S.C. § 1927, in an amount to be determined. The amount "may include . . . the costs, expenses, and attorneys' fees that [Bavelis] incurred in obtaining the award." *In re Royal Mgmt., Inc.*, 525 B.R. 338, 366 (6th Cir. BAP 2015) (quoting *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1298 (11th Cir. 2010)), *aff'd*, 652 Fed.Appx. 330.

### C. The Respondents' Arguments Are Meritless.

In an attempt to avoid sanctions for their bad faith conduct, the Respondents

---

**17.** Courts have used the clear and convincing evidence standard when exercising their inherent authority to sanction parties for bad faith. *See, e.g., Ali v. Tolbert*, 636 F.3d 622, 627 (D.C. Cir. 2011).

take a scattershot approach: They seek to escape liability by raising a plethora of arguments. But as explained below, the Respondents' arguments simply do not hold water.

The Respondents first argue that they cannot be held liable for withholding documents and lying during discovery because Bavelis did not seek discovery sanctions under Rule 7037 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule 7037"). Adv. Doc. 366 at 2; Adv. Doc. 367 at 1. But "[a] court's inherent authority to impose sanctions is not displaced by sanctions schemes available through statutes or court rules; rather, such inherent authority provides an independent basis for sanctioning bad-faith conduct in litigation." *Royal Manor*, 652 Fed.Appx. at 342 (citing *Chambers*, 501 U.S. at 46, 50, 111 S.Ct. 2123 and *First Bank of Marietta*, 307 F.3d at 518 n.14). And *"Chambers* should be read broadly to permit the [trial] court to resort to its inherent authority to sanction bad-faith conduct, even if the court has not expressly considered whether such conduct could be sanctioned under all potentially applicable rules or statutes." *First Bank of Marietta*, 307 F.3d at 514. True, a court "ordinarily should rely on the Rules rather than the inherent power." *Chambers*, 501 U.S. at 50, 111 S.Ct. 2123. "But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.*

Bankruptcy Rule 7037 is not up to the task here. The Respondents argue that Bavelis should have sought redress under Bankruptcy Rule 7037 by filing a motion to compel discovery, obtaining an order compelling discovery and then obtaining sanctions if Doukas and Quick Capital failed to comply with the order. Adv. Doc. 366 at 2. That process works where a party ac-

knowledges the existence of a document, but refuses to produce it. Perhaps it even works where a party refuses to acknowledge a document's existence, but the other party knows it exists, cannot obtain it except through discovery, and seeks to obtain sanctions for the failure to turn it over. But even a moment's thought should reveal that Bankruptcy Rule 7037 is inadequate to address a situation where, as here, the party being sanctioned not only failed to produce a document, but also made misrepresentations both to opposing counsel and the Court that were designed to conceal its existence. A motion to compel makes no sense where the document that should have been produced has been obtained from another source. Under these circumstances, it is appropriate to impose sanctions for the bad faith inherent in misleading both Bavelis and the Court. *See Williamson v. Recovery Ltd. P'ship*, No. 2:06–CV–00292, 2014 WL 1884401, at *10 (S.D. Ohio May 9, 2014) ("[The] request for sanctions targets . . . *conduct* in misrepresenting to the Court the existence and location of the missing inventories. This is not a case where the Court 'ha[s] . . . issued an order to redress a discovery violation committed by the defendants' from which [the Plaintiff] is able to seek relief under Rule 37 for Defendants' failure to comply."), *aff'd*, 826 F.3d 297 (6th Cir. 2016).

The Respondents next contend that Goldstein's joint representation of Doukas, Quick Capital and Socal negates the Respondents' liability because "a timely disclosure of the Assignment likely would simply have resulted in Debtor litigating the[ ] same issues with SoCal." Adv. Doc. 366 at 5 & n.9 (stating that "[p]ursuant to the terms of the Assignment, Quick Capital is required to cooperate in the defense of the assigned claim and, accordingly, would have been required to continue [to]

participate in this litigation regardless of when the Assignment was ultimately disclosed"); *see also* Adv. Doc. 367 at 1; Adv. Doc. 676 at 4–5; Adv. Doc. 677 at 50–52. This argument rings hollow for several reasons. To begin with, even if it were true that Socal would have taken the same approach to the bankruptcy case and adversary proceeding that Quick Capital took, this would not justify lying to Bavelis and the Court. Moreover, as the Court found above, given their conflicting financial interests, it is highly unlikely that Socal would have conducted itself in the manner Quick Capital did. Socal never filed a motion for the appointment of a Chapter 11 trustee, and Socal would not have made many of the arguments on which Doukas and Quick Capital relied in the other documents they filed. In addition, Goldstein made those arguments on behalf of Doukas and Quick Capital after failing to disclose to Socal the adversity that existed between it and Doukas and Quick Capital. For his part, Doukas knew about Goldstein's joint representation, Tr. I at 59, and, unlike Socal, Doukas no doubt was aware of how his and Quick Capital's interests were adverse to Socal's interests. Despite his knowledge of the adversity, Doukas permitted Goldstein to continue the joint representation and to take positions both in proceedings before the Court and in negotiations with Bavelis that were contrary to Socal's interest as a creditor. For all these reasons, Goldstein's joint representation of Doukas, Quick Capital and Socal provides no basis for the Respondents to escape the imposition of sanctions for misleading Bavelis during discovery and lying to the Court on multiple occasions.

The Respondents also argue that, because the FDIC joined the Trustee Motion and First Southern Bank filed its own motion for the appointment of a Chapter 11 trustee, the Trustee Motion imposed no additional costs on Bavelis. Adv. Doc. 366 at 6; Adv. Doc. 367 at 1; Adv. Doc. 676 at 4. But there would have been nothing for the FDIC to join if Quick Capital had not filed the Trustee Motion in the first place, and the FDIC in fact filed its joinder only after its counsel received strenuous urging to do so from Goldstein. As for First Southern Bank, Goldstein conceded that it likewise filed its motion for the appointment of a trustee only after he encouraged its counsel to do so. Tr. I at 98–99. Like other parties in interest, the FDIC and First Southern Bank were operating under the false pretense created by the Respondents that Quick Capital had standing to seek the appointment of a Chapter 11 trustee. Had they known the truth—and the Trustee Motion itself would have revealed the truth if the Respondents had not once again lied when they filed it—the FDIC and First Southern Bank may well have declined to seek the appointment of a Chapter 11 trustee. The FDIC's and First Southern Bank's involvement thus do nothing to absolve the Respondents from sanctions liability for filing a motion seeking the appointment of a Chapter 11 trustee that contained the false statement regarding Quick Capital's status as a creditor.

Doukas attempts to place the blame on Socal and Goldstein by arguing that Socal alone had the obligation to file a notice that the Claim had been transferred and that, as Socal's counsel, Goldstein should have taken responsibility for filing the notice. Adv. Doc. 677 at 46–49, 52. For his part, Goldstein attempts to portray his conduct merely as a failure to cause Socal to file a notice of the Assignment, arguing that he should not be sanctioned for that error. Adv. Doc. 676 at 8–11. But the question of who had an affirmative duty to file a notice that the Claim had been as-

signed—or whether anyone did—is beside the point. The Respondents had a duty to refrain from lying to Bavelis and the Court, and they are being sanctioned for their misrepresentations regarding Quick Capital's creditor status, as well as for the withholding of responsive documents and lying about the existence of the Assignment in discovery, not for the failure to file a notice of the Assignment. As already discussed, the Respondents' scheme depended on Socal's following Goldstein's advice (which was uncovered in the unredacted copy of the Engagement Letter) that Socal refrain from filing a notice that the Claim had been transferred. But that in no way relieves the Respondents of liability for their own misconduct, including making misrepresentations to Bavelis and the Court.

Doukas also contends that Goldstein alone should be liable for the misrepresentations the Respondents made in the discovery responses because only he signed them. Adv. Doc. 677 at 52–53. But there are several reasons why this argument does not provide a reason to exonerate Doukas and Quick Capital from liability for failing to produce the Assignment. First, Doukas and Quick Capital retained Goldstein to represent them, and a "client, having chosen a particular attorney to represent him in a proceeding, cannot 'avoid the consequences of the acts or omissions of this freely selected agent....'" *McCurry v. Adventist Health Sys./Sunbelt, Inc.*, 298 F.3d 586, 595 (6th Cir. 2002) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 397, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)); *see also Merritt v. Int'l Brotherhood of Boilermakers*, 649 F.2d 1013, 1091 (5th Cir. 1981) (rejecting parties' argument that only their attorneys should be liable for opposing counsel's fees incurred in filing a motion to compel where "nothing in the record indicate[d] that [their] attorneys ... were acting outside the scope of the authority delegated to them " and there thus was no reason not to apply "the general rule that a party is bound by the actions of his attorney"). Second, Goldstein testified that he typically would have provided copies of the discovery requests and the discovery responses to Doukas, and Doukas did not deny receiving them. Third, the duration and extent of Doukas's and Quick Capital's noncompliance with their obligations to respond honestly to Bavelis's discovery requests leads the Court to conclude that they deliberately chose not to produce the Assignment. In *Technology Recycling Corp. v. City of Taylor*, 186 Fed.Appx. 624, 633 (6th Cir. 2006), the plaintiffs argued that they should not be held liable for their failure to comply with a discovery order requiring the production of documents given that their attorney had just recently been retained. The Sixth Circuit rejected their argument because the "duration and extent of plaintiffs' noncompliance with discovery orders ... reasonably led the district court to believe that plaintiffs were able to produce the materials sought but willfully and in bad faith chose not to do so." *Tech. Recycling Corp.*, 186 Fed.Appx. at 633. Fourth, other evidence demonstrates that Doukas (and through him, Quick Capital) actively participated in the efforts to conceal the Assignment. For example, Doukas kept quiet about the Assignment during a full day of negotiations with Bavelis and the four-day Claim Objection Hearing, even though mentioning the Assignment at some point during the negotiations and the hearing would have been the natural thing to do—unless concealing it was the goal. For all these reasons, Doukas and Quick Capital are just as culpable as Goldstein.

Doukas argues that Goldstein alone should be liable for the additional reason

that he failed to disclose his conflict of interest. Adv. Doc. 677 at 52–53. But Goldstein's failure to disclose a conflict of interest is not a valid justification for Doukas's lying to Bavelis and the Court. Further, the evidence shows only that Goldstein failed to disclose the conflict of interest *to Socal*. Doukas knew what he and Goldstein were trying to accomplish in filing the Trustee Motion, the Disclosure Statement Objection and the Exclusivity Extension Objection—protect Doukas's interests—and he would have known that those interests were adverse to Socal's interest as a creditor. For all these reasons, the argument that Doukas and Quick Capital should be absolved from liability for sanctions because Goldstein failed to inform Socal of his conflict of interest is a non-starter.

In addition to joining those arguments made by Doukas and Quick Capital that do not point the finger at him, Goldstein makes four additional arguments, all devoid of merit. First, Goldstein contends that "[t]here is no allegation by [Bavelis] or even the Court that anything contained in the [documents Goldstein filed in the name of Doukas and Quick Capital] was factually inaccurate"—other than the allegation that Quick Capital was a secured creditor. Adv. Doc. 676 at 3. The Court need not decide whether this contention is accurate. For even if the documents contained factually correct statements, such statements could not possibly justify representing to the Court that Quick Capital was a secured creditor when it was not.

Second, Goldstein relies on the fact that he withdrew the Trustee Motion and the other documents he filed in Doukas's and Quick Capital's name, helped Socal obtain separate counsel, and procured Socal's consent to be bound by a final, nonap-

pealable order in *Bavelis I*. Adv. Doc. 676 at 5–6, 11. But because Goldstein undertook his remedial efforts only after Bavelis uncovered the Assignment and brought it to the Court's attention, the efforts in no way make him any less culpable for concealing the Assignment. *See Cerruti 1881 S.A. v. Cerruti, Inc.*, 169 F.R.D. 573, 583 (S.D.N.Y. 1996) (rejecting argument that sanctions should not be imposed on the defendants who "withdrew the disputed records" given that the defendants did not withdraw the documents on their own, but rather "waited until the falsity of the documents had been detected").

Third, Goldstein attempts to avoid being sanctioned by arguing that Bavelis benefitted from the Respondents' conduct in that "[t]he Bavelis estate and Mr. Bavelis personally settled the undisputed $1,280,000 IBB claim ... for $625,000 ... simply by naming SoCal as a defendant in the adversary case, and alleging improper conduct relating to the claims procedure." Adv. Doc. 676 at 7. Goldstein cites no authority for why this should absolve him of liability for his misbehavior, and there in fact is contrary authority. *See Derzack v. Cnty. of Allegheny*, 173 F.R.D. 400, 415 (W.D. Pa. 1996) ("[C]ounsel argued to the Court ... that 'this is a Godsend to the Defendants' because they will now be able to use plaintiffs' schemes and deception against them to impeach their credibility. 'Godsends' like this, litigants and the Court can do without."), *aff'd*, 118 F.3d 1575 (3d Cir. 1997). As did the district court in *Derzack*, this Court "rejects [the] clever 'spin' on the prejudice issue as pure sophistry." *Id.* Bavelis's settlement with Socal in no way serves to mitigate the Respondents' liability for their role in misleading Bavelis and the Court.

Fourth, as he has done before, Goldstein again pleads inadvertence,[18] arguing that

---

**18.** In connection with the proceeding in

which the Court ultimately revoked his admis-

his discovery violations and misrepresentations to Bavelis and the Court were mere mistakes and not the result of intentional misconduct on his part. Adv. Doc. 676 at 12 (proposing findings that "[t]here is nothing in the record to suggest that the filings were intentionally filed to mislead the court or [Bavelis]" and that "[a]t most they arise to a mistake."). But this argument "taxes the credulity of the credulous." *See Maryland v. King*, 569 U.S. 435, 133 S.Ct. 1958, 1980, 186 L.Ed.2d 1 (2013) (Scalia, J., dissenting). And indeed the Court has already rejected Goldstein's innocent-mistake defense, making contrary findings—findings that were not challenged and are now final and nonappealable—in its order revoking Goldstein's *pro hac vice* admission. *See* Doc. 645 at 9 ("When viewed in isolation, Goldstein's failure to mention the Socal Assignment in one of the five documents or two responses could conceivably have been inadvertent. But it strains credulity to assert that he inadvertently failed to mention the Socal Assignment in all seven. And it is inconceivable that he could have served as counsel during a four-day trial and failed to mention the Socal Assignment unless he intended to do so. In sum, the Court finds that the failure to disclose the Socal Assignment was intentional, despite Goldstein's assertion to the contrary. ").

Goldstein's suggestion that his misbehavior "[a]t most … arise[s] to a mistake," Adv. Doc. 676 at 12, is belied by (1) the sheer number of misrepresentations he made to Bavelis and the Court, (2) the extended period of time over which he made them, (3) the unredacted copy of the Engagement Letter—in which Goldstein counseled Socal not to disclose the Assignment and stated his belief that concealment would be strategically advantageous, and (4) Goldstein's well-established penchant for untruthfulness, as shown not only by his interaction with Bavelis and the Court, but also by his dealings with other parties in this case, most notably IBB and its counsel, Sarah Pape. In short, the record is replete with evidence that Goldstein intended to deceive Bavelis and the Court.

As already discussed, following the assignment to Socal, Goldstein filed document after document identifying Quick Capital as a secured creditor of Bavelis's bankruptcy estate. Those documents include the Disclosure Statement Objection, the Trustee Motion, the Exclusivity Extension Objection, a response to Bavelis's motion requesting that the Court bifurcate his objection to the Claim, two objections to the proofs of claim of certain third parties, and a motion for summary judgment. Again, one or two lapses by Goldstein might be chalked up to mistake, but

---

sion *pro hac vice*, Goldstein repeatedly represented to the Court that his conduct was unintentional. *See* Doc. 579 at 4 (representing to the Court during hearing that his failure to disclose the Assignment "was not done intentionally, Your Honor, to mislead the Bavelis parties or the Court"); *id.* at 6 ("I was wrong when I said it was Quick Capital who had the claim I should have said it was Socal and I apologized to the Court for that, it was my error. But it wasn't intentionally to mislead anyone, it just didn't register with me that I should do that since I was defending the claim pursuant to this agreement that re-

quired the claim to be defended."); *id.* at 11 ("It was not withheld intentionally for any nefarious reason. I mean it was a mistake in discovery but it wasn't intentional. And one other thing, Your Honor. I apologize to the Court for the time it took even for this hearing but it was not done intentionally."); Adv. Doc. 395 at 2 (stating in document filed with the Court that "[t]he filing of pleadings in the name of Quick Capital subsequent to the sale by Quick Capital of its Note to 'Socal' were not made to deceive the Court or any Party. The mistake was inadvertent [and] unintentional …. ").

not seven filings made over a two-year period (from July 2011 until Bavelis's counsel discovered the Assignment and brought it to the attention of the Court in August 2013). Then there is the smoking gun—the unredacted copy of the Engagement Letter, in which Goldstein advised Lennon Stravato (Goldstein's contact at Socal) that Socal should not file a notice of the Assignment and explained what Goldstein saw as the strategic benefits of concealing the Assignment. This also gives the lie to Goldstein's claim that his discovery violations and misrepresentations to Bavelis and the Court were merely unintentional lapses.

Finally, Goldstein's propensity for lying without reservation—made manifest by his dealings with IBB and Pape—also counsels strongly in favor of rejecting his facile suggestion that he did not act with intent to deceive. The evidence of the communications and course of dealing between Goldstein and Pape on behalf of their respective clients was offered by Bavelis's counsel in order to attempt to show that Doukas, despite his protestations to the contrary, was actually a secret principal of Socal. While the evidence adduced by Bavelis's counsel at the Show Cause hearing fell short of establishing that Doukas held an interest in Socal, it did lay bare the level of mendacity that Goldstein displayed in his communications and dealings with other parties in interest. This evidence is summarized below:

- As previously stated, Goldstein had engaged in an extended effort to encourage the FDIC to file a proof of claim in an amount that would dwarf the claims held by other creditors of Bavelis's bankruptcy estate. On December 5, 2011—the very same day on which Goldstein again goaded the FDIC to pursue its potential multi-million claim and join the Trustee Motion and the Exclusivity Extension Objection—Goldstein sent an e-mail to Pape. Ex. 247. In his e-mail, Goldstein advised Pape that one of his clients (whom he did not identify) was interested in purchasing IBB's claim. *Id.* IBB had filed a proof of claim asserting an unsecured, nonpriority claim against the Bavelis bankruptcy estate in the amount of $1,280,950.73. Claim 24–1.

- Several days later Goldstein informed Pape, in an email dated December 14, 2011, that his client remained interested in acquiring IBB's claim. Ex. 248 at 3. Pape responded that IBB would be willing to sell its claim for 20% of its face value if the sale closed by the end of 2011 or 30% if the closing occurred in January 2012. *Id.* at 1, 3. After Goldstein made a counteroffer, IBB agreed to sell its claim for 25% of its face value ($320,237.68) if: (1) Goldstein's client, R.P.M.—one of Doukas's companies—paid a nonrefundable deposit by December 28, 2011; and (2) the closing occurred before January 31, 2012. Ex. 249 at 1.

- On January 3, 2012, Goldstein advised Pape that Doukas would "sign the agreement" (with the $320,237.68 purchase price) that evening and that the executed agreement and the deposit would be sent to her by overnight mail. Ex. 253 at 4. Pape, however, did not receive the deposit or the signed agreement the next day. In fact, Pape still had not received the deposit or the agreement a week later when she advised Goldstein that "I have lost track of how many times you have promised that it has been sent via overnight. What's the deal? Is your client serious about

closing or is he just stringing my client along?" *Id.* at 2. In a separate e-mail Pape sent on January 10, 2012, she advised Goldstein that IBB would not assign its claim to R.P.M. if she failed to receive the deposit and the signed agreement by the end of the day. *Id.* at 1.

- Later in the day on January 10, 2012, Goldstein sent Pape an e-mail stating that he was attaching copies of the signed agreement and the check for the deposit. Ex. 254 at 2–3. But the agreement Goldstein attached was not the one Pape had sent with the $320,237.68 purchase price—that is, the agreement that Goldstein previously had said Doukas would sign. Instead, Goldstein sent Pape a revised agreement that reduced the purchase price to 20% of the face value of IBB's proof of claim, meaning that R.P.M. would be purchasing IBB's claim for $256,190.15 instead of the $320,237.68 set forth in the agreement that Goldstein had told Pape a week earlier Doukas would be signing. The "reason for the contractual change," according to Goldstein, was the "game changer" of the "filing by the FDIC of its claim in the amount of $30,000,000." Ex. 253 at 7.

- The FDIC indeed had filed an amended proof of claim on January 9, 2012, and in that proof of claim it asserted that the amount of its claim was "not less than $30,000,000." Claim 52–2 at 3. But the surprise that Goldstein expressed to Pape with respect to the large amount of the FDIC's proof of claim was stun-

ningly disingenuous. After all, back in November 2011, the Disclosure Statement Objection that Goldstein filed on behalf of Doukas and Quick Capital had stated that "the losses sustained by FDIC exceeded $50,000,000 . . . and that the breach of fiduciary duty and gross negligence claims of the FDIC are non-dischargeable," Ex. 224 (Doc. 243) at 4—statements that were followed that same month by similar allegations in the Exclusivity Extension Objection and the Trustee Motion. What's more, the FDIC filed its $30 million claim on the heels of a nine-month period from April through December 2011 in which Goldstein agitated for the FDIC's filing of a multimillion dollar claim and its joinder in the Trustee Motion and the Exclusivity Extension Objection.[19]

- Pape initially responded that selling the claim for a reduced price was "not acceptable to my client," but she later advised Goldstein that IBB would "reluctantly" agree to the reduced purchase price of $256,190.15. Ex. 254 at 1–2. Goldstein and Doukas, however, were not finished with their attempts to use the FDIC's claim as leverage to reduce the price R.P.M. would pay for IBB's claim. On January 28, 2012, Goldstein sent Pape an email stating that Doukas was still deciding whether he would cause R.P.M. to close on the purchase of the IBB claim, or whether Doukas would walk away from the deposits that he had paid IBB up to that point in the amount of $15,000, once again citing the large amount of the FDIC's claim as a reason to re-

---

19. Indeed, Goldstein had advised the FDIC's counsel that "the failure to act by the FDIC would be gross negligence and it would be just as complicit in the loss of the public's money as was George Bavelis." Ex. 279 at 6.

duce the purchase price. Ex. 255 at 1. On February 6, 2012, Goldstein advised Pape that counsel for the FDIC had informed him that the FDIC "intend[s] to be active in pursuing [its] claim" and that "[t]his means a reduced percentage distribution to Bavelis [sic] unsecured creditors." Ex. 256 at 2. The Respondents had been working toward that end for close to a year, and they would have known all along what Goldstein told Pape in that e-mail—that increasing the FDIC's claim would dilute the recovery of creditors.

- Goldstein ultimately was unsuccessful in his attempt to persuade IBB to reduce the purchase price below $256,190.15. On February 7, 2012, Pape emailed Goldstein, stating that "IBB respectfully declines any further renegotiation on the purchase terms" and that IBB was "prepared to take the $15,000 deposit and maintain its claim in the Bankruptcy." *Id.* at 1. The next day, Goldstein wired $241,190.15 (the $256,190.15 purchase price minus the $15,000 deposit), and Pape confirmed receipt of the funds. Exs. 257 & 258. Rather than having R.P.M. buy the claim, however, Doukas caused it to assign the purchase agreement with IBB to Socal. The assignment agreement between R.P.M. and Socal stated that Socal would purchase IBB's claim for the "agreed purchase price" and that it would "wire the claim Purchase Price to the trust account of Gary Goldstein." Ex. 259 at 6. While nothing in the record indicates the price that Socal paid, it indeed was Socal—not Doukas or one of his entities—that ultimately purchased IBB's claim. Exs. 259 & 263.

- Because the purchase agreement with IBB permitted R.P.M. to assign the agreement only "to another single purpose entity in which Ted Doukas is the principal," Ex. 252 at 7, Pape repeatedly asked Goldstein whether Doukas was a principal of Socal. *See* Exs. 260–61; *see also* Ex. 258 at 2 (Pape stating "I see that [the assignment] is to Socal Capital, LLC, which I assume is a single purpose entity in which Ted Doukas is the principal" and asking Goldstein to "[p]lease confirm"). After ignoring multiple inquiries by Pape, Goldstein responded to one of her e-mails with the following statement: "I have confirmed that Mr. Doukas is a principal." Ex. 264 at 1. Because Pape had inquired only whether Doukas was a principal of Socal, Goldstein clearly intended to leave Pape with the false impression that Doukas was a principal of Socal, and that is how Pape took his representation, as she sought no further assurances from Goldstein on this point. Ex. 246 at 27–28. When asked about this during the Show Cause Hearing, Goldstein testified that what he meant when he represented to Pape that "Doukas is a principal" was that Doukas was a principal of R.P.M. Tr. I at 116–23. Of course, Goldstein's testimony in this regard is utterly nonsensical, as Pape's inquiry clearly was made in order to obtain confirmation from Goldstein that Doukas was a principal of Socal and thus verify R.P.M.'s compliance with the terms of its purchase agreement with IBB.

The upshot is that in his dealings with IBB's counsel Goldstein displayed a breathtaking disregard for the truth. He had no hesitancy in lying to advance the

interest of his clients. Though he had engaged in a lengthy lobbying campaign aimed at convincing the FDIC to file a huge claim in the Bavelis bankruptcy case, Goldstein professed surprise when the FDIC ultimately filed its $30 million claim, describing it as a "game changer." Yet, in reality, as explained above, the FDIC's filing of a $30 million claim in January 2012 certainly would have come as no surprise to the Respondents, because the filing was the intended result of their nearly year-long efforts. The FDIC claim was a "game changer" only in the sense that Goldstein saw it as potential leverage Doukas could use to reduce the purchase price of the IBB claim.[20] Nor was Goldstein above lying—or at least doing his level best to create a false impression—when it came to responding to Pape's inquiry as to whether Doukas was a principal of Socal. In sum, Goldstein's demonstrated propensity to lie both to the Court and to parties when it suits his needs is rivaled only by Doukas's. In view of this dismal track record, Goldstein cannot credibly claim that his failings in this case stem from inadvertence rather than intentional misconduct.

### D. Damages

An award of attorneys' fees and expenses jointly and severally payable by all of the Respondents is an appropriate sanction for their bad-faith litigation conduct. *See Chambers*, 501 U.S. at 45–46, 111 S.Ct. 2123. Under § 1927, the Court also may separately order Goldstein to pay the excess costs, expenses, and attorneys' fees Bavelis reasonably incurred because of such conduct.

In addition, the Court may award Bavelis punitive damages in an amount to be determined. *See Adell v. John Richards*

*Homes Bldg. Co. (In re John Richards Homes Bldg. Co.)*, 552 Fed.Appx. 401, 414 (6th Cir. 2013) ("In this Circuit ∴. bankruptcy courts appear to have some authority to award punitive damages for abuse of process and fraud on the court under both § 105(a) and the court's inherent powers."). But while bankruptcy courts have "authority to award mild noncompensatory punitive damages," they lack the authority to award "serious noncompensatory punitive damages." *Id.* at 415. Thus, depending on whether the Court determines to make an award of punitive damages, and, if it does so, the amount of the award, the Court will either enter final judgment or submit proposed findings of fact and conclusions of law to the District Court.

### VI. Conclusion

For the reasons explained above, the Court determines that sanctions shall be imposed against all of the Respondents under § 105(a) and the Court's inherent authority and against Goldstein under § 1927. The amount of attorneys' fees for which the Respondents shall be liable will be determined at a later hearing. In addition, during the same hearing, the Court will assess the amount of punitive damages, if any, that it will award.

The Court will hold a status conference in this matter on **March 2, 2017 at 10:00 a.m.** in Courtroom A, United States Bankruptcy Court, 170 N. High Street, Columbus, Ohio 43215. Bavelis shall file a statement of attorneys' fees and expenses that he seeks to recover no later than **March 24, 2017**. The fee statement shall establish that the fees and expenses Bavelis seeks to recover were: (1) incurred due to the bad faith misconduct described in this opinion; and (2) reasonable and necessary. The fee statement also should provide a basis for

---

**20.** As the Court noted in *Bavelis I,* Doukas described his business as "creat[ing] a lever-

age that you can negotiate so it will make money...." *Bavelis I,* 490 B.R. at 268.

any punitive damages being sought by Bavelis. The Respondents shall have until **April 14, 2017** to file an objection to the fee statement. Any objection must state with particularity why any fees or expenses set forth in the fee statement—and any punitive damages sought by Bavelis—should not be awarded to him. A hearing on the fee statement and the objection will be held on **April 20, 2017 at 9:30 a.m.** in Courtroom A, United States Bankruptcy Court, 170 N. High Street, Columbus, Ohio 43215.

**IT IS SO ORDERED.**